UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

WEIDONG GUAN,
a/k/a "Bill Guan," and
LE VAN HUNG,
a/k/a "Hung Van Le,"
a/k/a "Van Hung Le,"

Defendants.

**MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANT
LE VAN HUNG'S MOTION
IN LIMINE**

Case No.: 24 Cr. 322 (VM)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT LE VAN HUNG'S
MOTIONS IN LIMINE**

Parlatore Law Group, LLP
Timothy C. Parlatore
260 Madison Ave., 17th Floor
New York, New York 10016
*Attorney for Defendant Le Van Hung*

# Table of Contents

*I. PRELIMINARY STATEMENT*.................................................................................... *1*

*II. BACKGROUND*................................................................................................... *2*

*III. THE PAXFUL PLATFORM: WHAT THE GOVERNMENT HAS ESTABLISHED*.................. *3*

A. Paxful's Criminal Operations................................................................................ 4

B. The Platform's Anonymity Architecture................................................................. 4

C. The Scale of Legitimate vs. Suspicious Activity ...................................................... 6

D. The Platform Failed to Detect Illicit Activity ......................................................... 7

E. The Government's Enforcement Framework............................................................. 7

*IV. LEGAL STANDARD*............................................................................................. *8*

A. Party-Opponent Admissions Under FRE 801(d)(2)................................................... 8

B. Public Records Under FRE 803(8)........................................................................ 10

C. The Knowledge Element of Section 1956............................................................... 11

*V. THE COURT SHOULD ADMIT THE GOVERNMENT'S OWN FINDINGS ABOUT PAXFUL*
.............................................................................................................................. *13*

A. Admissibility of Each Exhibit.............................................................................. 13

B. The McKeon Three-Part Test Is Satisfied.............................................................. 13

*VI. THE COURT SHOULD PRECLUDE CERTAIN GOVERNMENT ARGUMENTS*................ *15*

A. The Government Should Not Be Permitted to Argue That All Transactions Were Criminal
Absent Supporting Evidence.................................................................................... 15

B. The Government Should Not Be Permitted to Argue That the Discount, Standing Alone,
Establishes Knowledge ........................................................................................... 17

C. The Government Should Not Be Permitted to Argue That Awareness of a General Risk
Satisfies the Knowledge Element .............................................................................. 19

D. The Court Should Be Alert to Improper Burden Shifting............................................ 20

*VII. CONCLUSION* ................................................................................................. *20*

## I. PRELIMINARY STATEMENT

Defendant Le Van Hung respectfully submits this memorandum of law in support of his motion in limine seeking two forms of relief. First, Mr. Hung moves to admit at trial selected, redacted excerpts from the Government's own findings in its prosecution of the Paxful cryptocurrency platform, bearing on the Government's own findings that the platform emphasized anonymity and lack of customer identification, making it materially harder for users to know the nature of transactions; the platform's presentation of fabricated compliance policies that led users to believe the platform was lawfully operated; the platform's concealment from its own users of the criminal activity occurring on the platform; and the Government's own finding that approximately 95% of the platform's total transaction volume was not identified as suspicious, confirming that the overwhelming majority of activity on the platform was indistinguishable from legitimate commerce. Second, Mr. Hung moves to preclude the Government from making three specific categories of argument to the jury that are unsupported by the evidence or contrary to the legal standard governing the knowledge element of Section 1956:

(a) arguing that all or substantially all of Mr. Hung's transactions involved crime proceeds, absent transaction-specific, statistical, expert, or other competent evidence supporting that contention;

(b) arguing that the discount at which Mr. Hung purchased prepaid cards, standing alone, establishes knowledge that the cards were stolen; and

(c) arguing that Mr. Hung's awareness of a general risk of illicit activity on the Paxful platform satisfies the knowledge element.

To be clear, this motion does not seek to exclude evidence or to resolve the knowledge question before trial. It seeks a ruling that the Government's arguments to the jury must rest on

1

competent evidence, not on inferences the appellate courts have held are legally insufficient to establish knowledge under Section 1956. If the Government can support these arguments with transaction-specific or other competent proof, nothing in this motion prevents it from making them. If it cannot, it should not be permitted to invite the jury to convict on less than what the statute requires.

