UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                  :

UNITED STATES OF AMERICA              :

                                          :

                -*v.*-                :       24 Cr. 322 (VM)

                                          :

WEIDONG GUAN,                 :
  a/k/a "Bill Guan," and
LE VAN HUNG,                  :
  a/k/a "Hung Van Le,"
  a/k/a "Van Hung Le,"        :

                                          :

                      Defendants.    :

                                        :

------------------------------------------------------------x

## THE GOVERNMENT'S MOTIONS *IN LIMINE*

                                      JAY CLAYTON
                                        United States Attorney

Benjamin M. Burkett
Rebecca T. Dell
Paul M. Monteleoni
Amanda C. Weingarten
Assistant United States Attorneys

- Of Counsel -

**TABLE OF CONTENTS**

TABLE OF CONTENTS................................................................................................................. i

TABLE OF AUTHORITIES ...................................................................................................... iv

ARGUMENT ............................................................................................................................. 2

I.    THE COURT SHOULD ADMIT SELF-AUTHENTICATING RECORDS .................... 2

    A.    Applicable Law ................................................................................................. 2

        1.    Federal Rules of Evidence 902(11) and 803(6) ....................................... 3

        2.    Federal Rules of Evidence 902(1) and 902(4) ......................................... 5

        3.    Federal Rules of Evidence 902(13) and 902(14) ..................................... 5

    B.    Discussion ......................................................................................................... 6

        1.    The Court Should Admit Business Records that Are Admissible and Self-Authenticating Under Rules 902(11) and 803(6)....................................... 7

        2.    The Court Should Permit Authentication by Certification of Electronically Stored and Processed Data Produced by Internet Service Providers and Other Companies Under Rule 902(13) ...................................................... 10

II.   THE COURT SHOULD ADMIT OUT-OF-COURT STATEMENTS MADE BY THE DEFENDANTS' CO-CONSPIRATORS OR AGENTS ...................................................... 12

    A.    Background........................................................................................................ 12

    B.    Applicable Law ................................................................................................. 15

    C.    Discussion ......................................................................................................... 17

III.  THE COURT SHOULD PRECLUDE THE PROPOSED EXPERT TESTIMONY OF MATTHEW PRICE ......................................................................................................... 19

    A.    Background........................................................................................................ 19

    B.    Legal Standard .................................................................................................. 22

    C.    Discussion ......................................................................................................... 28

        1.    Price's Notice is Deficient ....................................................................... 28

        2.    Price's Proposed Testimony is Not Based on Any Recognized Methodology and is Within the Ken of the Jury....................................... 30

        3.    Price's Proposed Testimony Is Not Tied to the Defendants'

Contemporaneous Knowledge ................................................................. 34

    4.    Price's Proposed Testimony Improperly Seeks to Prove the Behavior and Motivations of Third Parties ..................................................................... 36

    5.    Price's Proposed Testimony Lacks Fit to This Case and Is Inadmissible Under Rule 403 ................................................................................................ 38

IV.    THE COURT SHOULD PRECLUDE THE PROPOSED EXPERT TESTIMONY OF JAMES SHANAHAN ................................................................................................. 40

    A.    Background ................................................................................................................. 40

    B.    Discussion ................................................................................................................. 42

        1.    Shanahan's Proposed Background Testimony Is Within the Ken of the Jury and Cumulative with the Testimony of the Fact Witnesses .............. 43

        2.    Shanahan's Opinions Regarding Chargeback Thresholds, Chargeback Prevalence, and Chargebacks in the Media Entities' Accounts Are Improper, Confusing, and Unfairly Prejudicial ....................................... 43

            a)    Expert Industry Practice Evidence Regarding Chargebacks is an Improper and Unfairly Prejudicial Attempt to Communicate a Legal Standard ............................................................................... 44

            b)    Shanahan's Analysis of the Media Entities' Chargeback Rates Makes Apples-to-Oranges Comparisons, Ignores Relevant Evidence, and Seeks to Suggest Good Acts of the Defendant ...... 48

V.    THE DEFENDANTS SHOULD BE PRECLUDED FROM OFFERING ARGUMENT CONCERNING ALLEGED RELIANCE ON THE ADVICE OR APPROVAL OF COUNSEL WITHOUT MEETING THE REQUIREMENTS FOR AN ADVICE-OF-COUNSEL DEFENSE ................................................................................................. 52

VI.    EVIDENCE OR ARGUMENT SUGGESTING THAT THE CHARGES ARE IMPROPERLY MOTIVATED, OR CONCERNING CLAIMS OF RELIGIOUS OR POLITICAL PERSECUTION OR OTHER INFLAMMATORY RELIGIOUS OR POLITICAL CONTROVERSIES, SHOULD BE PRECLUDED ................................... 64

VII.    EVIDENCE OR ARGUMENT CONCERNING THE PUNISHMENT OR CONSEQUENCES THE DEFENDANTS HAVE FACED OR WILL FACE IF CONVICTED, OR COLLATERAL CONSEQUENCES TO THIRD PARTIES, SHOULD BE PRECLUDED ................................................................................................. 69

VIII.    EVIDENCE OR ARGUMENT CONCERNING THE DEFENDANTS' PRIOR COMMISSION OF GOOD ACTS OR LACK OF PRIOR BAD ACTS SHOULD BE PRECLUDED ................................................................................................. 71

IX.    EVIDENCE OR ARGUMENT CONCERNING THE DEFENDANTS' FAMILY,

BACKGROUND, AGE, HEALTH, OR OTHER PERSONAL CHARACTERISTICS SHOULD BE PRECLUDED, ABSENT A SHOWING THAT SUCH PERSONAL MATTERS BEAR ON GUILT ........................................................................................ 72

CONCLUSION........................................................................................................................ 73

## TABLE OF AUTHORITIES

**Cases**

*Amorgianos v. Nat'l R.R. Pass. Corp.*, 303 F.3d 256 (2d Cir. 2002) .......................................... 21

*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996)................................ 23, 36, 46, 47

*Bourjaily v. United States*, 483 U.S. 171 (1987) ........................................ 13, 20, 56, 57

*Brewer v. United States*, 764 F. Supp. 309 (S.D.N.Y. 1991).......................................................... 10

*Bryan v. United States*, 524 U.S. 184 (1998)................................................................... 53

*Carter v. United States*, 530 U.S. 255 (2000)................................................................... 53

*Crigger v. Fahnestock & Co.*, 443 F.3d 230 (2d Cir. 2006)......................................... 14

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)..................................... 20, 21, 22, 23

*Davids v. Novartis Pharms. Corp.*, 857 F. Supp. 2d 267 (E.D.N.Y. 2012)................................... 48

*DeWit v. UPS Ground Freight, Inc.*, No. 16 Civ. 36, 2017 WL 5905575 (N.D. Fl. Jul. 25, 2017) .................................................................................................................................... 23

*First Premier Bank v. Future Card Ltd.*, No. 02 Civ. 4054 (LLP) (D.S.D. Dec. 7, 2004)........... 49

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ........................................................... 20

*Highland Capital Mgmt. v. Schneider*, 551 F. Supp. 2d 173 (S.D.N.Y. 2008) ............................ 22

*Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461 (S.D.N.Y. 2005).................... 36

*Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992)........................................................... 22, 42

*In re Mirena Ius Leyonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213 (S.D.N.Y. 2018).................................................................................................................... 48

*In re Mirena Ius Leyonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113 (2d Cir. 2020) .................................................................................................................................... 48

*In re Reserve Fund Secs. & Derivs. Litig.*, 09 Civ. 4346 (PGG), 2012 WL 12354233 (S.D.N.Y. Oct. 3, 2012) ..................................................................................................................... 15

*In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) .............. 22, 28, 29, 49

*Island Intell. Prop. LLC v. Deutsche Bank AG*, No. 09 Civ. 2675 (KBF), 2012 WL 526722 (S.D.N.Y. Feb. 14, 2012)..................................................................................................... 22

*Kumho Tire Co., Inc. v. Carmichael*, 526 U.S. 137 (1999) ................................................... 20, 21

*LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, No. 08 Civ. 8426 (WHP) (HBP), 2012 WL 466785 (S.D.N.Y. Feb. 14, 2012)..................................................................................................... 22

*Lurie v. Wittner*, 228 F.3d 113 (2d Cir. 2000) ........................................................... 54

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612 (S.D.N.Y. 2016)... 23, 36, 37

*Marx & Co. v. Diners Club, Inc.*, 550 F.2d 505 (2d Cir. 1977)......................................................22

*McFadden v. United States*, 576 U.S. 186 (2015) ..........................................................53

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005)..............................................20

*Pappas v. Middle Earth Condominium Ass'n*, 963 F.2d 534 (2d Cir. 1992).................... 14, 15, 16

*Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627 (2d Cir. 1994) ..........................4

*Riegel v. Medtronic, Inc.*, 451 F.3d 104 (2d Cir. 2006)..................................................26

*Rogers v. United States*, 422 U.S. 35 (1975) ................................................................67

*S.E.C v. Lek Sec. Corp.*, No. 17 Civ. 1789 (DLC), 2019 WL 5703944 (S.D.N.Y. Nov. 5, 2019) 59

*S.E.C. v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013) ...................................... 27, 30, 59, 61

*Shannon v. United States*, 512 U.S. 573 (1994)...........................................................67

*Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202 (2d Cir.1984)................................23

*Sparf & Hanson v. United States*, 156 U.S. 51 (1895) ..................................................65

*United States v. Agayev*, No. 18 Cr. 31 (WFN), 2019 WL 8989872 (E.D. Wash. Sept. 20, 2019) 6

*United States v. Al-Moayad*, 545 F.3d 139 (2d Cir. 2008) .............................................2

*United States v. Amawi*, 695 F.3d 457 (6th Cir. 2012) ..................................................33

*United States v. Amuso*, 21 F.3d 1251 (2d Cir. 1994) ........................................ 23, 40, 44

*United States v. Ansaldi*, 372 F.3d 118 (2d Cir. 2004) ..................................................52

*United States v. Armstrong*, 517 U.S. 456 (1996) ........................................................63

*United States v. Atias*, No. 14 Cr. 403 (DRH), 2017 WL 563978 (E.D.N.Y. Feb. 10, 2017) 54, 58, 59, 61

*United States v. Avenatti*, No. 19 Cr. 374 (JMF) ..........................................................67

*United States v. Ayelotan*, 917 F.3d 394 (5th Cir. 2019) ...............................................3

*United States v. Baker*, No. 14 Cr. 356 (ENV), 2016 WL 7176588 (E.D.N.Y. Dec. 8, 2016).....24

*United States v. Bankman-Fried*, No. S6 22-CR-0673 (LAK), 2023 WL 6162865 (S.D.N.Y. Sept. 21, 2023) ..............................................................................................37

*United States v. Battaglia*, No. S9 05 Cr. 774 (KMW), 2008 WL 144826 (S.D.N.Y. Jan. 15, 2008) ...........................................................................................................70

*United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181 (2d Cir. 1989)..........................54, 58

*United States v. Benedetto*, 571 F.2d 1246 (2d Cir. 1978) .............................................69

*United States v. Berg*, 710 F. Supp. 438 (E.D.N.Y. 1989) .............................................34

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991).................................... 42, 43, 55

*United States v. Blume*, 967 F.2d 45 (2d Cir. 1992) ....................................................68

*United States v. Bondars*, No. 16 Cr. 228 (LOG), 2018 WL 9755074 (E.D. Va. Aug. 20, 2018) . 6

*United States v. Boykoff*, 68 F. App'x 15 (2d Cir. 2003) ................................................................ 47

*United States v. Bracy*, No. 20 Cr. 483 (ARR), 2022 WL 17801133 (E.D.N.Y. Dec. 19, 2022). 10

*United States v. Brooks*, No. 08 Cr. 35 (PKL), 2008 WL 2332371 (S.D.N.Y. June 4, 2008) ...... 56

*United States v. Camacho*, 353 F. Supp. 2d 524 (S.D.N.Y. 2005) ................................................ 56

*United States v. Campos*, 763 F. App'x 97 (2d Cir. 2019) ............................................................ 32

*United States v. Carter*, No. 21 Cr. 681 (NSR), 2024 WL 268248 (S.D.N.Y. Jan. 24, 2024) .. 3, 5, 6, 11

*United States v. Chastain*, No. 22 Cr. 305 (JMF), 2023 WL 2966643 (S.D.N.Y. Apr. 17, 2023) 37

*United States v. Claus*, No. 24 Cr. 155 (SSV), 2026 WL 63149 (E.D. La. Jan. 8, 2026) ........ 6, 11

*United States v. Colasuonno*, 697 F.3d 164 (2d Cir. 2012) ........................................................... 54

*United States v. Collins*, 581 F. App'x 59 (2d Cir. 2014) ............................................. 31, 41, 43, 44

*United States v. Connolly*, No. 16 Cr. 370 (CM), 2019 WL 2125044 (S.D.N.Y. May 2, 2019). 35, 45

*United States v. Crowder*, 325 F. Supp. 3d 131 (D.D.C. 2018) ..................................................... 55

*United States v. Cuti*, 720 F.3d 453 (2d Cir. 2013) ...................................................................... 30

*United States v. Damti*, 109 F. App'x 454 (2d Cir. 2004) ............................................................ 46

*United States v. Day*, 524 F.3d 1361 (D.C. Cir. 2008) ................................................................. 25

*United States v. DeJesus*, 806 F.2d 31 (2d Cir. 1986) .................................................................. 57

*United States v. Demosthene*, 334 F. Supp. 2d 378 (S.D.N.Y. 2004) ........................................... 63

*United States v. Desena*, 260 F.3d 150 (2d Cir. 2001) ............................................................ 14, 15

*United States v. Diaz*, 176 F.3d 52 (2d Cir. 1999) ................................................................... 14, 16

*United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003) ............................................................... 28

*United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994) .................................................................... 22

*United States v. Dupree*, 706 F.3d 131 (2d Cir. 2013) ................................................................. 16

*United States v. Dzionara-Norsen*, No. 21-454, 2024 WL 191803 (2d Cir. Jan. 18, 2024) ... 24, 25

*United States v. Evangelista*, 122 F.3d 112 (2d Cir. 1997) .......................................................... 54

*United States v. Fazio*, No. S2 11 Cr. 873 (KBF), 2012 WL 1203943 (S.D.N.Y. Apr. 11, 2012) 69

*United States v. Ferguson*, No. 06 Cr. 137 (CFD), 2007 WL 4539646 (D. Conn. Dec. 14, 2007) ................................................................................................................................................ 25

*United States v. Gentile*, No. 21 Cr. 54 (RPK)(PK), 2024 WL 3455834 (E.D.N.Y. July 17, 2024) ................................................................................................................................................ 26

*United States v. George*, 386 F.3d 383 (2d Cir. 2004) ................................................................. 53

*United States v. Gigante*, 166 F.3d 75 (2d Cir. 1999) ................................................. 13

*United States v. Greenspan*, 923 F.3d 138 (3d Cir. 2019)....................................... 53, 54

*United States v. Guan*, No. 24 Cr. 322, 2026 WL 160995 (S.D.N.Y. Jan. 21, 2026) ........... 62, 64

*United States v. Gupta*, 747 F.3d 111 (2d Cir. 2014) .................................................. 13

*United States v. Harris*, 491 F.3d 440 (D.C. Cir. 2007) .............................................. 70

*United States v. Hatfield*, No. 06 Cr. 550 (JS), 2010 WL 183522 (E.D.N.Y. Jan. 8, 2010)......... 55

*United States v. Ho*, 984 F.3d 191 (2d Cir. 2020) .................................................. 16, 17

*United States v. Jackson*, 983 F.2d 757 (7th Cir. 1993) ................................................ 46

*United States v. Kaplan*, 490 F.3d 110 (2d Cir. 2007)................................................... 32

*United States v. Kaufman*, No. 19 Cr. 504 (LAK), 2021 WL 4084523 (S.D.N.Y. Sep. 7, 2021) 30

*United States v. Knox*, 687 F. App'x 51 (2d Cir. 2017).................................................. 68

*United States v. Komasa*, 767 F.3d 151 (2d Cir. 2014) ............................................... 3

*United States v. Kwok*, No. 23 Cr. 118 (AT), 2024 WL 1773143 (S.D.N.Y. Apr. 24, 2024) 24, 26, 27

*United States v. LaFlam*, 369 F.3d 153 (2d Cir. 2004).................................................. 65

*United States v. Long*, 917 F.2d 691 (2d Cir. 1990) .................................................. 23, 49

*United States v. Mahaffy*, No. 05 Cr. 613 (ILG), 2007 WL 1213738 (E.D.N.Y. Apr. 24, 2007). 25

*United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990).................................... 14

*United States v. Martoma*, 993 F. Supp. 2d 452 (S.D.N.Y. 2014) ................................... 32

*United States v. Mavashev*, No. 08 Cr. 902 (DLI) (MDG), 2010 WL 234773 (E.D.N.Y. Jan. 14, 2010) ....................................................................................................... 25

*United States v. McDonald*, No. 21 Cr. 12 (EKD), 2023 WL 5278716 (W.D. Va. Aug. 16, 2023) ....................................................................................................... 6, 11

*United States* v. *McGauley*, 279 F.3d 62 (1st Cir. 2002)............................................... 46

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008) .................................................. 28

*United States v. Mendlowitz*, No. 17 Cr. 248 (VSB), 2019 WL 6977120 (S.D.N.Y. Dec. 20, 2019) ..................................................................................................... passim

*United States v. Merchant*, No. 24 Cr. 362 (EK), 2026 WL 457435 (E.D.N.Y. Feb. 18, 2026)... 6, 11

*United States v. Mostafa*, 16 F. Supp. 3d 236 (S.D.N.Y. 2014) .................................... 65

*United States v. Mulder*, 273 F.3d 91 (2d Cir. 2001)............................................... 23, 29

*United States v. Neumann*, No. 21 Cr. 439 (NSR), 2023 WL 8700974 (S.D.N.Y. Dec. 14, 2023) ....................................................................................................... 14

vii

*United States v. Newkirk*, 684 F. App'x 95 (2d Cir. 2017).......................................... 35, 42

*United States v. Oldbear*, 568 F.3d 814 (10th Cir. 2009)................................................ 34

*United States v. Otufale*, No. 24 Cr. 170 (KAM), 2024 WL 3391094 (E.D.N.Y. July 12, 2024). 3, 6, 11

*United States v. Paccione*, 949 F.2d 1183 (2d Cir. 1991) ............................................ 70

*United States v. Padilla*, 203 F.3d 156 (2d Cir. 2000)................................................... 13

*United States v. Palmer*, No. 24 Cr. 67 (NSR), 2025 WL 2978633 (S.D.N.Y. Oct. 21, 2025) 6, 11

