# Exhibit B

**Disclosure as to Expert Witness Matthew J. Price**

March 26, 2026

Defendant Weidong "Bill" Guan expects to call Matthew J. Price as an expert witness in his defense case. The following statement and the exhibits thereto provide notice pursuant to Rule 16(b)(1)(C)(iii) of the Federal Rules of Criminal Procedure.

## I.     QUALIFICATIONS

I am an independent consultant providing cryptocurrency tracing, advisory, and expert witness services to clients involved in civil and criminal matters. Concurrently, I am the Vice President of Investigations and Strategic Advisory at Elliptic Inc.,[1] a leading blockchain analytics firm.

I received my B.S. in Accounting from the University of Scranton and my M.S. in Accounting and Information Technology from the University of Maryland Global Campus. I have over 20 years of experience in complex financial fraud investigations including global cryptocurrency and cybercrimes and have completed specialized training in blockchain investigation techniques.

Prior to entering private practice, I spent 17 years working in government law enforcement and intelligence roles. I previously served as a Special Agent with the Internal Revenue Service, Criminal Investigation–Cyber Crimes Unit (IRS-CI CCU), leading multi-agency, multinational investigations of darknet markets, illicit virtual currency tumblers, sanctions evasion, and banking integrity violations. I investigated numerous cases involving virtual currency (or "cryptocurrency"), money laundering, and various schemes using the Internet. My investigative work regularly involved exposure to peer-to-peer cryptocurrency marketplaces (peer-to-peer markets), including reviewing buyer and seller profiles, obtaining and reviewing transaction records, and participating in investigative operations related to the use of peer-to-peer markets to buy, sell, and trade cryptocurrencies through various means, including the use of gift cards and prepaid debit cards. I conducted open source and operational research on several peer-to-peer platforms, both to understand their function and for evidence gathering purposes. I have obtained evidence related to cryptocurrency transactions from peer-to-peer market platform operators and used this evidence to trace cryptocurrencies on the blockchain to identify buyers and sellers. In addition, in my law enforcement capacity I have personally interacted with several buyers and sellers operating on peer-to-peer markets, including Local Bitcoins and Paxful.

---

[1] I have been retained as an independent expert in this matter. The opinions contained within this disclosure are my own.

Prior to my work at IRS-CI, I was a Targeting Officer for the Central Intelligence Agency for five years based in Washington, D.C. In that position, I focused on foreign intelligence, counterterrorism, and counterintelligence threats.

Immediately prior to my work at Elliptic, I was the Global Head of Investigations for Binance, one of the world's largest cryptocurrency exchanges. I led a team of nearly 25 investigators focused on cryptocurrency investigations, advanced blockchain analysis, forensics, decentralized finance, and blockchain crimes. While leading the global Special Investigations team at Binance, I regularly conducted and supervised investigations of account holders who were involved in the buying and selling of cryptocurrency in peer-to-peer markets. In addition, I worked closely with the team managing Binance's own peer-to-peer cryptocurrency market, Binance P2P, on fraud and dispute investigations. I am intimately familiar with the business operations of the peer-to-peer platform, the different types of vendors and sellers operating on the platform and the communications between buyers and sellers that take place. In addition, I personally interacted with both buyers and sellers operating on the Binance P2P platform via a customer chat system, as part of my role investigating compliance violations.

In my current role at Elliptic, I regularly review the on-chain activities of peer-to-peer markets and their role in the cryptocurrency ecosystem, including methods used to buy and sell cryptocurrency on peer-to-peer markets. In this role, I regularly interact with compliance and investigative professionals around the world, including those working with peer-to-peer marketplaces.

In addition to 9 years of investigative experience focused on cryptocurrency investigations, I have attended numerous law enforcement, compliance and investigations training classes related to cryptocurrency investigative techniques, including the operation of peer-to-peer markets. I have also delivered training focused on cryptocurrency investigations to law enforcement and compliance professionals around the world in both my law enforcement and private sector careers. I have attended several industry conferences and personally interacted with compliance personnel employed by peer-to-peer cryptocurrency markets in discussions related to fraud prevention, blockchain analytics and compliance matters.

I have been previously engaged as an expert in several criminal and civil matters involving cryptocurrency. A list of the matters in which I have prepared declarations or given testimony, both as a government employee and an employee of Binance, is contained within my curriculum vitae, which is attached as Appendix A.

