UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES OF AMERICA,

      -against-                         No. 24-cr-0322 (VM)

WEIDONG GUAN and LE VAN HUNG,

       Defendants.
--------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT LE VAN HUNG'S
MOTION FOR CLASSIFIED-MATERIALS REVIEW UNDER CIPA § 4**

Timothy C. Parlatore
Parlatore Law Group, LLP
*Attorneys for Defendant Le Van Hung*
260 Madison Ave., 17th Floor
New York, New York 10016
212-679-6312

# Table of Contents

PRELIMINARY STATEMENT ................................................................................. 1
STATEMENT OF FACTS ...................................................................................... 3
   A. The Prosecution........................................................................................... 3
   B. The CCP's Documented Campaign Against Falun Gong...................................... 4
   C. Mr. Hung's Unique Position in Vietnam ........................................................... 5
   D. The Gift Card Fraud Ecosystem...................................................................... 6
   E. The Complaint Letter ................................................................................... 6
   F. CCP State Media Exploitation........................................................................ 8
   G. The CCP's Documented Efforts to Influence DOJ Decisions ............................... 8
   H. Procedural History ...................................................................................... 9
ARGUMENT ................................................................................................... 11
   I. THE COURT SHOULD ORDER THE GOVERNMENT TO CONDUCT A
CLASSIFIED-MATERIALS REVIEW BECAUSE THE DEFENSE HAS MADE A
PARTICULARIZED SHOWING THAT CLASSIFIED MATERIALS MAY BE
HELPFUL TO THE DEFENSE ............................................................................. 11
   II. THE GOVERNMENT'S BRADY OBLIGATIONS INDEPENDENTLY
REQUIRE A SEARCH OF CLASSIFIED HOLDINGS, AND THE DEFENSE'S
LETTERS HAVE PUT THE GOVERNMENT ON NOTICE........................................... 14
   III. THE GOVERNMENT'S PROSECUTION-TEAM ARGUMENT FAILS
BECAUSE THE AGENCIES IDENTIFIED BY THE DEFENSE HAVE SUBSTANTIVE
CONNECTIONS TO THIS CASE AND BECAUSE THE GOVERNMENT'S OWN
STRUCTURE AND PROCEDURES REQUIRE THE SEARCH........................................ 15
   IV. THE GOVERNMENT'S CONTEMPORANEOUS-KNOWLEDGE
ARGUMENT MISAPPLIES THE LEGAL STANDARD .................................................. 18
   V. THE DEFENSE'S REQUEST IS TIMELY ......................................................... 21
   CONCLUSION............................................................................................... 23

## PRELIMINARY STATEMENT

Defendant Le Van Hung respectfully moves this Court for an order directing the Government to conduct a classified-materials review and to submit responsive materials for in camera judicial review under Section 4 of the Classified Information Procedures Act ("CIPA"), 18 U.S.C. App. III § 4. The defense addresses the scheduling implications of this motion in a separate application filed contemporaneously.

It is undeniable that this prosecution is helping to fulfill the goals of the Chinese Communist Party. While they may be doing it unwittingly, that is not a matter of dispute. The CCP (Chinese Communist Party) and the PLA (People's Liberation Army) have openly designated Falun Gong as a primary target of "legal warfare," part of their Three Warfares military doctrine. Xi Jinping personally ordered an escalation of operations against Falun Gong abroad, specifying legal warfare as a primary tactic. CCP agents were convicted in this District for fabricating complaints to trigger government action against a Falun Gong entity. CCP state media is actively exploiting this prosecution to advance the Party's anti-Falun Gong narrative, which falls into the "public opinion warfare" part of the CCP and PLA's Three Warfares military doctrine. Therefore, a conviction in this case would accomplish precisely what the CCP's national strategy seeks: the dismantling of Falun Gong-affiliated institutions through the legal systems of foreign governments.

The discovery has already revealed likely CCP tampering. In fact, one of the Government's marked exhibits, GX 1A-6TR,[1] is an anonymous complaint which appears to have originated from the China's Ministry of State Security (MSS), the principal civilian intelligence and security

---

[1] It is unknown how the Government intends to authenticate this document or what theory of admissibility they are following.

service of the People's Republic of China, responsible for foreign intelligence, counterintelligence, covert action, and the political security of the Chinese Communist Party. This letter appears to have been intended to undermine the legitimacy of the Falun Gong movement and potentially catalyze this prosecution. This August 2020 complaint letter contains specific linguistic, cultural, and forensic anomalies that are inconsistent with genuine Falun Gong practitioner authorship and consistent with the documented CCP modus operandi of fabricating complaints, the precise conduct for which CCP agents Chen Jun and Lin Feng were convicted in this courthouse. Forensic linguistic analysis has confirmed that the complaint letter was written in simplified Chinese by a native mainland Chinese speaker, not translated from Vietnamese as one would expect from a Vietnamese Falun Gong practitioner. All thirteen core Falun Gong cultivation terms are absent from the letter. The writer demonstrated only superficial, non-practitioner-level knowledge of Falun Gong, while displaying fluency in Chinese legal and financial conventions. The analysis concluded that the practitioner identity served as "the cover" while the law enforcement information package was "the payload," a structure consistent with the fabricated-complaint methodology for which Chen Jun and Lin Feng were convicted.

