

**Timothy C. Parlatore, Esq.**

**Managing Partner**

timothy.parlatore@parlatorelawgroup.com

**Direct: 212-679-6312**

June 5, 2026

Paul M. Monteleoni
Assistant United States Attorney
United States Attorney's Office
Southern District of New York
Jacob K. Javits Federal Building
26 Federal Plaza, 37th Floor
New York, New York 10278

   Re: *United States v. Guan*, No. 24-cr-0322 (VM), CIPA Discovery Request

Dear Mr. Monteleoni:

   We represent Le Van Hung in the above-captioned matter. We write to join in and supplement the Classified Information Procedures Act ("CIPA") discovery request submitted on behalf of co-defendant Weidong Guan by letter dated June 1, 2026, and to request that the Government conduct the classified-materials review described herein.

**I. ADOPTION OF CO-DEFENDANT'S CIPA REQUEST**

   Mr. Hung joins in and adopts the CIPA discovery request set forth in Mr. Guan's June 1, 2026 letter in its entirety. The materials sought by Mr. Guan, including any classified or unclassified evidence showing that PRC and CCP agents surveilled, monitored, intercepted communications of, or interfered with the activities of Falun Gong members in the United States, are equally relevant and helpful to Mr. Hung's defense. Mr. Hung was a Falun Gong practitioner who worked closely with Mr. Guan and The Epoch Times, and any evidence bearing on CCP targeting of Falun Gong and The Epoch Times is material to his defense for the same reasons articulated in Mr. Guan's letter.

   Mr. Hung writes separately, however, because his circumstances present additional and independent grounds for CIPA review that Mr. Guan's letter does not address. Each ground identified below bears directly on the central disputed element of the charged offenses: whether Mr. Hung *knew* that the prepaid debit cards he purchased on the Paxful platform were loaded with criminally derived proceeds.

**II. MR. HUNG'S UNIQUE POSITION AS A VIETNAMESE FALUN GONG PRACTITIONER**

   Unlike Mr. Guan, who was based in the United States during the relevant period, Mr. Hung was operating primarily in Vietnam. This distinction is critical because the CCP's transnational

Licensed to Practice by the States of New York and New Jersey

U.S. District Courts in New York, New Jersey, Connecticut, Pennsylvania, Texas, and the District of Columbia

Parlatore Law Group is a nationwide cloud-based firm. Please send all correspondence electronically.

If physical mail is required, please use the central mailing address below.

www.parlatorelawgroup.com  1440 N Edgewood St, Arlington VA 22201

repression apparatus operates with far greater reach and effectiveness in Vietnam than in the United States. Classified materials bearing on the threat environment Mr. Hung faced are relevant to the knowledge element because conduct the Government characterizes as evidence of concealment or criminal intent may instead reflect the reasonable precautions of a Falun Gong practitioner operating under documented CCP surveillance.

### A. Vietnam Is a Documented CCP Repression Proxy State

Freedom House's 2026 report, *Collaboration and Resistance: Tracking Transnational Repression in 2025*, identified Vietnam as one of the top three perpetrators of transnational repression in the world, alongside China and Russia. The report documented 126 new incidents of physical transnational repression in 2025, with over half, 69 of 126, occurring in Southeast Asia, driven by "geopolitical pressure and economic incentives from Beijing."

Vietnam is not a country where CCP influence is speculative. It is a country where the CCP directs law enforcement action against Falun Gong practitioners through formal diplomatic channels.

### B. The CCP Has Directed Vietnam to Arrest Falun Gong Practitioners

In 2010, the Chinese Embassy in Hanoi sent a diplomatic memo to Vietnam's Ministry of Investigation and Security stating that Chinese police had discovered radio signals originating from Vietnamese territory containing Falun Gong-related content. The memo recommended "that all illegal activities of Falun Gong individuals in the Vietnamese territory must be attacked and stopped." The Vietnamese government complied: two Vietnamese Falun Gong practitioners were arrested, tried, and sentenced to two and three years in prison for broadcasting uncensored news programs into China.

This is a documented case of the CCP directing a foreign government to arrest and prosecute Falun Gong practitioners, via a formal diplomatic instrument, in the very country where Mr. Hung was operating.