## II. BACKGROUND

Mr. Hung is charged in a sealed superseding indictment with conspiracy to commit money laundering under 18 U.S.C. Section 1956(h), with objects of violating Sections 1956(a)(1)(B)(i) (concealment money laundering) and 1957(a) (monetary transactions in criminally derived property). (Dkt. 28.) The specified unlawful activity is wire fraud under 18 U.S.C. Section 1343. (*Id.*) The indictment alleges that Mr. Hung and others "used cryptocurrency to knowingly purchase tens of millions of dollars in crime proceeds," that the MMO Team "purchased the crime proceeds at a discount," and that scheme participants moved those proceeds into bank accounts "through tens of thousands of layered transactions utilizing, among other things, prepaid debit cards and financial accounts that were opened using stolen identification information, including the personal identification information of U.S. residents." (*Id.* at 2.) The indictment further alleges that in 2020, the scheme "caused tens of millions of illicit dollars to be transferred into the Media Entities' bank accounts," and that the Media Company's revenue increased "approximately 410 percent from approximately $15 million to approximately $62 million," with "[a] significant portion of this increase" attributable to the Media Company's Foreign Office, including the MMO Team. (*Id.* at 2-3.)

The central disputed element at trial is *knowledge*: whether Mr. Hung knew that the property involved in the transactions represented the proceeds of some form of unlawful activity.

*See United States v. Maher*, 108 F.3d 1513, 1525-26 (2d Cir. 1997). The Government's theory is that Mr. Hung purchased prepaid debit cards on the Paxful peer-to-peer cryptocurrency platform at a discount of approximately 70 to 80 cents on the dollar, and that this discount, combined with the volume of transactions, establishes that Mr. Hung knew the cards were loaded with criminally derived proceeds.

The defendants are practitioners of Falun Gong, whose adherents face what the Second Circuit has described as 'undisputed' persecution by the Chinese Communist Party. *See Gao v. Gonzales, 424 F.3d 122, 130 (2d Cir. 2005)*. That persecution is not confined to China's borders. CCP agents have been convicted in this District for conducting transnational operations against Falun Gong practitioners and entities in the United States, including fabricating complaints designed to trigger U.S. government action against Falun Gong organizations. *See United States v. Chen Jun, No. 22 Cr. 292 (S.D.N.Y.)*. The defense intends to address the CCP context, including the provenance and authenticity of the Government's primary evidence of knowledge, in subsequent filings.

III. THE PAXFUL PLATFORM: WHAT THE GOVERNMENT HAS ESTABLISHED

The evidence the defense seeks to admit consists entirely of the Government's own findings from its prosecution of the Paxful platform. The defense does not contend that Paxful's anonymity categorically precludes proof of knowledge. Rather, the Paxful materials are necessary to prevent the Government from converting ordinary features of the marketplace, such as anonymous counterparties, discounted prepaid card trades, and high transaction volume, into supposedly incriminating circumstances without giving the jury the Government's own platform-level findings.

3

**A. Paxful's Criminal Operations**

In December 2025, Paxful Holdings, Inc. pled guilty in the Eastern District of California to three federal conspiracy charges: conspiracy to violate the Bank Secrecy Act by failing to maintain an effective anti-money laundering program, conspiracy to operate an unlicensed money transmitting business, and conspiracy to violate the Travel Act. (Ex. A, Plea Agreement, Doc. 18, No. 2:25-cr-00235-JAM (E.D. Cal.).) In July 2024, Paxful co-founder and Chief Technology Officer Artur Schaback pled guilty to conspiracy to violate the Bank Secrecy Act. (Ex. B, Plea Agreement, No. 2:24-cr-00072-KJM (E.D. Cal.).) On December 9, 2025, FinCEN imposed a $3.5 million civil money penalty on Paxful for willful violations of the BSA. (Ex. D, FinCEN Consent Order No. 2025-02.)

The Government's theory in the Paxful prosecution was that the platform's lack of anti-money laundering controls and its failure to identify its customers created conditions that allowed criminal activity to occur on the platform ***without detection by its users***. (Ex. A at A-2.) The Government's sentencing memorandum confirmed a Guidelines fine range of $150,000,000 to $300,000,000, underscoring the severity of the platform's wrongdoing. (Ex. C, Gov't Sentencing Mem., Doc. 24, No. 2:25-cr-00235-JAM (E.D. Cal.), at 5.) Paxful has since ceased all operations.

**B. The Platform's Anonymity Architecture**

The Government's own filings establish that Paxful's business model emphasized anonymity, lack of customer identification, and inadequate transaction monitoring, making it materially harder for market participants to identify counterparties or determine the provenance of prepaid cards.