*United States v. Paul*, 110 F.3d 869 (2d Cir. 1997)....................................................... 57

*United States v. Perez*, No. 23 Cr. 99 (LJL), 2025 WL 551567 (S.D.N.Y. Feb. 19, 2025) ... 66, 69

*United States v. Peterson*, 808 F.2d 969 (2d Cir. 1987) ................................................ 64

*United States v. Petit*, No. 19 Cr. 850 (JSR) (S.D.N.Y.) ............................................... 60

*United States v. Quinones*, 417 F. App'x 65 (2d Cir. 2011)........................................... 54

*United States v. Rahme*, 813 F.2d 31 (2d Cir. 1987) .................................................... 14

*United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2011 WL 723530 (S.D.N.Y. Feb. 25, 2011) ........................................................................................................... 25

*United States v. Rangott*, No. 23 Cr. 4 (JHR), 2024 WL 3488038 (S.D.N.Y. July 19, 2024)...... 60

*United States v. Rastelli*, 870 F.2d 822 (2d Cir. 1989) .................................................. 14

*United States v. Re*, 401 F.3d 828 (7th Cir. 2005)........................................................ 62

*United States v. Reese*, 933 F. Supp. 2d 579 (S.D.N.Y. 2013) ....................................... 63

*United States v. Regan*, 103 F.3d 1072 (2d Cir. 1997) ........................................... 62, 63

*United States v. Rioux*, 97 F.3d 648 (2d Cir. 1996)................................................. 15, 16

*United States v. Rivera*, 22 F.3d 430 (2d Cir. 1994)..................................................... 13

*United States v. Rivera*, No. 13 Cr. 149 (KAM), 2015 WL 1725991 (E.D.N.Y. Apr. 15, 2015). 69

*United States v. Rom*, 528 F. App'x 24 (2d Cir. 2013).................................................... 3

*United States v. Romanello*, No. 22 Cr. 194 (EK), 2023 WL 8283435 (E.D.N.Y. Nov. 27, 2023) 6

*United States v. Rosado*, 728 F.2d 89 (2d Cir. 1984) .................................................... 35

*United States v. Sabir*, No. S4 05 Cr. 673 (LAP), 2007 WL 1373184 (S.D.N.Y. May 10, 2007) 56

*United States v. Saldarriaga*, 204 F.3d 50 (2d Cir. 2000) ............................................. 68

*United States v. Sanders*, No. 12 Cr. 574 (LAK), 2013 WL 1421487 (S.D.N.Y. Mar. 27, 2013) ...................................................................................................................... passim

*United States v. Scali*, No. 16 Cr. 466 (NSR), 2018 WL 461441 (S.D.N.Y. Jan. 18, 2018).. 55, 57

*United States v. Scarpa*, 897 F.2d 63 (2d Cir. 1990)..................................................... 68

*United States v. Scarpa*, 913 F.2d 993 (2d Cir. 1990) .................................................................. 47

*United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991) ............................................................... 34

*United States v. Scully*, 877 F.3d 464 (2d Cir. 2017) ............................................................ 54, 58

*United States v. Scully*, No. 14 Cr. 208 (ADS), 2015 WL 5826493 (E.D.N.Y. Oct. 6, 2015) ..... 57

*United States v. Shea*, No. 20 Cr. 412 (AT) (S.D.N.Y.) ................................................................ 60

*United States v. Smith*, No. S2 25 Cr. 4 (PAE), 2026 WL 128134 (S.D.N.Y. Jan. 16, 2026) ...... 48

*United States v. St. Rose*, No. 11 Cr. 349 (SJ), 2012 WL 1107659 (E.D.N.Y. Apr. 2, 2012) ...... 70

*United States v. Stewart*, No. 03 Cr. 717 (MGC), 2004 WL 113506 (S.D.N.Y. Jan. 26, 2004) .. 63

*United States v. Strother*, 49 F.3d 869 (2d Cir. 1995) ................................................................... 4

*United States v. Sun Myung Moon*, 718 F.2d 1210 (2d Cir. 1983) ............................................... 63

*United States v. Svoboda*, 633 F.3d 479 (6th Cir. 2011) .............................................................. 52

*United States v. Tarantino*, 846 F.2d 1384 (D.C. Cir. 1988) ....................................................... 14

*United States v. Thai*, 29 F.3d 785 (2d Cir. 1994) ....................................................................... 14

*United States v. Thomas*, 116 F.3d 606 (2d Cir. 1997) ................................................................ 64

*United States v. Tin Yat Chin*, 371 F.3d 31 (2d Cir. 2004) ............................................................ 2

*United States v. Ulbricht*, No. 14 Cr. 68 (KBF), 2015 WL 413318 (S.D.N.Y. Feb. 1, 2015) ...... 24

*United States v. Valencia*, 826 F2d 169 (2d Cir. 1987) ................................................................ 56

*United States v. Valle*, No. 12 Cr. 847 (PGG), 2013 WL 440687 (S.D.N.Y. Feb. 2, 2013) ......... 25

*United States v. Van Allen*, 524 F.3d 814 (7th Cir. 2008) ............................................................ 53

*United States v. Villegas*, 899 F.2d 1324 (2d Cir. 1990) .............................................................. 57

*United States v. Ward*, 197 F.3d 1076 (11th Cir. 1999) ............................................................... 46

*United States v. Washington*, 705 F.2d 489 (D.C. Cir. 1983) ....................................................... 65

*United States v. Weigand*, No. 20 Cr. 188 (JSR), 2021 WL 568173 (S.D.N.Y. Feb. 14, 2021) .... 2

*United States v. Wells Fargo Bank N.A.*, No. 12 Civ. 7527 (JMF), 2015 WL 3999074 (S.D.N.Y. June 20, 2015) .............................................................................................................................. 56

*United States v. White*, No. 02 Cr. 1111 (KTD), 2003 WL 721567 (S.D.N.Y. Feb. 28, 2003) ... 35

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) .................................................................... 21

*Williamson v. United States*, 207 U.S. 425 (1908) ....................................................................... 54

*Wilmington Tr., Nat'l Ass'n v. 31 Prince St., LLC*, No. 22 Civ. 5855 (JGK), 2023 WL 3647397 (S.D.N.Y. May 25, 2023) ................................................................................................................ 9

## Other Authorities

Fed. R. Crim. P. 16 adv. comm. n. ............................................................................................. 24, 25

Fed. R. Evid. 704 adv. comm. n.................................................................................... 22

Fed. R. Evid. 902 adv. comm. n..................................................................................... 5

**Rules**

Fed. R. Crim. P. 12(b)(3)(A)(iv)................................................................................... 63

Fed. R. Crim. P. 16 ...................................................................................................... 24

Fed. R. Crim. P. 16(b)(1)(C)(iii).................................................................................. 24

Fed. R. Crim. P. 49.1 ..................................................................................................... 8

Fed. R. Evid. 103(d)..................................................................................................... 57

Fed. R. Evid. 104(a)........................................................................................... 13, 56, 57

Fed. R. Evid. 104(c)(3) ................................................................................................ 56

Fed. R. Evid. 1101(d)(1)............................................................................................... 57

Fed. R. Evid. 401 ......................................................................................................... 21

Fed. R. Evid. 403 ................................................................................................... passim

Fed. R. Evid. 404(a)(2)(A)............................................................................................ 69

Fed. R. Evid. 405(a)...................................................................................................... 69

Fed. R. Evid. 702 ................................................................................... 20, 21, 25, 50

Fed. R. Evid. 702(c) ..................................................................................................... 26

Fed. R. Evid. 702(d)..................................................................................................... 26

Fed. R. Evid. 703 ......................................................................................................... 28

Fed. R. Evid. 704(a)..................................................................................................... 22

Fed. R. Evid. 704(b)..................................................................................................... 49

Fed. R. Evid. 801(d)(2)(C)............................................................................................ 16

Fed. R. Evid. 801(d)(2)(D) ........................................................................................... 14

Fed. R. Evid. 801(d)(2)(E)............................................................................................ 13

Fed. R. Evid. 803(6)............................................................................................... passim

Fed. R. Evid. 901(a)........................................................................................................ 2

Fed. R. Evid. 902 ................................................................................................... passim

Fed. R. Evid. 902(1)................................................................................................. 5, 10

Fed. R. Evid. 902(1)(A) .................................................................................................. 5

Fed. R. Evid. 902(11)............................................................................................. passim

Fed. R. Evid. 902(12)...................................................................................................... 5

Fed. R. Evid. 902(13)....................................................................................................... passim

Fed. R. Evid. 902(2).................................................................................................................. 5

Fed. R. Evid. 902(3).................................................................................................................. 5

Fed. R. Evid. 902(4)............................................................................................................ 5, 10

**Treatises**

Sand *et al.*, *Modern Federal Jury Instructions*, Instr. 8-01 ............................................................ 52

Sand *et al.*, *Modern Federal Jury Instructions*, Instr. 8-04 ............................................................ 53

The Government respectfully moves *in limine* for a series of orders to allow the trial to proceed in an orderly, efficient, and fair manner.  The Government seeks rulings (a) confirming that certain documentary evidence is self-authenticating pursuant to certifications under Federal Rule of Evidence 902, (b) providing that the statements of the defendants' agents and co-conspirators are admissible, (c) precluding a proffered defense expert consultant from offering improper and unfairly prejudicial opinions regarding cryptocurrency exchanges that are within the ken of the jury and not appropriately tied to the defendants' contemporaneous knowledge, (d) precluding a proffered defense expert consultant from offering improper payment industry practice evidence that can only serve to confuse the jury about the applicable standard to apply, (e) precluding the defendants from arguing that their actions were approved by counsel without actually meeting the requirements of an advice-of-counsel defense, (f) precluding the defendants from presenting evidence or argument that this prosecution is allegedly improperly motivated, or seeking to inflame and confuse the jury with evidence or argument concerning alleged political or religious persecution or other political or religious controversies, (g) precluding the defendants from presenting evidence or argument concerning the punishment or consequences they will face if convicted, have faced as a result of the charges, or believe third parties will face or have faced, (h) precluding the defendants from presenting evidence or argument concerning any alleged prior good acts or lack of prior bad acts, and (i) precluding the defendants from introducing evidence or argument concerning their family, background, age, health, or other personal characteristics absent a showing that they bear on guilt.

## <u>ARGUMENT</u>

### I.   THE COURT SHOULD ADMIT SELF-AUTHENTICATING RECORDS

In light of defendant Le Van Hung's refusal to enter large categories of standard stipulations (*see* Dkt. 140), the Government intends to offer certain documentary evidence as self-authenticating, pursuant to Federal Rule of Evidence 902, based on several types of records certifications set forth in that rule.  In order to facilitate the efficient and orderly trial of this action, the Government moves *in limine* now for a ruling that these records are self-authenticating.[1]

### A.   Applicable Law

Federal Rule of Evidence 901(a) provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  "[T]he bar for authentication of evidence is not particularly high, and proof of authentication may be direct or circumstantial."  *United States v. Al-Moayad*, 545 F.3d 139, 172 (2d Cir. 2008) (internal quotation marks and citation omitted).  "Rule 901 is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification."  *Id.* at 173 (internal quotation marks and citation omitted).  Under Federal Rule of Evidence 902, certain types of evidence are "self-authenticating" and therefore "require no extrinsic evidence of authenticity in order to be admitted."  Fed. R. Evid. 902.  "A district court has broad discretion to determine whether a piece of evidence has been properly authenticated."  *United States v. Tin Yat Chin*, 371

---

[1] Contrary to Hung's claims in his letter indicating this refusal to sign stipulations, this refusal will indeed "require additional witnesses" (Dkt. 140), such as seizure and chain of custody witnesses for certain electronic devices, among others, though the authentication, through certifications, of the documents that are subject to this motion will substantially reduce the number of additional witnesses required.

F.3d 31, 37 (2d Cir. 2004).

Consistent with the plain language of Rule 902, courts in the Second Circuit regularly admit self-authenticating evidence pursuant to Rule 902 without witness testimony.[2] *See, e.g.*, *United States v. Komasa*, 767 F.3d 151, 156-57 (2d Cir. 2014) ("the district court properly admitted the mortgage loan files as self-authenticating documents" pursuant to Fed. R. Evid. 902(11)); *United States v. Carter*, No. 21 Cr. 681 (NSR), 2024 WL 268248, at *3 (S.D.N.Y. Jan. 24, 2024) ("The [signed] certifications submitted by the Government comply with Rules 803(6) and 902(11), and thus . . . the corresponding business records are self-authenticating"); *United States v. Otufale*, No. 24 Cr. 170 (KAM), 2024 WL 3391094, at *9 (E.D.N.Y. July 12, 2024) (allowing government to authenticate Apple and Yahoo records through certifications under Fed. R. Evid. 902(13)).[3]

1.    *Federal Rules of Evidence 902(11) and 803(6)*

Records of regularly conducted activity, *i.e.*, what are commonly known as business records, that meet the necessary conditions to qualify under the hearsay exception in Federal Rule of Evidence 803(6) may be authenticated, among other methods, by a certification that complies

---

[2] "[A] custodian's certification pursuant to Federal Rule of Evidence 902(11) is not testimonial," and therefore use of such certifications to authenticate business records does not violate the Confrontation Clause. *United States v. Weigand*, No. 20 Cr. 188 (JSR), 2021 WL 568173, at *1 (S.D.N.Y. Feb. 14, 2021).

[3] Rule 902(11), which applies to only certain types of self-authenticated records, also requires the proponent to give the adverse party "reasonable written notice of the intent to offer the record" and "make the record and certification available for inspection [ ] so that the party has a fair opportunity to challenge them." Almost all of the pertinent records and certifications were produced to the defendants months ago in discovery, and the marked Government Exhibits subject to this motion, which include the certifications, have all now been produced to the defendants. To the extent it may be required, the Government accordingly provides written notice to the defendants through this motion. *See Carter*, 2024 WL 268248, at *4 ("[T]he Government has provided sufficient written notice by the filing of its [motion in limine].").

with Federal Rule of Evidence 902(11) for records stored domestically. Fed. R. Evid. 803(6)(D). "Rule 902(11) extends Rule 803(6) by allowing a written foundation in lieu of an oral one." *United States v. Rom*, 528 F. App'x 24, 27 (2d Cir. 2013) (internal quotation marks omitted); *see also United States v. Ayelotan*, 917 F.3d 394, 402 (5th Cir. 2019) ("Records are self-authenticating if they include a custodian certification that the records 'meet[] the requirements of Rule 803(6)(A)-(C).'"). Specifically, Rule 902(11) provides, in relevant part, that "[t]he original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person," is self-authenticating and requires no extrinsic evidence of authenticity to be admitted.

A record of regularly conducted activity meets the necessary conditions to qualify as such a business record under Rule 803(6) when (1) "the record was made at or near the time by – or from information transmitted by – someone with knowledge," (2) "the record was kept in the course of a regularly conducted activity of a business," and (3) "making the record was a regular practice of that activity." Fed. R. Evid. 803(6). "A business record may include data stored electronically on computers and later printed out for presentation in court, so long as the original computer data compilation was prepared pursuant to a business duty in accordance with regular business practice." *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632 (2d Cir. 1994).

"[T]he principal precondition to admission of documents as business records pursuant to Fed. R. Evid. 803(6) is that the records have sufficient indicia of trustworthiness to be considered reliable." *Id.* at 632-33 (internal quotation marks omitted). The Second Circuit has taken a "generous view of the business records exception, construing it to favor [] the admission of

4

evidence . . . if it has any probative value at all." *United States v. Strother*, 49 F.3d 869, 874 (2d Cir. 1995) (internal citations omitted).

### 2. *Federal Rules of Evidence 902(1) and 902(4)*

Federal Rule of Evidence 902 provides that certain domestic public documents are also "self-authenticating" and "require no extrinsic evidence of authenticity in order to be admitted." One example of such self-authenticating public records is a "copy of an official record – or a copy of a document that was recorded or filed in a public office as authorized by law – if the copy is certified as correct by: (A) the custodian or another person authorized to make the certification; or (B) a certificate that complies with Rule 902(1), (2), or (3), a federal statute, or a rule prescribed by the Supreme Court." Fed. R. Evid. 902(4). In addition, pursuant to Rule 902(1)(A), domestic public documents that bear, as relevant here, a "seal purporting to be that of the United States; . . . any state . . . of the United States; . . . or a department, agency, or officer of any entity named above" and "a signature purporting to be an execution or attestation" are admissible as self-authenticating documents, irrespective of whether the records come with a separate certification.

### 3. *Federal Rule of Evidence 902(13)*

Federal Rule of Evidence 902(13) provides that "[a] record generated by an electronic process or system that produces an accurate result" that is "shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11) or (12)" is self-authenticating. The certification requirements of Rule 902(11) or (12), in turn, reference Rule 803(6). "The reference to Rule 803(6), however, only applies to the procedural requirements contained in that rule." *Carter*, 2024 WL 268248, at *2 (citing Fed. R. Evid. 902 adv. comm. n.). "That is, there is no intent to require . . . a certification under [Rules 902(13) or (14)] to prove the requirements of Rule 803(6)." *Id.* (internal quotation marks omitted). "Therefore, the certification

5

must be made by a 'custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court [. . .]' or 'be signed in a manner that, if falsely made, would subject the maker to a criminal penalty in the country where the certification is signed.'" *Id.* (quoting Fed. R. Evid. 902(11) & (12)) (alterations in original).

Certifications under Rule 902(13) have been used to authenticate a wide variety of forms of electronically stored data, exports or copies of which are generated by electronic processes or systems that produce accurate results, from a wide variety of sources. *See, e.g.*, *United States v. Palmer*, No. 24 Cr. 67 (NSR), 2025 WL 2978633, at *10 (S.D.N.Y. Oct. 21, 2025) (extracted data from seized phones); *Carter*, 2024 WL 268248, at *3 (decrypted data from Apple iCloud account); *United States v. Merchant*, No. 24 Cr. 362 (EK), 2026 WL 457435, at *2 (E.D.N.Y. Feb. 18, 2026) (extracted data from cellphones and laptop); *Otufale*, 2024 WL 3391094, at *9 (records obtained from Apple, Yahoo, and other businesses); *United States v. Romanello*, No. 22 Cr. 194 (EK), 2023 WL 8283435, at *2 (E.D.N.Y. Nov. 27, 2023) (phone records from communications companies); *United States v. Bondars*, No. 16 Cr. 228 (LOG), 2018 WL 9755074, at *2 (E.D. Va. Aug. 20, 2018) (website images from Internet Archive); *United States v. McDonald*, No. 21 Cr. 12 (EKD), 2023 WL 5278716, at *6 (W.D. Va. Aug. 16, 2023) (emails from company IT vendor); *United States v. Agayev*, No. 18 Cr. 31 (WFN), 2019 WL 8989872, at *2 (E.D. Wash. Sept. 20, 2019) (content from internet service providers); *United States v. Claus*, No. 24 Cr. 155 (SSV), 2026 WL 63149, at *2 (E.D. La. Jan. 8, 2026) (records from multiple banks and financial companies); *Denton v. Rainer*, No. 19 Civ. 5743 (BHS), 2023 WL 5609213, at *4 (W.D. Wash. Aug. 30, 2023) (corrections department database entries).