II.    **SCOPE OF WORK / EXPERIENCE AND MATERIALS RELIED ON AND REFERENCED**

I have been retained by counsel for Weidong "Bill" Guan ("Guan") to opine, based on my experience, expertise, and analysis of publicly available open-source information,

2

on the history, function, characteristics and usage of peer-to-peer markets, specifically Paxful, for the purposes and buying and selling cryptocurrency using payment methods including gift cards and prepaid debit cards. As the basis for my opinions, I relied on my extensive work experience relating to the cryptocurrency markets and on open-source research of the kind I have used over many years, including academic articles, publicly accessible cryptocurrency forums, written and video guides detailing methods used to buy and sell cryptocurrencies, and publicly accessible archives, including of the Paxful webpage.

### III. SUMMARY OF OPINIONS

I have formed the following opinions:

- Paxful, during the period of the charges in this case, was one of the most widely used, global peer-to-peer cryptocurrency exchange platforms, and gift cards and prepaid debit cards were widely used as an accepted means on Paxful to buy and sell cryptocurrency.
- In promoting the use of gift cards and prepaid debit cards to buy and sell cryptocurrency on its platform, Paxful provided assurances that transactions on the platform were safe and legally compliant. The site described security features including Know Your Customer (KYC) checks and on-chain transaction monitoring.
- Gift cards and prepaid debit cards historically were and currently remain a common means used to buy and sell cryptocurrencies for fiat currency (*i.e.,* currency issued by sovereign governments). These cards offer a means for users in jurisdictions that lack formal fiat-to-crypto and crypto-to-fiat payment rails to buy and sell cryptocurrency. A "payment rail," as used in this document, is an established route or pathway that allows for the exchange of fiat currency and cryptocurrency, for example, an established and permitted link between a licensed bank and a cryptocurrency exchange.
- Gift cards and prepaid debit cards, when combined with cryptocurrencies, also play an important role in international remittances. Specifically, gift cards and prepaid debit cards allow an individual to easily purchase value for local currency, for example in the United States, and transfer that value to family members overseas, for example, in Latin America or Africa, in the form of cryptocurrency, which can then be used in the transferee locale for investment, conversion to local currency or as a hedge in jurisdictions experiencing currency volatility.

### IV. OVERVIEW OF CRYPTOCURRENCY AND PEER-TO-PEER MARKETS

Cryptocurrency is a digital form of value that is circulated over the Internet. The oldest and most famous cryptocurrency is Bitcoin (BTC). Bitcoin was first announced as a concept in a white paper published in late 2008. The Bitcoin whitepaper described BTC as a "a purely peer-to-peer version of electronic cash" allowing for "online payments to be

3

sent directly from one party to another without going through a financial institution.[2]" Numerous cryptocurrencies have been launched since BTC came to market in 2009. A key concept underpinning BTC and later cryptocurrencies is the ability of the holder to use permissionless means to transfer value around the world without the need for intermediaries, providing freedom from censorship and enhanced privacy for its users. Thus, privacy is a top consideration for many cryptocurrency users, leading to the later development of decentralized means to buy, sell and trade it and a reliance on alternative payment means to convert fiat currency to cryptocurrency and vice versa.

Another key concept inherent in cryptocurrencies is the ability to "self-custody" one's assets. Self-custody is the practice of holding and managing one's own private keys, giving a user sole control over their assets rather than relying on a third-party. Self-custody offers financial sovereignty, enhanced privacy, and security by removing counterparty risk. Self-custody users secure their own "wallet keys." By contrast, centralized entities such as cryptocurrency exchanges developed an alternative custody solution called a "custodial wallet." A custodial wallet is a cryptocurrency storage service where a third party, such as an exchange or financial institution, manages private keys on behalf of a user. A wallet custodian acts like a bank, offering convenience, account recovery, and built-in security.

Peer-to-peer trading, initially, was one of the primary means to exchange cryptocurrency following Bitcoin's 2009 release. Centralized cryptocurrency exchanges did not yet exist, leaving manual, peer-to-peer trading as the only means for individuals to trade fiat currency for cryptocurrency and vice versa. Many of the initial trades were organized through popular cryptocurrency forums such as the BitcoinTalk Forum[3], with users arranging trades manually. Payment methods and terms were directly arranged by individuals involved in transactions. However, manual cryptocurrency trades became cumbersome because they relied on decentralized means of arranging trades, exposed traders to potential security risks and lacked methods to protect against fraud, such as escrow services, dispute mechanisms and a means to validate the trustworthiness of trading partners.