The letter's documentary trail raises separate concerns. The letter was sent by an anonymous author using a pseudonymous Gmail account whose true owner has never been identified. Before reaching the defendants, it was routed through multiple intermediaries across at least two countries, through a Taiwan based intermediary before arriving at NTD headquarters. This multi hop delivery chain is consistent with how the MSS uses overseas cutouts to obscure the true origin of information. Despite all of this, the Government has not confirmed that it has searched existing classified holdings or consulted the DOJ components responsible for classified-information review in criminal cases. It refuses to confirm whether it consulted the National

2

Security Division (NSD), as the Justice Manual requires. And it refuses to confirm whether it has searched Intelligence Community (IC) files for exculpatory material.

The prosecutor's obligation is not merely to obtain convictions. It is to ensure "that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). When a prosecution objectively advances the declared goals of a hostile foreign intelligence service, and when the Government's own evidence bears hallmarks of that service's documented methods, the minimum step consistent with that obligation is to look. Mr. Hung asks only that the Court order the Government to do so, and to submit what it finds for in camera judicial review. If there is nothing to find, the review will confirm that and the case will proceed. If there is something to find, the Court and the parties need to know before trial.

**STATEMENT OF FACTS**

**A. The Prosecution**

Defendant Le Van Hung is a Vietnamese Falun Gong practitioner charged with money laundering conspiracy and related offenses arising from the purchase of gift cards on the Paxful cryptocurrency platform. The Government alleges that Mr. Hung knowingly purchased gift cards representing proceeds of unlawful activity. Trial is scheduled for July 7, 2026 before this Court.

As set forth in Mr. Hung's Motion in Limine, the central disputed element at trial is knowledge, specifically whether Mr. Hung knew that the specific gift cards he purchased represented proceeds of unlawful activity. The Government's primary evidence of that knowledge is an August 2020 complaint letter that purportedly warned the defendants about the nature of the gift card transactions.

Undersigned counsel was retained on August 8, 2025. The Government has produced over eight million pages of discovery, with productions continuing through at least June 12, 2026. The

3

Government made three separate Rule 16 productions in a single five-day span: Production 33 on June 8 (approximately 700 items), Production 34 on June 10 (approximately 283 items), and Production 35 on June 12 (Korean Ministry of Justice documents). The Government's letter arguing that the defense's discovery request is untimely was sent on June 9, 2026, sandwiched between Productions 33 and 34.

### B. The CCP's Documented Campaign Against Falun Gong

The Chinese government has codified "legal warfare," "public opinion warfare," and "psychological warfare" as official PLA military doctrine, collectively known as the "Three Warfares." Legal warfare includes the strategy of using or misusing law in place of traditional military means to achieve an operational objective.

In 2022, at an expanded meeting of the CCP's Central Political and Legal Affairs Commission, Xi Jinping personally ordered an escalation of anti-Falun Gong operations abroad, placing the MSS in charge. According to multiple credible sources, including Levi Browde, *Leaked CCP Files Expose Global Crackdown on Dissent*, The Diplomat (Feb. 26, 2025), testimony before the Tom Lantos Human Rights Commission, *Transnational Repression: Trends and Policy Approaches*, 119th Cong. (June 24, 2025), and statements by U.S. Rep. Scott Perry (December 2024), Xi's strategy specified two primary tactics: influencing global public opinion and leveraging legal warfare.

In this very District, CCP agents Chen Jun and Lin Feng were convicted for acting as illegal agents of the PRC government and conspiring to manipulate the IRS Whistleblower Program to strip the tax-exempt status of a Falun Gong entity. On a recorded call, Chen explicitly stated that the purpose was to carry out the CCP's aim of "toppl[ing] the Falun Gong." Chen pled guilty in November 2024 and was sentenced to 20 months in federal prison.

4

In a separate case, Eileen Wang agreed to plead guilty to acting as an illegal agent of a foreign government after operating a CCP-directed diaspora media operation using WeChat and a pseudo-news website to amplify CCP narratives in the United States.

The Tom Lantos Human Rights Commission documented six major CCP tactics targeting Falun Gong practitioners in the United States: Beijing-backed social media influencers, violent threats, lawfare, media manipulation, attempts to co-opt government agencies, and impersonations.

### C. Mr. Hung's Unique Position in Vietnam

Unlike co-defendant Guan, who was based in the United States, Mr. Hung was operating primarily in Vietnam. Freedom House's 2026 report identified Vietnam as one of the top three perpetrators of transnational repression in the world, alongside China and Russia, with over half of 126 documented incidents occurring in Southeast Asia, driven by "geopolitical pressure and economic incentives from Beijing."