### C. Systematic Vietnamese Government Suppression of Falun Gong

Vietnam has labeled Falun Gong a "counter-revolutionary" cult. Vietnam's Ministry of Interior has stated that Falun Gong members "are having a negative impact on Vietnam's political security and public order." In August 2018, Major General Nguyen Van Duc, head of the Propaganda Office of the General Politics Department in Vietnam's Ministry of Defense, issued a directive ordering a close watch by authorities on the activities of Falun Gong followers. Sporadic cases of harassment, detention, property confiscation, and forced renunciations of Falun Gong practice have been documented throughout the country.

### D. Implications for the Knowledge Element

Mr. Hung was a Falun Gong practitioner operating in a country where the government actively collaborates with the CCP to suppress Falun Gong, where the CCP can direct arrests through diplomatic memos, and where practitioners face surveillance, harassment, and imprisonment. Any conduct by Mr. Hung involving layered transactions, use of intermediaries, or

operational security measures must be evaluated against this threat environment. What the Government may characterize as evidence of concealment may instead reflect the reasonable precautions of a Falun Gong practitioner operating under documented state surveillance. Classified materials bearing on CCP-CPV security cooperation, CCP intelligence operations in Vietnam targeting Falun Gong practitioners, and any U.S. intelligence assessments of the threat environment Mr. Hung faced are directly relevant and helpful to his defense on the knowledge element.

## III.    THE GIFT CARD FRAUD ECOSYSTEM AND THE PAXFUL PLATFORM

The Government's theory is that Mr. Hung knowingly purchased stolen gift cards on the Paxful platform. The defense seeks classified materials bearing on who was selling stolen cards on Paxful and whether a buyer on that platform could have known the cards were criminally derived. This request is grounded in the following facts, each of which bears directly on the knowledge element.

### A. The Acting ICE Director's Testimony

On April 16, 2026, Acting ICE Director Todd Lyons testified before the House Appropriations Committee's Subcommittee on Homeland Security that HSI "broke the largest gift card fraud case ever, and it was from transnational gangs within the CCP that were sending that money back to military units in China. And that all came from gift card fraud here in the United States." Lyons further stated that "it was military-aged Chinese males who entered under the last administration…that were able to [send the gift cards] back to the People's Republic of China."

This is sworn congressional testimony by the head of ICE, a component of the same Department of Homeland Security that participated in the investigation of this case, establishing that CCP-linked organizations were primary actors in the gift card fraud ecosystem.

### B. Project Red Hook

DHS launched Project Red Hook, a dedicated task force targeting Chinese organized crime's role in gift card fraud. Project Red Hook has documented more than $1 billion in gift card fraud in the last two years; a supply chain involving "takers, tampers, placers, redeemers, and suppliers"; over 150 arrests nationwide with 80-90% being Chinese nationals or Chinese Americans; and a pipeline that, in DHS's own words, "funds the illicit activities of Chinese organized crime groups, such as, fentanyl production and smuggling, illegal migration, and human trafficking."

The defense recognizes that the Project Red Hook cases documented to date primarily involve physical card draining at retail stores rather than the sale of stolen cards on peer-to-peer cryptocurrency platforms. However, the defense seeks classified materials about CCP-linked organizations operating at all levels of the gift card fraud ecosystem, including both the physical card-draining operations documented by Project Red Hook and any organizations that sold stolen or fraudulently obtained cards on platforms like Paxful. The relevance to the knowledge element is direct: if the sellers on Paxful were part of sophisticated criminal networks designed to conceal the origins of stolen cards, a buyer on the platform would have had no way to distinguish stolen cards from legitimate ones.

3

### C. DOJ's Own Prosecutions and the Unidentified Sellers

Multiple DOJ prosecutions confirm that Chinese organized crime networks were primary actors in the gift card fraud ecosystem. In *United States v. Wu, Jiang & Chen* (D.N.H.), Chinese nationals pled guilty to conspiracy to commit wire fraud as part of a gift card ring where "organized criminal elements in China acquire gift cards through multiple fraudulent means" and "send the gift card data to multiple cells of Chinese nationals operating in the United States through a Chinese-based messaging platform." In *United States v. Wang* (N.D.N.Y.), a Chinese national was convicted of money laundering conspiracy involving $2.2 million in Walmart gift cards. In the Western District of North Carolina, six members of a prolific Chinese Money Laundering Organization pled guilty to laundering over $92 million in illicit funds.