The Paxful Statement of Facts admits that Paxful "marketed Paxful to customers as a platform that did not require KYC and/or that allowed 'buying without ID.'" (Ex. A at A-3.) Users

4

who encountered this marketing had no reason to believe the platform was operating unlawfully; to the contrary, the platform's public-facing representations suggested a legitimate marketplace. Schaback told a prospective customer that trades on the platform were "instant and anonymous whereas with exchanges you have to KYC yourself and wait 5 days for bitcoins to arrive," and further noted that trading gift cards for virtual currency was "instant and anonymous." (Ex. B at A-3.) Paxful "allowed customers to open Paxful accounts and trade without providing sufficient identifying information or documents to allow the Defendant to know the true identities of its customers." (Ex. A at A-3.) Paxful "facilitated the transfer of funds between customers without conducting KYC, despite knowing Paxful was required to do so, claiming Paxful outsourced KYC procedures to Paxful vendors." (*Id.*) And Schaback and his co-founder "presented fake AML and KYC policies to third parties that they knew were not, in fact, implemented or enforced at Paxful, Inc." (Ex. B at A-2.) To the extent the Government suggests that users should have inferred criminality from Paxful's compliance environment, the Government's own findings show that Paxful represented ***to their users*** compliance controls that were not actually implemented.

The FinCEN Consent Order confirms that Paxful "failed to implement effective policies, procedures, and internal controls to identify when customers were using geographic spoofing (geo-spoofing) to hide the location from where they were doing business, including using virtual private networks (VPNs)" and "failed to implement any controls to review a customer's geography, including through Internet Protocol (IP) addresses." (Ex. D at 9.) Paxful's own assessment identified "over 1,500 accounts opened between May 2015 and August 2018 with Iranian, Syrian, Cuban, Crimean, or Sudanese IP addresses," yet the platform took no action. (Ex. D at 10.)

The practical effect of this architecture was that a buyer on Paxful could see only the seller's username (often pseudonymous), reputation score, price, and card denomination. A buyer

could not see the seller's real name, physical location, the source of the cards, or whether the cards were legitimately obtained or stolen. There was no KYC information available to the buyer, no verified seller identity, and no platform mechanism for determining the source of a gift card.

## C. The Scale of Legitimate vs. Suspicious Activity

The FinCEN Consent Order establishes the ratio of suspicious to legitimate activity on Paxful. Total platform volume exceeded 50 million trades worth "several billion dollars in trade value," with "over 20 million external bitcoin transactions worth well over $10 billion." (Ex. D at 4-5.) On a weekly basis, "Paxful processed tens of millions of dollars' worth of bitcoin deposits and withdrawals." (*Id.* at 5.)

The ratio is approximately $500 million suspicious transactions out of well over $10 billion in total transactions, or approximately 5%. The Government's own comprehensive enforcement record, the most thorough examination of Paxful's transaction history ever conducted, identified approximately 5% of total transaction volume as suspicious. The remaining 95% was not identified as connected to illicit activity." . But the burden of proving the actual rate of illicit activity rests with the Government, not the defense. The Government cannot rely on speculation about undetected activity to establish knowledge beyond a reasonable doubt. The point is not that only at least 5% of Paxful activity was illicit. The point is that the Government's own comprehensive enforcement record, the most thorough examination of Paxful's transaction history ever conducted, does not support a blanket inference that Paxful prepaid card trades were presumptively criminal. At minimum, the jury is entitled to know this fact.

Prepaid card trading was the dominant transaction type on Paxful. "From May 2015 through December 2019, the top payment methods through Paxful were iTunes and Amazon prepaid access cards, constituting over $1.7 billion in value transmitted through Paxful." (Ex. D at

6

11.) "In 2020, trades where users converted CVC to prepaid access cards constituted over half the total bitcoin volume traded on the platform, or around $20 million worth of transactions per week." (*Id.*) The $500 million figure includes suspicious activity across all transaction types, not just prepaid card fraud. The FinCEN record therefore does not establish that prepaid card transactions, as a category, were presumptively criminal.

**D. The Platform Failed to Detect Illicit Activity**

Paxful had no written AML program until July 2019, more than four years after beginning operations. (Ex. D at 6.) It filed zero suspicious activity reports until November 2019. (Ex. D at 15.) Its leadership "instructed employees not to file SARs on suspicious activity." (*Id.*) It "failed to implement appropriate policies, procedures, and internal controls to meaningfully monitor and report illicit activity taking place in its prepaid access sales across its platform." (Ex. D at 11.)

The FinCEN Consent Order documents that Paxful processed transactions with individuals associated with the Lazarus Group, a North Korean state-sponsored cyber-criminal group designated by OFAC for malicious cyber activity on critical infrastructure, and with entities later designated by OFAC in Iran, yet "took no action even after receiving law enforcement inquiries related to this activity." (Ex. D at 12-13.) If the platform could not detect transactions with North Korean hackers and Iranian sanctions evaders, even after receiving law enforcement inquiries about those specific accounts, the suggestion that an individual buyer should have detected stolen gift cards is untenable.