### B.    Discussion

At trial, the Government intends to offer records that were created and maintained in the

6

regular course of business by certain third parties, including financial institutions and technology companies, as well as public records and electronically stored data obtained from internet service providers. To streamline the trial and avoid needlessly burdening the Court and the jury with a parade of live records custodians, the Government seeks a ruling in advance of trial that certain records discussed below and set forth in the chart attached as Exhibit A, which were produced by the entities pursuant to subpoenas and search warrants, or are federal government records, are admissible as self-authenticating business records pursuant to Federal Rules of Evidence 902(11) and 803(6), self-authenticating public records, or certified electronic records. The certifications have been produced as the Government Exhibits listed in Exhibit A.[4]

> 1. *The Court Should Admit Business Records that Are Admissible and Self-Authenticating Under Rules 902(11) and 803(6)*

The Government seeks a ruling that the business records listed in Exhibit A are authenticated by the certifications also listed in Exhibit A, summarized as follows:

*First*, various financial institutions and financial services corporations have certified, under Rule 902(11), that, in sum and substance, bank account statements and other financial records that the Government seeks to admit comply with Rule 803(6). Exhibit A lists these entities and the Government Exhibit numbers that correspond with each certification. (*See* Ex. A rows 1-456).[5] To highlight just two examples: (1) Bank of America, N.A., has certified that the records marked

---

[4] The Government is in the process of seeking additional record certifications from other entities and for other Government Exhibits, and will provide such certifications to the defendants promptly once received. The Government will seek a ruling as soon as practicable with regard to any additional certifications it receives and intends to rely upon to introduce self-authenticating evidence.

[5] Some of the certifications under Rule 902(11) are also certifications under Rule 902(13). (*See, e.g.*, GX 3B-CR1).

for identification as Government Exhibits 2D-1 through 2D-29 and 2D-101 through 2D-417 are "records of a regularly conducted banking activity" that were "made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of these matters," were "made and kept in the course of regularly conducted banking activity by Bank of America, N.A. personnel or by persons acting under their control," and were "made and kept by the regularly conducted activity of Bank of America, N.A. as a regular practice, on or about the time of the act, condition, or event recorded." and (2) Green Dot Corporation has certified that the records marked for identification as Government Exhibits 2A-1 through 2A-6, 2A-10 through 2A-22, 2A-100 through 2A-125, and 2A-201 through 2A-203 were "made at or near the time of the occurrence of the matters set forth in the records, by, or from information transmitted by, a person with knowledge of those matters," and that the records were "kept in the course of regularly conducted business activity" and "made by the regularly conducted business activity as a regular practice." (GX 2A-CR5).[6]

*Second*, a number of third party business entities—including Gemini Trust Company LLC, Payward Ventures d/b/a Kraken, Meta Platforms, and the Epoch Times and related entities—have certified that certain records the Government seeks to admit were, in sum and substance, created and maintained in the regular course of business and, therefore, comply with Rule 803(6). (*See* Ex. A rows 457-746). To take one example, Gemini Trust Company LLC, has certified that the

---

[6] The Government Exhibit ranges set forth in this motion include exhibits with numbers within the range marked with the suffix "UR," reflecting unredacted records that the Government intends, after conferring with the defendants, to offer into evidence under seal in order to allow the jury to see personally identifiable information ("PII") that is required under Federal Rule of Criminal Procedure 49.1 to be redacted from public filings or is otherwise sensitive, such as certain victim PII.

documents marked for identification as Government Exhibits 1C-1 through 1C-9 "were made at or near the time of the occurrence of the matters set forth in the records, by, or from information transmitted by, a person with knowledge of those matters," were "kept in the course of regularly conducted business activity," and were "made by the regularly conducted business activity as a regular practice." (*See* GX 1C-CR). The other certifications likewise mirror the language of Rule 803(6)(A)-(C). (*See* Ex. A rows 457-746).

*Third*, several government agencies have provided certifications regarding records kept in the ordinary course of government business. (*See* Ex. A rows 747-819). For example, several state unemployment agencies, such as the Massachusetts Department of Unemployment Assistance, have certified that records of unemployment insurance applications "were made at or near the time of the occurrence of the matters set forth by (or from information transmitted by) a person with knowledge of these matters," that such records "were kept in the course of regularly conducted business activity," and that "it was the regular practice of this business to make such records." (*See* GX 4C-CR). Similarly, the United States Department of State has certified that the records of a visa application marked for identification as Government Exhibit 4H-1 were "made from the information provided by the visa applicant at or near in time to when that information was transmitted to the Department of State," and "was kept pursuant to the Department of State's procedures for adjudication and retention of visa applications and was made as part of a regular practice." (GX 4H-1 at 1).

The State Department records are additionally, and independently, authentic pursuant to Rules 902(1) and 902(4) because they are attached to a certification that contains the seal of the State Department (*i.e.*, a "seal purporting to be that of the United States; . . . or a department,

9

agency, or officer of any entity named above") and that is signed by the Deputy Director with the Office of Information Management and Liaison within the Visa Office of the Bureau of Consular Affairs within the State Department.  (*See* GX 4H-1 at 1).  *See. e.g.*, *Wilmington Tr., Nat'l Ass'n v. 31 Prince St., LLC*, No. 22 Civ. 5855 (JGK), 2023 WL 3647397, at *2 (S.D.N.Y. May 25, 2023) ("The provided mortgage assignments are self-authenticating documents pursuant to Federal Rule of Evidence 902(1) because they are attached to the recorded filing made with the New York City Department of Finance, which bears the appropriate seal and signature of a government official." (internal quotation marks omitted); *United States v. Bracy*, No. 20 Cr. 483 (ARR), 2022 WL 17801133, at *7 (E.D.N.Y. Dec. 19, 2022) (granting motion to authenticate public records signed and sealed by a state agency "[b]ecause the records may be authenticated by custodian certifications or self-authenticated" under Rule 902(1)); *Brewer v. United States*, 764 F. Supp. 309, 318 (S.D.N.Y. 1991) (holding IRS Form 4340 was self-authenticating under Rule 902(4)).

Because the records produced by these providers are certified records that satisfy the requirements of Rule 803(6), Government Exhibits listed on rows 1-819 of Exhibit A are self-authenticating under Rule 902(11), and are business records under Rule 803(6), without extrinsic evidence of authenticity or the need to call a custodian of records from each of these entities to establish that they are business records.

2.    *The Court Should Permit Authentication by Certification of Electronically Stored and Processed Data Produced by Internet Service Providers and Other Companies Under Rule 902(13)*

Certain of the evidence in this case consists of electronically stored data provided to the Government by internet service providers such as Google and Facebook pursuant to court-authorized search warrants, or electronically stored data provided to the Government by other companies that store data in electronic accounts and devices, such as Green Dot Corporation and

the Epoch Times, and are authenticated by certifications included by the provider pursuant to Federal Rule of Evidence 902(13).

Google has certified, through a records custodian who is "familiar with how the records were created, managed, stored and retrieved," that a data file of records pertaining to a particular Google account, provided to the Government pursuant to a court-authorized search warrant, is "a true duplicate of original records that were generated by Google's electronic process or system that produces an accurate result," and that "[t]he accuracy of Google's electronic process and system is regularly verified by Google." (GX 1200CR1; *see also* Ex. A rows 820-1088). Accordingly, these records are self-authenticating. *See, e.g.*, *Otufale*, 2024 WL 3391094, at *9 (admitting Apple and Yahoo records, stating, "[a] 'record generated by an electronic process or system that produces an accurate result,' as shown by a records custodian's certification meeting the requirements of Rule 902(11), also is self-authenticating." (quoting Fed. R. Evid. 902(13)).

Similarly, other companies, including Green Dot Corporation, the Epoch Times and its related entities, and Commonspace, that store data on electronic media, whether in electronic databases, accounts, or devices, have certified that the data produced to the Government was derived from those media through an "electronic process or system that produces an accurate result." (*See, e.g.*, GX 2A-CR4 (Green Dot Corporation); *see also* Ex. A rows 1089-549). Such certifications authenticate the relevant electronic records, just as they have for a broad array of types of electronically stored and processed data. *See, e.g.*, *Palmer*, 2025 WL 2978633, at *10; *Carter*, 2024 WL 268248, at *3; *Merchant*, 2026 WL 457435, at *2; *McDonald*, 2023 WL 5278716, at *6; *Claus*, 2026 WL 63149, at *2.

Accordingly, Government Exhibits listed on rows 820-1549 of Exhibit A are self-

11

authenticating under Rule 902(13) without extrinsic evidence of authenticity or the need to call a custodian of records from each of these entities.

*    *    *

Based on the foregoing, the Court should rule that the Government Exhibits listed on rows 1-819 of Exhibit A to these motions are self-authenticating under Rule 902(11), and are business records under Rule 803(6), without extrinsic evidence of authenticity or the need to call a custodian of records from each of these entities to establish that they are business records.[7] The Court should also rule that the Government Exhibits listed on rows 820-1549 of Exhibit A are self-authenticating under Rule 902(13) without extrinsic evidence of authenticity or the need to call a custodian of records from each of these entities.

## II.    THE COURT SHOULD ADMIT OUT-OF-COURT STATEMENTS MADE BY THE DEFENDANTS' CO-CONSPIRATORS OR AGENTS

### A.    Background

The Government expects to prove at trial that the defendants engaged in an extensive criminal scheme including the money laundering conspiracy charged in Count One of the Guan Indictment (Dkt. 5) and Count One of the Hung Indictment (Dkt. 28, collectively, the "Indictments"), as well as the identity theft conspiracy charged in Count Four of the Hung Indictment, in addition to each of the other offenses charged in the Indictments.

The scheme involved the MMO Team, as defined in the Indictments—under the supervision of Guan and day-to-day management of Hung—purchasing gift cards and prepaid

---

[7] Such a ruling, of course, would be without prejudice to the parties seeking a limiting instruction or redactions with respect to hearsay-within-hearsay, such as where a business record contains within it the contents of statements of third parties, or a defendant, not subject to any hearsay exclusion or exception.

debit cards loaded with stolen funds on the Paxful peer-to-peer cryptocurrency marketplace.[8]  To fund these purchases, Guan diverted large sums of money (hundreds of thousands of dollars at a time, totaling tens of millions of dollars) from the Media Entities' bank accounts into his own personal bank accounts, and from there to personal cryptocurrency accounts that were in his name, but for which he shared the login credentials with Hung.  The funds were then converted to bitcoin, which the MMO Team used on Paxful to purchase gift and prepaid debit cards from bulk card sellers at a substantial discount.  After receiving the stolen cards, the MMO Team transferred them to the Media Entities as purported charitable donations, notwithstanding that they derived from the funds Guan had sent from the Media Entities (*i.e.*, the supposed donees) themselves.

When the legitimate cardholders of the stolen cards noticed the theft and attempted to complain, Guan, Hung, and other members of the MMO Team used a variety of means to prevent the cardholders from exposing the scheme (and in many cases to prevent the cardholders from getting their money back).  As described in more detail in Section IV.A, below, this involved making false and misleading statements to banks to contest cardholders' attempts to receive refunds through their payment card networks, as well as using vast quantities of stolen personally identifiable information to set up nominee accounts through which to conduct layered transactions preventing the defrauded victims from knowing that their funds went to the Media Entities.  When defrauded victims contacted the Media Entities directly, Guan would typically pass their complaints on to Hung and/or other MMO Team members, and the MMO Team would then contact the victims and make false and misleading statements attempting to conceal the Media Entities' role in funding the purchases of the stolen funds.

---

[8] Terms defined in the Indictments have the meanings set forth in the Indictments.

During the course of the conspiracies, both defendants worked together with a number of co-conspirators in the MMO Team, as well as, in Guan's case, a number of agents employed by or otherwise associated with the Media Entities, due to his senior leadership position in the Media Entities (including his role as Chief Financial Officer of the Media Company).    Guan was described as "the manager of and overseeing" the MMO Team (GX 5401), and Hung was listed on the MMO Team's payroll spreadsheets in the "Business Operations" category as "Manager." (*See, e.g.*, GX 3102UR).  The evidence at trial will show numerous instances of both defendants closely supervising and directing the actions of the MMO Team, and of Guan supervising and directing a variety of employees or other personnel for the Media Entities, including by, for example, directing employees of the Media Entities regarding how to handle complaints of fraud arising from the MMO Team's activities (*see, e.g.*, GX 1A-131, GX 1A-151), congratulating the MMO Team on their profitability (GX 1A-107), directing and instructing the MMO Team on how to make false and misleading statements to banks (GX 1A-3), and closely reviewing the false and misleading statements they were transmitting to banks (GX 1A-57).

The Government will offer at trial numerous statements of members of the MMO Team or of personnel affiliated with the Media Entities, within the scope of their agency for the defendants—and, as to those persons who were co-conspirators, within the scope of the conspiracy.  These statements concern a number of matters core to the scope of the agency relationship and the conspiracy, such as reporting on the methods, progress, and profitability of the MMO Team's activities, recording and responding to numerous reports of fraud in connection with the MMO Team's activities, and carrying out other actions to facilitate the MMO Team's activities, such as maintaining, unfreezing, or opening bank or cryptocurrency accounts.

14

### B. Applicable Law

Federal Rule of Evidence 801(d)(2)(E) provides in relevant part that a statement is not hearsay if "[t]he statement is offered against an opposing party and . . . was made by the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement under this Rule, a court must find two facts by a preponderance of the evidence: (i) that a conspiracy that included the defendant and the declarant existed; and (ii) that the statement was made during the course of, and in furtherance of, that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). "In determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged coconspirator's statement itself." *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014). When determining whether the predicate conspiracy has been established, the court is not bound by the Federal Rules of Evidence, *see* Fed. R. Evid. 104(a), and "the district court may consider the hearsay statement itself" as evidence of "the existence of a conspiracy." *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000) (citing *Bourjaily*, 483 U.S. at 181).

To be "in furtherance" of a conspiracy, a statement "must in some way have been designed to promote or facilitate achievement of the goals of that conspiracy." *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994). Under this standard, a co-conspirator statement is admissible if it "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988). Thus, statements are in furtherance of the conspiracy if they, for example: (1) inform or provide an update as to the status or progress of the conspiracy, *see United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001);

15

(2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990); (3) "seek to induce a co-conspirator's assistance," *Desena*, 260 F.3d at 158; (4) "provide reassurance," *id.*; (5) "serve to foster trust and cohesiveness," *id.*; (6) "facilitate and protect" the conspiratorial activities, *United States v. Diaz*, 176 F.3d 52, 87 (2d Cir. 1999); or (7) inform a co-conspirator of "the identity and activities of his co-conspirators," *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989); *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987).  A narrative description of a past event is admissible as long as it serves "some current purpose in the conspiracy."  *United States v. Thai*, 29 F.3d 785, 813 (2d Cir. 1994).

Federal Rule of Evidence 801(d)(2)(D) also excludes from the definition of "hearsay" a statement offered against an opposing party that was "made by the party's agent or employee on a matter within the scope of that relationship and while it existed."  A Rule 801(d)(2)(D) proponent must establish "(1) existence of an agency relationship; (2) that the statement was made in the course of that relationship; and (3) that the statement relates to a matter within the scope of that relationship." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 238 (2d Cir. 2006).  The Second Circuit has stated that "[a]dmissibility under this rule should be granted freely." *Pappas v. Middle Earth Condominium Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992); *see also*, *e.g.*, *United States v. Neumann*, No. 21 Cr. 439 (NSR), 2023 WL 8700974, at *5 (S.D.N.Y. Dec. 14, 2023) (statements made by individuals who had been hired to file the defendant's tax returns are admissible); *In re Reserve Fund Secs. & Derivs. Litig.*, 09 Civ. 4346 (PGG), 2012 WL 12354233, at *7 (S.D.N.Y. Oct. 3, 2012) ("Where an individual defendant controls the entity that employs the declarant, and is the declarant's ultimate supervisor, the employee is an agent of the defendant for purposes of F.R.E.

16

801(d)(2)(D), and his statements are admissible against that individual defendant." (citing *United States v. Rioux*, 97 F.3d 648, 660 (2d Cir. 1996))).

### C.    Discussion

The pertinent statements made by members of the MMO Team and others at the Media Entities were all statements of agents of the defendants, and in some cases, statements of co-conspirators, and thus, to the extent they contain assertions of fact, are admissible for the truth of the matters asserted if so offered by the Government (though not admissible if offered by the defendants, *see United States v. Elmaani*, No. 20 Cr. 661 (CM), 2023 WL 2770742, at *6 (S.D.N.Y. Apr. 4, 2023) ("It is well-established that a defendant does not have a parallel ability to offer his own statement into evidence." (citing cases)).).  Although it is premature and inefficient to litigate exhibit by exhibit at this time, the basic facts concerning the conspiracy, the Media Entities, and the defendants' roles in each are sufficient to show that the hearsay exceptions are met for, at a minimum, the following categories of statements:

- Statements by persons associated with the MMO Team updating the defendants or others on the progress, activities, and profitability of the MMO Team's operations. These are classic statements of co-conspirators keeping one another informed on the status and progress of the conspiracy, and are admissible as a result. *See, e.g.*, *Desena*, 260 F.3d at 158.  Even if any of the people making the statements had lacked criminal intent, they would still be the statements of agents of the defendants given the supervisory role both defendants had over the actions of the MMO Team.  *See, e.g.*, *Pappas*, 963 F.2d at 537; *Rioux*, 97 F.3d at 660.