As the cryptocurrency ecosystem grew, centralized peer-to-peer exchanges developed to fill this market weakness by offering cryptocurrency buyers, sellers and traders a more reliable, secure means to facilitate trades. Early platforms developed as online marketplaces that facilitated peer-to-peer transactions by offering a space for buyers and sellers to advertise, communicate and negotiate transactions, and enjoy enhanced security and fraud prevention tools, such as escrow services and buyer/seller rating systems. Peer-to-peer markets generally did not offer centralized custody of private keys, meaning users of the services maintained control of their own private keys. Local

---

[2] See Bitcoin Whitepaper accessible at https://bitcoin.org/bitcoin.pdf.
[3] BitcoinTalk Forum is still active and can be accessed at https://bitcointalk.org/

Bitcoins[4] was one of the early peer-to-peer platforms and became one of the most popular, along with Paxful. I regularly interacted with Local Bitcoins in my law enforcement capacity, including reviewing buyer and seller profiles and reviewing account and transaction records.

Through my experience interacting with exchanges and working for a major cryptocurrency platform, I know that centralized, custodial cryptocurrency exchanges grew rapidly as cryptocurrency adoption grew globally. In addition to offering custodial wallet services, centralized exchanges match buyers and sellers by means of a centralized order book which functions similar to a brokerage account. Many exchanges developed advanced trading products such as derivatives, futures contracts and margin trading. Centralized exchanges also offer fiat currency payment rails that allow customers to buy cryptocurrency with fiat currency (such as US Dollars, Euros, Yen, Pounds Sterling) using linked bank accounts, credit cards and other payment platforms. Likewise, fiat payment rails allow customers to sell crypto for fiat and transfer the proceeds into a linked bank account. The types of fiat currency accepted varies by exchange and is largely dependent upon the geographic markets in which they operate and whether they meet the regulatory requirements necessary to offer fiat currency payment rails in specific jurisdictions.

Peer-to-peer markets remained popular even as centralized exchanges expanded across the globe. Several early centralized exchanges, including Mt. Gox[5] and Bitfinex[6], suffered large-scale hacks, resulting in significant losses for consumers. These events led to resurgent interest in peer-to-peer marketplaces because, similar to an exchange, they allowed users to buy, sell and trade cryptocurrencies. However, unlike a centralized exchange, peer-to-peer markets provide users the ability to practice self-custody, reducing the risk of loss from hacks targeting centralized wallet custodians.

Based on my experience working in the cryptocurrency industry and interacting with thousands of cryptocurrency users, I know that privacy and individual financial sovereignty (including the ability to control one's own private keys) is a paramount reason driving the global adoption of cryptocurrency. Unlike a centralized exchange, peer-to-peer markets provide users with the ability to practice self-custody while limiting the involvement of an intermediary between parties involved in a transaction. The individual parties maintain control of their private keys, controlling when and how to conduct a transaction with

---

[4] Local Bitcoins was a prominent global peer-to-peer cryptocurrency marketplace based in Finland. It operated from approximately 2012 until 2023. It was considered a peer competitor of Paxful.

[5] Mt. Gox was a Japan-based centralized cryptocurrency exchange that operated from 2010 to 2014. It was shut down following a major hack in 2014 that caused the loss of hundreds of thousands of bitcoin.

[6] Bitfinex is a major cryptocurrency exchange specializing in institutional traders. It was originally launched as a peer-to-peer exchange in 2012, later becoming a centralized exchange. It suffered a hack to 2016, causing the loss of nearly 120,000 BTC.

another party. These marketplaces provide a forum that allows buyers and sellers to connect, and often provide services to enhance transaction security such as escrow services and a buyer/seller rating system (similar to platforms such as eBay) which provide users a means to assess the reliability and trustworthiness of a potential trading partner. However, unlike a centralized exchange, peer-to-peer markets generally do not offer fiat payment rails, leaving individual buyers and sellers to negotiate payment terms, including the types of fiat currency used and methods of payment. In practice, this means buyers and sellers on peer-to-peer markets have many more payment options than a centralized exchange, including cash payments, bank wires, third party payment processors and payment means such as gift cards and prepaid debit cards.

Peer-to-peer markets remain in operation currently. Some of the most popular peer-to-peer markets today include Binance P2P, Bybit P2P and OKX P2P. Notably, each of these services is managed by a centralized exchange provider, but maintains the features of traditional peer-to-peer markets by removing intermediaries, allowing for the negotiation by users of payment terms, and allowing users to conduct cryptocurrency trades without relinquishing custody of private keys. Many of these platforms offer the use of non-traditional payment methods, including prepaid debit cards and gift cards, to buy and sell cryptocurrency on the platform.