In 2010, the Chinese Embassy in Hanoi sent a diplomatic memo to Vietnam's Ministry of Investigation and Security recommending "that all illegal activities of Falun Gong individuals in the Vietnam territory must be attacked and stopped." The Vietnamese government complied: two Vietnamese Falun Gong practitioners were arrested, tried, and sentenced to prison for broadcasting uncensored news programs into China.

Vietnam has banned Falun Gong and labelled it a "counter-revolutionary" cult. In August 2018, Major General Nguyen Van Duc of Vietnam's Ministry of Defense issued a directive ordering a close watch on the activities of Falun Gong followers.

### D. The Gift Card Fraud Ecosystem

In April 2026, ICE Director Caleb Lyons publicly stated that HSI "broke the largest gift card fraud case ever, and it was from transnational gangs within the CCP that were sending that money back to PLA military units in China. And that all came from gift card fraud here in the United States."

DHS launched Project Red Hook, a dedicated task force targeting Chinese organized crime's role in gift card fraud, documenting more than $1 billion in fraud, over 150 arrests, and a supply chain involving "takers, tampers, placers, redeemers, and suppliers."

Multiple DOJ prosecutions confirm that Chinese organized crime networks were a primary source of fraudulent gift cards on platforms like Paxful. In *United States v. Wu, Jiang & Chen* (D.N.H.), Chinese nationals pled guilty to conspiracy to commit wire fraud as part of a gift card ring where "organized criminal elements in China acquire gift cards through multiple fraudulent means."

Paxful itself pled guilty and admitted it knew it was used as a vehicle for fraud and that it attracted criminal clientele by promoting its lack of anti-money laundering controls. The Government's own prosecution of Paxful established that the platform was designed to conceal the criminal origins of transactions from its users. In the Paxful prosecution, the Government described buyers on the platform as victims, not as knowing participants.

### E. The Complaint Letter

The Government's knowledge case rests substantially on the August 2020 complaint letter. Defense investigation has identified specific linguistic, cultural, and forensic anomalies in the letter that are inconsistent with genuine Falun Gong practitioner authorship and consistent with

6

the documented CCP modus operandi of fabricating complaints, the precise conduct for which Chen Jun and Lin Feng were convicted in this District.

The letter's documentary trail raises separate concerns about its origins. The letter was sent from a pseudonymous Gmail account (thietmoclan2016@gmail.com) using the name "Thiet Moc Lan." The Government has never identified the actual author. Before reaching the defendants, the letter was routed from Vietnam to a phone number in Taiwan, then through a Taiwan based intermediary who forwarded it to NTD headquarters. This multi country routing through an intermediary is consistent with how the MSS uses overseas cutouts to deliver information while keeping the real source hidden. The letter also contains an unusual level of operational specificity that is more consistent with the product of sustained intelligence collection than a spontaneous complaint.

Forensic linguistic analysis has confirmed that the complaint letter was written directly in simplified Chinese by a native mainland Chinese speaker, with no Vietnamese-to-Chinese translation intermediary. The letter omits all thirteen core Falun Gong cultivation terms, uses terminology and discourse patterns characteristic of an external critic rather than a practitioner, and conforms to Chinese legal-writing conventions rather than Vietnamese formal-complaint conventions. The analysis concluded that the letter functions as a "pseudo-internal complaint" in which the practitioner identity is a facade and the law enforcement information package is the true purpose of the document.

The complaint letter is not collateral to this case. It is the Government's primary evidence of knowledge, the central disputed element at trial. If its provenance is compromised, the Government's case is fundamentally undermined.

7

The timing of the letter's appearance adds to the picture. The letter showed up in August 2020, in the middle of the COVID 19 pandemic, at a moment when the Epoch Times and NTD had just released documentaries on the origins of the virus and the CCP was furious about the coverage. The USAO's investigation started within months. The first search warrant was authorized on March 3, 2021. The CCP's joint Ministry of Public Security (MPS)/MSS appointment of Wu Xiuhua as Director of the "North America Falun Gong Combat Work Division" was finalized on March 30, 2021, within weeks of the first warrant. None of this is dispositive on its own. But the alignment between the letter's appearance, the CCP's documented operational escalation, and the start of this investigation is one more reason the classified materials review is warranted.

### F. CCP State Media Exploitation

CCP state media has systematically weaponized this prosecution. CGTN, a registered foreign agent of the CCP, published articles citing Mr. Guan's arrest and the $67 million money laundering allegation, then used it to attack Falun Gong's media operations. Sina Finance / China Anti-Cult, Chengde government anti-cult sites, China Anti-Cult Network / Sohu, and multiple provincial government platforms have amplified the prosecution in Chinese-language media targeting the diaspora community.