Notably, despite the documented massive volume of stolen gift card trafficking through Paxful, including over $620 million by the Black Axe criminal organization alone, to the defense's knowledge, the DOJ has never prosecuted a single individual for selling stolen gift cards on the Paxful platform. The only case that comes close is *United States v. Kvashuk* (W.D. Wash.), where a Microsoft employee sold stolen Xbox gift card tokens on Paxful, but he was prosecuted for the underlying theft from Microsoft, not for selling on Paxful. The entire seller side of the Paxful gift card ecosystem remains unidentified and uninvestigated. Classified materials about who was selling stolen cards on Paxful are therefore directly relevant to the defense, because the identity and methods of the sellers bear directly on whether a buyer could have known the cards were stolen.

### D. Paxful Was Designed to Conceal the Nature of Transactions from Its Users

Paxful itself pled guilty in December 2025 to three federal criminal charges, including conspiracy to operate an unlicensed money transmitting business through which it knowingly transmitted funds derived from criminal offenses. The Government's prosecution of Paxful was premised on the theory that the platform attracted criminal sellers by promoting its lack of anti-money laundering controls and its "deliberate decision not to identify its customers."

The Government's own Statement of Facts in the Paxful plea agreement (Doc. 18, No. 2:25-cr-00235, E.D. Cal.) establishes that Paxful was designed to obscure the identities and activities of its users. Specifically, the Statement of Facts admits that Paxful "marketed Paxful to customers as a platform that did not require KYC and/or that allowed 'buying without ID'"; that Paxful's co-founder told a prospective customer that trades on the platform were "instant and anonymous"; that Paxful "allowed customers to open Paxful accounts and trade without providing sufficient identifying information or documents to allow the Defendant to know the true identities of its customers"; and that Paxful failed to file a single suspicious activity report until November 2019, despite knowing that suspicious and criminal activity was being perpetrated by users through the platform.

The relevance to the knowledge element is direct: the Government prosecuted Paxful for concealing the criminal nature of its marketplace from its users. If the platform itself was criminally liable for preventing its users from knowing the nature of the transactions they were participating in, classified materials bearing on the specific sellers and transactions at issue in this case could establish that Mr. Hung, as an end user of that platform, could not have known the cards he purchased were loaded with crime proceeds.

4

### E. Implications for CIPA Review

If the gift cards Mr. Hung purchased on Paxful were placed there by criminal organizations, as the Acting ICE Director and Project Red Hook have established regarding the broader gift card fraud ecosystem of which Paxful was a central component, then classified materials about those organizations, their relationship to the CCP state apparatus, and their operations on Paxful are directly relevant and helpful to the defense on the knowledge element. Such materials could establish that Mr. Hung was an unwitting end user of a criminal supply chain, not a knowing participant in money laundering.

## IV.    THE INTEGRITY OF THE PROSECUTION'S EVIDENTIARY FOUNDATION

In addition to the materials sought above, Mr. Hung identifies a separate and independent basis for CIPA review: the possibility that CCP intelligence operations influenced the evidentiary foundation of this prosecution. This concern bears on the knowledge element because the Government's primary evidence that Mr. Hung knew the cards were criminally derived is a complaint letter whose provenance has not been established.

### A. The August 2020 Complaint Letter

The Government's knowledge case against the defendants rests substantially on an August 2020 complaint letter that purportedly warned the defendants about the nature of the gift card transactions. This letter is the Government's bridge from "commercial activity on a crypto platform" to "knowing participation in money laundering."

Defense investigation has identified specific features of the complaint letter that present serious questions about its provenance. The letter contains terminology errors inconsistent with authorship by a genuine Falun Gong practitioner, uses simplified Chinese characters where Vietnamese practitioners typically use traditional characters, and employs Chinese legal writing conventions rather than Vietnamese ones. The phone number associated with the purported sender has zero digital footprint. These features, individually and collectively, warrant further investigation into whether the letter was fabricated or seeded through CCP-linked channels.

### B. The Chen Jun / Lin Feng Precedent: Same District, Same Playbook

Those questions are particularly significant in light of the documented CCP modus operandi of fabricating complaints to trigger government action against Falun Gong entities. In this District, CCP agents Chen Jun and Lin Feng were convicted for acting as illegal agents of the PRC government and conspiring to manipulate the IRS Whistleblower Program to strip the tax-exempt status of a Falun Gong entity. On a recorded call, Chen explicitly stated that the purpose was to carry out the PRC Government's aim of "toppl[ing] the Falun Gong." Chen pled guilty in November 2024 and was sentenced to 20 months in federal prison.