**E. The Government's Enforcement Framework**

Despite the scale of illicit activity that the Government itself has documented on the Paxful platform, the DOJ has never prosecuted a single individual for selling stolen gift cards on Paxful. The only case that comes close is *United States v. Kvashuk*, No. 2:19-cr-00159 (W.D. Wash.),

where a Microsoft employee sold stolen Xbox gift card tokens on Paxful, but he was prosecuted for the underlying theft from Microsoft, not for selling on Paxful. No buyer has ever been prosecuted for purchasing cards on Paxful. Mr. Hung would be the first.

To be clear, the defense does not assert selective prosecution. The point is evidentiary: the Government's broader Paxful enforcement record focused on platform-level failures and upstream fraud, not on treating ordinary market participation as sufficient proof of knowledge. The jury is entitled to know this context in evaluating the Government's theory that a buyer on this platform should have known the cards were stolen.

## IV. LEGAL STANDARD

### A. Party-Opponent Admissions Under FRE 801(d)(2)

The Second Circuit has a well-developed line of authority holding that the Government's prior statements in other proceedings can be admitted against it as party-opponent admissions. In *United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984), the court established a three-part test: (1) the prior argument must involve an assertion of fact inconsistent with similar assertions in a subsequent trial; (2) the statements of counsel must be the equivalent of testimonial statements by the client; and (3) the court must determine by a preponderance of the evidence that the inference the proponent wishes to draw is fair and that an innocent explanation does not exist. *Id.* at 33. The court held that to exclude such evidence "would not only invite abuse and sharp practice but would also weaken confidence in the justice system itself by denying the function of trials as truth-seeking proceedings." *Id.* at 31.

In *United States v. GAF Corp.*, 928 F.2d 1253 (2d Cir. 1991), the Second Circuit reversed a conviction because the district court refused to admit the Government's prior inconsistent bill of particulars, holding that "the jury is at least entitled to know that the government at one time

8

believed, and stated, that its proof established something different from what it currently claims." *Id.* at 1260. The court emphasized that "[c]onfidence in the justice system cannot be affirmed if any party is free, wholly without explanation, to make a fundamental change in its version of the facts between trials, and then conceal this change from the final trier of the facts." *Id.*

In *United States v. Salerno*, 937 F.2d 797 (2d Cir. 1991), rev'd on other grounds, 505 U.S. 317 (1992), the Second Circuit addressed, *inter alia*, the admissibility of the Government's prior jury arguments as party-opponent admissions under the *McKeon* framework, finding that the district court abused its discretion in refusing to admit evidence of the Government's inconsistent positions. *Id.* at 810-12. The Supreme Court reversed on other grounds relating to the Rule 804(b)(1) "similar motive" issue; the party-opponent admissions analysis was not disturbed.

The Ninth Circuit extended this principle to plea agreements in *United States v. Mirabal*, 98 F.4th 981 (9th Cir. 2024), holding that "in a criminal case, the sworn statement of a government attorney in a plea agreement or sentencing memorandum is a party admission, excluded from the definition of hearsay under Rule 801(d)(2)." *Id.* at 981. The court vacated the defendant's conviction after the district court erroneously excluded the Government's original factual basis from a co-defendant's plea agreement, holding that the factual basis "constituted the official position of the United States" and was "not the mere errant remark or personal viewpoint of a government attorney." *Id.* at 989. *See also United States v. Kattar*, 840 F.2d 118, 131 (1st Cir. 1988) (Government "cannot indicate to one federal court that certain statements are trustworthy and accurate, and then argue to a jury in another federal court that those same assertions are hearsay"); *United States v. Yildiz,* 355 F.3d 80, 82 (2d Cir. 2004) (distinguishing informant statements from formal government filings and recognizing that the latter can bind the government as party admissions).

9

The defense recognizes that not every Government statement in another case is automatically admissible. The prior statement must be factual, not merely argument; it must be sufficiently inconsistent or probative; the inference must be fair; and the Court retains Rule 403 discretion. *See GAF Corp.*, 928 F.2d at 1262 (Altimari, J., concurring). The defense submits these limits are satisfied here because the defense seeks only specific factual findings about Paxful's anonymity architecture, monitoring failures, and the scale of legitimate activity, all of which bear directly on the central disputed element of the charged offenses.