- Statements by persons associated with the Media Entities or the MMO Team reporting, responding to, or otherwise concerning numerous reports of fraud received by the Media Entities related to the activities of the MMO Team, or responding to audit inquiries about the activities of the MMO Team.  Given Guan's supervisory role in the Media Entities, and particularly, as Chief Financial Officer of the Media Company, his role in responding to inquiries or complaints that the funds received by the Media Entities were derived from crime, all of these statements were made by his agents within the scope of their agency relationship. *See, e.g.*, *Pappas*, 963 F.2d at 537; *Rioux*, 97 F.3d at 660.  Moreover, a number of these statements, such as those made by leaders within the MMO Team, were made by co-conspirators and within the scope of the

conspiracy, including to conceal and thereby perpetuate the conspiracy. *See, e.g.*, *Diaz*, 176 F.3d at 87.[9]

- Statements, whether by persons associated with the Media Entities or with the MMO Team, otherwise regarding the carrying out of the MMO Team's activities, such as statements regarding the opening, use, maintenance, freezing, unfreezing, or termination of bank or cryptocurrency accounts used for the MMO Team's activities. All of these are, at a minimum, statements of agents of the defendants within the scope of their agency relationship, given Guan's role in the Media Entities and overseeing the MMO Team, *see e.g.*, *Rioux*, 97 F.3d at 660 (and those made by co-conspirators obviously serve to "facilitate and protect" the conspiracy's activities, *Diaz*, 176 F.3d at 87), and all are admissible by the Government for their truth.

A number of such statements, of course, are admissible for purposes other than for their truth, such as to prove the defendants' awareness that such statements were being made, and therefore their knowledge, understanding, and/or as context for subsequent actions. *See, e.g.*, *United States v. Ho*, 984 F.3d 191, 208 (2d Cir. 2020) ("When statements by an out of court declarant are admitted as background, they are properly so admitted not as proof of the truth of the matters asserted but rather to show the circumstances surrounding the events, providing explanation for such matters as the understanding or intent with which certain acts were performed." (internal quotation marks omitted)); *United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013) ("We have repeatedly held that a statement is not hearsay where, as here, it is offered, not for its truth, but to show that a listener was put on notice."). To the extent that certain statements of the defendants were made in response to what they were told, what they were told is also admissible to render the defendants' statements comprehensible. *See, e.g.*, *Ho*, 984 F.3d at 208 ("[The defendant's] response—however it was meant—would have made little sense to the

---

[9] In some cases, such as where Guan literally told members of the MMO Team what to write in order to contest efforts by fraud victims to receive their money back, such statements are directly authorized by a defendant under Rule 801(d)(2)(C).

jury without the admission of [a third party's] statement and reaction."). Moreover, a number of statements made by the defendants or their co-conspirators responding to complaints of fraud were false or misleading—and thus plainly are not being offered for the "truth" of matters asserted. Accordingly, the Government may not offer all such statements for the truth of the matters asserted therein. However, should the Government choose to offer such statements, they should be admitted as statements of the defendants' agents, and in some cases, of their co-conspirators.

### III. THE COURT SHOULD PRECLUDE THE PROPOSED EXPERT TESTIMONY OF MATTHEW PRICE

#### A. Background

Guan has noticed the testimony of Matthew Price, a private consultant, to offer sweeping opinions evidently aimed at legitimizing activity by the defendants and their co-conspirators on Paxful, the cryptocurrency exchange, to purchase stolen funds.

As set forth in Section II.A, above, Paxful was a peer-to-peer cryptocurrency marketplace through which members of the MMO Team purchased prepaid debit cards or gift cards in the names of third persons, loaded with stolen funds, from bulk card sellers. As discussed above, the MMO Team was able to purchase these stolen funds at a substantial discount, exchanging them for bitcoin at a rate of approximately 80 cents of bitcoin per dollar of prepaid card funds in many cases.

In his notice, attached hereto as Exhibit B, Price proposes to opine that Paxful was "widely used" and "gift cards and prepaid cards were widely used as an accepted means on Paxful to buy and sell cryptocurrency." (Ex. B at 3). These supposed opinions by Price are that unidentified other persons, at unidentified times, for unidentified reasons on the Paxful website allegedly traded gift cards or prepaid debit cards for cryptocurrency. (Ex. B at 8 ("I reviewed several historical

Paxful user profiles through a publicly accessible internet archive. Many of these profiles advertised offers of prepaid debit cards in exchange for cryptocurrency, often at rates discounted from the face value of the card.")).

Price also offers what purports to be an "opinion" that Paxful publicly "provided assurances that transactions on the platform were safe and legally compliant," including the purported "opinion" that Paxful publicly "described" certain "security features." (Ex. B at 3). These supposed opinions include a number of press releases from 2022 (well after the defendants began to use the Paxful platform) and even October 2024 (after the arrests of the defendants). (Ex. B at 6 & nn. 7-9). Price does not purport to explain how such press releases could possibly bear on the defendants' actions earlier in time—when the defendants plainly had no knowledge of the unissued future releases.

Price also seeks to opine broadly, and again, without any connection to the defendants' alleged contemporaneous knowledge, that "[g]ift cards and prepaid debit cards historically were and currently remain a common means used to buy and sell cryptocurrencies for fiat currency." (Ex. B at 3). This putative historical survey is laden with characterizations of the supposed motivations of numerous unidentified third parties—again, devoid of any connection to the defendants—such as the sweeping claim that "privacy and individual financial sovereignty (including the ability to control one's own private keys) is a paramount reason driving the global adoption of cryptocurrency." (Ex. B at 5). Price's "opinions" also extend to describing the activities of a number of *other* cryptocurrency exchanges not at issue in this case, and the claim that these other exchanges "offer the use of non-traditional payment methods, including prepaid debit cards and gift cards, to buy and sell cryptocurrency on the platform." (Ex. B at 6).

20

Price similarly proposes to testify broadly about the motivations of persons buying cryptocurrency, relying on sources such as "[h]istorical posts in numerous cryptocurrency focused forums" (Ex. B at 8), and his own personal interactions with unidentified and nontestifying "users who bought or sold cryptocurrency using gift cards and prepaid debit cards" (Ex. B at 9). Again, he does not purport to tie any of these supposed opinions to the defendants' alleged contemporaneous knowledge—or even to the time period of their actions.

Finally, Price proposes to testify in detail that "[g]ift cards and prepaid debit cards, when combined with cryptocurrencies, also play an important role in international remittances" (Ex. B at 3), specifically the transfer of funds from persons in the United States to "family members overseas" (*id.*). These opinions, which are described only as based both on his "experience and based on publicly available research" from unspecified sources (Ex. B at 10), extend to such factual assertions as the reasons for the alleged popularity of these remittances (*id.*), the claim that "prepaid cards are usually sold at a discount" (without any explanation of the reasons for such a discount) but that nevertheless this process "can be more cost efficient than using a traditional remittance service" due to exchange rates (*id.*), and that cryptocurrencies are "often viewed as a critical store of value in jurisdictions experiencing currency devaluation and hyperinflation." (*Id.* at 10-11). Once again, he does not purport to tie any of these supposed opinions to the defendants' alleged contemporaneous knowledge—or even to the time period of their actions.

Price, whose background is in law enforcement and who supervised internal investigations at a different cryptocurrency exchange (*not* the one he seeks to offer expert testify about), appears to have principally based his "opinions"—which are often merely regurgitation of the out-of-court statements of others—on outcome- and litigation-driven "open-source research" evidently

21

consisting, at least in large part, of gathering and synthesizing hearsay sources and various webpages that may be intended to be defense exhibits. (Ex. B at 3 ("As the basis for my opinions, I relied on my extensive work experience relating to the cryptocurrency markets and on open-source research of the kind I have used over many years, including academic articles, publicly accessible cryptocurrency forums, written and video guides detailing methods used to buy and sell cryptocurrencies, and publicly accessible archives, including of the Paxful webpage.")).

### B.    Legal Standard

#### 1.    *Expert Testimony Generally*

Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The party that proffers the testimony, here, a defendant, bears the burden of showing that it is admissible by a preponderance of the evidence. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 & n.10 (1993) (citing *Bourjaily*, 483 U.S. at 175-76). A district court's exclusion of expert testimony will be affirmed unless it constitutes an abuse of discretion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).

A threshold issue is, of course, whether the witness "is qualified to be an 'expert'" in the subject matter at issue. *See Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005).

22

Testimony from a qualified expert is admissible only if the trial court determines that it is both relevant and reliable. *Daubert*, 509 U.S. at 589-90; *see Kumho Tire Co., Inc. v. Carmichael*, 526 U.S. 137 (1999). Specifically, in *Daubert*, the Supreme Court held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. "*Daubert* applies to both defense and government experts." *United States v. Yousef*, 327 F.3d 56, 148 (2d Cir. 2003).

Applying Rule 702, the Court must determine whether the proffered expert's reasoning and methodology underlying his testimony is valid, and whether that reasoning or methodology was applied reliably to the facts, so as to be relevant and helpful to the jury. *See Kumho Tire*, 526 U.S. 137. The reliability inquiry is flexible and "must be tied to the facts of a particular case." *Id.* at 150 (citations and internal quotation marks omitted). The Second Circuit has emphasized that "it is critical that an expert's analysis be reliable at every step." *Amorgianos v. Nat'l R.R. Pass. Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* Minor flaws with an otherwise reliable expert opinion will not bar admission of that evidence; however, the Court should exclude the expert evidence "if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *Id.* (quotation marks omitted).

Rules 401 and 403 of the Federal Rules of Evidence provide that relevant evidence is admissible when it tends to make the existence of any fact that is of consequence more or less probable than it would be without the evidence, but it may be excluded if its probative value is

23

substantially outweighed by, among other things, the danger of unfair prejudice, confusion of the issues, and misleading the jury. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (quoting authority omitted).

Among other things, the Court "must consider whether an expert's proposed testimony would usurp the province of the judge to instruct on the law, or of the jury to make factual determinations." *Island Intell. Prop. LLC v. Deutsche Bank AG*, No. 09 Civ. 2675 (KBF), 2012 WL 526722, at *2 (S.D.N.Y. Feb. 14, 2012) (citations omitted). While Federal Rule of Evidence 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue," the Second Circuit has admonished courts to take care "lest [the expert] be allowed to usurp the function of the judge." *Marx & Co. v. Diners Club, Inc.*, 550 F.2d 505, 511 (2d Cir. 1977). Accordingly, courts must not admit "opinions which would merely tell the jury what result to reach." *Hygh v. Jacobs*, 961 F.2d 359, 363-64 (2d Cir. 1992) (quoting Fed. R. Evid. 704 adv. comm. n.); *see also United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." (emphasis in original)). Nor may an expert opine as to a party's state of mind, credibility, intent, or motive. *See LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, No. 08 Civ. 8426 (WHP) (HBP), 2012 WL 466785, at *7 (S.D.N.Y. Feb. 14, 2012) (collecting cases); *see, e.g.*, *Highland Capital Mgmt. v. Schneider*, 551 F. Supp. 2d 173, 182-183, 187 (S.D.N.Y. 2008).

For similar reasons, it is settled law that expert witnesses should "not testify about lay matters" that are properly left for the jury, such as "facts or opinions stated by other potential witnesses," *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004), or "interpretations of conduct or views as to the motivation of parties," *id.* at 541; *see also, e.g., United States v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001) ("[T]he district court should not admit testimony that is directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help." (internal quotation marks omitted)); *DeWit v. UPS Ground Freight, Inc.*, No. 16 Civ. 36, 2017 WL 5905575, at *2 (N.D. Fl. Jul. 25, 2017) (precluding expert opinion that "merely takes a commonsense concept and applies it to a specific field," does not "concern matters that are beyond the understanding of the average lay person," and "therefore would not be helpful to the jury and offers nothing more than what lawyers for the parties can argue in closing arguments" (internal quotation marks omitted)). A party may not offer "expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror." *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994). *Cf. United States v. Long*, 917 F.2d 691, 701-02 (2d Cir. 1990) (it was an abuse of discretion to permit an expert to testify about "organized crime families" when "the fact" that was relevant, whether an individual was connected to organized crime and demanded a fee, could have been testified to by a lay witness).

Finally, expert opinion should not be offered where it does not fit the facts of the case. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (internal quotation marks omitted); *cf. Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("expert testimony should be excluded if it is . . . [*inter*

25

*alia*] in essence an 'apples and oranges comparison'" (quoting *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir.1984))); *see also LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 642 (S.D.N.Y. 2016) (expert opinion inadmissible where it is "a mismatch for the facts" of the case).

2.      *Notice of Expert Testimony*

A defendant seeking to introduce expert testimony must provide a written disclosure for each expert witness, which must contain, among other things, "a complete statement of all opinions that the defendant will elicit from the witness in the defendant's case-in-chief" and "the bases and reasons for them." Fed. R. Crim. P. 16(b)(1)(C)(iii). The 2022 amendments to Rule 16 were enacted to "require more specificity" in expert disclosures, *United States v. Kwok*, No. 23 Cr. 118 (AT), 2024 WL 1773143, at *1 (S.D.N.Y. Apr. 24, 2024), and to "facilitate trial preparation, allowing the parties a fair opportunity to prepare to cross-examine expert witnesses and secure opposing expert testimony if needed," Fed. R. Crim. P. 16 adv. comm. n. (2022 amendment). While this requirement "does not require a verbatim recitation of the testimony the expert will give at trial," Fed. R. Crim. P. 16 adv. comm. n., a "brief summary of the proposed testimony" that does not set forth a "full statement of . . . opinions and reasons for them" is insufficient, *United States v. Dzionara-Norsen*, No. 21-454, 2024 WL 191803, at *4 (2d Cir. Jan. 18, 2024). Similarly, disclosing a mere list of topic areas for which the expert will provide opinions is insufficient. *See United States v. Ulbricht*, No. 14 Cr. 68 (KBF), 2015 WL 413318, at *5 (S.D.N.Y. Feb. 1, 2015) (exclusion under Rule 16 is "justified when the expert disclosures merely list general topics about which the expert will testify"); *United States v. Baker*, No. 14 Cr. 356 (ENV), 2016 WL 7176588,

at *1 (E.D.N.Y. Dec. 8, 2016) ("[M]erely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's actual opinions.").

"Even if the disclosure provides a sufficient summary of any opinions to be offered by the witness, it may be excluded if the [proponent] has made no attempt at all to describe the bases and reasons for those opinions" in its disclosure. *United States v. Mavashev*, No. 08 Cr. 902 (DLI) (MDG), 2010 WL 234773, at *2 (E.D.N.Y. Jan. 14, 2010). "Where a defendant fails to comply with such disclosure requirements, a court may prohibit [him] from introducing the evidence at trial." *Dzionara-Norsen*, 2024 WL 191803, at *3; *see also, e.g.*, *United States v. Valle*, No. 12 Cr. 847 (PGG), 2013 WL 440687, at *5 (S.D.N.Y. Feb. 2, 2013); *United States v. Mahaffy*, No. 05 Cr. 613 (ILG), 2007 WL 1213738, at *2 (E.D.N.Y. Apr. 24, 2007); *United States v. Ferguson*, No. 06 Cr. 137 (CFD), 2007 WL 4539646, at *1 (D. Conn. Dec. 14, 2007).

This is for good reason. The expert disclosure provisions of the Rules exist to allow opposing counsel the opportunity to challenge the admissibility of testimony, prepare for cross-examination, and decide whether to retain rebuttal experts. *See, e.g.*, *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2011 WL 723530, at *3 (S.D.N.Y. Feb. 25, 2011) ("[T]he purpose of reciprocal expert disclosures is 'to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination.'" (quoting Fed. R. Crim. P. 16 adv. comm. n. (1993 amendment))); *Valle*, 2013 WL 440687, at *5 (same); *United States v. Day*, 524 F.3d 1361, 1372 (D.C. Cir. 2008) (same). This is not possible without timely and proper notice.

27

### C.     Discussion

Price's sweeping opinions are not proper expert testimony under Rule 702, for multiple reasons. As best the Government can discern from Price's vague notice, none of Price's proffered opinions—to the extent they are opinions at all—appear to be a product of any expertise, much less properly applied. Even if they were, they consist of matters well within the ken of the jury and that could be offered through lay witnesses, many do not fit the facts of the case at all, most concern irrelevant behavior of third parties and are not proved with any competent evidence, and none is tied, as all must be, to the contemporaneous knowledge of either defendant. And even if the opinions were not inadmissible for all of these reasons, they should be precluded under Federal Rule of Evidence 403.

### 1.     *Price's Notice is Deficient*

Price's notice, while identifying a series of alleged facts he wishes to put before the jury, does not identify any way in which those facts are the products of any specialized expertise, let alone give enough detail to test whether his purported expertise involves a methodology reliably applied to the facts of this case. Although the evident conclusion, as discussed below, is that Price's testimony is not the product of any valid methodology or expertise, the vagueness of his disclosures about his methods frustrates any attempt to prepare to challenge his testimony, itself justifying preclusion.

Price's disclosure does not identify how his purported expertise in any discipline contributes to his opinion on such matters as the history of Paxful, the features it offers, what payment methods cryptocurrency exchanges accept, or that people in the United States use gift cards to send money abroad. *See Kwok*, 2024 WL 1773143, at *1 ("An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence

28

substantiate that conclusion." (quoting *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006))). Although Price worked for a cryptocurrency exchange, he does not explain how that experience taught him any "reliable principles and methods" for offering the type of testimony he proposes here, let alone whether his proposed testimony "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(c), (d); *see also, e.g.*, *United States v. Gentile*, No. 21 Cr. 54 (RPK)(PK), 2024 WL 3455834, at *2 (E.D.N.Y. July 17, 2024) ("[A] statement of an opinion's bases and reasons cannot merely be the *ipse dixit* of the expert from experience" (internal quotation marks omitted)).

To the extent that Price does describe his approach, it does nothing to clarify his methodology. Price claims that his opinions are based on his work experience (principally in law enforcement and internal investigations in the cryptocurrency industry) and an eclectic form of "open-source research" consisting of perusing "academic articles, publicly accessible cryptocurrency forums, written and video guides detailing methods used to buy and sell cryptocurrencies, and publicly accessible archives, including of the Paxful webpage. This grab-bag of sources does not suggest any "principles and methods" but rather the work of a litigation consultant assisting defense lawyers preparing for a case. The reference to "academic articles," an outlier among the other types of sources, only deepens the mystery. Price does nothing to explain which of his opinions these "academic articles" support; how he evaluates and uses them despite his apparent lack of specialized academic background; or even what discipline or field of study these "academic articles" relate to. Because this lack of disclosure of any methodological approach "fails to provide the Court with enough information to conduct a rigorous examination of the experts' methodology," it is insufficient. *Kwok*, 2024 WL 1773143, at *3.

29

2.    *Price's Proposed Testimony is Not Based on Any Recognized Methodology and is Within the Ken of the Jury*

Rather than offering any expert opinion, Price's testimony consists of a narrative assembled through hearsay statements and apparently litigation-driven open-source research. Because this approach is not "traceable to a reliable methodology," *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013), and does not offer any opinions that are beyond the ken of the jury, it is not proper expert testimony.