## V.    PAXFUL – HISTORY

Paxful originally launched in 2015 as an international cryptocurrency peer-to-peer market. I am aware through historical interaction with the Paxful platform that it provided a means to connect cryptocurrency buyers, traders, and sellers securely through advertisements on the Paxful website, and provided features such as a vendor rating system and escrow service. In 2024, Paxful publicly reported that the platform served more than 14 million customers in 140 countries, offering nearly 300 payment methods[7]. The platform was widely known in the cryptocurrency community, including positive coverage in media outlets such as Time[8] and Forbes[9].

Paxful's founders publicly described Paxful as a means to democratize finance, particularly by offering people in emerging markets the ability to access otherwise

[7] Paxful press release dated October 15, 2024 retrieved from https://www.globenewswire.com/news-release/2024/10/15/2963326/0/en/Paxful-Modernizes-P2P-with-Reinvented-App-and-Brand-featuring-AI-Enhanced-Safety-Security-and-Support.html on March 25, 2026.

[8] Paxful was named one of Time's 100 Most Influential Companies of 2022, retrieved from https://time.com/collections/time100-companies-2022/6159501/paxful/ on March 24, 2026.

[9] Paxful was named one of Forbes Best Startup Employers in 2022, retrieved from https://www.forbes.com/sites/jairhilburn/2022/03/08/meet-americas-best-startup-employers-2022/ on March 25, 2026.

unavailable payment means. In August 2020, the then-CEO stated in a podcast episode[10] that Paxful helped to solve the problem of payment network interoperability in Africa by using cryptocurrency as a means to bridge multiple fiat currencies and payment methods. For example, he cited the use of cryptocurrencies on Paxful to facilitate payments from one country to another, including, as an example, by converting a gift card bought in one part of the world to a gift card that is usable in another, using Bitcoin as the means of clearance.

Paxful advertised itself as a legally compliant platform, implementing advanced features to prevent fraud. Company officials stated publicly that the platform had zero tolerance for fraud, scams and illicit finance on the platform. The platform disclosed that it had implemented Know-Your-Customer (KYC) checks beginning in April 2019, including implementing an AI-driven identity verification platform and requiring any user conducting more than $1,500 in trade volume to submit KYC documents[11]. The platform additionally required address verification for users conducting over $10,000 in trade volume. Paxful also publicly announced the implementation of blockchain transaction monitoring solutions to conduct real time monitoring of cryptocurrency transactions on the platform. I know through my experience working for and with cryptocurrency platforms that many use measures such as KYC verification software and blockchain analytics solutions to identify and mitigate fraud risks and make it more difficult for fraudsters to engage in transactions on their platforms.

Based on an analysis of on-chain transactions using commercial blockchain analysis software, between 2016 and 2026, cryptocurrency addresses controlled by Paxful processed more than $13 billion in transactions on the platform, across more than 100 different cryptocurrencies. Paxful's landing page for cryptocurrency sellers contained numerous buyers offering to pay for cryptocurrency, and stated the platform allowed for 350 payment methods according to an archived copy of the Paxful webpage dated March 3, 2021[12]. These pages cited numerous payment methods used to buy and sell cryptocurrencies, including bank transfers, online wallets, gift cards, prepaid debit cards, cash payments, digital currencies and physical goods and services. The site also noted that it hosted 12,000+ "vendors" offering to buy and sell cryptocurrencies.

---

[10] Excerpt from April 5, 2020, Episode of On the Brink with Castle Island titled "Ray Youssef (Paxful) on building the world's largest Bitcoin p2p market (Apple Podcasts).

[11] Announced in Bitcoin Magazine article "Paxful Introduces AI-Powered, Biometric Verification to Improve KYC and AML," dated April 2, 2019, accessed from https://bitcoinmagazine.com/business/paxful-introduces-ai-powered-biometric-verification-improve-kyc-and-aml on March 25, 2026.

[12] Archived copy of Paxful obtained from https://web.archive.org/web/20210303201917/https://paxful.com/sell-bitcoin on March 25, 2026.

Paxful posted online customer support videos explaining how to set up a cryptocurrency seller profile, including how to accept payment, prominently featuring forms of payment such as Walmart Money cards and GreenDot prepaid debit cards[13]. I reviewed several historical Paxful user profiles through a publicly accessible internet archive. Many of these profiles advertised offers of prepaid debit cards in exchange for cryptocurrency, often at rates discounted from the face value of the card.