### G. The CCP's Documented Efforts to Influence DOJ Decisions

In *United States v. Michel*, No. 19-148-1 (D.D.C.), the Government itself alleged that the CCP's Ministry of State Security used intermediaries to "convince the Administration of the President of the United States and the United States Department of Justice to drop forfeiture proceedings and related investigations," and separately to arrange the return of a high-profile CCP

8

dissident. The classified record revealed that "the MSS was using Pras Michel, and Elliott Broidy to influence the U.S. Government in connection with the extradition of Guo Wengui."

## H. Procedural History

The factual predicate for this motion developed over time. While some individual facts were publicly available before the October 22, 2025 pretrial motions deadline, the defense's CIPA theory did not crystallize until counsel, retained only 2.5 months before that deadline and processing over eight million pages of discovery, was able to connect the Chen Jun precedent, the complaint letter anomalies, the ICE Director's statement, and the CCP exploitation pattern into a coherent theory warranting classified-materials review. That synthesis occurred in 2026. The following chronology illustrates the development:

*August 8, 2025:* Undersigned counsel retained to represent Mr. Hung. Counsel immediately began reviewing the Government's voluminous production.

*October 22, 2025:* Pretrial motions deadline. Counsel had been on the case for 2.5 months. The CIPA theory had not yet crystallized.

*November 2024:* CCP agent Chen Jun pled guilty in this District to acting as an illegal agent of the Chinese government and conspiring to fabricate complaints against a Falun Gong entity.

*February 2025:* The Diplomat published reporting on the Xi Jinping directive to escalate lawfare against Falun Gong abroad.

*June 2025:* The Tom Lantos Human Rights Commission documented CCP tactics targeting Falun Gong practitioners in the United States, including lawfare and attempts to co-opt U.S. government agencies.

*April 2026:* ICE Director Caleb Lyons publicly stated that CCP-linked gangs generated the largest gift card fraud case ever, sending proceeds to Chinese military units.

*2026:* Freedom House published its report identifying Vietnam as one of the top three perpetrators of transnational repression.

*Spring 2026:* Counsel completed sufficient review of the discovery record and public-source materials to connect the complaint letter anomalies, the Chen Jun precedent, the gift card fraud ecosystem, and the CCP exploitation pattern into a unified CIPA theory.

*June 1, 2026:* Co-defendant Guan submitted a CIPA discovery letter to the Government.[2]

*June 5, 2026:* Mr. Hung submitted a supplemental CIPA letter adopting Guan's request and raising additional grounds for classified-materials review.[3]

*June 8, 2026:* The Government made Production 33 (approximately 700 items).

*June 9, 2026:* The Government responded to the defense's CIPA letters, refusing to conduct the requested review and arguing waiver.[4]

*June 10, 2026:* The Government made Production 34 (approximately 283 items).

*June 12, 2026:* The Government made Production 35 (Korean Ministry of Justice documents).

---

[2] A copy of this letter is annexed hereto at Exhibit "A."

[3] A copy of this letter is annexed hereto at Exhibit "B."

[4] A copy of this letter is annexed hereto at Exhibit "C."

## ARGUMENT

### I. THE COURT SHOULD ORDER THE GOVERNMENT TO CONDUCT A CLASSIFIED-MATERIALS REVIEW BECAUSE THE DEFENSE HAS MADE A PARTICULARIZED SHOWING THAT CLASSIFIED MATERIALS MAY BE HELPFUL TO THE DEFENSE

Under the Second Circuit's binding framework in *United States v. Aref*, 533 F.3d 72, 79-80 (2d Cir. 2008), the district court must apply a sequential three-step analysis when classified information is at issue. First, the court determines whether the information is discoverable. Second, the court determines whether the state-secrets privilege applies. Third, if the information is discoverable but privileged, the court determines "whether the information is helpful or material to the defense, i.e., useful 'to counter the government's case or to bolster a defense.'" *Id.* at 80 (quoting *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993)).

The standard is lower than *Brady*: "To be helpful or material to the defense, evidence need not rise to the level that would trigger the Government's obligation under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), to disclose exculpatory information." *Aref*, 533 F.3d at 80. "[I]nformation can be helpful without being 'favorable' in the *Brady* sense." *Id.* However, mere "theoretical relevance" is insufficient. *United States v. Yunis*, 867 F.2d 617, 624 (D.C. Cir. 1989).

Mr. Hung does not ask the Court to order disclosure of classified information to the defense in the first instance. He asks the Court to require the Government to make the submission that CIPA § 4 contemplates, so the Court can determine whether responsive classified information is discoverable, privileged, helpful to the defense, subject to substitution, or properly withheld. SDNY courts routinely conduct this kind of review. *See, e.g.*, *United States v. Ho Wan Kwok*, No. 23 Cr. 118 (AT) (S.D.N.Y. Apr. 18, 2024) (extensive in camera CIPA review, supplemental submissions, redactions, and substitutions); *United States v. Liu*, No. 19 Cr. 804 (VEC) (S.D.N.Y. July 8, 2021) (court solicited ex parte defense submissions regarding anticipated defenses before

ruling on CIPA § 4 motion); *United States v. El-Hanafi*, S5 10 Cr. 162 (KMW) (S.D.N.Y. Feb. 24, 2012) (court directed Government to re-review classified materials to reconsider whether any could be helpful to the defense); *United States v. Seng*, S5 15-CR-706 (VSB) (S.D.N.Y. June 21, 2017) (court held ex parte conference with defense counsel to understand defense theory before ruling on CIPA § 4 motion).