The same U.S. Attorney's Office that convicted CCP agents for fabricating complaints against Falun Gong entities is now prosecuting a Falun Gong-affiliated entity based on a complaint letter whose provenance has not been established. Classified materials bearing on whether the complaint letter was part of a CCP intelligence operation are directly relevant to the knowledge

element, because if the letter was fabricated, the Government's primary evidence of Mr. Hung's knowledge collapses.

### C. The Xi Jinping Directive and the Three Warfares Doctrine

In 2022, at an expanded meeting of the CCP's Central Political and Legal Affairs Commission, Xi Jinping personally ordered an escalation of anti-Falun Gong operations abroad, placing the Ministry of State Security in charge. According to multiple credible sources, including reporting by The Diplomat (February 2025), Congressional testimony before the Tom Lantos Human Rights Commission (June 2025), and statements by U.S. Rep. Scott Perry (December 2024), Xi's strategy specified two primary tactics: influencing global public opinion and leveraging legal warfare.

These tactics correspond to two of the three components of the PLA's "Three Warfares" doctrine, which is codified in the PLA's Political Work Regulations, Chapter 2, Section 18, formally adopted by the CCP Central Committee and Central Military Commission in December 2003. The U.S. Department of Defense has officially recognized and defined all three warfares, public opinion warfare, psychological warfare, and legal warfare, in its 2011 Annual Report to Congress on Military and Security Developments Involving the People's Republic of China (p. 26). The Pentagon commissioned a 566-page unclassified study by Stefan Halper for the Office of Net Assessment in 2013, which described the Three Warfares as "a dynamic three dimensional war-fighting process that constitutes war by other means." The 2025 DOD Annual Report assesses that Beijing treats the "legal domain" as a contested operational space. Classified materials bearing on the implementation of this directive against Falun Gong are relevant to whether this prosecution, or the evidence underlying it, was influenced by CCP operations.

### D. CCP State Media Exploitation of This Prosecution

CCP state media has systematically weaponized this prosecution to advance the "evil cult" narrative against Falun Gong and The Epoch Times. CGTN, a registered foreign agent of the PRC government in the United States, published articles directly citing Mr. Guan's arrest and the $67 million money laundering allegation, then used it as a springboard to attack Falun Gong's media operations. Sina Finance / China Anti-Cult, Chengde government anti-cult sites, China Anti-Cult Network / Sohu, and multiple provincial government platforms have amplified the prosecution in Chinese-language media targeting the Chinese diaspora community. This pattern of exploitation is consistent with the PLA's Three Warfares doctrine of attacking targets through coordinated legal warfare, public opinion warfare, and psychological warfare.

### E. The CCP's Documented Efforts to Influence DOJ Decisions

The concern that CCP operations may have touched this prosecution is grounded in documented precedent. In *United States v. Michel*, No. 19-148-1 (D.D.C.), the Government itself alleged that the PRC's Ministry of State Security used intermediaries to "convince the Administration of the President of the United States and the United States Department of Justice to drop forfeiture proceedings and related investigations," and separately to arrange the return of a high-profile PRC dissident living in the United States. That case, prosecuted by the Department of Justice itself, establishes that the MSS has targeted specific DOJ decisions regarding PRC dissidents as a matter of documented fact.

6

Given that this prosecution targets a Falun Gong-affiliated entity that is a documented target of CCP intelligence operations; that the same U.S. Attorney's Office convicted CCP agents for fabricating complaints against Falun Gong entities; that the Acting ICE Director has testified that CCP-linked organizations were primary actors in the gift card fraud ecosystem; and that CCP state media is actively exploiting this prosecution, the defense respectfully requests that the Government confirm whether it has conducted a counterintelligence assessment of this case to determine whether any aspect of the investigation or evidence may have been influenced by CCP operations. If no such assessment has been conducted, the defense submits that one should be completed before trial.