## B. Public Records Under FRE 803(8)

Government reports prepared pursuant to statutory authority are presumptively admissible under FRE 803(8). *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000); *Owens v. Republic of Sudan*, 864 F.3d 751, 792 (D.C. Cir. 2017) (government reports prepared pursuant to statutory authority "fit squarely within the public records exception"). The limitation in Rule 803(8)(A)(ii), which restricts admission of "matters observed by law-enforcement personnel" in criminal cases, is aimed at observations offered *by the prosecution against criminal defendants*, not at regulatory findings offered *by a defendant against the Government*. The FinCEN Consent Order, prepared pursuant to FinCEN's statutory enforcement authority under 31 U.S.C. Section 5321(a), is a regulatory enforcement document offered by the defense against the Government. Nor is there any serious trustworthiness concern: the Consent Order was issued by a federal regulator pursuant to statutory authority, after an enforcement investigation, and Paxful consented to its entry. The defense offers the Consent Order for its factual findings concerning Paxful's systems and controls, not to prove Mr. Hung's guilt or innocence by regulatory conclusion.

10

**C. The Knowledge Element of Section 1956**

Under *Maher*, the Government must prove that Mr. Hung knew the property involved in the transactions "represented the proceeds of some form of unlawful activity." 108 F.3d at 1525-26. The statute defines this requirement to mean that the defendant "knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony." *Id.* (quoting 18 U.S.C. Section 1956(c)(1)). While the defendant need not know the precise type of unlawful activity, the statute requires actual knowledge that the specific property represents criminal proceeds.  An assumption is not enough.

Congress deliberately chose this heightened scienter standard. As then-Judge Sotomayor noted in *United States v. Huezo*, 546 F.3d 174, 191 n.1 (2d Cir. 2008), in a portion of the opinion joined by all panel members, "the legislative history of 18 U.S.C. Section 1956 suggests that the scienter standard was deliberately heightened to 'knowing' because lower standards, such as 'reckless disregard' or 'reason to know,' 'could lead to prosecution of people who were not in any way involved in money laundering.'" (quoting S. Rep. No. 99-433, at 6 (1986)). Congress rejected these lower standards precisely to prevent the Government from prosecuting people who transacted in environments where some activity was illicit but who did not know the specific property they handled was criminally derived.

The Tenth Circuit applied this principle to reverse money laundering convictions in *United States v. Rahseparian*, 231 F.3d 1257 (10th Cir. 2000), holding that "mere suspicion of illegal activity … is insufficient to prove participation in a conspiracy" to launder money, and that "evidence that only places the defendant in a climate of activity that reeks of something foul" does not establish knowledge. *Id.* at 1264, 1266. The *Rahseparian* court reversed because the

11

Government proved only that the defendant had a "suspicion of criminality," which was "insufficient to support an inference that he intended to join known criminal activity." *Id.* at 1266.

These authorities establish the guardrails within which the Government's arguments must operate. The Government is free to present whatever evidence it possesses. But its arguments to the jury must track the legal standard: knowledge, not suspicion; awareness that the specific property involved represented criminal proceeds, not awareness of a general risk on a platform.

D. Relevance and Rule 403

Evidence bearing on whether a buyer on Paxful could have known the cards were stolen is directly relevant to the knowledge element under FRE 401. The probative value of the Government's own findings about the platform substantially outweighs any danger of unfair prejudice, confusion, or misleading the jury under FRE 403, because the evidence goes to the central disputed element of the charged offenses. Excluding it would allow the Government to present the Paxful transactions in a vacuum, stripped of the context that explains why a buyer on the platform faced material barriers to determining whether the cards he purchased were legitimate or stolen.

To minimize any risk of jury confusion, the defense is prepared to work with the Court and the Government to identify specific excerpts from the exhibits that are most directly relevant to the knowledge element, rather than introducing the entirety of those documents. The defense proposes that the following categories of findings are the most probative and least prejudicial: (1) the Government's own findings that the platform emphasized anonymity and lack of customer identification; (2) the platform's presentation of fabricated compliance policies; (3) the platform's concealment of criminal activity from its users; and (4) the ratio of suspicious to legitimate activity. The defense is amenable to redacting portions of the exhibits that address conduct unrelated to the

knowledge element, provided the core findings bearing on the anonymity architecture and the scale of legitimate activity are admitted.

## V. THE COURT SHOULD ADMIT THE GOVERNMENT'S OWN FINDINGS ABOUT PAXFUL

### A. Admissibility of Each Exhibit

The defense seeks admission of four exhibits, each with a distinct admissibility basis:

*Exhibits A and B (Paxful Holdings Plea Agreement and Statement of Facts; Schaback Plea Agreement and Factual Basis):* These are the strongest candidates for admission as party-opponent admissions under FRE 801(d)(2). Both are signed by DOJ attorneys, presented to federal courts, and contain sworn factual admissions about how the platform operated. Under *Mirabal*, "the sworn statement of a government attorney in a plea agreement or sentencing memorandum is a party admission, excluded from the definition of hearsay under Rule 801(d)(2)." 98 F.4th at 981.