Much of Price's report appears to be based, not on any valid expert methodology, but simply upon the repetition or repackaging of hearsay statements, which is not a proper basis for expert opinion. For example, Price bases his "opinions" about the motivations of cryptocurrency buyers on sources such as "[h]istorical posts in numerous cryptocurrency focused forums" (Ex. B at 8), and his own personal interactions with unidentified and nontestifying "users who bought or sold cryptocurrency using gift cards and prepaid debit cards" (Ex. B at 9). This is not the result of any recognized expert methodology, but an attempt to smuggle in hearsay. While an expert may rely on "facts or data" that "otherwise may be inadmissible" under the hearsay rules, Rule 703 does not permit an expert witness "to circumvent rules prohibiting hearsay" by "relying on . . . conversations with non-testifying witnesses . . . in order to prove 'the truth of the matter asserted'" about a fact. *United States v. Dukagjini*, 326 F.3d 45, 59 (2d Cir. 2003); *see also United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) ("The expert may not . . . simply transmit that hearsay to the jury."). "Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever, a practice that allows the [defendant] to circumvent the rules prohibiting hearsay." *Mejia*, 545 F.3d at 197 (internal quotation marks omitted); *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d at 547 ("[T]he opinions of these witnesses on the intent, motives, or states

30

of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise."). That is exactly what Price attempts here. (*See, e.g.*, Ex. B. at 9 ("I have personally interacted with users who bought or sold cryptocurrency using gift cards and prepaid debit cards. Often individuals used this method because it offered more privacy than linking a bank account to an exchange, in keeping with the privacy ethos present amongst many cryptocurrency enthusiasts.")). Simply "repeating hearsay evidence," *Mejia*, 545 F.3d at 197, from cryptocurrency forums and statements of nontestifying cryptocurrency purchasers has no "basis in any relevant body of knowledge or expertise," *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d at 547, and is not a proper basis for expert testimony.

Similarly, Price's opinions about the practices of international remittances are not the result of any recognized methodological expertise, but apparently of his collection of a variety of hearsay sources on the internet in preparation for this litigation. (Ex. B at 3 ("As the basis for my opinions, I relied on my extensive work experience relating to the cryptocurrency markets and on open-source research of the kind I have used over many years, including academic articles, publicly accessible cryptocurrency forums, written and video guides detailing methods used to buy and sell cryptocurrencies, and publicly accessible archives, including of the Paxful webpage.")). Reading "publicly accessible cryptocurrency forums," "written and video guides detailing methods used to buy and sell cryptocurrencies," and "the Paxful webpage" is not any recognized expert methodology; rather, it is the work of *lawyers and litigation consultants* seeking to assemble hearsay defense evidence, and is entirely improper as a basis for expert testimony.

Related to and underscoring the lack of any recognized expert methodology, none of Price's opinions is beyond the ken of the jury. Price does not propose to offer detailed and

specialized knowledge of, for example, the mechanics of cryptocurrency transactions, which might require technical or other specialized expertise. Instead, he seeks to testify about a series of alleged facts about the Paxful exchange and about the cryptocurrency marketplace more generally that—to the extent relevant and admissible, and much of it is not—must be proved by lay evidence, not provided with imprimatur of an expert. *See, e.g.*, *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d at 546 (experts should "not testify about lay matters"); *see also, e.g.*, *Mulder*, 273 F.3d 91, 101 (2d Cir. 2001) ("[T]he district court should not admit testimony that is directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help." (internal quotation marks omitted)).

The bulk of Price's proposed testimony is not opinion, but—improperly—simply a factual narrative regarding matters within the ken of the jury. "Acting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise, nor is such a narration traceable to a reliable methodology," and for that reason, "[m]ere narration . . . fails to fulfill *Daubert*'s most basic requirements." *United States v. Kaufman*, No. 19 Cr. 504 (LAK), 2021 WL 4084523, at *21 n.226 (S.D.N.Y. Sep. 7, 2021) (quoting *Tourre*, 950 F. Supp. 2d at 675). But this type of historical narrative is exactly what Price offers. (*See* Ex. B at 3-6 (providing history of cryptocurrency and peer-to-peer marketplaces beginning with the announcement of bitcoin "as a concept in a white paper published in late 2008"); *id.* at 6-8 (providing history of Paxful beginning with its launch in 2015)).

Indeed, much of Price's proposed testimony cannot even reasonably be characterized as an opinion at all, much less one offered through the application of expertise. *See United States v. Cuti*, 720 F.3d 453, 457-58 (2d Cir. 2013) (the "initial question" in distinguishing between fact

32

and expert testimony is "whether the contested testimony should be characterized as fact or opinion"). For example, whether "Paxful provided assurances that transactions on the platform were safe and legally compliant," let alone whether "[t]he site described security features including Know Your Customer (KYC) checks and on-chain transaction monitoring," (Ex. B at 3), or whether other cryptocurrency exchanges accept prepaid debit cards (Ex. B at 6), are simply factual questions, not even colorable matters of opinion at all. To the extent that either defendant wishes to prove, for example, that Paxful made certain factual representations that they relied upon, they must do so through admissible nonexpert evidence.[10] *See United States v. Rahman*, 189 F.3d 88, 136 (2d Cir. 1999) (affirming exclusion of expert testimony that "constituted an effort to tell the jury the defendant's intentions through the mouths of witnesses other than himself").

Similarly, Price's supposed opinion that gift cards "play an important role in international remittances" (Ex. B at 3) is not an expert opinion at all, but a fig leaf to cover a factual narrative—an account of the supposed behaviors of unidentified third parties—that Price attempts to cobble together from a variety of hearsay sources. Price's view that these payment methods are "important" is based on no recognized discipline but simply a review of internet hearsay materials.[11] Clearly, a factual narrative does not become an expert opinion just because the witness opines—without any methodology, recognized discipline, or specialized standards—that it is "important." Were it otherwise, any factual narrative could be smuggled into court in the guise of

---

[10] As discussed above and below, that evidence would need to be appropriately tied to the contemporaneous knowledge of the defendants in order to be relevant and admissible. Plainly, the defendants cannot offer press releases *post*-dating their conduct, as they appear to intend to do, as somehow explaining their conduct. Nor can they offer press releases from any time period without a connection to their contemporaneous knowledge.

[11] As discussed in Section III.C.5, below, it is also irrelevant whether such payment methods "play an important role in international remittances." (Ex. B at 3).

an expert's so-called opinion that the narrative, or an aspect of it, is "important."  To the extent that there is any probative value to the practices of third parties engaging in international remittances, those practices must be proved by admissible fact evidence.

In short, expert testimony that is not the product of expertise but is cumulative with the testimony of lay witnesses, including a defendant himself, is entirely improper.  *See Rahman*, 189 F.3d at 136; *United States v. Collins*, 581 F. App'x 59, 60 (2d Cir. 2014) (upholding district court's exclusion of expert testimony regarding a fact issue where the defendant "could alternatively [make his case as to that issue] through cross-examination of government witnesses," and the issue "was within the competence of a jury unassisted by opinion testimony"); *United States v. Mendlowitz*, No. 17 Cr. 248 (VSB), 2019 WL 6977120, at *7 (S.D.N.Y. Dec. 20, 2019) ("Because many of these witnesses had prior experience working for credit card processors or had knowledge generally about the industry because of their work history, there was no need for expert testimony related to industry practice.").  Yet that is precisely what Price proposes to offer here.

### 3.    *Price's Proposed Testimony Is Not Tied to the Defendants' Contemporaneous Knowledge*

Even if Price's proposed testimony took the form of a proper expert opinion, and even if it arguably involved any expertise, *none* of it is tied to the contemporaneous knowledge of either defendant, requiring its exclusion.  The supposed security features of the Paxful exchange, for example (*see* Ex. B at 7-8), are simply not relevant to the defendants' criminal intent if they were unknown at the time to the defendants.  *See, e.g.*, *United States v. Kaplan*, 490 F.3d 110, 121-22 (2d Cir. 2007) (holding district court erred in admitting evidence of one person's knowledge to show defendant's knowledge without evidence that defendant was aware of the same information, expressing doubt that evidence was relevant, and explaining that, in any event, it should have been

precluded under Rule 403 because it "required [the jury] to draw a series of inferences, unsupported by other evidence," yet was offered on "the ultimate issue in the case"); *United States v. Martoma*, 993 F. Supp. 2d 452, 455-56 (S.D.N.Y. 2014) (in insider trading case, excluding expert opinion that a stock was overvalued absent evidence that the defendant had himself conducted such analyses or been contemporaneously reading such analyses); *see also, e.g.*, *United States v. Campos*, 763 F. App'x 97, 100 (2d Cir. 2019) (precluding a defense witness on the basis that "what [the defense witness] knew or believed sheds little, if any, light on what [the defendant] knew or believed").

Price does not even attempt to provide such a linkage to the defendants. Indeed, as described above, he does not even purport to limit his testimony to pertinent areas or timeframes. (*See* Ex. B at 3 (describing white paper introducing bitcoin); *id.* at 5 (describing purported "paramount reason driving the global adoption of cryptocurrency"); *id.* at 6 (opining about activities of other cryptocurrency exchanges not at issue in this case); *id.* at 8-9 (opining about motives of persons buying cryptocurrency without any indication defendants interacted with any of those persons); *id.* at 10-11 (describing international remittances without any indication the defendants were aware of such practices)). If the defendants have competent evidence of their own alleged beliefs about the Paxful marketplace or other matters encompassed by Price's notice at the time of the offense conduct, then they can present that evidence if it is otherwise admissible. But what they may not do is put forth an expert to opine, with the benefit of hindsight, as to the existence of any such facts, thereby offering their supposed defense without either them or any other lay witness being subject to cross-examination. *See, e.g.*, *Mendlowitz*, 2019 WL 6977120, at *7 (expert properly precluded because "assuming that [the expert's] testimony was an

35

appropriate subject for expert testimony, its relevance hinged on [the defendant's] subjective knowledge of general industry practices in the payment processing industry."); *cf. United States v. Amawi*, 695 F.3d 457, 480 (6th Cir. 2012) (affirming exclusion of proposed expert testimony about "politics and cultural norms in the Middle East," and explaining that there was a "very weak link, if any" between his testimony and "the relevant states of mind of the defendants").

### 4. *Price's Proposed Testimony Improperly Seeks to Prove the Behavior and Motivations of Third Parties*

Even if the foregoing flaws were assumed away, a great deal of Price's proffered testimony is inadmissible under Rules 401 and 403 because it consists of irrelevant, confusing, and unfairly prejudicial evidence of the alleged behavior of *other persons* who are not parties or witnesses to this case. (*See, e.g.*, Ex. B at 5 (describing "privacy and individual financial sovereignty" as "a paramount reason driving the global adoption of cryptocurrency"); *id.* at 8 (describing "the philosophy of many cryptocurrencies users"); *id.* at 9 (describing reasons why unidentified persons bought or sold cryptocurrency using gift cards and prepaid debit cards); *id.* (describing "the privacy ethos present amongst many cryptocurrency enthusiasts")). Whether *other users* of the Paxful exchange sold gift cards, at a discount or otherwise, is not tied to an issue the jury will be asked to decide, and is a classic example of wholly irrelevant and improper supposed evidence. *See United States v. Berg*, 710 F. Supp. 438, 445 (E.D.N.Y. 1989) ("[T]he custom of other arms dealers in complying with arms export laws is irrelevant to the state of mind of [the defendants] . . . . ."), *aff'd in part, rev'd in part on other grounds sub nom. United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991); *United States v. Oldbear*, 568 F.3d 814, 821 (10th Cir. 2009) (affirming preclusion of evidence in embezzlement case as to how persons other than the defendant used funds because "only [the defendant's] actions and state of mind were material to her guilt"); *cf. United States v.*

36

*Sanders*, No. 12 Cr. 574 (LAK), 2013 WL 1421487, at *2 (S.D.N.Y. Mar. 27, 2013) (precluding proposed expert testimony as to "custom and usage in the insurance industry" as irrelevant to the question of whether "inaccurate information allegedly supplied by the defendant was not material to the insurance carriers").

Indeed, introducing alleged evidence of other transactions by nonwitnesses, such as Price's description of viewing archives of trades offered by other persons (Ex. B at 7-8), let alone his interaction with other cryptocurrency traders about their own motivations for their own trades (*id.* at 9), would invite an endless series of minitrials about whether those other transactions were relevantly similar to the defendants' transactions, or potentially even whether those other transactions were legal. For good reason, Rules 401 and 403 bar this sort of sideshow. *See, e.g.*, *Mendlowitz*, 2019 WL 6977120, at *5 ("the fact that certain conduct may be common or general practice in an industry was not relevant to the jury's consideration of the conduct of [the defendant], and is not a defense to wire fraud"); *United States v. Connolly*, No. 16 Cr. 370 (CM), 2019 WL 2125044, at *13 (S.D.N.Y. May 2, 2019) ("'[E]verybody is doing it' is not a defense to the crime of wire fraud or conspiracy to commit wire fraud; just as 'everybody speeds' is not a defense if your car happens to get picked up on the radar."); *United States v. White*, No. 02 Cr. 1111 (KTD), 2003 WL 721567, at *7 (S.D.N.Y. Feb. 28, 2003) (evidence focusing "on whether others may have committed uncharged crimes" is a "waste of time and thus is totally irrelevant"); *cf., e.g.*, *United States v. Rosado*, 728 F.2d 89, 93 (2d Cir. 1984) (criticizing admission of evidence about the propriety of a prosecution "for turning the trial away from a determination of whether the elements of the offense charged had been proved beyond a reasonable doubt into a wide-ranging inquiry into matters far beyond the scope of legitimate issues in a criminal trial").

As irrelevant as the behavior of *other* Paxful users is, even more irrelevant is evidence about the behavior of users of *other cryptocurrency exchanges*, or what terms were offered on those exchanges. (*See* Ex. B at 6 (describing features of "Binance P2P, Bybit P2P, and OKX P2P")). There is simply no probative value to such testimony about what other participants in the industry intend, which says nothing about what *the defendants* intended. *See United States v. Newkirk*, 684 F. App'x 95, 97 (2d Cir. 2017) (affirming district court's exclusion of expert testimony concerning "customary industry practices" as irrelevant to the defendant's "obligations not to convey information [he] actually know[s], or consciously avoid[ed] knowing, is false—the only two theories on which the jury was instructed that it could convict"); *Sanders*, 2013 WL 1421487, at *2; *Mendlowitz*, 2019 WL 6977120, at *5 (precluding expert testimony on the "general industry practices in the payment processing industry" as not relevant to whether the defendant violated the wire fraud statute). Such testimony is highly likely to confuse and complicate issues for the jury unnecessarily, if not invite jury nullification outright. *See Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469-70 (S.D.N.Y. 2005) (rejecting expert's attempt to speculate "regarding the state of mind and motivations of certain parties" and as to the "knowledge possessed by defendants and non-parties").

5.    *Price's Proposed Testimony Is Also Inadmissible Under Rule 403 Because It Lacks Fit to This Case*

Even if it was not otherwise inadmissible on multiple grounds (and it is), much of Price's testimony lacks any fit to the central issues to be tried in this case, which concern whether the defendants conspired to engage in specific transactions with the proceeds of specified unlawful activity when they bought stolen prepaid cards from bulk card sellers, not the reasons that other unidentified persons prefer cryptocurrency or use gift cards to send money to their family members

38

abroad. *Boucher*, 73 F.3d at 21 ("expert testimony should be excluded if it is . . . [*inter alia*] in essence an apples and oranges comparison" (internal quotation marks omitted)); *see also LVL XIII Brands*, 209 F. Supp. 3d at 642 (expert opinion inadmissible where it is "a mismatch for the facts" of the case). This case does not concern the reasons why cryptocurrency was adopted or became popular (Ex. B at 3-5), why some cryptocurrency users prefer to retain their own private keys (*id.* at 5-6), why Paxful was for a time a commercially successful business (*id.* at 6-7), or why individuals in the United States may use gift cards to remit funds to family members abroad (*id.* at 10-11). Opinions premised on inapplicable facts or addressing irrelevant issues should in any event be excluded under Rule 403, as any slight hypothetical probative value is greatly outweighed by the risk of unfair prejudice, juror confusion, and waste of time in presenting evidence about practices far afield from the defendants' conduct.

Even if any hypothetical practices of third parties bore any relevance to the case (and Guan, who bears the burden, fails to identify any such relevance), the specific practices Price describes do not. The jury will not be asked to pass upon the practice, for example, of international remittances to family members (Ex. B. at 10-11), which bear no resemblance to the issues to be tried here. *See United States v. Bankman-Fried*, No. S6 22-CR-0673 (LAK), 2023 WL 6162865, at *2 (S.D.N.Y. Sept. 21, 2023) ("whether or not FTX was innovative or combined aspects of traditional and decentralized finance in its services is not at issue in this case"); *United States v. Chastain*, No. 22 Cr. 305 (JMF), 2023 WL 2966643, at *9 (S.D.N.Y. Apr. 17, 2023) (precluding expert testimony about the academic definitions of certain finance terms and a comparison between those terms and the information in the case because such testimony had "limited or no bearing on the issues in this case," and any probative value was "substantially outweighed by the dangers of

39

confusing or misleading the jury"). Indeed, the practices of international remittances simply do not fit the facts that will be proven at trial, given that the defendants did not buy gift cards and prepaid debit cards from relatives of United States residents receiving remittances, but instead bought cards in the name of third persons from bulk card sellers (indeed, bulk sellers of stolen cards). *See, e.g.*, *LVL XII Brands*, 209 F. Supp. 3d at 642 (excluding expert testimony as "mismatch for the facts of this case" where the expert's definition of the relevant market was contrary to evidence). Instead of responding to the issues to be tried, this aspect of Price's testimony appears intended only to paint a wide range of superficially similar transactions with a veneer of legitimacy, which is an impermissible purpose for expert testimony.