## VI.    THE USE OF PREPAID CARDS TO BUY AND SELL CRYPTOCURRENCY

A continuing challenge in the cryptocurrency market is presented by the need to rely on fiat currency payment rails to buy, sell or exchange cryptocurrency for fiat. This reliance on centralized payment rails runs somewhat counter to the original decentralized digital cash system originally envisaged by the BTC and crypto communities. For example, fiat currency payment providers decide which cryptocurrency platforms they will and will not service, decide which retail clients they will and will not service globally and which fiat currencies they will accept. Likewise, fiat currency payment providers, including those servicing cryptocurrency platforms, are often subject to local regulations that place limitations on their services in support of cryptocurrency trading. And, in some jurisdictions, some bank institutions do not accept or have not accepted transfers to or from cryptocurrency platforms.

Historical posts in numerous cryptocurrency focused forums, including BitcoinTalk and Reddit, discuss the various challenges individuals face when attempting to buy or sell cryptocurrency with fiat currency. These challenges include lack of fiat currency rails on certain platforms, adverse banking decisions based on exposure to cryptocurrency transactions, difficulty transmitting cash, and the slow speed of wire transfers. A commonly suggested solution to these challenges, especially in the period before the more recent mainstream adoption of cryptocurrency, was to use gift cards and prepaid debit cards as a means to transfer fiat currency when buying or selling cryptocurrency.

Gift cards and prepaid debit cards act as a form of digital cash. Cards can be easily loaded with fiat currency value (including purchased directly for cash), are not tied to a bank account and can be easily transferred, either physically or digitally (by digital photo, for example). The purchase of gift and prepaid cards is also relatively easy, with no application required, a privacy feature in line with the philosophy of many cryptocurrencies users. Thus, gift cards and prepaid debit cards through and including the period of the charges in this case became a popular and widely accepted means to buy and sell cryptocurrencies, including on peer-to-peer markets such as Paxful. In addition to peer-to-

---

[13] Archived copy of Paxful User Video titled "How to Create an Offer on Paxful" dated May 30, 2019 obtained from https://web.archive.org/web/20200705194942/https://www.youtube.com/watch?v=w3wfUDKdKJQ&gl=US&hl=en on March 24, 2026. Prepaid debit card payment methods are displayed at minute 00:38 of the video.

peer markets, there are currently specialized cryptocurrency platforms, including Bitrefill, which allow platform users to buy gift cards and prepaid debit cards using cryptocurrency.

I have personally interacted with users who bought or sold cryptocurrency using gift cards and prepaid debit cards. Often individuals used this method because it offered more privacy than linking a bank account to an exchange, in keeping with the privacy ethos present amongst many cryptocurrency enthusiasts. In some cases, individuals defaulted to the prepaid card option because banks were very likely to close customer accounts belonging to individuals engaged in cryptocurrency transactions, especially before cryptocurrency became widely accepted in the last few years.

While established global cryptocurrency exchanges such as Binance and OKX often operate in many jurisdictions globally, they offer fiat payment ramps in only a limited number of jurisdictions and fiat currencies. Binance, the world's largest cryptocurrency exchange, advertises the ability to trade in 35 different currencies; OKX, the second largest, supports 46. There are over 180 fiat currencies in circulation around the globe, according to the United Nations[14]. Based on my experience, the number and types of fiat currencies supported by cryptocurrency exchanges is often driven by market conditions, as it generally only makes business economic sense to offer fiat currency channels in the most popular global currencies. Furthermore, based on my experience in the cryptocurrency industry, not all jurisdictions worldwide permit or have permitted (depending on the time period) the use of fiat currencies to buy or sell cryptocurrency. For example, China enacted a total ban on cryptocurrency trading in 2021, eliminating the ability to buy or sell cryptocurrency in exchange for renminbi, and in February 2021, the Central Bank of Nigeria (in a country with more than 200 million people) banned banks and financial institutions from dealing with cryptocurrency exchanges or processing cryptocurrency transactions. Thus, given market conditions and regulations, cryptocurrency users in some jurisdictions are unable to buy, sell or trade cryptocurrency for fiat because payments rails simply do not exist for their local currency. Users therefore must find alternative means to transfer fiat currency to or from a cryptocurrency platform in order to buy or sell cryptocurrencies.