The defense's showing exceeds theoretical relevance. As set forth in the Motion in Limine, the central disputed element at trial is knowledge. The classified materials sought bear directly on that element:

*Materials bearing on the provenance of the complaint letter* would address the Government's primary evidence of knowledge. The complaint letter is not collateral; it is the Government's bridge from "commercial activity on a crypto platform" to "knowing participation in money laundering." Forensic linguistic analysis has already confirmed that the letter was written in simplified Chinese by a native mainland Chinese speaker, not by a Vietnamese practitioner. If the letter was fabricated or seeded through CCP-linked channels, as the Chen Jun/Lin Feng precedent suggests is a real possibility, the Government's knowledge case would be substantially undermined.

The documentary trail of the complaint letter, the anonymous authorship, the routing through a Taiwan based intermediary, and the unusual level of operational specificity, all come from the Government's own exhibits, including GX 1A-6TR and the underlying email chain. The defense has identified specific individuals and specific email addresses from those exhibits: the pseudonymous author (thietmoclan2016@gmail.com) and the Taiwan intermediary "Yi Xin" (silvilin@gmail.com). These are not vague categories. They are specific people whose identities and affiliations can be checked against classified holdings.

12

*Materials concerning CCP-linked organizations that generated the gift cards* would bear on whether Mr. Hung was an unwitting end user of a CCP-directed criminal supply chain rather than a knowing participant. The Government's own prosecution of Paxful established that the platform was designed to conceal the criminal origins of transactions from buyers.

*Materials concerning CCP surveillance of Falun Gong practitioners in Vietnam* would provide context for Mr. Hung's operational security measures that the Government characterizes as evidence of criminal intent.

*Materials bearing on any counterintelligence assessment of this case* would address the integrity of the prosecution's evidentiary foundation. A conviction in this case would fulfill the CCP's openly declared strategic objectives. The question whether witnesses, documentary evidence, or investigative leads in this case have been influenced by CCP-linked efforts is not speculative; it is the natural consequence of the factual record before this Court.

Based on these factual predicates, the defense expects that a classified-materials review would reveal, among other things: (a) intelligence assessments of CCP operations targeting Falun Gong entities, including any assessment of the complaint letter's provenance or the CCP's use of fabricated complaints; (b) counterintelligence reports on CCP-linked criminal organizations operating in the gift card fraud space; (c) intelligence assessments of CCP-CPV security cooperation regarding the suppression of Falun Gong in Vietnam; (d) any FBI defensive briefings provided to the prosecution team regarding CCP targeting of Falun Gong entities; and (e) any surveillance or collection touching the defendants, The Epoch Times, or Falun Gong entities.

The U.S. government's well-documented counterintelligence efforts targeting the CCP and PLA's intelligence operations provide a non-speculative basis to believe that responsive classified holdings may exist.

13

## II. THE GOVERNMENT'S BRADY OBLIGATIONS INDEPENDENTLY REQUIRE A SEARCH OF CLASSIFIED HOLDINGS, AND THE DEFENSE'S LETTERS HAVE PUT THE GOVERNMENT ON NOTICE

The Government has an independent, affirmative obligation to search for exculpatory material in the files of agencies reasonably expected to possess such information. *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001) (citing *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). The defense's June 5 letter identified specific agencies and specific categories of materials that the defense believes contain information favorable to Mr. Hung. Having received this notice, the Government cannot later claim ignorance of potentially exculpatory material in those agencies' files. *See United States v. Risha*, 445 F.3d 298, 304-05 (3d Cir. 2006) (prosecutors risk constructive possession of *Brady* material where they have notice and "ready access" to the evidence); *see also Banks v. Dretke*, 540 U.S. 668, 695-96 (2004) ("Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." A rule declaring "'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process.").

The Second Circuit has already intervened when DOJ components attempted to wall off classified materials from the prosecution team. In *United States v. Stillwell*, 986 F.3d 196, 198 (2d Cir. 2021), the court vacated a protective order that barred SDNY prosecutors and defense counsel from reviewing classified documents, ordering disclosure "consistent with the prosecution's obligations under *Brady v. Maryland* … and *Giglio v. United States*." In *United States v. Hunter*, 32 F.4th 22, 32 (2d Cir. 2022), the court expressed "doubt that the NDDS, or any similarly-situated organ of the executive branch, for that matter, having stepped out of the shadows … could then successfully draw a curtain of secrecy over 'evidence … material either to guilt or to punishment' by invoking our *Brady* jurisprudence."