### F. Implications for CIPA Review

The charged offenses require proof that Mr. Hung knowingly engaged in transactions involving criminally derived proceeds. Classified materials bearing on the categories identified in this letter are directly relevant to that element. Materials bearing on the provenance of the complaint letter would address the Government's primary evidence of knowledge. Materials concerning the criminal organizations that generated the gift cards would bear on whether Mr. Hung was an unwitting end user rather than a knowing participant. Materials concerning CCP surveillance of Falun Gong practitioners in Vietnam would provide context for Mr. Hung's operational security measures that the Government characterizes as evidence of criminal intent. If the complaint letter was fabricated or seeded through CCP-linked channels, the Government's knowledge case would be substantially undermined.

### V. LEGAL FRAMEWORK

### A. CIPA Section 4 Discovery Standard

Under the Second Circuit's binding framework in *United States v. Aref*, 533 F.3d 72, 79-80 (2d Cir. 2008), the Government's privilege over classified information must give way when the information is "relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." The court adopted the *Roviaro* standard for CIPA cases. *Id.* at 80.

The standard is lower than *Brady*: "To be helpful or material to the defense, evidence need not rise to the level that would trigger the Government's obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose exculpatory information." *Aref*, 533 F.3d at 80. "[I]nformation can be helpful without being 'favorable' in the *Brady* sense." *Id.*

However, mere "theoretical relevance" is insufficient. *United States v. Yunis*, 867 F.2d 617, 624 (D.C. Cir. 1989). The defense must make a particularized showing of how the material would aid a specific defense theory.

The defense's showing here exceeds theoretical relevance. The same U.S. Attorney's Office convicted CCP agents for fabricating complaints against Falun Gong entities. The complaint letter in this case contains specific linguistic and formatting anomalies inconsistent with genuine Falun Gong practitioner authorship. A documented Xi Jinping directive ordered the escalation of lawfare against Falun Gong abroad. The Acting ICE Director has testified before Congress that CCP-linked gangs were primary actors in the gift card fraud ecosystem. The Government's own prosecution of Paxful established that the platform was designed to conceal

7

the criminal origins of transactions from its users. The MSS has been documented attempting to influence specific DOJ decisions regarding PRC dissidents. And Mr. Hung was operating in a country where the CCP directs law enforcement action against Falun Gong practitioners through formal diplomatic channels. This is a concrete, particularized basis for believing that classified counterintelligence materials may be helpful to the defense on the knowledge element.

### B. *Brady* Obligations for Classified Materials

The Government has an independent, affirmative obligation to search for exculpatory material in the files of "related agencies reasonably expected to have possession of such information." *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). This letter identifies specific agencies and specific categories of materials that the defense believes contain information favorable to Mr. Hung. Having received this notice, the Government cannot later claim ignorance of potentially exculpatory material in those agencies' files. *See United States v. Risha*, 445 F.3d 298, 304-05 (3d Cir. 2006) (prosecutors risk constructive possession of *Brady* material where they have notice and "ready access" to the evidence); *see also Banks v. Dretke*, 540 U.S. 668, 696 (2004) (rejecting a rule under which "prosecutor may hide, defendant must seek").

The Second Circuit has already intervened when DOJ components attempted to wall off classified materials from the prosecution team. In *United States v. Stillwell*, 986 F.3d 196, 198 (2d Cir. 2021), the court vacated a protective order that barred SDNY prosecutors and defense counsel from reviewing classified documents, ordering disclosure "consistent with the prosecution's obligations under *Brady v. Maryland* … and *Giglio v. United States*." In *United States v. Hunter*, 32 F.4th 22, 32 (2d Cir. 2022), the court expressed "doubt that the NDDS, or any similarly-situated organ of the executive branch, for that matter, having stepped out of the shadows … could then successfully draw a curtain of secrecy over 'evidence … material either to guilt or to punishment' by invoking our *Brady* jurisprudence."

The "prosecution team" for *Brady* purposes is defined functionally: "the relevant inquiry is what the person did, not who the person is." *Hunter*, 32 F.4th at 28. To the extent that FBI counterintelligence, the Intelligence Community, or DHS components participated in, contributed to, or possess information bearing on the investigation or the subjects of the investigation, those agencies fall within the scope of the Government's *Brady* obligations.

### C. Consequences of Non-Disclosure

If classified information is found relevant and helpful, the Government may propose deletions, summaries, or stipulations under CIPA Section 4. *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 116 (2d Cir. 2008). If the Government refuses to disclose or provide adequate substitutions, "the presumptive remedy is dismissal of the indictment." *Id.* at 116-17; *see also United States v. Abu Ali*, 528 F.3d 210, 250 (4th Cir. 2008).