*Exhibit C (Government's Sentencing Memorandum in the Paxful case):* Also admissible as a party-opponent admission under *Mirabal*, which expressly held that sentencing memoranda are party admissions. *Id.*

*Exhibit D (FinCEN Consent Order):* Admissible as a public record under FRE 803(8) rather than as a party-opponent admission. The Consent Order was prepared by FinCEN, a bureau within the Department of the Treasury, pursuant to its statutory enforcement authority under 31 U.S.C. Section 5321(a). It contains factual findings from a legally authorized investigation and is presumptively admissible under *Bridgeway*. The defense offers it against the Government, not for the Government, which avoids the criminal-case limitation in Rule 803(8)(A)(ii).

### B. The McKeon Three-Part Test Is Satisfied

*First*, the Government's position in the Paxful prosecution is inconsistent with its position here. The Government will likely argue that prosecuting a platform for AML failures and

prosecuting a user for money laundering are different theories of liability, not contradictory ones. But the inconsistency the defense identifies is not between prosecuting a platform and prosecuting a user.. The inconsistency is between the Government's factual finding that the platform's business model emphasized anonymity and lack of customer identification, making it materially harder for users to know the nature of transactions; that the platform presented fabricated compliance policies to its users, leading them to believe the platform was lawfully operated; and that the platform actively concealed criminal activity from its own users, ensuring that no user received any indication that transactions involved illicit funds, and the Government's argument in this case that this particular user knew. The Government cannot establish as fact in one courtroom that Paxful concealed the criminal nature of transactions from its users, and then argue in another courtroom that a user of that same platform should have detected what the platform was prosecuted for hiding. The Government told the Eastern District of California that Paxful made a "deliberate decision not to identify its customers" and that the platform was "instant and anonymous." It now tells this Court that a customer of that same platform should have known the nature of the transactions he was conducting.

*Second*, the Paxful Holdings plea agreement, the Schaback plea agreement, and the Government's sentencing memorandum are all signed by DOJ attorneys and presented to federal courts. Under *Mirabal*, *Kattar*, and *Yildiz*, these are squarely party-opponent admissions. The FinCEN Consent Order is a formal agency finding admissible as a public record under *Bridgeway*.

*Third*, the inference the defense seeks to draw is fair: if the platform emphasized anonymity, had no KYC requirements, filed no SARs for over four years, and could not even detect transactions with North Korean hackers and Iranian sanctions evaders after receiving law enforcement inquiries, a buyer on that platform faced material barriers to knowing whether the

14

cards he purchased were legitimate or stolen. The question is not whether Mr. Hung *could* theoretically have been culpable despite the anonymity, but whether the jury is entitled to know that the Government itself has established the platform made it materially harder for users to know the nature of transactions.

Under *GAF Corp.*, the answer is yes: "the jury is at least entitled to know that the government at one time believed, and stated, that its proof established something different from what it currently claims." 928 F.2d at 1260.

## VI. THE COURT SHOULD PRECLUDE CERTAIN GOVERNMENT ARGUMENTS

The defense seeks to ensure that the Government's arguments to the jury operate within the guardrails established by the statute and the appellate courts. The preclusion the defense seeks is limited to the Government's *circumstantial* evidence of knowledge, specifically the discount and the volume of transactions. The defense does not seek to preclude the Government from presenting any direct evidence of knowledge it may possess, such as communications or documents reflecting Mr. Hung's actual awareness of the nature of the transactions.

**A. The Government Should Not Be Permitted to Argue That All Transactions Were Criminal Absent Supporting Evidence**

The indictment alleges the scheme laundered "at least approximately $67 million of illegally obtained funds" and attributes the Media Company's revenue increase of "approximately 410 percent from approximately $15 million to approximately $62 million" to the scheme, stating that "[a] significant portion of this increase was attributable to the Media Company's Foreign Office, including the MMO Team." (Dkt. 28 at 1-3.) The Government's own FinCEN investigation found that approximately 95% of Paxful's total transaction volume was not identified as suspicious. (Ex. D at 4-5, 15.)

Under *United States v. Hassan*, 578 F.3d 108 (2d Cir. 2009), the Government must prove that the funds were "in fact" proceeds of specified unlawful activity. The court reversed forty-one substantive money laundering convictions because the Government failed to meet this burden, holding that "the government must show not simply that Hassan laundered money that he believed to be the proceeds of cathinone sales, but that the funds he laundered were in fact the proceeds of cathinone sales." *Id.* at 127.