## IV.  THE COURT SHOULD PRECLUDE THE PROPOSED EXPERT TESTIMONY OF JAMES SHANAHAN

### A.  Background

Guan has also noticed James Shanahan, a payments industry consultant, to provide expert testimony regarding chargebacks, a procedure wherein holders of payment cards such as credit or debit cards can dispute, and potentially reverse, transactions made with their cards. (*See* Ex. C at 3-5).[12] Since fraud is one of the grounds on which a cardholder can initiate a chargeback (though not the only ground), some of the stolen funds that the Media Entities received during the course of the money laundering scheme were the subject of chargebacks, and some of the Government's

---

[12] In addition to Price and Shanahan, Guan has also noticed the testimony of David Gannaway to testify regarding certain flows of funds. The noticed testimony does not appear to be expert testimony—and Guan's counsel agrees that it does not constitute expert testimony—but rather summary witness testimony. On the understanding that Gannaway will not seek to offer any expert opinions, or to be qualified as an expert, the Government does not herein move to preclude them, but reserves the right to seek to preclude any expert opinions from Gannaway should the defense subsequently attempt to offer them and to object otherwise under the Federal Rules of Evidence.

evidence will concern such chargebacks.  The evidence will show that Guan, Hung, and their co-conspirators took a variety of measures to prevent defrauded cardholders from recovering their funds through chargebacks, including by attempting to contest the chargebacks by making a series of false and misleading statements to banks.  Beyond contesting chargebacks when they happened, the defendants also took steps to prevent chargebacks from ever being initiated by layering the fraud proceeds through a series of financial accounts established with stolen identities before transferring them to the Media Entities.  (*See, e.g.*, Guan Indictment ¶ 8 (describing layered transactions); Hung Indictment ¶ 5 (describing use of stolen identities in layered transactions); *see also, e.g.*, GX 2101TR-UR (translated instruction spreadsheet directing MMO Team to use layered transactions)).  Because countermeasures such as these prevented the defrauded cardholders from being aware that their funds went to the Media Entities—let alone charging them back from the Media Entities—the vast majority of the fraud proceeds received by the Media Entities was not subject to any chargebacks at all.

Shanahan's proposed testimony includes background testimony defining chargebacks and explaining the process for initiating and resolving a chargeback.  (Ex. C at 3-5).  Those opinions, at least in large part, are substantively unobjectionable, although should be precluded as cumulative with fact testimony.  But regardless of whether this limited testimony is admissible, Shanahan also appears to intend to offer a series of opinions intended to improperly communicate to the jury that industry standards on chargebacks govern the jury's determination whether the money laundering charges in this particular case are proven.  That is entirely improper, as well as inevitably deeply confusing to the jury.  For example, Shanahan proposes to testify that "[c]hargebacks are commonplace within the card industry," with "an estimated 261 million

41

chargebacks globally in 2026 with an estimated value of $33 billion" (Ex. C at 5), and opines that

it is "commonly agreed in the card industry that an acceptable chargeback rate is below 1%." (Ex.

C at 6). Shanahan also proposes to testify that "[b]usinesses with chargeback rates lower than 1%

are considered lower risk," and that "the chargeback rate for travel businesses is 0.89% and the

chargeback rate for Mexico is 2.81%." (Ex. C at 6).

In addition to testifying about industry-wide rates and standards regarding chargebacks,

Shanahan proposes to testify about his review of fourteen merchant accounts associated with the

Media Entities, and the aggregate number of chargebacks during that time period compared to the

total number of transactions in those accounts. (Ex. C at 6). Shanahan proposes to testify that the

"overall rate by number of transactions of 0.68%" is only slightly over the estimated average global

chargeback rate and "significantly below the chargeback rate which occurs in other types of

businesses such as travel and in other countries such as Mexico." (Ex. C at 6). Shanahan also

opines that the "chargebacks [in this case] were also concentrated in just a few merchant accounts,

suggesting that there was a specific cause that drove chargebacks that was not experienced in the

accounts as a whole" (Ex. C at 6), and in a certain time period during the charged scheme ("from

July 2020 to January 2021"), "suggesting a specific cause limited to this time period" (Ex. C at 7),

and finally opines that "the chargeback rate typically fell to low levels in the months after it spiked,

suggesting that [the Media Entities'] management was able to take remedial actions to reduce

chargeback rates after they increased" (id.).

## B.    Discussion

Shanahan's testimony improperly seeks to suggest to the jury that industry practices on

chargebacks are the appropriate standard for them to evaluate the defendants' conduct, and to do

so through a series of particularly misleading apples-to-oranges comparisons. It should thus be

42

precluded.  And the portion of Shanahan's proposed testimony that constitutes otherwise relevant background facts regarding the definitions and procedures governing the chargeback process is improperly cumulative with the fact testimony and should be proved through fact evidence, not through expert opinion.

> 1. *Shanahan's Proposed Background Testimony Is Within the Ken of the Jury and Cumulative with the Testimony of the Fact Witnesses*

Although certain background facts to which Guan proposes Shanahan testify—consisting of basic definitions of the concept of chargebacks and the procedures for initiating and resolving a chargeback—appear to be relevant, they do not require expert testimony and the Government expects they will "impermissibly mirror[] the testimony offered by fact witnesses," *Amuso*, 21 F.3d at 1263, who will testify regarding basic concepts regarding chargebacks.  Accordingly, they should, consistent with the approach taken in multiple other cases, be excluded as cumulative with the testimony of the fact witnesses.  *See, e.g.*, *Collins*, 581 F. App'x at 60; *Mendlowitz*, 2019 WL 6977120, at *7; *Sanders*, 2013 WL 1421487, at *2 (precluding expert testimony regarding industry practice, reasoning, "Nor would such testimony be helpful to the jury, especially given the abundant evidence thus far offered by percipient witnesses[.]").  Should there be some aspect of this portion of the testimony that the defense believes has not adequately been brought out through the Government's case, including through cross-examination of the Government's witnesses, the defense can offer admissible fact (not expert) evidence on these matters.

> 2. *Shanahan's Opinions Regarding Chargeback Thresholds, Chargeback Prevalence, and Chargebacks in the Media Entities' Accounts Are Improper, Confusing, and Unfairly Prejudicial*

Even if Shanahan's testimony was appropriate as to background facts governing chargebacks, the remainder of Shanahan's proposed expert testimony (*i.e.*, Sections III.E-F and

IV-V of his notice) goes well beyond the bounds of appropriate expert testimony by: improperly suggesting to the jury that industry practices on chargebacks are the appropriate standard for it to evaluate the defendants' conduct; evaluating the chargebacks at the Media Entities' bank accounts using specious apples-to-oranges comparisons; serving as a vessel to introduce evidence of the defendants' alleged "good act" conduct; and drawing purportedly exonerating, and wholly improper, factual inferences about the defendants' conduct and intentions.  (*See* Ex. C at 5-7).[13]

a)      <u>Expert Industry Practice Evidence Regarding Chargebacks is an Improper and Unfairly Prejudicial Attempt to Communicate a Legal Standard</u>

Shanahan should not be permitted to opine on industry practices concerning threshold levels of chargebacks, let alone to suggest that chargebacks under a particular industry standard are "acceptable."  (Ex. C at 6).  Doing so is a classic example of using industry practice to attempt to communicate, or substitute for, a legal standard—and to suggest improperly that supposed compliance with such a standard is a defense to a criminal charge.  *See, e.g.*, *Mendlowitz*, 2019 WL 6977120, at *5, *7 (precluding expert testimony on the "general industry practices in the payment processing industry," reasoning, "the risk of prejudice was high since there was a likelihood of jury confusion that the standard against which [the defendant's] conduct was to be measured was industry practice rather than whether his conduct violated the wire fraud statute"); *Newkirk*, 684 F. App'x at 97 (affirming district court's exclusion of "expert testimony regarding customary industry practices" which was irrelevant to the jury's task of assessing whether the defendant knowingly conveyed false information); *Sanders*, 2013 WL 1421487, at *2 (precluding

---

[13] The Government refers to the relevant sections of Shanahan's notice as Sections III.E-F, even though what the Government construes to be Section III.F is captioned as a second Section III.E due to an apparent typographical error.  (*See* Ex. C at 5).

44

proposed expert testimony as to "custom and usage in the insurance industry" as irrelevant to the question of whether "inaccurate information allegedly supplied by the defendant was not material to the insurance carriers" and unhelpful to the jury "given the abundant evidence thus far offered by percipient witnesses"); *cf. Hygh*, 961 F.2d at 364 ("Even if a jury were not misled into adopting outright a legal conclusion proffered by an expert witness, the testimony would remain objectionable by communicating a legal standard—explicit or implicit—to the jury."); *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (holding expert testimony "must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it"); *id.* at 1295 ("[T]estimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissible, and may not be made so simply because it is presented in terms of industry practice.").

Although some fact evidence regarding chargebacks is appropriate, Shanahan's industry practice testimony must be precluded to avoid the jury being confused into believing that the inquiry is whether the Media Entities complied with payment card industry standards, rather than whether the defendants conspired to transact in the proceeds of specified unlawful activity, that is, whether they complied *with the law*. *Mendlowitz*, 2019 WL 6977120, at *7. The Government's factual evidence likely will include contemporaneous statements of witnesses regarding the relevant chargeback thresholds (which the Media Entities often exceeded), so the jury will be aware of them as a factual matter. They defendants may also attempt to elicit admissible fact evidence of their contemporaneous beliefs about chargebacks, such as through their own testimony. These forms of presenting the evidence is not only appropriately tied to the applicable

chargeback thresholds for the relevant accounts, but it also poses a far lower risk of causing "jury confusion that the standard against which [the defendant's] conduct was to be measured was industry practice," *Mendlowitz*, 2019 WL 6977120, at \*7. In any case, the mere fact that expert testimony on the chargeback threshold would be cumulative of the fact evidence is itself grounds for preclusion. *See, e.g.*, *id.* ("Because many of these witnesses had prior experience working for credit card processors or had knowledge generally about the industry because of their work history, there was no need for expert testimony related to industry practice."); *Collins*, 581 F. App'x at 60.

To the extent that Guan intends Shanahan's testimony regarding the prevalence of chargebacks to seek to rebut some hypothetical argument that the presence of a single chargeback, by itself, made Guan aware that he was transacting in criminal proceeds, the Government does not intend to make such a strawman argument. Guan's awareness that the funds were criminally derived will be proven by a variety of means, including by numerous direct reports from whistleblowers, bank investigators, and law enforcement officers; Guan's own false and misleading statements regarding the transactions to banks and lawyers; Guan's communications with Hung and other co-conspirators; Guan's awareness of specific customer complaints made directly to the Media Entities and the Media Entities' false and misleading statements to those complaining customers; and—as one factor among many—the high volume of chargebacks, in many cases leading to bank inquiries and account restrictions, as well as Guan's actions organizing and drafting a series of false and misleading statements to banks disputing those chargebacks.

Accordingly, while the Government does not object to limited *fact* evidence, if it is tied to the defendants' contemporaneous knowledge, tending to show that chargebacks are not such an extraordinarily rare and anomalous phenomenon that the presence of some small volume of

chargebacks would, by itself and in isolation, prove that that funds are stolen, this is not a proper subject for expert testimony at all. *See, e.g.*, *Amuso*, 21 F.3d at 1263; *Collins*, 581 F. App'x at 60; *Mendlowitz*, 2019 WL 6977120, at *7; *Sanders*, 2013 WL 1421487, at *2. But in no event should Shanahan be permitted to introduce expert opinions regarding the prevalence of chargebacks worldwide (not tied to the defendants' contemporaneous knowledge), which can only serve to attempt to distract and prejudice the jury, and improperly suggest that chargebacks cannot be an indication of fraud so long as they fall within the thresholds established by industry practice. *See, e.g.*, *Mendlowitz*, 2019 WL 6977120, at *5; *Connolly*, 2019 WL 2125044, at *13.

Moreover, even if otherwise proper (and it is not), Shanahan's opinions about the prevalence and volume of chargebacks worldwide necessarily rests on the behavior and knowledge of other, uncharged individuals, about whom there is no indication that the defendants contemporaneously knew. That too renders those opinions inadmissible. *See, e.g.*, *Mendlowitz*, 2019 WL 6977120, at *5 ("the fact that certain conduct may be common or general practice in an industry was not relevant to the jury's consideration of the conduct of [the defendant], and is not a defense to wire fraud"). It is well settled that evidence that "everybody does it" is improper, distracting the jury from its task in evaluating the defendants' conduct and risking endless minitrials about whether the behavior of other individuals was truly comparable, or whether it was legal. *Connolly*, 2019 WL 2125044, at *13. And of course, evidence of the global volume of chargebacks in 2026, as Shanahan offers (Ex. C at 5), is simply irrelevant to a trial of a scheme that ended years earlier. That he does not even attempt to limit his analysis to the pertinent time period is telling. Guan is not proposing to offer relevant evidence. He is proposing to seek to deeply confuse and distract the jury. He is not entitled to do so.

b)   <u>Shanahan's Analysis of the Media Entities' Chargeback Rates
Makes Apples-to-Oranges Comparisons, Ignores Relevant
Evidence, and Seeks to Suggest Good Acts of the Defendant</u>

Shanahan's analysis of the Media Entities' chargebacks should also be precluded because it makes numerous apples-to-oranges comparisons, neglects contrary evidence, and amounts to impermissible presentation of evidence of a defendant's good acts, including the expert's sheer speculation—purely from the patterns of chargebacks observed in the Media Entities' accounts— that Guan took innocent remedial actions.

Shanahan's assessment of the rate of the Media Entities' chargebacks is improper because it makes numerous apples-to-oranges comparisons.  *Boucher*, 73 F.3d at 21 ("expert testimony should be excluded if it is . . . [*inter alia*] in essence an apples and oranges comparison" (internal quotation marks omitted)).  First, because chargebacks may be initiated for reasons other than fraud, the total number of all chargebacks (regardless of whether they were fraud) is irrelevant to the charged offenses.  Second, even limiting the analysis to fraud chargebacks, the *rate* of those chargebacks—*i.e.*, the number of chargebacks divided by the total number of transactions—is irrelevant and extremely likely to confuse the jury.  The money laundering statute does not require that *any* specific proportion or percentage of transactions involve the proceeds of crime.  *See, e.g.*, *United States* v. *McGauley*, 279 F.3d 62, 71 (1st Cir. 2002) (upholding money laundering conviction for transfer of $49,000, of which only $155 was fraud proceeds, rejecting "*de minimis* exception" to money laundering statute); *United States v. Ward*, 197 F.3d 1076, 1083 (11th Cir. 1999); *United States v. Jackson*, 983 F.2d 757, 768 (7th Cir. 1993).  Nor does the Government intend to argue that every chargeback in this case flowed from fraud.

In short, Guan is not entitled to present testimony that suggests that it is acceptable to engage in transactions involving fraudulently obtained property so long as one also engages in a

48

large volume of transactions *not* involving such property.[14]   Indeed, evidence of legitimate transactions is classic improper evidence of "good acts."  *United States v. Damti*, 109 F. App'x 454, 455–56 (2d Cir. 2004) ("evidence of past 'good acts' by a defendant is generally not probative"; precluding evidence of legitimate transactions even where the Government argued that ten specific fraudulent transactions were "representative of a substantial portion of" a larger volume of transactions); *United States v. Boykoff*, 68 F. App'x 15, 20–21 (2d Cir. 2003) ("[E]vidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant."); *United States v. Scarpa*, 913 F.2d 993, 1010 (2d Cir. 1990) (observing that "good acts" evidence "would only be relevant if the indictment charged [defendants] with ceaseless criminal conduct").  Evidence that a defendant may have acted lawfully on some occasions is simply not relevant to charges that the defendant acted unlawfully on others.  *See, e.g.*, *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999) (affirming district court's refusal to allow defendant accused of preparing false asylum applications to admit evidence of truthful applications he had allegedly submitted, because whether the defendant "had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent"); *United States v. Chambers*, 800 F. App'x 43, 46 (2d Cir. 2020) (rejecting defense argument that defendant's "running of a legitimate law practice makes it less likely that he had corrupt intent" to pay bribes as "precisely the type of propensity inference that Rule 404(b)(1) is intended to prohibit").  And even if any such comparison were appropriate (it is not), it is the essence of an improper "apples-to-oranges" comparison, *Boucher*, 73 F.3d at 21 (internal quotation

---

[14] Moreover, as described below, a number of the transactions that did not involve chargebacks nevertheless did involve criminal property.

marks omitted), to compare the business of the Media Entities to other very different businesses like the travel industry (Ex. C at 6), which was not the Media Entities' business, or businesses in Mexico (*id.*), which was not the Media Entities' location.

Shanahan's testimony on the Media Entities' rate of chargebacks is an even worse fit for the case because the majority of the transactions involving stolen funds did not result in chargebacks at all. Indeed, the Government expects it will show that, as alleged in the indictments, numerous such transactions involved funds that, after being fraudulently obtained, were routed through nominee accounts controlled by the defendants' co-conspirators before being transferred, by the nominee account, to the Media Entities. (*See, e.g.*, Guan Indictment ¶ 8 (describing "multiple layered transactions designed to conceal the unlawful origins of the funds"); Hung Indictment ¶ 5 ("Members of the MMO Team and other scheme participants moved the crime proceeds into the Media Entities' accounts through tens of thousands of layered transactions, utilizing, among other things, prepaid debit cards and financial accounts that were opened using stolen identification information, including the personal identification information of U.S. residents."); *see also, e.g.*, GX 2101TR-UR (translated instruction spreadsheet directing MMO Team members "Don't make donation from an account that received money directly from the seller" and "Transfer money from the 'Received/Receiving' account to the 'Donation' account then create a secondary card, transfer money from the primary card of the Donate account to the secondary card and then donate.")). As a result, fraud victims could dispute only the transfer of their own funds to the *nominee* account (which was typically created using a stolen identity), but would be entirely unaware of, and certainly unable to charge back, the nominee account's transfer to the Media Entities.

Accordingly, as inappropriate as it would be to compare fraud chargebacks (let alone all chargebacks) to the volume of legitimate transactions, Shanahan's opinions ignore that the layered transactions alleged in the indictments mean that many of the supposedly legitimate, non-chargeback transactions in the Media Entities accounts were not legitimate at all. An expert opinion that ignores highly relevant explanations or evidence in this fashion is methodologically unreliable and should be precluded. "[E]ven though an expert need not rule out every potential cause in order to satisfy *Daubert*, the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant." *Davids v. Novartis Pharms. Corp.*, 857 F. Supp. 2d 267, 278 (E.D.N.Y. 2012) (internal quotation marks omitted); *see also, e.g.*, *In re Mirena Ius Leyonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 242 (S.D.N.Y. 2018) ("Where an expert ignores evidence that is highly relevant to his conclusion . . . exclusion of the expert's testimony is warranted."), *aff'd*, 982 F.3d 113 (2d Cir. 2020); *United States v. Smith*, No. S2 25 Cr. 4 (PAE), 2026 WL 128134, at *11 (S.D.N.Y. Jan. 16, 2026) (expert's failure to consider relevant evidence was "a glaring lapse that renders his conclusion . . . so fundamentally unsupported that it can offer no assistance to the jury." (internal quotation marks omitted)).