Peer-to-peer markets, including Paxful, helped solve this challenge by offering direct seller- to-buyer transactions that are not dependent on established fiat payment rails. Many seller posts accessible on archived copies of Paxful's webpage [relating to the period of the charges] offered buyers the ability to purchase gift cards or prepaid cards denominated in a variety of fiat currencies using cryptocurrency. The value stored on the cards could then be easily accessed by the buyer without having to rely on cumbersome or non-existent fiat payment rails. Based on my experience and research, gift cards and prepaid debit cards are useful for buying cryptocurrency in jurisdictions that lack fiat payment rails or limit or prohibit crypto currency trading. In such jurisdictions, prepaid

---

[14] UN Operational Rates of Exchange
https://treasury.un.org/operationalrates/OperationalRates.php accessed March 24, 2026.

cards are often readily obtainable, whether (i) from relatives overseas, (ii) through peer-to-peer markets such as Paxful, or (iii) through specific card vendor services. In other words, buyers are able to purchase gift or prepaid debit cards denominated in fiat currencies that are supported by existing fiat payment channels and then, in another country, use these cards to purchase cryptocurrencies for investment, trading, or cross-border payments. This provides users in jurisdictions that are unfriendly to cryptocurrency access to cryptocurrency that they otherwise would not have.

The market for such alternatives is substantial. Popular fiat payment rails used by cryptocurrency exchanges often require access to a bank account, credit card or other payment provider in order to buy and sell cryptocurrency using fiat. But the World Economic Forum estimated in 2024 that almost 1.4 billion people worldwide lack access to a bank account[15], meaning the unbanked lack the ability to exchange fiat and crypto currency through a financial institution. Gift cards and prepaid debit cards generally do not require access to a bank account to purchase or load value, providing the unbanked population a means to access the fiat currency needed to buy cryptocurrency or transfer the fiat proceeds of cryptocurrency sales.

In addition, in both my experience and based on publicly available research, gift cards and prepaid debit cards used in cryptocurrency transactions are a popular means for sending remittances globally. Specifically, cryptocurrencies serve as an alternate means of international clearance, supplanting traditional money transmitters for a quick and efficient means to transmit value from one jurisdiction to another. Remitters often purchase prepaid cards for cash. The cards serve as a stable store of value, are easily accessible and do not require access to a bank account. The remitter shares the card details with the relative, who often sells the card on a peer-to-peer marketplace, such as Paxful, for cryptocurrency, often at a discount to the face value based on market conditions on the platform. The family member then receives cryptocurrency from the sale of the prepaid card and is able to sell or convert the cryptocurrency for local currency.

I have learned through my work experience and by keeping current on developments in the market that this method was popular in certain jurisdictions for a number of reasons. First, the process tends to be much faster than traditional remittance services because it can be completed entirely online, without the need for transactions to clear a bank account or the need for the sender or recipient to travel to a physical money remitter. Second, even though prepaid cards are usually sold at a discount, this process can be more cost efficient than using a traditional remittance service which often must transact based on official exchange rates set by the local government. Cryptocurrency can often be sold at higher off-market rates, netting the recipient more local currency than a traditional remittance when accounting for fees and unfavorable official exchange rates.

---

[15] World Economic Forum "Why financial inclusion is the key to a thriving digital economy," dated July 29, 2024, accessed at https://www.weforum.org/stories/2024/07/why-financial-inclusion-is-the-key-to-a-thriving-digital-economy/ on March 24, 2026.

Third, although cryptocurrency values can be volatile, they are often viewed as a critical store of value in jurisdictions experiencing currency devaluation and hyperinflation. Cryptocurrency's fungibility and the ability to quickly transfer value internationally provides remittance recipients with an important hedge against unstable economies.

In sum, based upon my years of experience working in investigative and compliance roles within the cryptocurrency industry, combined with significant publicly available documentation, it is my opinion that gift cards and prepaid debit cards have historically been, and remain, a common payment means used to buy and sell cryptocurrencies. Cryptocurrency buyers and sellers on major peer-to-peer exchange platforms, including Paxful during the period of the charges in this case, regularly offered or accepted gift cards and prepaid debit cards in exchange for buying or selling cryptocurrencies. Peer-to-peer platforms, including Paxful, provided a market in which gift cards and prepaid debit cards could serve as a secure means of payment, while offering security features and on-chain monitoring to reduce instances of fraud. Gift cards and prepaid debit cards were regularly used to buy and sell cryptocurrencies because they provide users with access to fiat currency payment rails while preserving their individual privacy, a key concept behind the launch and widespread adoption of many of the most popular cryptocurrencies. These cards offered an important bridge between cryptocurrency platforms and individuals seeking to buy or sell cryptocurrencies in jurisdictions that either lacked functioning fiat currency channels or did not permit locally regulated banks and financial institutions to conduct transactions with users of cryptocurrency platforms. Finally, it is my opinion that gift cards and prepaid debit cards, when used in transactions with cryptocurrencies that serve as a clearance mechanism, are an important means for global remittances that provides a faster, more efficient and potentially more beneficial exchange rate than traditional global remittance channels.