14

The Government's response is telling. It refused to confirm whether it has searched classified holdings. It refused to confirm whether it consulted the National Security Division. It stated that it is "not required to disclose to the defendants how it has complied with its discovery obligations." (Ex. C at 2.) If the Government has searched and found nothing, it should say so. If it has not searched, it should be ordered to do so. A Government that is seeking justice, not merely a conviction, should welcome the opportunity to verify the integrity of its own case.

### III. THE GOVERNMENT'S PROSECUTION-TEAM ARGUMENT FAILS BECAUSE THE AGENCIES IDENTIFIED BY THE DEFENSE HAVE SUBSTANTIVE CONNECTIONS TO THIS CASE AND BECAUSE THE GOVERNMENT'S OWN STRUCTURE AND PROCEDURES REQUIRE THE SEARCH

The Government argues that the Intelligence Community is "not part of the prosecution team in this case, which is a criminal matter, not an intelligence matter." (Ex. C at 3.) This argument fails for three independent reasons.

#### A. The Agencies Identified by the Defense Have Substantive Connections to This Case

The Government cites this Court's decision in *United States v. Gupta*, No. 23 Cr. 289 (VM) (S.D.N.Y. Aug. 27, 2025), for the prosecution-team definition. But *Gupta* is readily distinguishable. In *Gupta*, the defense sought materials from DEA Country Attachés who served as logistical coordinators with Czech law enforcement, individuals who had no investigative responsibilities, did not develop prosecutorial strategy, and did not attend court proceedings. This Court correctly held that logistical coordination alone was insufficient to create prosecution-team membership.

Here, the defense does not seek materials from logistical liaisons. It seeks materials from FBI counterintelligence, the same division that convicted CCP agents in this District for fabricating complaints against Falun Gong entities; from DHS/ICE, the agency whose Director has publicly stated that CCP-linked gangs generated the gift card fraud underlying this case; and from the

15

Intelligence Community, the agencies that the Justice Manual requires prosecutors to consult when national security equities are implicated.

This Court observed in *Gupta* that prosecution-team membership depends on "the facts and circumstances of the case" and that "individuals who perform investigative duties or make strategic decisions about the prosecution" are team members. The facts of this case, including documented CCP transnational repression, CCP-linked criminal organizations, and the conviction of CCP agents for fabricating complaints in this District, require a broader search than was necessary in *Gupta*.

Moreover, *Gupta* did not involve CIPA, classified information, or national security. The CIPA framework, with its "helpful or material" standard under *Aref*, is broader than the ordinary Rule 16 materiality standard applied in *Gupta*.

The Government's own letter concedes that the FBI provided assistance early in the investigation, that the case carries an OCDETF designation, and that CBP provided assistance. (Ex. C at 3.) Those admissions confirm that agencies beyond the immediate trial team have substantive connections to this case. While we do not yet know the extent of the prosecution's witness list, it is safe to assume there may be FBI agents on it.  The FBI is a member of the Intelligence Community. The Government cannot simultaneously admit FBI participation and deny any Intelligence Community nexus.

### B. The Government's Own Internal Procedures Contemplate the Requested Search

The Justice Manual, § 9-90.000, provides that the National Security Division's Counterintelligence and Export Control Section (CES) has "primary responsibility to assist all Departmental officials and USAOs on all matters related to national security, including approval of requests for production of preexisting classified information in connection with an anticipated

or ongoing criminal prosecution." The Justice Manual further provides that "the information within the possession of the intelligence community is classified shall have no effect either on the prosecutor's obligation to undertake the review of IC files or on the legally-mandated scope of that review."

Although the Justice Manual does not itself create a substantive discovery right, it confirms that DOJ has an established mechanism for precisely this circumstance: a criminal case with national security equities requiring coordination between prosecutors and the Intelligence Community. The Government's response gives no indication that this mechanism was engaged. The defense respectfully requests that the Court direct the Government to confirm whether NSD's CES was consulted and whether a search of IC files was conducted or directed.

### C. The Government's Own Unit Assignment and Organizational Structure Underscore the Need for Review

This case is being prosecuted by the SDNY Public Corruption Unit. According to the Office's own published description, that Unit "oversees the investigation and prosecution of corruption crimes committed by elected and appointed officials, government employees, and individuals and companies doing business with the city, state, and federal government, as well as campaign finance offenses." Its stated priorities are "the bribery of public officials, campaign finance violations and fundraising fraud, corruption of union officials, and fraud on the government."

There are no public officials in this case. There is no bribery, no campaign finance violation, no union corruption, and no fraud on the government. The charges are money laundering, bank fraud, and identity theft arising from cryptocurrency transactions on a peer-to-peer platform. SDNY has dedicated units whose published mandates encompass precisely these

17

charges, including the Money Laundering and Transnational Criminal Enterprises Unit and the Complex Frauds and Cybercrime Unit. The case was not assigned to either.