### VI.    SPECIFIC DISCOVERY REQUESTED

The United States government's well-documented counterintelligence efforts targeting PRC intelligence operations, including operations directed at Falun Gong and The Epoch Times,

make it highly likely that responsive classified materials exist within the files of the agencies identified below.

In addition to the materials sought in Mr. Guan's June 1, 2026 letter, Mr. Hung requests that the Government conduct a thorough search of the files of the agencies identified in Mr. Guan's letter, as well as the CIA, the Office of the Director of National Intelligence, and any other relevant Intelligence Community component, to the extent those agencies participated in, contributed to, or possess information bearing on the investigation or the subjects of the investigation, for the following categories of classified or unclassified materials:

(a) Any intelligence assessments, counterintelligence reports, or other materials bearing on CCP intelligence operations targeting Falun Gong, The Epoch Times, or the defendants, including operations conducted in Vietnam and Southeast Asia;

(b) Any materials bearing on CCP-CPV (Chinese Communist Party-Communist Party of Vietnam) security cooperation regarding the suppression of Falun Gong, including any diplomatic communications, intelligence-sharing agreements, or joint operations;

(c) Any materials bearing on the provenance, authorship, or authenticity of the August 2020 complaint letter, including any counterintelligence investigation of whether the letter was fabricated or seeded through CCP-linked channels;

(d) Any intelligence assessments of CCP-linked criminal organizations ("CMLOs") operating in the gift card fraud space, including any assessments of the relationship between CMLOs and the CCP state apparatus, and any materials identifying the specific sellers or networks that placed gift cards on the Paxful platform;

(e) Any materials bearing on the Xi Jinping directive to escalate lawfare against Falun Gong abroad, including any classified reporting on the implementation of that directive;

(f) Any materials bearing on CCP state media exploitation of this prosecution, including any intelligence assessments of CGTN, China Anti-Cult Network, or other CCP-affiliated media operations that have amplified the indictment;

(g) Any materials bearing on CCP transnational repression operations in Vietnam targeting Falun Gong practitioners, including any surveillance, harassment, rendition, or law enforcement cooperation directed by CCP authorities;

(h) Any counterintelligence assessment, review, or analysis conducted with respect to this case, including any evaluation of whether CCP operations may have influenced the investigation, the evidence, or the initiation of the prosecution;

(i) Any intelligence assessments, law enforcement reports, or investigative materials identifying the specific sellers or networks that placed stolen gift cards or prepaid debit cards on the Paxful platform during the period 2019-2024, including any materials identifying whether those sellers were affiliated with CCP-linked criminal organizations, West African cybercrime networks, or other transnational criminal organizations; and

(j) Any materials bearing on the relationship between Chinese Money Laundering Organizations and the CCP state apparatus, including any intelligence assessments of whether CMLOs operating in the gift card fraud space receive direction, support, or protection from CCP entities including the United Front Work Department, the Ministry of State Security, or the Ministry of Public Security.

## VII.    CONCLUSION

For the foregoing reasons, Mr. Hung respectfully requests that the Government conduct the classified-materials review described above and produce all responsive materials under CIPA and Rule 16(a). If the Government has already conducted such a review, we ask that it so confirm. If the Government declines to conduct the requested review or to produce responsive materials, the defense will file a formal motion under CIPA Section 4 with the Court, supported by the factual record set forth in this letter.

The defense recognizes that the scope of the classified-materials review required by both defendants' CIPA demands will necessarily require time that is not available under the current trial schedule. The defense consents to the exclusion of time under 18 U.S.C. Section 3161(h)(7)(A) and is prepared to work with the Government and the Court to establish a revised schedule that permits the Government to discharge its obligations.

To facilitate the efficient and secure handling of any classified materials identified through this review, undersigned counsel notes that he holds an active TS/SCI security clearance and has ready access to SCIF facilities in the Washington, D.C. area. Counsel is prepared to review any classified materials at a facility of the Government's choosing, at the Government's convenience, and in accordance with all applicable security protocols.

We are available to meet and confer at your convenience. However, given the approaching trial date, we respectfully request a response by June 8, 2026.

Very truly yours,

Timothy C. Parlatore

10