The defense recognizes that the conspiracy count under Section 1956(h) does not require proof that each individual transaction "in fact" involved crime proceeds. The defense does not contend that the Government must prove the provenance of every card to establish the conspiracy count. But if the Government asks the jury to infer knowledge from specific transactions, volume, or alleged proceeds amounts, it must tie that argument to evidence rather than generalized marketplace risk. The Government should not be permitted to use unproven transaction volume as a substitute for proof of the alleged agreement, its unlawful object, or Mr. Hung's knowledge

The Government's own investigation found that approximately 5% of Paxful transactions were suspicious. If the Government seeks to argue that a higher percentage of Mr. Hung's specific transactions involved crime proceeds, it should be required to present transaction-specific, statistical, expert, or other competent evidence supporting that higher figure. Absent such evidence, the Government's arguments should not exceed what its own findings support.

Moreover, the Government's concealment theory is undermined by the structure of the transactions themselves. The charged transactions bore the name THE EPOCH TIMES on the cardholder's bank statement. A scheme designed to conceal the nature and source of funds would not stamp the recipient's name on every transaction visible to every cardholder and every issuing bank. This is the opposite of concealment.

16

**B. The Government Should Not Be Permitted to Argue That the Discount, Standing Alone, Establishes Knowledge**

The indictment itself treats the discount as a feature of the alleged crime, alleging that the MMO Team "purchased the crime proceeds at a discount." (Dkt. 28 at 2.) But the Government's own prosecution of Paxful established that buying prepaid cards at a discount was the standard business model on the platform. The Government should not be permitted to charge the discount as part of the scheme and simultaneously argue to the jury that the discount is evidence of knowledge, when its own findings establish that the discount was the normal market price for both legitimate and illegitimate transactions.

Schaback marketed the platform as offering "instant and anonymous" gift card trading where discounts were the norm. (Ex. B at A-3.) The defense should not be hindered in simply saying this when the government's own records show it to be true, though an exhaustive search of the over 8 million pages on discovery failed to produce this exhibit, gathered by defense counsel through other means. Prepaid card trading constituted over $1.7 billion in volume from 2015-2019 and over half of total bitcoin volume in 2020. (Ex. D at 11.) The legitimate gift card resale market, including platforms such as CardCash, Raise, and GiftDeals, routinely offers discounts of 10 to 25% off face value. A 15 to 25% discount is the standard market rate for gift card resale, not an indicator of criminal activity. And the Government's own FinCEN investigation found that approximately 95% of Paxful's transactions were not identified as suspicious, meaning the Government's own enforcement record does not treat discounted Paxful transactions as presumptively illicit.

A market-standard discount that is equally consistent with innocent participation in a legitimate marketplace and with knowing participation in money laundering has no tendency to

17

make knowledge "more or less probable than it would be without the evidence" under FRE 401. And even if the Court finds the discount marginally relevant, its probative value is substantially outweighed under FRE 403 by the danger that the jury will treat the discount as a proxy for guilt, when the Government's own findings establish that the overwhelming majority of discounted transactions on Paxful were not identified as suspicious.

An analogy to other online marketplaces, while imperfect, illustrates the principle. The U.S. Government Accountability Office conducted an investigation in which it purchased branded products from major online marketplaces, including Amazon.com, and found that nearly 43% of the products purchased were counterfeit. The defense acknowledges that Amazon and Paxful differ in structure: Amazon is a retail marketplace with consumer protections, while Paxful was a peer-to-peer cryptocurrency exchange. But the principle is the same: buying at a discount on a marketplace where some goods are illicit does not, standing alone, establish knowledge. If a 43% counterfeit rate on Amazon does not support an inference that every discounted purchase is knowing, a 5% suspicious-activity rate on Paxful cannot support that inference either.

The defense does not seek to exclude evidence of the discount from the trial entirely. Nor does it seek to prevent the Government from arguing that the discount may be considered as part of the totality of circumstances if tied to other evidence. The defense seeks only to preclude the Government from arguing that the mere existence of a market-standard discount proves knowledge, unless the Government can demonstrate that (a) the specific discount Mr. Hung received was materially below the standard Paxful market rate for the type of card purchased, or (b) the discount was accompanied by other transaction-level indicia of knowledge beyond the mere fact of a discount, such as communications with the seller referencing the criminal origin of the cards or patterns of purchasing from sellers known to deal in stolen cards.