Finally, Shanahan's opinions are not limited to the chargebacks themselves but instead appear to involve vouching for the innocent mental state of Guan, which he believes he can divine from the simple fact that chargeback rates dropped after spiking. (Ex. C at 7 ("the chargeback rate typically fell to low levels in the months after it spiked, suggesting that [the Media Entities] management was able to take remedial actions to reduce chargeback rates after they increased")). This factually untethered speculation that a defendant took innocent action is tantamount to an

opinion as to the defendant's intent, which is prohibited under blackletter law. Fed. R. Evid. 704(b); *see also, e.g.*, *United States v. DiDomenico*, 985 F.2d 1159, 1164 (2d Cir. 1993) (excluding expert from testifying on defendant's intent notwithstanding "semantic camouflage" to avoid literally stating it). Shanahan, of course, is neither an expert on Guan's mental state nor a witness to Guan's actions, and should not be permitted to offer evidence that would be an end run around Guan or other lay witnesses testifying. *See, e.g.*, *Long*, 917 F.2d at 701-02 (it was an abuse of discretion to permit an expert to testify about facts that could have been testified to by a lay witness); *Rahman*, 189 F.3d at 136. In any event, whatever inferences can be drawn as to the defendants' intent from their measures to reduce chargebacks (which typically involved switching to payment methods that would prevent cardholders from being able to know, or challenge, that their funds went to the Media Entities at all) are "interpretations of conduct" that are well within the ken of the jury and not the proper subject of expert testimony. *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d at 541.[15]

## V.    THE DEFENDANTS SHOULD BE PRECLUDED FROM OFFERING ARGUMENT CONCERNING ALLEGED RELIANCE ON THE ADVICE OR APPROVAL OF COUNSEL WITHOUT MEETING THE REQUIREMENTS FOR AN ADVICE-OF-COUNSEL DEFENSE

Although the Government does not expect the defendants to raise an advice-of-counsel defense, they should, in any event, be precluded from making any argument that they relied on the express or implicit advice or approval of counsel in engaging in the charged conduct—*i.e.*,

---

[15] This would not be the first time that Shanahan has offered inadmissible expert testimony that was excluded. *See First Premier Bank v. Future Card Ltd.*, No. 02 Civ. 4054 (LLP) (D.S.D. Dec. 7, 2004) (ECF No. 194) (excluding expert testimony, ruling, "After reviewing the materials submitted by the parties and considering the arguments of counsel, the Court has determined that the expert witness report of James Shanahan is overbroad, resulting in portions of the anticipated testimony being unreliable under Rule 702 and [*Daubert*].").

argument seeking to give them the benefit of the advice-of-counsel defense without actually meeting the strict legal requirements of that defense.[16]

A.     Background

The Government may offer evidence that, during the course of the charged scheme, defendant Guan made misrepresentations to two attorneys representing the Media Entities in an apparent attempt to procure what he could then represent as a supposed legal opinion authorizing one or more aspects of the charged conduct.

In October 2019—after Guan had been funding the MMO Team's purchase of stolen prepaid cards for months, and just days after a whistleblower report seeking to stop the MMO Team was forwarded to Guan—Guan contacted an outside attorney representing the Media Entities ("Attorney-1") and asked, "If a company purchases a large quantity, for example, $10,000 per day, of prepaid cards/gift cards at a discounted price and cashes them by using its own credit card machine/system, is it a legal business or not?"  (GX 1A-2).  When Attorney-1 asked several follow-up questions, including, "How is the company able to buy discounted cards?", Guan did not respond for several months.  (*Id.*).  When Guan finally responded in January 2020, Guan gave Attorney-1 the following false and misleading answers:

> How is the company able to buy discounted cards?  What I said
> before wasn't accurately.  Let me tell you more accurately.  Here is
> how the business would work:
> First step, we purchase bitcoins.

---

[16] The defendants' notices of affirmative defenses are due today.  (Dkt. 120).  From its correspondence with counsel in connection with the requests to charge, the Government does not expect either defendant to give notice that he intends to raise an advice-of-counsel defense, nor has either defendant produced any documents to the Government suggesting that such a defense is forthcoming.  Should either defendant do so by today's Court-ordered deadline, the Government respectfully reserves the right to file an additional motion to ensure that the legal requirements for invoking the defense are met.

53

> Second step, we purchase prepaid gift cards at its face value (no discount) with bitcoins.
> Last step, we cash the gift cards on our website.
> We could make a profit or loss because the price of bitcoin fluctuates.

(*Id.*).  These statements falsely and misleadingly denied the existence of the substantial discount at which the MMO Team obtained the stolen funds (*see* Guan Indictment ¶ 8 (alleging that crime proceeds were sold at 80 cents or less per dollar)), and presented this business as a prospective plan under consideration, rather than an operation that had been ongoing for months.  Moreover, this account misleadingly omitted that the proceeds would be transferred to the Media Entities as so-called charitable donations—when they plainly were not.

Later in January 2020, after not receiving a response from Attorney-1, Guan asked another attorney representing the Media Entities ("Attorney-2") the same question, repeating nearly verbatim the false and misleading account of the transactions that he had provided to Attorney-1. (*See* GX 1A-18).  Attorney-2 warned Guan of the high-risk nature of the activity, and gave a highly conditional opinion that "it appears that it is not a legal issue, *unless you know that the gift cards that are being purchased have been stolen* or are counterfeit which would make you the receiver of stolen property."  (*See id.* (emphasis added)).

Having made false and misleading statements to Attorney-2 to obtain that conditional opinion, Guan proceeded to distort it as a justification for his illegal scheme.  Later in 2020, when an employee of the Media Entities ("Employee-1") questioned Guan about a series of complaints by fraud victims whose funds had been sent to the Epoch Times without authorization, Guan told Employee-1 a limited and highly sanitized account of the MMO Team's activities and then falsely assured Employee-1 that he had been advised that the activities were not illegal.  In disregard of Attorney-2's admonition that the knowing receipt of stolen funds was illegal, however, Guan did

not change the MMO Team's activities upon receiving these complaints—among many other complaints—that the cards were stolen, and did not return to either Attorney-1 or Attorney-2 to seek further advice in light of these complaints.

### B.        Applicable Law

####      1.        *Good Faith – Generally*

When fraudulent or wrongful intent or willfulness is an element of an offense charged, a defendant may request a "good faith" instruction that specifies that acting based on an honestly held belief negates the element of intent with respect that that offense.  *See* Sand *et al.*, *Modern Federal Jury Instructions*, Instr. 8-01.

However, such an instruction is not applicable to charges that lack such an element.  *See, e.g.*, *United States v. Svoboda*, 633 F.3d 479, 484 (6th Cir. 2011) (instruction not applicable where defendant was charged with presenting false identification, because the offenses required only that the defendant acted "knowingly"); *United States v. Ansaldi*, 372 F.3d 118, 128 (2d Cir. 2004) (instruction not applicable where defendants were charged with distributing and possessing with intent to distribute a controlled substance, because that offense requires only that the defendant act "knowingly or intentionally"), *abrogated on other grounds by McFadden v. United States*, 576 U.S. 186 (2015).  For such "general intent" statutes, "the background presumption that every citizen knows the law makes it unnecessary to adduce specific evidence to prove that 'an evil-meaning mind' directed the 'evil-doing hand.'"  *Bryan v. United States*, 524 U.S. 184, 193 (1998).  A "good faith" instruction has no place when such offenses are charged, because the government must prove only (at most) the defendant's knowledge of the facts comprising the offense, that is, "knowledge with respect to the *actus reus* of the crime," *Carter v. United States*, 530 U.S. 255,

269 (2000), not that the defendant acted with any specific intent in committing the crime. *See generally United States v. George*, 386 F.3d 383, 389-96 (2d Cir. 2004).

### 2.    *Advice-of-Counsel Defense*

The advice-of-counsel (or as it is sometimes described, reliance-on-counsel) defense is a more specific form of the defense of good faith, available in limited circumstances in which a good faith instruction may otherwise be applicable. *See, e.g.*, *United States v. Greenspan*, 923 F.3d 138, 146 (3d Cir. 2019); *see also* Sand *et al.*, *Modern Federal Jury Instructions*, Instr. 8-04. Advice-of-counsel "is not a free-standing defense." *United States v. Van Allen*, 524 F.3d 814, 823 (7th Cir. 2008) (internal quotation marks omitted).

To establish a colorable advice-of-counsel defense, and thus be entitled to a jury instruction with respect to those offenses to which it may apply, the defendant must be able to identify admissible evidence that:

> 1. Before taking action, he in good faith sought the advice of an attorney whom he considered competent to advise him on the matter; and
> 2. He consulted this attorney for the purpose of securing advice on the lawfulness of his possible future conduct; and
> 3. He made a full and accurate report to his attorney of all material facts that he knew; and
> 4. He then acted strictly in accordance with the advice of this attorney.

*United States v. Scully*, 877 F.3d 464, 478 (2d Cir. 2017) (In addition to the model instruction in Sand *et al.*, *Modern Federal Jury Instructions*, "[w]e also refer district courts to the model instructions drafted by our sister circuits, particularly the Seventh Circuit's model, which reads [as set forth above]."); *see also Williamson v. United States*, 207 U.S. 425, 453 (1908); *United States v. Colasuonno*, 697 F.3d 164, 181 (2d Cir. 2012); *United States v. Evangelista*, 122 F.3d 112, 117 (2d Cir. 1997); *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1194 (2d Cir. 1989).

"Each requirement must be satisfied." *Colasuonno*, 697 F.3d at 181. Where the defendant fails to meet one or more requirements, he is not entitled to a jury instruction. *Id.*; *see also, e.g.*, *Greenspan*, 923 F.3d at 146-47; *Scully*, 877 F.3d at 476; *Evangelista*, 122 F.3d at 117. Nor is he entitled to argue, directly or indirectly, that he has such a defense. *See, e.g.*, *United States v. Quinones*, 417 F. App'x 65, 67 (2d Cir. 2011) (affirming denial of instruction and order precluding defense from arguing advice of counsel; "defendants are not entitled to such an instruction unless there are sufficient facts in the record to support the defense," and "the defendants [in this case] have not shown the required factual predicate for an advice-of-counsel defense"); *United States v. Atias*, No. 14 Cr. 403 (DRH), 2017 WL 563978, at *3 (E.D.N.Y. Feb. 10, 2017) ("All available information indicates that the [pertinent] attorney represented [another], not defendants. Accordingly, the term 'advice of counsel' should not be employed in referring to [the attorney]. Doing so would be legally inappropriate and likely to mislead the jury.").

In short, the "situations in which the advice-of-counsel defense may be employed are severely limited." *Lurie v. Wittner*, 228 F.3d 113, 134 (2d Cir. 2000).

3.    *Notice of and Discovery Concerning an Advice-of-Counsel Defense*

Given the complexity and potential issues concerning an advice-of-counsel defense, courts routinely order defendants to provide notice of whether they intend to advance such a defense in advance of trial, and, if so, to provide discovery materials concerning the defense. *See, e.g.*, *United States v. Scali*, No. 16 Cr. 466 (NSR), 2018 WL 461441, at *8 (S.D.N.Y. Jan. 18, 2018). That "disclosure should include not only those documents which support [the] defense, but also all documents (including attorney-client and attorney work product documents) that might impeach or undermine such a defense." *United States v. Hatfield*, No. 06 Cr. 550 (JS), 2010 WL 183522,

at *13 (E.D.N.Y. Jan. 8, 2010).

Further, when a defendant asserts a defense based on his reliance on the advice of counsel, he waives any attorney-client privilege over his communications with the counsel on that subject— and not only over those specific communications that he seeks to use. *See, e.g.*, *Bilzerian*, 926 F.2d at 1292 ("[a] defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes").  As a result, defendants asserting such a defense must disclose to the government "any communications or evidence defendants intend to use to establish the defense" and "even otherwise-privileged communications that defendants do *not* intend to use at trial, but that are relevant to proving or undermining the advice-of-counsel defense, are subject to disclosure in their entirety." *United States v. Crowder*, 325 F. Supp. 3d 131, 138 (D.D.C. 2018) (internal quotation marks omitted; emphasis in original) (collecting cases).  Failure to make such a disclosure results in forfeiture of the defense.  *See Bilzerian*, 926 F.2d at 1291 (affirming refusal to let the defendant testify about his "good faith regarding the legality" of the charged conduct unless he was also subject to cross-examination regarding communications with his attorney); *see also United States v. Wells Fargo Bank N.A.*, No. 12 Civ. 7527 (JMF), 2015 WL 3999074, at *1 (S.D.N.Y. June 20, 2015) (civil defendant asserting advice-of-counsel must "make a full disclosure during discovery and the failure to do so constitutes a waiver of that defense" (internal quotation marks omitted)).

####        4.       *Federal Rule of Evidence 104*

Preliminary questions concerning the admissibility of evidence, including whether evidence is relevant or a privilege exists, are to be determined by the Court.  Fed. R. Evid. 104(a). The Court has discretion to order a hearing to assist it in resolving such questions.  Fed. R.

Evid. 104(c)(3) (the court "must conduct a[] hearing" when "justice so requires").  The Court's authority to resolve such questions is rooted in its "inherent authority to manage the course of trials."  *United States v. Valencia*, 826 F2d 169, 171 (2d Cir. 1987) (internal quotation marks omitted).  At such a hearing, and more generally, the proponent of evidence bears the burden of demonstrating its admissibility by a preponderance of the evidence.  *See Bourjaily*, 483 U.S. at 175; *see also United States v. Brooks*, No. 08 Cr. 35 (PKL), 2008 WL 2332371, at *1 (S.D.N.Y. June 4, 2008) ("As the proponent of the proposed testimony, defendant has the burden of establishing admissibility by a preponderance of the evidence."); *United States v. Sabir*, No. S4 05 Cr. 673 (LAP), 2007 WL 1373184, at *6 (S.D.N.Y. May 10, 2007) (the "burden of showing that proffered testimony is offered to negate the *mens rea* element of a crime and not in support of some improper defense theory falls squarely on the defendant" (internal quotation marks omitted)); *United States v. Camacho*, 353 F. Supp. 2d 524, 536 (S.D.N.Y. 2005) ("defendants as proponents of the evidence bear the burden of [admissibility]").

The Federal Rules of Evidence, other than with respect to privileges, do not apply at a preliminary hearing. Fed. R. Evid. 104(a); Fed. R. Evid. 1101(d)(1).  Accordingly, statements that would be inadmissible hearsay at trial are admissible at such a hearing.  *See, e.g.*, *Bourjaily*, 483 U.S. at 178; *United States v. DeJesus*, 806 F.2d 31, 34 (2d Cir. 1986).

One circumstance in which a preliminary hearing may be ordered is to determine the propriety of a proffered defense.  *See, e.g.*, *United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997) ("[I]t is appropriate for a court to hold a pretrial evidentiary hearing to determine whether a defense fails as a matter of law.").  This is so for good reason: "no proper interest of the defendant would be served by permitting his legally insufficient evidence to be aired at trial, and interests of judicial

economy suggest that the jury should not be burdened with the matter." *United States v. Villegas*, 899 F.2d 1324, 1343 (2d Cir. 1990); *see also* Fed. R. Evid. 103(d) ("To the extent practicable, the court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means."). A preliminary hearing may be ordered to consider a proffered advice-of-counsel defense just as it may be ordered to consider any other defense. *See United States v. Scully*, No. 14 Cr. 208 (ADS), 2015 WL 5826493 (E.D.N.Y. Oct. 6, 2015) (ruling concerning advice-of-counsel defense after a hearing); *see also Scali*, 2018 WL 461441, at *8 n.4 ("Guided by efficiency and judicial economy, it behooves the Court to address [advice of counsel] before trial.").

### C.    Discussion

As the defendants have not asserted that they are entitled to an advice-of-counsel defense (nor does the evidence appear to permit it), they should not be permitted to seek to receive the benefits of one by making arguments that they relied on the advice or approval of counsel.

The Government is unaware of any basis for either defendant to offer an advice-of-counsel defense. Indeed, the defendants appear unable to meet a single part of the rigorous four-part test. As an initial matter, neither Attorney-1 nor Attorney-2 was retained or serving as counsel to Guan, nor has Guan contended to the contrary at any point.[17] *See Atias*, 2017 WL 563978, at *3.[18]

In any event, "[i]nherent in the concept of advice of counsel is that the defendant sought an attorney's advice as to what he could lawfully do in the future." *Beech-Nut Nutrition Corp.*, 871 F.2d at 1195; *see also Scully*, 877 F.3d at 478 (defense requires that, "[b]efore taking action, he in good faith sought the advice of an attorney"). Here, the Government is unaware of any

---

[17] The Government is unaware of Hung having had any contact with Attorney-1, Attorney-2, or any other relevant attorney during the course of the scheme.

[18] The client Media Entities have waived privilege over these communications.

factual basis to find that, prior to engaging in the charged conduct, the defendant spoke with Attorney-1 or Attorney-2 "for the purpose of securing advice on the lawfulness of [the defendant's] possible future conduct,." *Id.*   Indeed, Guan concealed the fact that the MMO Team had been engaged in the charged conduct for several months *before* he ever contacted Attorney-1 (and for several additional months before he contacted Attorney-2).  Nor is there any factual basis of which the Government is aware to find that, before acting, Guan "made a full and accurate report" to Attorney-1 or Attorney-2 of all "material facts." *Id.*  Neither attorney was provided with a full understanding of Guan's goals and then rendered advice to Guan about the "lawful[]" way to achieve them.  To the contrary, when Attorney-1 asked Guan how the company could purchase gift cards at a "discount," Guan stated that his prior representation of the discount was incorrect, and he went on to present a false account to Attorney-2.  And of course, far from acting "strictly in accordance with the advice" of Attorney-2, who warned Guan that the conduct would be illegal if he was using stolen funds, Guan entirely disregarded Attorney-2's admonition even after receiving numerous complaints of fraud and stolen funds.

That being the case, neither defendant should be permitted to advance what would amount to a quasi-advice-of-counsel defense—that is, having failed to meet the requirements for the defense, to argue nonetheless that he should not be found guilty because a lawyer purportedly approved of or did not object to the defendant's conduct.  That is precisely the kind of argument that is "likely to mislead the jury," *Atias*, 2017 WL 563978, at *3, into thinking that a defendant has a defense that the law says, in no uncertain terms, he does not have.  The advice-of-counsel defense is subject to multiple and meaningful restrictions—including that a defendant seek the advice of a lawyer acting as his lawyer, communicate all material facts to his lawyer, and strictly

follow the advice of his lawyer—because a defense based on alleged legal advice or approval that does not meet these strictures is ripe for abuse. A defendant should not be permitted to engage in an end run around the requirements of an advice-of-counsel defense. *Cf. Tourre*, 950 F. Supp. 2d at 684 (The defendant "argues that the presence of lawyers is relevant to the overall context of the transaction, but that is such a fine-grained distinction from a reliance on counsel defense, that it would likely confuse the jury. A lay jury could easily believe that the fact that a lawyer is present at a meeting means that he or she must have implicitly or explicitly 'blessed' the legality of all aspects of a transaction. . . . This misunderstanding would give the defendant all of the essential benefits of an advice of counsel defense without having to bear the burden of proving any of the elements of the defense."); *see also S.E.C v. Lek Sec. Corp.*, No. 17 Civ. 1789 (DLC), 2019 WL 5703944, at *4 (S.D.N.Y. Nov. 5, 2019) ("The intimation that counsel has blessed a transaction or practice without waiver of the attorney-client privilege" is improper); *United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015) (There is no "advice-of-counsel defense without demonstrating advice of counsel.").