## VII.    RESERVATION OF RIGHTS

I reserve the right to supplement my opinions in the event that additional information or arguments are provided to me or submitted in connection with this matter. I reserve the right to use graphics, figures and/or illustrations at trial to illustrate my conclusions herein.

*/s/ Matthew J. Price*

_____

Matthew J. Price

11

# PRICE DISCLOSURE

# APPENDIX A

**Appendix A:**

# MATTHEW PRICE

**Curriculum Vitae**

**PROFESSIONAL EXPERIENCE**

*2025 TO PRESENT*
*INDEPENDENT CONSULTANT*

• Provide forensic accounting, financial investigations and cryptocurrency asset tracing services to criminal and civil attorneys in support of litigation.
• Prepare expert reports, declarations and affidavits for use in litigation. Provide expert testimony in civil and criminal litigation proceedings.
• Advise cryptocurrency protocols, business, and exchanges on compliance best practices, technology implementation, licensing and investigations/transaction monitoring techniques.

*2023 TO PRESENT*
*VP OF INVESTIGATIONS AND STRATEGIC ADVISORY, ELLIPTIC*

• Serve as Elliptic's cryptocurrency investigations Subject Matter Expert, supporting product development, driving intelligence collection and providing investigations guidance for all sectors of the business.
• Build, grow and manage Elliptic's relationships with public sector agencies across the globe, including law enforcement, intelligence and regulatory agencies.
• Maintain extensive contacts with key law enforcement, intelligence, and regulatory agencies focused on cryptocurrency issues across the globe.
• Provide training, guidance and expertise to cryptocurrency investigators in compliance departments at major Fintech firms and throughout the global law enforcement community.
• Develop and lead new product and intelligence initiatives in the areas of Decentralized Finance, cross-chain crime and public/private sector collaboration.
• Provide Subject Matter Expertise to compliance organizations in the FinTech space to build and scale fraud investigation teams, to include implementing technology solutions.

***2021 TO 2023***
***GLOBAL HEAD OF INVESTIGATIONS, BINANCE***

• Globally recognized expert in the field of cryptocurrency investigations, including blockchain analysis techniques, forensics, decentralized finance, and modus operandi related to blockchain crimes.
• Built and led a high functioning investigations team of nearly 25 investigators worldwide that is recognized globally for its cryptocurrency expertise.
• Led the development and implementation of blockchain analysis tools, case management system, and data analysis tools.
• Created policies and procedures governing investigative operations, strategic priorities, and resource allocation.
• Built strong relationships with global law enforcement agencies, regulatory agencies and blockchain analysis firms.
• Developed a cryptocurrency investigations training program and delivered training to law enforcement and corporate partners globally.
• Sought after speaker at numerous domestic and international Fintech and law enforcement conferences, media appearances in Tier 1 media outlets, television and book appearances.

***2017 TO 2021***
***SPECIAL AGENT, IRS-CI CYBER CRIMES UNIT, WASHINGTON, DC***

• Conducted complex, cutting-edge international cyber investigations, including the first-ever investigations of illicit bitcoin mixing services. My case work directly led to new case law affirming the applicability of the Bank Secrecy Act and U.S. FinCEN regulations to virtual currency mixers.
• Planned and led numerous international investigations, coordinating the actions of investigative, prosecutorial and regulatory authorities both in the U.S. and abroad.
• Collaborated closely with the U.S. Department of Justice, FinCEN and Treasury regulators to successfully target and dismantle illicit bitcoin mixing services and darknet markets.
• Developed new tools and methodologies to successfully identify, arrest and prosecute cyber criminals using cryptocurrency to protect their anonymity.
• Developed and conducted innovative cyber undercover operations to identify and target cyber-criminal actors.
• Seized hundreds of millions of dollars in illicit crypto currency.