Equally notable is the unit that is absent. SDNY's National Security and International Narcotics Unit is responsible for "counterintelligence, sanctions evasion, export control, malign foreign influence, transnational repression, and international narcotics and weapons trafficking matters." That is a precise description of the CCP activity at issue in this motion. Yet the National Security Unit is not involved in this prosecution.

The defense does not suggest that internal unit assignment is subject to judicial review. But the Government cannot credibly argue that this case has no intelligence dimensions when its own office assigned it to a unit whose mandate centers on the integrity of government, rather than to a financial crimes unit or the National Security Unit whose mandate expressly encompasses malign foreign influence and transnational repression. The unit assignment itself raises the question this motion seeks to answer: what institutional considerations, beyond the face of the charges, led to this case being handled by the Public Corruption Unit? A classified-materials review may illuminate that question.

## IV. THE GOVERNMENT'S CONTEMPORANEOUS-KNOWLEDGE ARGUMENT MISAPPLIES THE LEGAL STANDARD

The Government argues that classified materials about CCP operations are immaterial because the defendants did not have contemporaneous knowledge of those operations. (Ex. C at 4.) This argument conflates two different questions: what the defendant knew at the time of the charged conduct, which is relevant to mens rea at trial, and what information is useful to the defense now, which is relevant to CIPA discovery.

18

Under *Aref*, the question is whether classified information is "useful to counter the government's case or to bolster a defense." 533 F.3d at 80. The Second Circuit has applied this standard as a present-tense inquiry into whether classified materials would be useful to the defense at the time of the CIPA proceeding. *See United States v. Al Farekh*, 956 F.3d 99, 116-17 (2d Cir. 2020) (reviewing classified materials to determine whether they were helpful or material to the defendant's defense).

Each category of requested materials is relevant regardless of contemporaneous knowledge:

*The complaint letter.* If the complaint letter was fabricated by CCP agents, that goes to the Government's evidence, not the defendant's knowledge. The defendant does not need to have known about the fabrication. The point is that the Government's key proof of knowledge may be manufactured. The Government cannot be permitted to introduce an exhibit in court that may have been produced by a foreign adversary without disclosing its origins.

The provenance concerns laid out in Section E are not speculation. They are drawn from the Government's own exhibits and the discovery record. The anonymous authorship and the Taiwan routing are facts stated in documents the Government itself intends to introduce at trial. If a classified materials review confirms, for example, that disseminating false documents to further its own strategic goals is not a hallmark of CCP or PLA foreign malign influence operations and the letter is authentic, that would strengthen the Government's case. On the other hand, if it reveals the likelihood of CCP involvement, it could prevent a gross miscarriage of justice. Either way, the review serves the interests of justice.

*The gift card ecosystem.* If classified materials show that CCP-linked organizations generated the gift cards and that Paxful was designed to conceal their origins from buyers, that

directly negates the "knowingly" element. The defendant's lack of contemporaneous knowledge is the entire defense: he was an unwitting end user. The Government's argument that the materials are immaterial because Mr. Hung did not know about them is circular, assuming the conclusion the defense is trying to disprove.

*The Vietnam threat environment.* Classified materials would corroborate the threat environment that motivated Mr. Hung's behavior. The defendant does not need to have known the specific classified details to know that the CCP has co-opted the Vietnamese government into persecuting Falun Gong practitioners.

*The counterintelligence assessment.* This goes to prosecution integrity, not defendant knowledge. If witnesses, documentary evidence, or investigative leads in this case have been influenced by CCP-linked efforts, that is relevant and necessary to the defense regardless of what Mr. Hung knew at the time of the charged conduct. This is a distinct question from the knowledge element addressed in the defense's Motion in Limine. The CCP has openly admitted to a national strategy of influencing foreign legal proceedings against Falun Gong. The question is not whether such efforts exist, but whether they have touched this case.

The Government cites *United States v. Campos*, 763 F. App'x 97, 100 (2d Cir. 2019) (summary order), for the proposition that "what [a third party] knew or believed sheds little, if any, light on what [the defendant] knew or believed." But the defense does not seek evidence of what third parties believed about Mr. Hung's intent. It seeks evidence that the Government's key evidence may have been fabricated, that the criminal supply chain was CCP-directed, that the defendant's conduct has an innocent explanation, and that the prosecution may have been influenced by a hostile foreign intelligence service. None of these categories depends on what a third party "knew or believed" about the defendant's state of mind.

20

## V. THE DEFENSE'S REQUEST IS TIMELY

The Government argues that any discovery motion is waived because the pretrial motions deadline passed on October 22, 2025. (Ex. C at 4-5.) This argument fails for multiple independent reasons.