18

**C. The Government Should Not Be Permitted to Argue That Awareness of a General Risk Satisfies the Knowledge Element**

The Government may argue that Mr. Hung's awareness that Paxful was a marketplace where some illicit activity occurred is sufficient to establish that he "knew" the specific cards he purchased were loaded with crime proceeds. This argument should be precluded because it conflates suspicion with knowledge, in direct contravention of the statute's deliberately heightened scienter standard.

Congress rejected "reckless disregard" and "reason to know" standards for Section 1956 precisely because such standards "could lead to prosecution of people who were not in any way involved in money laundering." *Huezo*, 546 F.3d at 191 n.1 (quoting S. Rep. No. 99-433, at 6 (1986)). The Tenth Circuit applied this principle to reverse money laundering convictions in *Rahseparian*, holding that "mere suspicion of illegal activity … is insufficient to prove participation in a conspiracy" and that "evidence that only places the defendant in a climate of activity that reeks of something foul" does not establish knowledge. 231 F.3d at 1264, 1266. The *Rahseparian* court reversed because the Government proved only that the defendant had a "suspicion of criminality," which was "insufficient to support an inference that he intended to join known criminal activity." *Id.* at 1266.

The Government's theory in this case risks the same error that produced a reversal in *Rahseparian*. If the Government's argument to the jury is that Mr. Hung transacted on a platform where some activity was illicit, purchased cards at the standard market discount, and conducted a high volume of transactions, that argument establishes at most that Mr. Hung was aware of a general risk, not that he knew the specific cards he purchased were criminally derived. Awareness that a marketplace contains some stolen goods is not knowledge that the specific goods you

19

purchased are stolen. If it were, every buyer on Paxful, every buyer on Amazon, and every customer at a pawn shop would be guilty of receiving stolen property. The statute requires more. *Maher*, 108 F.3d at 1525-26 ("the property involved in the financial transaction represented the proceeds of some form of unlawful activity"). "The property involved in the financial transaction" means the specific property in the specific transaction, not the general character of the marketplace.

The Government should not be permitted to argue that awareness of a general risk of illicit activity on the Paxful platform, without more, satisfies the knowledge element. If the Government possesses evidence that Mr. Hung knew the specific property involved in the charged transactions represented proceeds of unlawful activity, it may present that evidence and argue knowledge. But it should not be permitted to invite the jury to convict on the basis of platform-level risk awareness alone, which is precisely the type of inference that Congress rejected when it heightened the scienter standard to "knowing."

### D. The Court Should Be Alert to Improper Burden Shifting

The Government bears the burden of proving knowledge beyond a reasonable doubt. It may not present circumstantial evidence of marketplace participation and then argue that the absence of an innocent explanation establishes guilt. The defense has no obligation to explain why Mr. Hung purchased gift cards at a discount on a public platform. The Government must affirmatively prove he knew the cards were stolen, not merely that he failed to prove they were legitimate.

**VII. CONCLUSION**

For the foregoing reasons, Mr. Hung respectfully requests that the Court enter an order:

(1) Admitting at trial selected excerpts from the following exhibits concerning the Government's own findings about Paxful's anonymity and lack of customer identification,

20

the platform's fabricated compliance policies, the platform's concealment of criminal activity from its users, and the ratio of suspicious to legitimate activity, subject to redaction of portions unrelated to the knowledge element as agreed upon by the parties or ordered by the Court:

(a) Paxful Holdings plea agreement and Statement of Facts (Ex. A);

(b) Schaback plea agreement and Factual Basis (Ex. B);

(c) Government's sentencing memorandum in the Paxful case (Ex. C); and

(d) FinCEN Consent Order (Ex. D);

(2) Precluding the Government from arguing that all or substantially all of Mr. Hung's transactions involved crime proceeds, unless the Government presents transaction-specific, statistical, expert, or other competent evidence supporting that contention;

(3) Precluding the Government from arguing that the discount at which Mr. Hung purchased prepaid cards, standing alone, establishes knowledge, unless the Government presents evidence that the discount was materially below the standard Paxful market rate or was accompanied by other transaction-level indicia of knowledge;

(4) Precluding the Government from arguing that Mr. Hung's awareness of a general risk of illicit activity on the Paxful platform satisfies the knowledge element of Section 1956, unless the Government presents evidence that Mr. Hung knew the specific property involved in the charged transactions represented proceeds of unlawful activity; and

(5) Alternatively, if the Court declines to preclude the arguments identified in paragraphs (2) through (4), requiring the Government to make an evidentiary proffer before making those arguments to the jury.

Dated: June 8, 2026

Respectfully submitted,
Parlatore Law Group, LLP

Timothy C. Parlatore
260 Madison Ave., 17th Floor
New York, New York 10016
*Attorney for Defendant Le Van Hung*