Courts in this district routinely preclude defendants from suggesting to the jury that the involvement of attorneys somehow legitimates their conduct, unless the requirements of the advice-of-counsel defense are actually met. *See, e.g.*, *United States v. Rangott*, No. 23 Cr. 4 (JHR), 2024 WL 3488038, at *2 (S.D.N.Y. July 19, 2024) (citing cases). Indeed, evidence of the involvement of counsel is often precluded even if offered to support arguments with the same "practical effect" as an advice-of-counsel defense. *See id.* at *3 (precluding such evidence, reasoning, "[h]owever [the defendant] attempts to characterize or label his argument, its practical effect is indistinguishable from a presence-of-counsel defense"). For the same reason, to the extent

62

that any party may seek to offer evidence regarding the involvement of attorneys, even in a limited manner, the Court should provide a cautioning instruction at the time that evidence is offered, as has been done in other cases in this district. *See, e.g.*, *United States v. Shea*, No. 20 Cr. 412 (AT) (S.D.N.Y.), Dkt. 245 (May 31, 2022 Tr.) at 787 ("A lawyer's involvement with an individual or entity does not itself constitute a defense to any charge in this case. The defense has not claimed, and cannot claim, that the defendant's conduct was lawful because he acted in good faith on the advice of a lawyer."); *United States v. Petit*, No. 19 Cr. 850 (JSR) (S.D.N.Y.), Dkt. 189 (Oct. 26, 2020 Tr.) at 2402 ("[T]here is no defense in this case of so-called reliance on counsel.").

To be sure, either defendant, if he elects to testify, and within the bounds of the Federal Rules of Evidence, may talk about whether he believed himself to be acting wrongfully. But that this subject is generally proper does not mean that all testimony (or other evidence, if any exists) purportedly offered on this subject is admissible, or that a defendant may argue that evidence means something that, as a matter of law, it does not. On the contrary, as discussed above, a defendant is not permitted to offer evidence of the involvement of lawyers or to suggest that he should be acquitted because they purportedly approved of certain conduct unless the defendant can satisfy each of the several requirements of an advice-of-counsel defense. Accordingly, before either defendant offers any such purported evidence or argument in the presence of the jury, including in the form or cross-examination, the defendant doing so should have to describe such evidence or argument fully to the Court and the Government, so that it may be cabined, as is likely to be necessary, and the jury be instructed appropriately. *See, e.g.*, *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2024 WL 477043, at *2 (S.D.N.Y. Feb. 7, 2024) (requiring defendant to make "an offer of proof outside the presence of the jury" where defendant's prior

63

notice only "identified the general subjects on which he proposed to testify" regarding his knowledge of the involvement of counsel and "did not specify the substance of the proposed testimony"). And under no circumstance should either defendant be permitted to offer evidence or argument suggesting that the defendant relied on the assistance or approval of a lawyer acting as a lawyer, a defense that has no apparent basis in fact, no basis in law (unless he can establish an advice-of-counsel defense, which he cannot), and would mislead the jury and thus fail under Federal Rule of Evidence 403. *See Atias*, 2017 WL 563978, at *3; *Tourre*, 950 F. Supp. 2d at 684.

**VI.    EVIDENCE OR ARGUMENT SUGGESTING THAT THE CHARGES ARE IMPROPERLY MOTIVATED, OR CONCERNING CLAIMS OF RELIGIOUS OR POLITICAL PERSECUTION OR OTHER INFLAMMATORY RELIGIOUS OR POLITICAL CONTROVERSIES, SHOULD BE PRECLUDED**

Both defendants have made statements and arguments suggesting that they intend to assert that the charges against them are improperly motivated, and suggesting that this case is an example of alleged political and religious persecution. As set forth below, Guan has claimed that this prosecution is the result of the influence of the Chinese government allegedly seeking, among other things, to persecute and destroy a spiritual movement of which a number of members of the Media Entities are practitioners (the "Spiritual Movement"), and Hung has claimed that this prosecution was brought for domestic political purposes. The defendants should not be permitted to make any of these inflammatory claims—which are baseless but in any event not for the jury— or otherwise invoke any religious or political controversies.

Following his indictment, Guan has made a series of social media posts and drafted an open letter to all practitioners of the Spiritual Movement alleging that this prosecution is part of "legal warfare" by the Chinese Communist Party against the Spiritual Movement. (*See* Ex. D at 1). In this account, Guan claimed baselessly that his prosecution was brought either as an act of

purported (and of course in reality nonexistent) domestic political prosecution in retaliation for the perceived editorial position of the Media Entities, or "more likely" as a result of (again in reality nonexistent) purported foreign "infiltration of the U.S. justice system."  (Ex. D at 3).

During pretrial proceedings, Hung (joined by Guan) has made discredited assertions that the charges against him are vindictive, selective, and/or politically motivated.  (Dkt. 97; Dkt. 87 at 1 n.1).  *See United States v. Guan*, No. 24 Cr. 322, 2026 WL 160995, at *9 (S.D.N.Y. Jan. 21, 2026) ("Hung rests his motion to dismiss the indictment on the theory that the allegations against him are the product of an unconstitutional selective prosecution.").  This Court rejected those baseless allegations.  *Id.* at *9-10.  Rightly so.

Whatever the intent behind either defendants sweeping, facially serious, and wholly unsupported accusations, under settled law, such accusations are not for the jury in weighing the defendants' guilt.  Offering supposed evidence or argument on such matters would serve no purpose other than to seek to distract the jury from the evidence of the defendants' guilt or to encourage jury nullification notwithstanding their guilt.  Such evidence and argument should therefore be precluded, in any form, including in opening statements.  *See United States v. Regan*, 103 F.3d 1072, 1082 (2d Cir. 1997) (a "selective prosecution defense is an issue for the court rather than the jury"); *United States v. Re*, 401 F.3d 828, 833 (7th Cir. 2005) (prosecuting authority's motives or views underlying its "charging decisions are not proper subjects for cross-examination and argument"); *United States v. Reese*, 933 F. Supp. 2d 579, 583 (S.D.N.Y. 2013) (precluding defendant from advancing arguments aimed at jury nullification and the overall propriety of the government's investigation); *United States v. Demosthene*, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004) (defendant "may not argue before the jury issues relating to the overall propriety of the

Government's investigation in this case"); *United States v. Stewart*, No. 03 Cr. 717 (MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (granting motion to preclude defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting [the defendant], as opposed to other individuals who may also have committed the crimes charged or similar crimes"); *see also* Fed. R. Crim. P. 12(b)(3)(A)(iv); *United States v. Sun Myung Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983).

The basis for this settled rule is fundamental. A claim of improper prosecutorial motive or purpose, whatever its grounds, "is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996). Such a claim is self-evidently "unrelated to factual innocence of the crime[s] charged," which is the sole issue to be decided by the jury, and, as a result, the Court alone must resolve it to the extent raised (which here the Court already has). *Regan*, 103 F.3d at 1082.

Nor should either defendant be permitted to advance arguments or to seek to introduce evidence in aid of substantially the same alleged points—even if they do not expressly argue that he has been selectively, vindictively, politically, or discriminatorily prosecuted—because the *reasons* for the prosecution of the defendants, including the charges and the timing thereof, have no bearing whatsoever on the jury's proper function. Neither defendant, for example, should be permitted to offer evidence or argument that others have purportedly engaged in similar conduct without being prosecuted, as Hung baselessly claimed in his pretrial motions. *See Guan*, 2026 WL 160995, at *9 ("Hung contends that the 'discriminatory effect is evident by the absence of any similar, sweeping investigation into left-leaning or administration-aligned media organizations.'

66

But that claim falls far short of establishing that Hung has been 'singled out for prosecution,' as Hung does not plausibly point to any other 'similarly situated' individual or group—*i.e.*, an individual or group who engaged in similar conduct to that alleged in the Indictments—whom the Government failed to prosecute." (citation omitted)).

Similarly, neither defendant should be allowed to offer evidence tending to suggest the alleged patterns of religious or political persecutions they referenced in their motions, whether alleged domestic political persecution or alleged persecution by the Chinese government of the members of the Spiritual Movement, or other similarly charged political or religious controversies. Such evidence, even if non-hearsay, has absolutely no bearing on the jury's task of assessing whether every element is proved beyond a reasonable doubt. *See, e.g.*, *United States v. Peterson*, 808 F.2d 969, 977 (2d Cir. 1987) ("Statements designed to appeal to the jury's emotions or to inflame the passions or prejudices of the jury are improper."). Any argument or evidence along these lines, just like any evidence or argument going to the motives or timing behind this prosecution, is wholly improper because it would cause juror confusion and invite nullification, which is patently inappropriate. *See United States v. Thomas*, 116 F.3d 606, 615 (2d Cir. 1997) (Jury nullification is "by no means a right or something that a judge should encourage or permit if it is within his authority to prevent."); *id.* at 614 ("We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent."); *see also Sparf & Hanson v. United States*, 156 U.S. 51, 101 (1895) ("Public and private safety alike would be in peril if the principle be established that juries in criminal cases may, of right, disregard the law as expounded to them by the court, and become a law unto themselves."); *United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir.

1983) (per curiam) ("A jury has no more '*right*' to find a 'guilty' defendant 'not guilty' than it has to find a 'not guilty' defendant 'guilty,' and the fact that the former cannot be corrected by a court, while the latter can be, does not create a right out of the power to misapply the law.  Such verdicts are lawless, a denial of due process and constitute an exercise of erroneously seized power." (emphasis in original)).

To be sure, the defendants' support for the Media Entities and the Spiritual Movement may be parts of their motives to commit the charged offenses, and as such, evidence tending to prove such motive would be relevant, and thus admissible if presented in admissible form, *i.e.*, not through hearsay or speculation.  *See, e.g.*, *United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004) (affirming admission of evidence of motive); *United States v. Mostafa*, 16 F. Supp. 3d 236, 256 (S.D.N.Y. 2014) (evidence of beliefs or affiliations admissible to prove motive).  But proving that a defendant may have had a motive to support a particular organization or ideology, and thus to commit a crime to procure funds for that organization or ideology, is very different from proving that members of that organization or ideology were allegedly being persecuted by a foreign government, let alone proving the details of any political or religious controversy related to that ideology or suggesting that the defendants were prosecuted by this government *because of* their association with that organization or ideology.  The latter type of evidence raises precisely the concerns of unfair prejudice, juror confusion, and waste of time with minitrials on far-flung controversies that Rule 403 was designed to prevent.  Thus, some evidence of the defendants' connection to and motive to support the Media Entities and the Spiritual Movement may be relevant and admissible to establish their offenses, and of course if the defendants wish to respond by presenting admissible evidence tending to show that they did not support or have a connection

68

to the Media Entities or the Spiritual Movement, they may seek to do so.[19]  But that quotidian

evidence bearing on motive does not open the door to a parade of inflammatory evidence on the

substance of highly charged religious or political controversies having nothing to do with the jury's

task in this case—much less would it permit the defendants to attack the decision to prosecute

them.  *See, e.g.*, *United States v. Perez*, No. 23 Cr. 99 (LJL), 2025 WL 551567, at *4 (S.D.N.Y.

Feb. 19, 2025) ("The Second Circuit has directed that trial courts have the duty to forestall or

prevent jury nullification. . . .  Defendant is precluded from offering evidence that has no bearing

on his guilt or innocence[.]" (internal quotation marks omitted)).

In short, any argument or attempt to elicit evidence that is intended to place the

Government's charging decisions at issue, to suggest to the jury that the defendants should be

acquitted because the case was brought for improper reasons, to prove any alleged pattern of

religious or political persecution, or to evidence any religious or political controversy, is irrelevant

to the issues properly before the jury, would create a time-consuming and contentious distraction,

and would encourage the jury to make or decline to make a decision on an improper basis.  It

should thus be precluded in its entirety.

### VII.    EVIDENCE OR ARGUMENT CONCERNING THE PUNISHMENT OR CONSEQUENCES THE DEFENDANTS HAVE FACED OR WILL FACE IF CONVICTED, OR COLLATERAL CONSEQUENCES TO THIRD PARTIES, SHOULD BE PRECLUDED

Where the jury has no role at sentencing—such as in this case—it "should be admonished

to 'reach its verdict without regard to what sentence might be imposed.'"  *Shannon v. United*

---

[19] By the same token, if a defendant offers admissible evidence of his contemporaneous beliefs that is truly relevant to understanding the defendant's actions at issue in the schemes (such as through a defendant testifying about what beliefs led him to take certain relevant actions), such evidence might be properly admitted, subject to Rule 403.

*States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)).  This is so for good reason: argument concerning punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.*  There is no proper basis for the defendants to put these issues before the jury in any form, and the defendants should not be permitted to offer evidence or argument inviting the jury to consider them, whether directly or indirectly.  *See, e.g.*, *United States v. Avenatti*, No. 19 Cr. 374 (JMF) (S.D.N.Y. Jan. 13, 2022) (ECF No. 288) (Tr. 9-10) ("anything that adverts to possible punishments, including possibility of incarceration, however obliquely, is improper and will not be permitted," including, for example, a statement in opening or closing arguments that the defendant's "liberty is at stake," which would be "a not-so-thinly-veiled reference to the prospect of incarceration, which is altogether improper").

For the same reasons, the defendants should be precluded from offering evidence or argument about consequences they allegedly have *already* faced from the charges brought.  No proper purpose would be served by offering supposed evidence or argument that one or both of the defendants had suffered consequences through being charged with crimes.  And even if there were a theoretical proper purpose—and there is none—to a defendant making such an argument, to rebut such an argument and place it in context, the Government would have to present to the jury its charging policies and practices, matters far beyond the scope of a criminal trial.  *See, e.g.*, *United States v. Knox*, 687 F. App'x 51, 54-55 (2d Cir. 2017); *United States v. Saldarriaga*, 204 F.3d 50, 52 (2d Cir. 2000).  Any evidence or argument concerning such consequences should accordingly be precluded.

70

Similarly, the defendants should be precluded from introducing evidence of any alleged collateral consequences to third parties that have allegedly resulted from the charges or would or might allegedly result from a conviction. Indeed, Guan's open letter describes a series of alleged negative collateral consequences that he believes will befall the Media Entities and the Spiritual Movement if he is convicted in this case. (Ex. D at 2-3). As these matters are irrelevant to the only question the jury will have to decide—whether the charges have been proven beyond a reasonable doubt—introducing evidence on them could serve no proper purpose but to invite nullification. *See, e.g.*, *United States v. Blume*, 967 F.2d 45, 49 (2d Cir. 1992) ("Federal courts usually instruct juries not to consider a verdict's consequences.").

## VIII. EVIDENCE OR ARGUMENT CONCERNING THE DEFENDANTS' PRIOR COMMISSION OF GOOD ACTS OR LACK OF PRIOR BAD ACTS SHOULD BE PRECLUDED

To the extent that a defendant may seek to present evidence or argument concerning his prior commission of alleged "good acts," or to offer evidence of his non-criminal activities to seek to disprove guilt on the ground that he is a good person, has done good things, or is committed to good works, he should be precluded from doing so. Specific-act propensity evidence is no more admissible to refute a criminal charge than it is to establish one.

It is settled law that "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on [other] specific occasions." *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990). Similarly, while a defendant may offer general testimony from a character witness about his reputation for a "pertinent trait" of character, or the witness's opinion of the defendant as regards that trait, *see* Fed. R. Evid. 404(a)(2)(A) & 405(a), a defendant can neither testify nor offer other proof to establish specific acts in conformity with that trait that are not an element of the offense. *See, e.g.*, *United States v. Benedetto*, 571 F.2d 1246, 1249-50 (2d

71

Cir. 1978) (evidence of defendant's specific acts improperly admitted because "character evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts"); *United States v. Rivera*, No. 13 Cr. 149 (KAM), 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015) (precluding evidence of charitable giving); *United States v. Fazio*, No. S2 11 Cr. 873 (KBF), 2012 WL 1203943, at *5 (S.D.N.Y. Apr. 11, 2012) ("[A] defendant may not affirmatively try to prove his innocence by reference to specific instances of good conduct; character is to be proven by reputation or opinion evidence.").  The defendants should accordingly be expressly precluded from offering evidence or argument, including in their opening statements, concerning any charity, philanthropy, civic or political activism, public service, or any other specific instance or instances of prior alleged good or public-oriented acts, or the lack of commission of other bad acts, or lack of criminal history.

## IX.    EVIDENCE OR ARGUMENT CONCERNING THE DEFENDANTS' FAMILY, BACKGROUND, AGE, HEALTH, OR OTHER PERSONAL CHARACTERISTICS SHOULD BE PRECLUDED, ABSENT A SHOWING THAT SUCH PERSONAL MATTERS BEAR ON GUILT

Finally, the Government is unaware of any lawful basis for either defendant to offer evidence or argument concerning his family background, ethnicity or nationality, immigration status, marital status, ancestry, health, age, or any other similar factors.  Each defendant should be expressly precluded from doing so, and from mentioning such subjects in his opening statements, absent a showing, outside of the presence of the jury, that such a factor bears on his guilt and is not precluded under Rule 403.  *See, e.g.*, *Perez*, 2025 WL 551567, at *4 ("Defendant is precluded from offering evidence that has no bearing on his guilt or innocence and, unless it is relevant to the charges and its relevance outweighs the risk to the Government of prejudice and of the possibility of jury nullification, from offering evidence on his family background, health, or age

72

or other personal facts."); *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that defendant had son with cerebral palsy whom defendant had devoted his life to care for); *United States v. Harris*, 491 F.3d 440, 447 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man"); *United States v. Battaglia*, No. S9 05 Cr. 774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); *United States v. St. Rose*, No. 11 Cr. 349 (SJ), 2012 WL 1107659, at *1 (E.D.N.Y. Apr. 2, 2012) (precluding evidence of the defendant's immigration status because it does "not bear on the Defendant's innocence or guilt").

## CONCLUSION

For the foregoing reasons, the Government's motions *in limine* should be granted.

Dated: New York, New York
June 8, 2026

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:    s/ _____
Benjamin M. Burkett
Rebecca T. Dell
Paul M. Monteleoni
Amanda C. Weingarten
Assistant United States Attorneys
(212) 637-2455/2198/2219/2257

73