• Provided training, education and outreach to U.S. and foreign law enforcement partners and corporate partners in the crypto currency space. Developed strong relationships with domestic and international law enforcement, regulatory and corporate partners.
• Speaker at numerous domestic and international conferences, including 2019 Korean National Police International Symposium on Cybercrime Response, 2021 Europol EC3 Cryptocurrencies Conference, and 2019 Inspectors General Conference.
• Recipient of IRS-CI Chief's Award and IRS Commissioner's Award for investigative excellence.

*2012 TO 2017*
*TARGETING OFFICER, CENTRAL INTELLIGENCE AGENCY, WASHINGTON, DC*

• Served as an integral member of a multi-agency team pursuing high value targets of critical importance to the U.S. Intelligence Community.
• Independently identified people, relationships, and organizations having access to the information needed to address the most critical U.S. foreign intelligence requirements and found opportunities to disrupt terrorist attacks, illegal arms trading, drug networks, cyber threats and counterintelligence threats.
• Served a one-year Joint Duty Assignment detailed to the Federal Bureau of Investigation, Counterintelligence Division.

*2009 TO 2012*
*SPECIAL AGENT, IRS-CI, BALTIMORE, MARYLAND*

• Independently conducted complex criminal investigations of money laundering, identity theft, fraud and criminal tax statutes leveraging the full range of investigative tools and techniques.
• Successfully served as the lead case agent for a multi-million dollar white collar fraud and narcotics money laundering investigations that led to convictions in Federal court.
• Planned, executed and led numerous successful enforcement operations including search warrants, surveillance, arrest and undercover operations.
• Leveraged advanced accounting and financial investigative skills to gather, analyze and present complex financial evidence to obtain criminal convictions.
• Served as a leader in several multi-agency investigations of major white-collar fraud, identity theft and narcotics money laundering cases.

3

*2007 TO 2009*
*POLICE OFFICER, MONTGOMERY COUNTY POLICE, ROCKVILLE, MARYLAND*

• Solo patrol officer providing proactive community-oriented police services in a high call volume area.
• Successfully investigated misdemeanor and felony crimes, prepared detailed incident and arrest reports, criminal complaints, civil and criminal citations, search and arrest warrants and testified in court.
• Experienced in conflict resolution, crisis management and emergency response.
• Built close professional relationships within a diverse community to foster collaboration and mutual respect.

**TESTIMONY/TRIAL EXPERIENCE RELATED TO CRYPTOCURRENCY**

- Expert Declaration on behalf of iFinex, Inc in the matter of *United States v. Ilya Lichtenstein and Heather Morgan* [23-CR-239 (CKK)], US District Court for the District of Columbia
- Expert Declaration on behalf of plaintiff Leena Kahn in the matter of *Leena Khan v. Muneeb Ali* [365408/2025], Supreme Court of the State of New York, County of New York
- Government fact witness testimony, *United States v. Alain Tzvi Bibliowicz Mitrani* [1:25-cr-00039], United States District Court for the Eastern District of New York
- Government fact witness testimony *United States v. Roman Sterlingov* [21-CR-399 (RDM)] United States District Court for the District of Columbia
- Government Fact Witness Testimony Regarding the Technical Functions of a Bitcoin Mixer, *United States v. Larry Harmon*, [19-CR-395 (BAH)], United States District Court for the District of Columbia
- Corporate Representative testimony in Rule 30(b)(6) depositions in the matter of *Commodities Futures Trading Commission v. Binance Holdings Limited* [1:23-cv-0188], United States District Court for the Northern District of Illinois
- Corporate Representative testimony in Rule 30(b)(6) deposition in the matter of *Steven Paul Kowalski et al vs. Binance Holdings Ltd et al* [ 2021-023426-CA-01] Eleventh Judicial District of Florida

**TRAINING/CERTIFICATIONS**

- Certified Fraud Examiner

4

- Specialist Investigator Certification, Elliptic
- Crypto Investigators Certification, Elliptic
- Reactor Certification, Chainalysis
- Operational and Analysis Training, Central Intelligence Agency
- Criminal Investigators Training Program, Federal Law Enforcement Training Center
- IRS-CI Special Agent Basic Training, National Criminal Investigation Training Academy
- Specialized Cybercrimes Investigations Training, IRS-CI
- Police Officer Training Program, Montgomery County Maryland Public Safety Training Academy

**EDUCATION**

DECEMBER 2008
M.S. University of Maryland University College, Accounting and Information Systems

MAY 2004
B.S. University of Scranton, Accounting