### A. CIPA § 4 Is a Discovery Mechanism, Not a Rule 12(b) Motion

The Second Circuit has consistently characterized CIPA § 4 as a discovery provision. "Section 4 of CIPA establishes procedures for discovery of classified information" and "clarifies district courts' power under Federal Rule of Criminal Procedure 16(d)(1) to issue protective orders denying or restricting discovery for good cause." *United States v. Stewart*, 590 F.3d 93, 130 (2d Cir. 2009) (quoting *Aref*, 533 F.3d at 78). CIPA § 4 operates within the Rule 16 discovery framework, not the Rule 12(b) pretrial motions framework. The Government's waiver argument conflates two different procedural tracks.

### B. Good Cause Exists

Even if the Court treats this motion as subject to Rule 12(c)(3)'s good-cause standard, the defense has demonstrated good cause. As the chronology in the Statement of Facts demonstrates, while some individual facts were publicly available before the October 2025 deadline, the defense's CIPA theory did not crystallize until counsel was able to connect the complaint letter anomalies, the Chen Jun precedent, the gift card fraud ecosystem, and the CCP exploitation pattern into a coherent theory warranting classified-materials review. That synthesis required time that was not available to counsel, who was retained only 2.5 months before the deadline and was processing over eight million pages of discovery. *See United States v. Nayyar*, 628 F. App'x 40, 42-43 (2d Cir. 2015) (summary order) (recognizing change of counsel as relevant to good-cause inquiry under Rule 12(c)(3) and remanding); *United States v. Pikus*, 39 F.4th 39, 74, 80 (2d Cir.

21

2022) (holding that the Government's own discovery conduct was the "true cause of the delay" and that the Government could not benefit from delay caused by its failure to produce documents it agreed to produce).

The classified nature of the materials further supports good cause. The defense cannot know what classified materials the Government possesses. The Second Circuit has recognized that "CIPA procedures … place all parties involved (except perhaps the government) at a substantial disadvantage." *Stewart*, 590 F.3d at 132.

### C. The Government's Own Discovery Conduct Forecloses Its Waiver Argument

The Government made three separate Rule 16 productions in a single five-day span: Production 33 on June 8, 2026 (approximately 700 items, Bates-stamped USAO_00628645 through USAO_00629336); Production 34 on June 10, 2026 (approximately 283 items, Bates-stamped USAO_00629337 through USAO_00629619); and Production 35 on June 12, 2026 (Korean Ministry of Justice documents, Bates-stamped USAO_00629620 through USAO_00629624). The Government's letter arguing waiver was sent on June 9, 2026, the day after Production 33 and the day before Production 34.

The Government cannot make nearly 1,000 pages of new Rule 16 disclosures in the same week it argues that the defense's discovery request is untimely. A party that is still producing discovery has no standing to argue that the opposing party's discovery requests are time-barred. *See Pikus*, 39 F.4th at 74 (the Government's own discovery conduct was the "true cause of the delay").

### D. Brady Obligations Are Continuing

The Government itself acknowledges that its *Brady* obligations are "continuing." (Ex. C at 5.) Those obligations do not expire when a pretrial motions deadline passes. *See Coppa*, 267 F.3d

at 140. The defense's CIPA letters are, in part, *Brady* demands. *Brady* demands cannot be waived by a scheduling order.

## CONCLUSION

For the foregoing reasons, Mr. Hung respectfully requests that the Court enter an order:

(1) Directing the Government to search existing classified holdings through appropriate DOJ and NSD channels, prioritized as follows:

(a) materials bearing on the provenance, authorship, or authenticity of the August 2020 complaint letter, including any counterintelligence investigation of whether the letter was fabricated or seeded through CCP-linked channels;

(b) materials bearing on CCP fabrication of complaints against Falun Gong entities generally;

(c) materials bearing on CCP-linked criminal organizations operating in the gift card fraud space, including any materials identifying the specific sellers or networks that placed gift cards on the Paxful platform;

(d) any counterintelligence assessment, review, or analysis conducted with respect to this case; and

(e) materials bearing on CCP transnational repression operations in Vietnam targeting Falun Gong practitioners, to the extent the Government relies on Mr. Hung's operational security measures as evidence of criminal intent;

(2) Directing the Government to submit responsive materials, or a classified declaration describing the results of its search, for in camera judicial review under CIPA § 4;

(3) Directing the Government to confirm whether the National Security Division's Counterintelligence and Export Control Section was consulted before the Government

23

responded to the defense's CIPA letters, and whether a counterintelligence assessment of this case has been conducted; and

(4) Scheduling oral argument on this motion at the Court's earliest convenience.

To facilitate the efficient and secure handling of any classified materials, undersigned counsel holds an active TS/SCI security clearance and has ready access to SCIF facilities in the Washington, D.C. area.

Dated: June 15, 2026

Respectfully submitted,

Timothy C. Parlatore
Parlatore Law Group, LLP
*Attorneys for Defendant Le Van Hung*
260 Madison Ave., 17th Floor
New York, New York 10016
212-679-6312