UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

WEIDONG GUAN,
    a/k/a "Bill Guan,"

        *Defendant.*

24 Cr. 322 (VM)

---

### DEFENDANT WEIDONG GUAN'S MEMORANDUM OF LAW
### IN OPPOSITION TO THE GOVERNMENT'S MOTIONS *IN LIMINE*

PETRILLO KLEIN + BOXER LLP
655 Third Avenue, 12th Floor
New York, New York 10017

*Counsel for Weidong Guan*

TABLE OF CONTENTS

I.      THE COURT SHOULD ADMIT SELF-AUTHENTICATING RECORDS ONLY TO THE EXTENT THAT SUCH RECORDS DO NOT SUFFER FROM OTHER EVIDENTIARY DEFICIENCIES ................................................................................... 1

II.     ALLEGED CO-CONSPIRATOR STATEMENTS SHOULD BE ADMITTED ONLY TO THE EXTENT THE GOVERNMENT MAKES THE REQUISITE SHOWING ....... 3

III.    THE COURT SHOULD DENY THE GOVERNMENT'S REQUEST TO PRECLUDE MR. GUAN'S EXPERTS ........................................................................ 4

        A.     Legal Standard ............................................................................................ 5

               1.     Expert Testimony Generally ............................................................. 5

               2.     Expert Disclosure Notices................................................................. 7

        B.     The Court Should Admit the Proposed Testimony of Matthew Price..................... 8

               1.     Background ......................................................................................... 8

               2.     Discussion ..........................................................................................11

        C.     The Court Should Admit the Proposed Testimony of James Shanahan................ 21

               1.     Background ......................................................................................... 21

               2.     Discussion .......................................................................................... 23

IV.     THE COURT SHOULD PERMIT EVIDENCE CONCERNING MR. GUAN'S COMMUNICATIONS WITH ATTORNEYS NOTWITHSTANDING THAT HE IS NOT ASSERTING AN ADVICE-OF-COUNSEL DEFENSE........................................ 32

V.      THE GOVERNMENT CANNOT FORECLOSE EVIDENCE OF RELIGIOUS BELIEF OR PERSECUTION TO THE EXTENT IS BEARS ON A DEFENDANT'S STATE OF MIND ................................................................................ 38

VI.     THE COURT SHOULD ADMIT PROPER CHARACTER EVIDENCE AND EVIDENCE OF PRIOR GOOD CONDUCT IF RELEVANT TO THE ISSUES IN THIS CASE ................................................................................................................. 41

VII.    MR. GUAN'S BACKGROUND AND CHARACTERISTICS SHOULD BE ADMITTED TO THE EXTENT PERTINENT TO OTHER ISSUES IN THE CASE.... 42

CONCLUSION................................................................................................................................ 43

TABLE OF AUTHORITIES

<u>Cases</u>

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d. Cir. 2002)..................................................................................................5

*Borawick v. Shay*,
68 F.3d 597 (2d Cir. 1995)....................................................................................................20

*Carpenter v. United States*,
585 U.S. 296 (2018) ...............................................................................................................8

*Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.*,
No. 99-CV-1725 (VM), 2003 WL 1878246 (S.D.N.Y. April 11, 2003) ...............................6, 29

*Chen-Oster v. Goldman, Sachs & Co.*,
114 F. Supp. 3d 110 (S.D.N.Y. 2015) ..................................................................................20

*Clarke v. LR Sys.*,
219 F.Supp.2d 323 (E.D.N.Y. 2002).....................................................................................5

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) ..............................................................................................................5

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
No. 12-CV-7372 (AT), 2020 WL 4251229 (S.D.N.Y. Feb. 19, 2020).......................6, 15, 18, 24

*Highland Cap. Mgmt., L.P. v. Schneider*,
551 F. Supp. 2d 173 (S.D.N.Y. 2008) ............................................................................6, 15, 25

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007) ..................................................................................5

*Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007) ..................................................................................5

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
No. 09 CIV. 3255, 2012 WL 2568972 (S.D.N.Y. July 3, 2012) ..........................................5, 31

*Media Glow Digital, LLC v. Panasonic Corp. of N. Am.*,
No. 16-CV- 7907, 2019 WL 1055527 (S.D.N.Y. Mar. 6, 2019)................................................13

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005)...................................................................................................20

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,*
  691 F. Supp. 2d 448 (S.D.N.Y. 2010) ................................................................. 6, 24

*POM Wonderful LLC v. Organic Juice USA, Inc.,*
  769 F. Supp. 2d 188 (S.D.N.Y. 2011) ......................................................................... 5

*Ross v. Guy,*
  No. 18-CV-1340 (WFK) (PK), 2022 WL 768196 (E.D.N.Y. Mar. 14, 2022) ............................. 1

*Scott v. Chipotle Mex. Grill,*
  315 F.R.D. 33 (S.D.N.Y. 2016)......................................................................... 6, 15, 25

*SEC v. Am. Growth Funding II, LLC,*
  No. 16-CV-828 (KMW), 2018 WL 6322145 (S.D.N.Y. Dec. 4, 2018) ....................................... 37

*SEC v. Ferrone,*
  163 F. Supp. 3d 549 (N.D. Ill. 2016) ........................................................................ 37

*Trouble v. The Wet Seal, Inc.,*
  179 F. Supp. 2d 291 (SDNY 2001).............................................................................. 3

*United States v. Adelekan,*
  567 F. Supp. 3d 459 (S.D.N.Y. 2021) ....................................................................... 43

*United States v. Amuso,*
  21 F.3d 1251 (2d Cir. 1994)......................................................................... 17, 23, 26

*United States v. Bankman-Fried,*
  No. S6 22-CR-0673 (LAK), 2023 WL 6392718 (S.D.N.Y. Oct. 1, 2023) ................................... 36

*United States v. Bankman-Fried,*
  No. S6 22-CR-0673 (LAK), 2024 WL 477043 (S.D.N.Y. Feb. 7, 2024) ................................... 37

*United States v. Blackwell,*
  853 F.2d 86 (2d Cir. 1988)................................................................................. 43

*United States v. Chastain,*
  No. 22 Cr. 305 (JMF), 2023 WL 2966643 (S.D.N.Y. Apr. 17, 2023)....................................... 14

*United States v. Collins,*
  581 F. App'x 59 (2d Cir. 2014).............................................................................. 25

*United States v. Cruz,*
  894 F.2d 41 (2d Cir. 1990)................................................................................... 2

*United States v. Daly*,
  842 F.2d 1380 (2d Cir.1988).................................................................................... 14

*United States v. Denkberg*,
  139 F.4th 147 (2d Cir. 2025)................................................................................... 32

*United States v. DiDomenico*,
  985 F.2d 1159 (2d Cir. 1993)............................................................................ 7, 31

*United States v. DiMaria*,
  727 F.2d 265 (2d Cir. 1984).................................................................................... 39

*United States v. Duncan*,
  42 F.3d 97 (2d Cir. 1994)............................................................................ 5, 15, 20

*United States v. Elmaani*,
  No. 20-CR-661 (CM), 2023 WL 2770742 (S.D.N.Y. Apr. 4, 2023)........................................ 39

*United States v. Fox*,
  No. 23-CR-227 (NGG), 2025 WL 2076664 (E.D.N.Y. July 23, 2025) ....................................... 2

*United States v. Gorski*,
  36 F. Supp. 3d 256 (D. Mass 2014) ......................................................................... 38

*United States v. Grinage*,
  390 F.3d 746 (2d Cir. 2004)..................................................................................... 3

*United States v. Guldi*,
  141 F.4th 435 (2d Cir. 2025)................................................................................... 33

*United States v. Guo*,
  No. 1:23-CR-00118-AT, 2024 WL 2262706 (S.D.N.Y. May 17, 2024) .......................... 8, 13, 17

*United States v. Guo*,
  No. 23 Cr. 118 (AT), 2024 WL 1939221 (S.D.N.Y. May 2, 2024)........................................... 41

*United States v. Han*,
  230 F.3d 560 (2d Cir. 2000)................................................................................... 42

*United States v. Hassan*,
  578 F.3d 108 (2d Cir. 2008).................................................................................... 33

*United States v. Hoke*,
  551 F. App'x 611 (2d Cir. 2014).............................................................................. 33

*United States v. Kosinski*,
No. 3:16-CR-00148 (VLB), 2017 WL 4953902 (D. Conn. Oct. 31, 2017)................................ 43

*United States v. Kukushkin*,
61 F.4th 327 (2d Cir. 2023)............................................................................. 33

*United States v. Leech*,
No. 1:24-CR-658-GHW, 2026 WL 1113346 (S.D.N.Y. Apr. 24, 2026) .......................... 7, 28, 31

*United States v. Litvak*,
808 F.3d 160 (2d Cir. 2015)........................................................................25, 29, 30

*United States v. Locas*cio,
6 F.3d 924 (1993)....................................................................................... 16

*United States v. Lopez*,
547 F.3d 364 (2d Cir. 2008)......................................................................... 7, 28, 31

*United States v. Malvasio*,
No. 23-CR-396 (JMF), 2026 WL 1329849 (S.D.N.Y. May 13, 2026)...................................... 25

*United States v. McBride*,
786 F.2d 45 (2d Cir. 1986).............................................................................. 20

*United States v. Mejia*,
545 F.3d 179 (2d Cir. 2008)............................................................................ 15

*United States v. Mendlowitz*,
No. 21-2049, 2023 WL 2317172 (2d Cir. Mar. 2, 2023)........................................................ 26

*United States v. Mendlowitz*,
No. S2 17 CR. 248 (VSB), 2019 WL 6977120 (S.D.N.Y. Dec. 20, 2019)................................ 26

*United States v. Mulder*,
273 F.3d 91 (2d Cir. 2001)...................................................................... 6, 14, 24, 28

*United States v. Nachamie*,
28 F. App'x 13 (2d Cir. 2001)............................................................................ 42

*United States v. Onumonu*,
967 F.2d 782 (2d. Cir. 1992)......................................................................... 19, 20

*United States v. Patel*,
No. 3:21-CR-220 (VAB), 2023 WL 2643815 (D. Conn. Mar. 27, 2023).................................... 4

*United States v. Pedroza,*
  750 F.2d 187 (2d Cir. 1984)..................................................................................... 4

*United States v. Peraire-Bueno,*
  No. 24-CR-293 (JGLC), 2025 WL 2753560 (S.D.N.Y. Sept. 29, 2025) ................................... 42

*United States v. Ray,*
  583 F. Supp. 3d 518 (S.D.N.Y. 2022) ............................................................... 13, 14

*United States v. Sanders,*
  No. S1 12-CR-0574 LAK, 2013 WL 1421487 (S.D.N.Y. Mar. 27, 2013) ............................... 26

*United States v. Scully,*
  877 F.3d 464 (2d Cir. 2017)................................................................................... 32

*United States v. Smith,*
  811 F. Supp. 3d 523 (2025)..................................................................................... 8

*United States v. Ulbricht,*
  858 F.3d 71 (2d Cir. 2017)..................................................................................... 8

*United States v. Valle,*
  No. 12-CR-847 (PGG), 2013 WL 440687 (S.D.N.Y. Feb. 2, 2013)........................ 7, 13, 28, 31

*United States v. Weiner,*
  No. 22 Cr. 19 (PGG), 2024 WL 82729 (S.D.N.Y. Jan. 8, 2024) ................................... 8

Rules

Fed. R. Crim. P. 16..............................................................................................*passim*

Fed. R. Crim. P. 16(b)(1)(C)(iii) ....................................................................... 7, 10

Fed. R. Crim. P. 16(d)(2)(D) ................................................................................. 13

Fed. R. Evid. 401 ........................................................................................... 20, 31

Fed. R. Evid. 403 ...............................................................................................*passim*

Fed. R. Evid. 404(a)(1) ....................................................................................... 42

Fed. R. Evid. 404(a)(2)(A)................................................................................ 41, 42

Fed. R. Evid. 405 ............................................................................................... 41

Fed. R. Evid. 702(a)............................................................................................. 5

Fed. R. Evid. 704(b)............................................................................................................ 6, 7

Fed. R. Evid. 801(d)(2)(E) .................................................................................................. 3

Fed. R. Evid. 803(6) ...................................................................................................... 1, 2, 3


Other Authorities

Wright & Miller, 29 Fed. Prac. & Proc. Evid. § 6283 (2d ed.) ......................................... 5

Defendant Weidong "Bill" Guan, through his undersigned counsel, respectively submits this memorandum in opposition to the government's Motions *in Limine* dated June 8, 2026 ("Motion").[1] To the extent that the government's points require any response at all, they are addressed in the same order as set forth in the government's brief ("Gov't Br.").

I.      THE COURT SHOULD ADMIT SELF-AUTHENTICATING RECORDS ONLY TO THE EXTENT THAT SUCH RECORDS DO NOT SUFFER FROM OTHER EVIDENTIARY DEFICIENCIES

In the abstract, Mr. Guan does not object to the recitation of the self-authentication process laid out in the government's motion. Indeed, as previously reported to the Court, Mr. Guan has already stipulated to the authenticity of the vast majority of exhibits identified by the government and to the admission of many of those exhibits as business records. (ECF 142.)

To the extent that there are disputes about admissibility, however — and many remain — such disputes involve exhibits that, on their face, appear to suffer from evidentiary failings that simply are not solved by the government's reference to the "regularly conducted activity" exception set forth in Rule 803(6) of the Federal Rules of Evidence ("Fed. R. Evid."). Although we submit that these disputes cannot be fully addressed before trial, because the admissibility of certain evidence will depend on, among other things, the purpose for which the subject evidence is offered, these failings generally fit within one of three categories:

- <u>Hearsay-within-hearsay.</u> Some of the purported business records the government lists plainly contain hearsay-within-hearsay for which there is no apparent valid exception. *See Ross v. Guy,* No. 18-CV-1340 (WFK) (PK), 2022 WL 768196, at *4 (E.D.N.Y. Mar. 14, 2022) ("Business records may contain hearsay statements, each of which must

---

[1] As the Court is aware, both defendants individually submitted their own motions *in limine* on June 8, 2026. To the extent that Mr. Hung's motions relate to evidence that could be relevant to the charges against Mr. Guan, Mr. Guan joins in those motions.

independently qualify as a hearsay exception or exclusion in order to be admissible.");

*United States v. Cruz*, 894 F.2d 41, 44 (2d Cir. 1990) ("Each hearsay statement within

multiple hearsay statements must have a hearsay exception in order to be admissible.").

Some exhibits, for example, contain references to a statement by a consumer that a

particular card that was sold to defendants or their alleged co-conspirators was stolen or

was otherwise the proceeds of some form of fraud. Other exhibits appear to be

spreadsheets in which the listed entries appear to have been selected precisely because

they relate to reportedly stolen or fraudulent cards, thereby incorporating the underlying

hearsay into how the universe of data was selected in the first instance. As discussed in

more detail in Mr. Guan's motion *in limine*, (ECF 146 ("Guan Br.") at 5-6), these

underlying out-of-court statements, if offered for their truth, constitute inadmissible

hearsay even if they are reflected in a document that otherwise may look like a business

record.

- <u>References to atypical activity.</u> Some of the purported business records reflect activity

  that plainly does not qualify as regularly conducted activity that would satisfy the

  requirements of Rule 803(6). The government has identified, for example, documents that

  on their face pertain to internal investigations and other out-of-the-ordinary inquiries that

  remove the document from the category of inherently reliable documents that the

  business record rule is aimed at. *See generally United States v. Fox*, No. 23-CR-227

  (NGG), 2025 WL 2076664, at*13 (E.D.N.Y. July 23, 2025) ("[E]mails containing unique

  and sporadic communications, not created as a record of any regularly conducted

  business activity, fall outside the business records exception to the rule against hearsay."

  (alterations and internal quotations omitted)); *Trouble v. The Wet Seal, Inc.*, 179 F. Supp.

2

2d 291, 299 n.5 (SDNY 2001) (Marrero, J.) ("A business record is not evidence, under Federal Rule of Evidence 803(6), if it was drafted in response to unusual or isolated events.").

- <u>Improper lay opinions and legal conclusions.</u> As noted in Mr. Guan's motion *in limine*, (Guan Br. at 1-5), some of the government's proffered exhibits make reference to internal conclusions about risk, fraud, and/or suspicious activity that not only are inadmissible hearsay but also constitute improper lay opinions on issues that properly fall within the sole purview of the jury. *See United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004) (case agent's testimony based on review of recorded telephone conversations was improper lay opinion testimony under Rule 701 that usurped the role of the jury).

Accordingly, beyond those (many) documents covered by stipulations we have agreed to, Mr. Guan reserves his right to argue, on a document-by-document basis, that government exhibits, for reasons such as the above, are inadmissible notwithstanding the proffered document certifications.[2]

## II.   ALLEGED CO-CONSPIRATOR STATEMENTS SHOULD BE ADMITTED ONLY TO THE EXTENT THE GOVERNMENT MAKES THE REQUISITE SHOWING

Mr. Guan concurs that a co-conspirator statement can only be properly admitted upon a showing that the defendant and the alleged co-conspirator joined the same conspiracy and that the statement made was in furtherance of that conspiracy. *See* Fed. R. Evid. 801(d)(2)(E). We also concur with the government that "it is premature and inefficient to litigate exhibit by exhibit

---

[2] Notably, the government's papers seem to contemplate that at least some portion of the proffered exhibits might have to be redacted or subject to limiting instructions when hearsay-within-hearsay exists. (*See* Gov't Br. at 12 n.7.)

at this time," (Gov't Br. at 17), and, accordingly, Mr. Guan reserves his rights to argue that any particular alleged co-conspirator statement is not properly admissible.

That said, it is worth noting now that there are four conspiracy counts contained in the two Indictments that are proceeding to trial: a money laundering conspiracy charge that is contained in both the Guan Indictment and the Hung Indictment; a bank fraud conspiracy charge in the Hung Indictment; and an identity theft conspiracy charge in the Hung Indictment. There is no indication in the Indictments, and it is not discernable in the identified exhibits, that Mr. Guan is alleged to have any involvement whatsoever in the bank fraud or identity theft conspiracy charges, alleged in the Hung Indictment. The government cannot properly admit co-conspirator statements against Mr. Guan concerning those unrelated alleged conspiracies. "Where there are multiple conspiracies, co-conspirator statements are only admissible against defendants who are proven, by a preponderance of the evidence, to have joined the specific conspiracy that the co-conspirator statements allegedly furthered." *United States v. Patel*, No. 3:21-CR-220 (VAB), 2023 WL 2643815, at *49 (D. Conn. Mar. 27, 2023); *see also United States v. Pedroza*, 750 F.2d 187, 201-02 (2d Cir. 1984) (statements made in furtherance of uncharged drug conspiracy not admissible against defendants who participated only in charged kidnapping conspiracy).

III.   THE COURT SHOULD DENY THE GOVERNMENT'S REQUEST TO PRECLUDE MR. GUAN'S EXPERTS

The government's motion to exclude the proposed expert testimony of Matthew Price and James Shannahan should be denied in its entirety. With respect to both witnesses, the proffered expert testimony not only plainly constitutes relevant, specialized industry specific knowledge that would be helpful to the jury but is also necessary to rebut erroneous and misleading assertions that are being advanced by the government on issues that are critical to the jury's determination of the charges against Mr. Guan.

A.   <u>Legal Standard</u>

1.   Expert Testimony Generally

It is axiomatic that experts may testify to "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *see also United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("Generally, expert testimony may be admissible if it is helpful to the trier of fact."); Wright & Miller, 29 Fed. Prac. & Proc. Evid. § 6283 (2d ed.) ("While experts usually offer opinions or inferences, experts also can be used for other purposes such as explaining evidence."). The Federal Rules of Evidence are to be applied with a "liberal thrust," *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 588 (1993), and "favor the admissibility of expert testimony," *POM Wonderful LLC v. Organic Juice USA, Inc.*, 769 F. Supp. 2d 188, 197 (S.D.N.Y. 2011) (citation omitted). "[T]he *Daubert* inquiry is fluid and will necessarily vary from case to case." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d. Cir. 2002). The Second Circuit's standard for admissibility of expert testimony is "especially broad." *Clarke v. LR Sys.,* 219 F.Supp.2d 323, 332 (E.D.N.Y. 2002) (collecting cases). In turn, "excluding expert testimony is the exception rather than the rule, particularly since vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof can serve as the means to attack" admissible evidence. *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 562 (S.D.N.Y. 2007) (citation and quotations omitted). "Indeed, most objections to expert testimony are related only to the weight of the evidence, not its admissibility." *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, No. 09 CIV. 3255, 2012 WL 2568972, at *15 (S.D.N.Y. July 3, 2012).

The use of an expert to provide meaningful background information — particularly with respect to a specialized area outside a juror's common everyday understanding — is a traditional and long-accepted use of expert testimony. *See, e.g., United States v. Mulder*, 273 F.3d 91, 102

(2d Cir. 2001) (affirming use of expert testimony to provide contextual background useful to allow the jury to draw conclusions concerning the intent of the defendants); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 463-65 (S.D.N.Y. 2010) (permitting expert testimony on "industry standards" in the hedge fund business); *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, No. 12-CV-7372 (AT), 2020 WL 4251229, at *5 (S.D.N.Y. Feb. 19, 2020) ("An expert may, . . . 'offer testimony discussing ordinary practices and usages in a particular industry.'" (quoting *Scott v. Chipotle Mex. Grill*, 315 F.R.D. 33, 46 (S.D.N.Y. 2016))). This type of expert testimony is admissible, in part, because it helps the jury understand the evidence. *See, e.g.*, *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 181 (S.D.N.Y. 2008) (admitting expert testimony concerning customs and practices of brokerage industry as "helpful in allowing the trier of fact to better understand the evidence and providing the trier of fact with the tools necessary to make an ultimate determination"); *Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.*, No. 99-CV-1725 (VM), 2003 WL 1878246, at *4 (S.D.N.Y. April 11, 2003) (Marrero, J.) (permitting expert testimony on concepts of corporate governance and veil-piercing, and recognizing that trial courts have "latitude to allow experts to testify about issues that would help the jury understand concepts it needed to know to render a verdict despite the fact that the opinions may encroach on matters of law").

Federal Rule of Evidence 704(b) provides that, "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Fed. R. Evid. 704(b). The rule, however, "does not prohibit all expert testimony that gives rise to an inference concerning a defendant's mental state." *United States v. DiDomenico*, 985 F.2d 1159, 1165 (2d Cir. 1993) (Rule 704(b) only applies to the "bottom-line" conclusion as to the defendant's actual

6

mental state). Courts in this Circuit have, in turn, repeatedly permitted expert testimony so long

as the expert "will not opine as to [the defendant's] mental capacity or whether he had criminal

intent," and that the "possibility that the jury may infer from [the expert's] testimony that [the

defendant] did not intend to" commit the crime "does not require exclusion." *United States v.*

*Valle*, No. 12-CR-847 (PGG), 2013 WL 440687, at *10 (S.D.N.Y. Feb. 2, 2013); *see also United*

*States v. Leech*, No. 1:24-CR-658-GHW, 2026 WL 1113346, at *22 (S.D.N.Y. Apr. 24, 2026)

(permitting expert testimony where it did not "expressly state the inference" that defendant

engaged in conduct "with the requisite criminal intent" — "*i.e.*, that [defendant] was engaging in

the conduct 'knowingly, willingly, and with intent to defraud'"); *United States v. Lopez*, 547 F.3d

364, 373-74 (2d Cir. 2008) (no Rule 704(b) violation where expert testimony included an opinion

on whether evidence was consistent with drug distribution generally and did not include an

opinion on whether the particular defendant "had the requisite intent to distribute").

> 2.     Expert Disclosure Notices

Pursuant to Rule 16 of the Federal Rules of Criminal Procedure ("Fed. R. Crim. P."), a

defendant who intends to call an expert witness must provide:

> a complete statement of all opinions that the defendant will elicit
> from the witness in the defendant's case-in-chief; the bases and
> reasons for them; the witness's qualifications, including a list of all
> publications authored in the previous 10 years; and a list of all
> other cases in which, during the previous 4 years, the witness has
> testified as an expert at trial or by deposition.

Fed. R. Crim. P. 16(b)(1)(C)(iii). "The purpose of the expert disclosure requirement is to

minimize surprise that often results from unexpected expert testimony, reduce the need for

continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's

testimony through focused cross-examination." *United States v. Ulbricht*, 858 F.3d 71, 114 (2d

Cir. 2017) (quotations and citations omitted), *overruled on other grounds by Carpenter v. United*

*States*, 585 U.S. 296 (2018). The disclosure must include "a complete statement of all opinions the expert will provide, but does not require a verbatim recitation of the testimony the expert will give at trial." Fed. R. Crim. P. 16 advisory committee's note to the 2022 amendment. An expert disclosure that describes the expert's industry expertise, which forms the bases for the expert's opinions, and identifies "illustrative examples of the materials reviewed," satisfies the notice requirement of Rule 16. *United States v. Guo*, No. 1:23-CR-00118-AT, 2024 WL 2262706, at *5 (S.D.N.Y. May 17, 2024).

Even in cases "[w]here a party's expert disclosure is inadequate to enable the district court to determine admissibility under the Federal Rules of Evidence, the court has 'broad discretion in fashioning a remedy.'" *United States v. Smith*, 811 F. Supp. 3d 523, 545 (2025) (quoting *United States v. Weiner*, No. 22-CR-19 (PGG), 2024 WL 82729, at *6 (S.D.N.Y. Jan. 8, 2024)). Courts have consistently found exclusion to be too harsh a remedy where sufficient time before trial remains for the government to respond to a supplemental disclosure and have instead ordered supplementation. *See Smith*, 811 F. Supp. 3d at 545 (collecting cases).

    B.    <u>The Court Should Admit the Proposed Testimony of Matthew Price</u>

        1.    Background

Matthew Price is currently the Vice President of Investigations and Strategic Advisory at Elliptic Inc., a leading blockchain analytics firm, and was the former Global Head of Investigations for Binance, a leading peer-to-peer cryptocurrency exchange platform. Prior to his roles in private practice, Mr. Price spent 17 years working in government law enforcement and intelligence roles, including as a Special Agent with the Internal Revenue Service, Criminal Investigation–Cyber Crimes Unit (IRS-CI CCU) where he led multi-agency, multinational investigations, including numerous cases involving virtual currency (or "cryptocurrency"), money laundering, and various schemes using the Internet. Mr. Guan intends to call Mr. Price as

an expert witness to opine on the functions, characteristics, history, and usage of peer-to-peer cryptocurrency markets, including Paxful.com ("Paxful"), for the purpose of buying and selling cryptocurrency using payment methods including gift cards and prepaid debit cards.

Paxful was a peer-to-peer cryptocurrency exchange platform where users could buy, sell, and exchange Bitcoin, among other cryptocurrencies, including for gift cards and prepaid debit cards. The government alleges that Mr. Guan and others "used cryptocurrency to knowingly purchase tens of millions of dollars in crime proceeds," that the MMO Team "purchased the crime proceeds at a discount," and that Mr. Guan moved those proceeds into bank accounts "through tens of thousands of layered transactions utilizing, among other things, prepaid debit cards and financial accounts that were opened using stolen identification information, including the personal identification information of U.S. residents." (*See* ECF 5 ("Guan Indictment") ¶¶ 2-3.) A central component of the government's theory is that the MMO team used Bitcoin to purchase gift cards and prepaid debit cards on Paxful at prices below their face value. (*See* Gov't Br. at 12-13.) The government characterizes the discounts received during the purchase as "substantial" and it appears that the government intends to argue to the jury that such "substantial" discounts were a clear indication that the cards were stolen. (*See id.*) Because this argument could affect the jury's determination of the issue that is likely to be the most important one in this case (i.e., Mr. Guan's knowledge and intent), Mr. Guan must be able to present evidence that there are alternative, innocent explanations for why gift cards and prepaid debit cards sold at discounts to their face value that do not support the government's theory of illegality.

9

On March 26, 2026, Mr. Guan timely served his expert disclosure notice upon the

government pursuant to Fed. R. Crim. P. 16 (b)(1)(C)(iii). The notice disclosed that Mr. Price is

expected to testify that:

1. Paxful, during the period of the charges in this case, was one of the most widely used, global peer-to-peer cryptocurrency exchange platforms, and gift cards and prepaid debit cards were widely used on Paxful as an accepted means to buy and sell cryptocurrency.

2. In promoting the use of gift cards and prepaid debit cards to buy and sell cryptocurrency on its platform, Paxful provided assurances that transactions on the platform were safe and legally compliant. The site described security features including Know Your Customer (KYC) checks and on-chain transaction monitoring.[3]

3. Gift cards and prepaid debit cards historically were and currently remain a common means used to buy and sell cryptocurrencies for fiat currency (i.e., currency issued by sovereign governments). These cards offer a means for users in jurisdictions that lack formal fiat-to-crypto and crypto-to-fiat payment rails to buy and sell cryptocurrency. A "payment rail," as used in this document, is an established route or pathway that allows for the exchange of fiat currency and cryptocurrency, for example, an established and permitted link between a licensed bank and a cryptocurrency exchange.

4. Gift cards and prepaid debit cards, when combined with cryptocurrencies, also play an important role in international remittances. Specifically, gift cards and prepaid debit cards allow an individual to easily purchase value for local currency, for example in the United States, and transfer that value to family members overseas, for example, in Latin America or Africa, in the form of cryptocurrency, which can then be used in the transferee locale for investment, conversion to local currency or as a hedge in jurisdictions experiencing currency volatility.

(Price Notice at 3.)

---

[3] As noted in the motion *in limine* submitted by co-defendant Le Van Hung, Paxful's assurances about safety and compliance turned out to be misrepresentations that resulted in subsequent criminal and regulatory actions brought by the government after the Indictments were returned. Among other things, Hung moves to admit various statements made by the government about Paxful's misrepresentations.

The bases and foundation for Mr. Price's opinions stem from a long career investigating the types of transactions at issue in this case, both in law enforcement and in directly relevant roles in his post-government career, including (i) seventeen years of experience working in government law enforcement and intelligence roles where he investigated numerous cases in the cryptocurrency industry generally and the use of peer-to-peer markets to buy, sell, and trade cryptocurrencies specifically, (ii) his role as the Global Head of Investigations for Binance, one of the world's largest cryptocurrency exchanges, and (iii) his current role at Elliptic where he specializes in cryptocurrency-related exchanges. In addition to his many years of directly relevant experience, Mr. Price also expressly relied on open-source research including academic articles, publicly accessible cryptocurrency forums, written and video guides detailing methods used to buy and sell cryptocurrencies, and publicly accessible archives. (Price Notice at 3.) In sum, Mr. Price is an impressively credentialed expert that has served as an expert witness in the cryptocurrency industry for many years.

2. Discussion

i. Mr. Price's Expert Notice Complies with Rule 16

The government's challenge to Mr. Guan's expert disclosure blatantly mischaracterizes Mr. Price's proffered opinions and seeks to impose a heightened disclosure standard that is simply not required under Rule 16. The government fails to identify any specific language in Mr. Price's 11-page report that is insufficient to qualify as an "opinion" under Rule 16. Simply characterizing Mr. Price's proffered testimony as "a series of alleged facts," (Gov't Br. at 28), is meaningless (as one would hope that all expert opinions are based on facts) and does not amount to a valid challenge to the clarity or admissibility of his opinion. The summary of Mr. Price's opinions set forth in Section III of his notice is plainly adequate to give the government notice of

11

the testimony and any fair reading of it demonstrates that the testimony is proper and would be helpful to the jury.

The government's contention that Mr. Price's notice does not explain how his expertise contributes to his opinions regarding Paxful, the payment methods crypto currency exchanges accept and the various usage of gift cards, (Gov't Br. at 28), is not supported either by the language of the notice (as the connections between Mr. Price's opinions and his highly relevant, industry specific experience is made clear by any good faith reading of the notice) or by the relevant caselaw. Rather, the government's argument attempts to impose a disclosure requirement that is not contemplated by Rule 16 or any other rule. Notwithstanding the government's contentions, Mr. Price's disclosure more than sufficiently demonstrates that he has the experience and credentials to support the proffered opinions. Mr. Price's disclosure details his work in various investigative and compliance roles within the cryptocurrency industry over the last twenty years, which support his opinions. During his tenure in government law enforcement, Mr. Price directly engaged with the Paxful platform and its users. (Price Notice at 1.) In his current role at Elliptic, Mr. Price regularly reviews "on-chain activities of peer-to-peer markets and their role in the cryptocurrency ecosystem, including methods used to buy and sell cryptocurrency on peer-to-peer markets." *Id.* at 2. The government nonetheless asks this Court to force Mr. Price to include an explanation of "how" his experience "taught him any 'reliable principles and methods'" for offering the proffered testimony. That suggestion goes well beyond what Rule 16 requires and invites error.[4]

---

[4] It is worth noting that the government's own disclosure concerning its money laundering expert, Mr. Ross S. Delston, does not include an explicit explanation of how Mr. Delston's experience taught him any reliable principles and methods for his proposed testimony. As with Mr. Price's opinions, the nexus between relevant experience and expert opinion is a straightforward inference that any good faith reader does not need spelled out.

The government's related contention — that it somehow lacks notice of the bases of Mr. Price's proffered testimony because he does not disclose a specific methodological approach — is equally baseless. Mr. Price is not offered as a scientific expert; rather, Mr. Price, who has more than a decade of experience analyzing cryptocurrency trading and the usage of peer-to-peer platforms, will provide helpful background about cryptocurrency exchanges and explain why, peer-to-peer platforms, like Paxful, are used for the purposes of buying and selling cryptocurrency using gift cards and prepaid debit cards. On its face, no mathematical or scientific analysis is required for such testimony. *See, e.g.*, *United States v. Ray*, 583 F. Supp. 3d 518, 533 (S.D.N.Y. 2022) ("[N]ot every expert admissible under *Daubert* need rely on a method that conforms with 'the exactness of hard science methodologies." (quotations and citation omitted)). Indeed, specific to the cryptocurrency industry, expert disclosures have been found to satisfy Rule 16 wherein the cryptocurrency expert merely described "industry expertise, which form[ed] the bases for [the expert's] opinions, and identified illustrative examples of the materials reviewed. *See, e.g.*, *Guo*, 2024 WL 2262706, at *3 (quotations omitted).[5]

      ii.    Mr. Price's Proposed Testimony Should be Admitted Because it is Based Upon His Industry-Specific Experience and is not Within the Ken of the Jury

As discussed above, Mr. Price's proposed testimony is based upon his experience, industry articles, and publicly available materials. The government attempts to recast Mr. Price's

---

[5] We submit that Mr. Price's expert disclosure is plainly sufficient, but should the Court determine that it is insufficient in some way, Mr. Guan requests leave to cure any such insufficiency through a supplemental notice. *See* Fed. R. Crim. P. 16(d)(2)(D) (permitting the Court to issue an "order that is just under the circumstances" in response to a party's noncompliance with Rule 16,). Courts regularly permit parties to supplement their Rule 16 disclosures when they are insufficient. *Media Glow Digital, LLC v. Panasonic Corp. of N. Am.*, No. 16-CV- 7907, 2019 WL 1055527, at *1 (S.D.N.Y. Mar. 6, 2019) ("[T]he rejection of expert testimony is the exception rather than the rule."); *Valle*, 2013 WL 440687, at *6 (permitting defendant to serve supplemental disclosure).

13

proposed testimony as improper by: (1) ignoring the foundation for his opinion; (2) mischaracterizing the proper bases for his opinions; and (3) incorrectly portraying his opinions as a mere factual narrative within the ken of the jury. None of these arguments withstand scrutiny.

First, contrary to the government's assertions, an expert witness need not employ a specific methodology where the expert's opinions do not involve scientific or technical analysis. Courts in this Circuit have routinely recognized that experience-based and industry-specific expertise may properly provide a sufficient foundation for admissible expert testimony. *See United States v. Chastain*, No. 22 Cr. 305 (JMF), 2023 WL 2966643, at *8-9 (S.D.N.Y. Apr. 17, 2023) (permitting cryptocurrency expert testimony based on industry-specific experience and publicly available information); s*ee generally Ray*, 583 F. Supp. 3d at 533 ("[n]ot every expert admissible under Daubert need rely on a method that conforms with 'the exactness of hard science methodologies'" (citation omitted)).

Second, opinions based on hearsay or other inadmissible evidence are acceptable if experts in the field reasonably rely on such evidence in forming their opinions. *See Mulder*, 273 F.3d at 102; *see also United States v. Daly*, 842 F.2d 1380, 1387–88 (2d Cir.1988) ("[I]f experts in the field reasonably rely on hearsay in forming their opinions and drawing their inferences, the expert witness may properly testify to his opinions and inferences based upon such hearsay."). But it is not clear why the government even offers this mistaken argument. Contrary to its claim, none of the topics on which Mr. Price is offered as an expert will require a mere "repackaging of hearsay statements." Rather, Mr. Price will provide (1) helpful background on the cryptocurrency industry, including peer-to-peer markets such as Paxful and (2) analysis of relevant cryptocurrency trading practices, norms, and market trends during the time period of the charged conduct. This all falls squarely within the norm of industry experts and should be admitted.

14

The government relies heavily on *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008), as its basis for excluding Mr. Price's testimony, but the circumstances in that case are readily distinguishable. In *Mejia*, the Second Circuit faulted the district court's admission of expert testimony because the expert did not "explain how he had pieced together bits of information from different sources and reached a studied conclusion that he then gave to the jury." *Id*. at 198. Here, Mr. Price, based on his extensive experience, would offer testimony discussing ordinary practices and customs in the cryptocurrency industry, specifically as it relates to Paxful, to help the jury understand the evidence. *Fin. Guar. Ins.*, 2020 WL 4251229, at *5 ("An expert may, . . . 'offer testimony discussing ordinary practices and usages in a particular industry.'" (quoting *Scott*, 315 F.R.D. at 45)); *Highland Cap.*, 551 F. Supp. 2d at 181 (admitting expert testimony concerning customs and practices of brokerage industry as "helpful in allowing the trier of fact to better understand the evidence and providing the trier of fact with the tools necessary to make an ultimate determination"); *Duncan*, 42 F.3d at 101 (permitting expert testimony to assist the trier of fact in evaluating evidence).

Indeed, Mr. Price's notice demonstrates explicitly that he applied his expertise in analyzing the sources he relied upon. He synthesizes information from multiple sources — including sources that may themselves be independently admissible — and cross-checked that material against other supporting data and his own experience to reach his conclusions. For example, after reviewing publicly available data indicating that approximately 180 fiat currencies circulate globally, Mr. Price compared that information with his prior experience at Binance, the world's largest cryptocurrency exchange supporting 35 different currencies, as well as his broader industry experience researching jurisdictions that have banned cryptocurrency trading. (*See* Price Notice at 9.) From this, he concluded that market participants without access to

cryptocurrency would have strong incentives to find alternative ways to move fiat currency to and from peer-to-peer platforms, including through the sale of gift cards and prepaid debit cards. (*See id.*) Similarly, Mr. Price cites to and relies upon World Economic Forum data showing that billions of people worldwide lack access to bank accounts, and combines it with his own industry experience to conclude that gift cards and prepaid cards provide a quick and efficient means of transmitting value across jurisdictions without the need for a bank account — making their use worthwhile and prevalent even when transactions are effected at a discount to face. (Price Notice at 10.) Taken together, these connections support Mr. Price's opinion that gift cards "play an important role in remittances." (*Id.* at 3.) To the extent that the government disagrees with Mr. Price's conclusions, any such dispute properly goes to weight, not admissibility, and it should be left to the jury to decide, after listening to both direct and cross, whether Mr. Price's conclusions are supported.

Third, the government's suggestion that Mr. Price merely seeks to offer a "factual narrative that is within the ken of the jury," we submit, lacks credulity. The relevant inquiry is whether the proposed expert testimony concerns matters beyond the understanding of the average juror. *United States v. Locas*cio, 6 F.3d 924, 937 (1993). The idea that the average juror in this district is equipped, without expert help, to understand the relevant aspects of the international cryptocurrency marketplace, in particular the role that peer-to-peer exchanges such as Paxful play, assumes a level of juror sophistication that is downright fanciful. *See, e.g.*, *Guo*, 2024 WL 2262706, at *3 (admitting cryptocurrency expert because "the average juror does not possess the specialized knowledge to analyze the market capitalization for cryptocurrencies or

their level of ownership concentration"). There is simply no credible argument in this case that a

jury would not find expert testimony on these arcane markets useful.[6]

### iii. Mr. Price's Proposed Testimony Should Be Admitted Because it is Directly Relevant Both to one of the Government's Key Theories and to Mr. Guan's State of Mind

The notion offered by the government that Mr. Price's testimony must be excluded

because it is not tied to the "contemporaneous knowledge of either defendant" is wholly

misplaced. The transactions that were conducted on Paxful constitute the core component of the

financial transactions that the government alleges constituted money laundering in this case.

Solely as a general matter, therefore, expert testimony explaining how Paxful functioned and

what role it played in the international cryptocurrency marketplace would plainly be helpful to

the jury and would serve to contextualize the MMO team's exchange of cryptocurrency for gift

and debit cards on Paxful. Contrary to the government's preferred narrative, Paxful was not a

website operating in some secret, inherently suspicious corner of the dark web; it was a widely

marketed, publicly available web-based exchange reporting millions of users. Those facts alone

tend to undercut the government's main theory that all or substantially all of the cards being

exchanged on Paxful were stolen (a theory that we do not believe will be borne out by the

---

[6] The government fails to provide any persuasive basis for its assertion that Mr. Price's testimony will merely be cumulative of fact witness testimony, (Gov't Br. at 34), and such arguments are at best premature in any event. Though district courts can preclude "expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses," *Amuso*, 21 F.3d at 1263, such preclusion is only warranted after the relevant fact witnesses have testified. Here, barring the highly unlikely scenario that the government's witnesses will testify to the same facts and conclusions as Mr. Price, Mr. Guan must be permitted to present his own expert evidence to assist the jury in understanding the cryptocurrency industry, including peer-to-peer exchanges, and the practices of cryptocurrency traders who use peer-to-peer exchange platforms.

admissible evidence, as discussed in Mr. Guan's motions *in limine*), irrespective of the personal knowledge of the defendants or their alleged co-conspirators.

And more specifically, Mr. Price's testimony directly contradicts one of the government's core arguments with respect to knowledge and intent. Again, the government relies heavily on the so-called "substantial discount" from face value that MMO members could purchase prepaid gift and debit cards when paying with Bitcoin, apparently on the premise that no one would sell prepaid debit cards for a discount unless such cards were stolen. The fact that Mr. Price's testimony will discuss two alternative, innocent reasons for such transactions (i.e., the acquisition of Bitcoin for parties who, lacking payment rails, could not otherwise easily obtain cryptocurrency and as a method of remittance) is therefore squarely relevant independent of the defendants' personal knowledge. Fundamental fairness dictates that Mr. Guan be permitted to present such testimony.

Moreover, Mr. Price's proposed testimony that gift cards and prepaid debit cards were sold for Bitcoin often at a discount for legitimate reasons is not an improper attempt to provide an opinion on the behavior or motivations of third parties; instead, it is evidence of a common practice on peer-to-peer cryptocurrency platforms. Such testimony is relevant to determining whether the actions and intent of Mr. Guan and any alleged co-conspirators was more consistent with non-culpable conduct. *See Fin. Guar. Ins.*, 2020 WL 4251229, at *5-6 (permitting expert testimony about "the professional standards applicable to the parties' interactions, and whether a party deviated from those standards" as well as "industry practice and deviations from such practice" because it gave "the jury a baseline to help evaluate" defendants' conduct, but the expert could not "testify as to what an individual or party's intent, motive, or knowledge was on any given time").

In any event, Mr. Price's testimony is generally relevant to Mr. Guan's state of mind. The defense contends that the evidence at trial will show that, during the relevant time period, Mr. Guan believed, after he himself visited the Paxful website, that Paxful was a legitimate platform with appropriate measures to mitigate fraud risks for purchasing prepaid debit cards. Mr. Price's testimony about Paxful, how it was used by the general public, and how it marketed itself, including its statements about its compliance efforts, manifestly tends to support Mr. Guan's general perception and are therefore relevant, all without offering any impermissible opinion concerning Mr. Guan's state of mind. *See United States v. Onumonu*, 967 F.2d 782, 787 (2d. Cir. 1992).

      iv.    Mr. Price's Proposed Testimony is Wholly Relevant to The Central Issues in This Case and Its Probative Value is Not Substantially Outweighed by Risk of Prejudice, Confusion or Delay

In a last-ditch attempt to generate a one-sided trial in which it is allowed to present its facts and arguments but the defense's own proof and arguments on those same topics are circumscribed, the government baldly asserts that "much of" Mr. Price's proposed testimony — including testimony concerning (i) the adoption of cryptocurrency, (ii) cryptocurrency users' privacy preferences, (iii) Paxful's commercial success, and (iv) legitimate reasons individuals may use gift cards to remit funds to family members abroad — should be excluded under Rule 403 on the ground that it "lacks any fit to the central issues to be tried in this case." (Gov't Br. at 38.) The government's contention lacks all merit.

As a threshold matter, courts must adhere to a "liberal standard of admissibility for expert opinions," *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005), beginning with "a presumption that expert evidence is admissible," *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015) (citing *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995)). "Generally, expert testimony may be admissible if it is helpful to the trier of fact." *Duncan.*, 42

F.3d at 101. "[W]here relevant testimony from a qualified expert would help a jury determine a fact in issue, and where the testimony does not fall under one of the rule 403 exceptions, such testimony should normally be admitted where the district court fails to provide 'a legitimate basis for excluding the proffered evidence.'" *Onumonu*, 967 F.2d at 786 (quoting *United States v. McBride*, 786 F.2d 45, 51 (2d Cir. 1986)).

Given the centrality of transactions on Paxful to the government's basic narrative in this case and, in particular, the core materiality of the discount issue to the government's theory of knowledge and intent, the government's challenge to Mr. Price's testimony under Rules 401 and 403 appears to be nothing more than a blatantly unfair effort to hamstring Mr. Guan's defense. Blocking Mr. Price's testimony, which would arm the jury not only with a better understanding of how Paxful operated (and thus providing important context to the transactions at issue in this case) but also help the jury evaluate whether the government's discount theory withstands scrutiny — would be fundamentally unfair and cut the legs out from Mr. Guan's ability to defend himself against the charges. Such evidence is highly relevant, and its probative value is not substantially outweighed by unfair prejudice (which "unfair prejudice," we submit, is completely absent). Moreover, the government's attempt to exclude general expert testimony for no other reason than that it is favorable to Mr. Guan is unfair, especially where the government has itself noticed an expert to testify about money laundering generally in order to establish context for the jury. (*See generally* Ex. A, Delston Notice.) Mr. Price's testimony similarly seeks to provide useful context to the jury, and the fact that such context does not support the government's theory does not magically transform the testimony into something that violates Rule 403. It is axiomatic that evidence may only be precluded under Rule 403 upon a showing that its relevancy and probative value is "substantially outweighed" by a danger of "unfair" prejudice, confusion, or

20

waste of time. Fed. R. Evid. 403. The government utterly fails to meet this heavy burden, and the Court should reject its attempt to limit the presentation of Mr. Guan's defense and admit Mr. Price's proffered testimony.

### C.    The Court Should Admit the Proposed Testimony of James Shanahan

#### 1.    Background

The government has stated that, in order to establish the alleged money laundering conspiracy, it will rely, among other things, on evidence about transactions at merchant accounts belonging to the Epoch Times Entities, communications to and from the banks holding those accounts, and so-called "chargebacks" in those accounts. (*E.g.*, Gov't Br. at 40 ("[S]ome of the stolen funds that the Media Entities received during the course of the money laundering scheme were the subject of chargebacks, and some of the Government's evidence will concern such chargebacks); Gov't Br. at 45 ("The Government's factual evidence likely will include contemporaneous statements of witnesses regarding the relevant chargeback thresholds . . . ."); Gov't Br. at 46 ("Guan's awareness that the funds were criminally derived will be proven by a variety of means, including by . . . — as one factor of many — the high volume of chargebacks, in many cases leading to bank inquiries and account restrictions . . . .").)

The government has marked as exhibits several communications between Mr. Guan and Bank of America ("BofA") or J.P.Morgan Chase ("JPMC") regarding the merchant accounts at the respective banks. (GX 1A-75 (correspondence with JPMC regarding and attaching a chargeback "dispute list" from November 2019 identifying the number of chargebacks and reversals); GX 1A-76 (same); GX 1A-77 (correspondence with JPMC regarding information from prepaid debit card company's website regarding amount of time to initiate chargeback); GX 1A-78 (correspondence with JPMC discussing current chargeback ratio in merchant accounts and all chargebacks were for fraud); GX 1A-87 (correspondence with JPMC regarding the

chargeback ratio in three merchant accounts in the past 30 days and noting money was being held in merchant accounts pending resolution of chargebacks).) Put simply, the government's exhibits and representations to the Court indicate its intention to raise at trial the debit card transactions in the relevant merchant accounts and the related chargeback resolution process between merchants and banks.

Mr. Shanahan's testimony will address these issues, specifically, "opinions relating to chargebacks within the credit and debit card industry generally and specifically as related to the chargebacks incurred" by the Epoch Times Entities. (Shanahan Notice at 1.) Mr. Shanahan's notice was detailed about the specific aspects of the chargeback process that would be the subject of testimony. For instance, Mr. Shanahan's proposed testimony would address not only the definition of a chargeback, but the four main categories in which chargebacks are categorized: fraud, authorization, cardholder dispute, and processing error. (*Id.* at 3.) Mr. Shanahan would also testify regarding the four major types of organizations involved in the chargeback process — issuing bank, acquiring bank, merchant, and card network — and the roles they play in the process. (*Id.* at 4.) The testimony would also explain the chargeback process itself, including the timing for initiating a chargeback, the resolution process between the card issuing bank and acquiring bank, and how funds are held during this process. (*Id.*)

Mr. Shanahan's testimony is also expected to address his analysis of Epoch Times merchant accounts and chargebacks in those accounts. More specifically, Mr. Shanahan analyzed 381 monthly merchant account statements for two merchant accounts at BofA and fourteen merchant accounts from JPMC. (*Id.* at 6.) All sixteen merchant accounts belong or belonged to the Epoch Times Entities. Mr. Shanahan's analysis covers card activity in the accounts over a 63-month period from January 2019 to March 2024 — the entire relevant time period of this case.

(*Id.*) Based on this analysis, there were 263,710 card transactions in the Epoch Times Entities merchant accounts totaling $132,830,734. (*Id.*) But there were only 1,800 chargebacks, totaling $723,560, with $137,027 in chargebacks being reversed. (*Id.*) The resulting chargeback ratio can be expressed in two ways: (i) comparing the total number of chargebacks against the total number of transactions, and (ii) comparing the total dollar amount of chargebacks to the dollar amount of transactions. The chargeback rate by transaction number is 0.68%. (*Id.*) The chargeback ratio by dollar amount is 0.54%. (*Id.*)

2.    Discussion

i.    Shanahan's Proposed Testimony is Relevant and not Cumulative, and, in any Event, the Government's Motion is Premature

The government's leading argument to exclude Mr. Shanahan's testimony is that, although Mr. Shanahan's testimony "appear[s] to be relevant" — his proposed testimony is within the ken of the jury because it will "impermissibly mirror[] the testimony offered by fact witnesses." (Gov't Br. at 43 (quoting *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994).) The government is mistaken that the topics of Mr. Shanahan's proposed testimony would be at all cumulative or familiar to ordinary jurors.

Mr. Shanahan will testify about both general industry standards and practices regarding chargebacks, as well as his analysis of the Epoch Times Entities' merchant accounts. (Shanahan Notice at 1.) Mr. Shanahan's testimony regarding industry standards and practices includes the mechanics and timing of chargeback dispute process, which involves, among other things: the card issuing bank provisionally crediting the cardholder pending the dispute, debiting or withdrawing the value of the disputed purchase from the merchant account, re-presenting the chargeback to the card issuing bank by submitting evidence, if any, that the purchase was valid. (*Id.* at 4-5.) Mr. Shanahan's testimony will also address general background on effectively

23

calculating a chargeback ratio given of a lag effect between an initial purchase and chargeback, and that it is therefore more accurate to measure chargeback activity over a period of time instead of one month. (*Id.* at 5.) Mr. Shanahan's testimony is necessary to help the jury understand the evidence that the government has already said it will likely introduce regarding statements to BofA and JPMC about the merchant accounts and the adjudication of chargebacks in those accounts. (Gov't Br. at 40, 45-46).

Mr. Guan is entitled to introduce evidence from his own expert to provide contextual background regarding industry standards and norms on chargebacks, BofA and JPMC's actions in relation to the chargebacks in the Epoch Times Entities' accounts and the subsequent dispute resolution of those chargebacks. While jurors may be familiar with the process cardholders follow to dispute a card transaction, they are unlikely to be familiar with how issuing and acquiring banks adjudicate those disputes or the processes for holding funds from merchants to satisfy any disputes, let alone the methodology to accurately calculate a chargeback ratio. Providing a jury with helpful background regarding merchant accounts and chargeback processes is a traditional and long-accepted use of expert testimony. *See generally Mulder*, 273 F.3d at 102 (permitting expert testimony on industry standards); *Pension Comm. of Univ. of Montreal*, 691 F. Supp. 2d at 463-65 (same); *Fin. Guar. Ins.*, 2020 WL 4251229, at *5 (same). This background will help educate the jury about the niche field of chargeback dispute resolution and how to effectively calculate chargebacks, allowing it to place Mr. Guan's conduct and the Epoch Times Entities' merchant accounts in the context of industry norms. *See United States v. Litvak*, 808 F.3d 160, 182-83 (2d Cir. 2015) (holding district court exceeded its discretion in excluding defendant's proposed witness "in respect of the process by which investment managers value RMBS" because the testimony "could have educated the jury . . . about [a] highly-specialized

24

field"). That is because, after all, the expert's "role" in providing such testimony "is to identify [a company's] practices and structures and place them within a larger context of industry norms." *Scott*, 315 F.R.D. at 46 (rejecting argument that proposed expert testimony is a "rehashing of the record evidence"); *see also Highland Cap.*, 551 F. Supp. 2d at 181.

Separately, despite its bald representations about cumulative testimony, the government fails to identify a single fact witness, in specific or general terms, with which Mr. Shanahan's testimony would overlap. The government is silent as to how many such fact witnesses it will take to explain the concepts, or even what concepts it is referring to, what these unknown witnesses will generally testify about and how that will render Mr. Shanahan's testimony duplicative, or any other specific explanation of why the government believes Mr. Shanahan's testimony is likely to overlap with the testimony of one or more fact witnesses.

Even putting that aside, since no witnesses have yet testified, the government's motion on this basis is plainly premature. *See United States v. Malvasio*, No. 23-CR-396 (JMF), 2026 WL 1329849, at *5 (S.D.N.Y. May 13, 2026) (finding premature the government's motion that defense expert's testimony was cumulative since no witness has testified). Notably, all the authority the government cites are all inapplicable since the courts in those cases excluded expert testimony only *after* fact witnesses testified, while generally reserving judgment prior to trial. *See, e.g.*, *United States v. Collins*, 581 F. App'x 59, 60 (2d Cir. 2014) (specific witnesses already testified regarding limited areas of relevance of expert's testimony); *United States v. Mendlowitz*, No. S2 17-CR-248 (VSB), 2019 WL 6977120, at *3 (S.D.N.Y. Dec. 20, 2019) (noting that at oral argument on government's motion *in limine* to exclude defense expert, prior to trial, the court "reserve[d] decision because it was premature to make a ruling without hearing the testimony of the witnesses . . . and could potentially testify about industry practice"); *United States v. Sanders*,

25

No. S1 12-CR-0574 LAK, 2013 WL 1421487, at *1-2 (S.D.N.Y. Mar. 27, 2013) (excluding

defendant's expert that was noticed, for the first time, two weeks after trial began because it was

untimely and the "abundan[ce] of evidence thus far offered by percipient witnesses"). The

government also relies on *Amuso*, where the Second Circuit endorsed law enforcement agent

testimony that would "bolster the government's witnesses' versions of events" because the agent

would testify on topics that "are still beyond the knowledge of the average citizen." *Amuso*, 21

F.3d at 1264. Regardless, testimony from a scattered set of government witnesses is "not

necessarily a substitute for an expert's testimony about standard industry practices." *United

States v. Mendlowitz*, No. 21-2049, 2023 WL 2317172, at *4 (2d Cir. Mar. 2, 2023).

        ii.     Shanahan's Testimony is Proper and Not Unduly Prejudicial

The government next argues that Mr. Shanahan's testimony should be precluded because

(i) it attempts to communicate a legal standard, (ii) it makes false comparisons about the

chargeback ratio, and (iii) it is not fit to the case because a majority of the transactions were not

charged back. These arguments fundamentally misunderstand the thrust and relevance of Mr.

Shanahan's proffered testimony.

        a.     Mr. Shanahan's Testimony Provides the Jury with Helpful
                Information Regarding Industry Norms on Chargebacks and Does
                not Communicate a Legal Standard

The government argues that Mr. Shanahan's testimony communicates a legal standard by

noting that in the card industry "an acceptable chargeback rate is below 1%," and that would

confuse the jury as to whether Mr. Guan complied with card industry standards rather than

complying with the law. Mr. Shanahan's testimony would do no such thing. Instead, his

testimony addresses topics that the government has stated it will put at issue in this case while

leaving the jury to consider the testimony when it considers all of the evidence concerning Mr.

Guan's state of mind.

26

As previously discussed, the government made clear that it will introduce evidence about communications with BofA and JPMC, which served as the merchant acquiring banks for the Epoch Times Entities, and the chargebacks in those accounts. (*E.g.*, Gov't Br. at 40, 45, 46; GX 1A GX 1A-75; GX 1A-76; GX 1A-77; GX 1A-78; GX 1A-87.) Mr. Guan should have the opportunity to provide expert testimony that is helpful to the jury in understanding industry norms regarding the chargeback disputes that are a feature of the government's case. For instance, the government's exhibits of JPMC's communications with Mr. Guan indicate that JPMC told Mr. Guan that the bank applied a 1% chargeback ratio. (*See* GX 1A-78.) Mr. Guan should, in turn, be permitted to introduce expert testimony about the industry standards for chargebacks and the calculation of the actual chargeback ratio at the Epoch Times Entities' accounts.

Testimony regarding the chargeback rate in the Epoch Times Entities' accounts is particularly relevant to Mr. Guan's state of mind as it would reasonably impact whether he would discern suspicious activity in the merchant accounts. The evidence at trial — from the government's own exhibits — will establish that Mr. Guan monitored the overall chargeback rate as well as individual chargebacks in the relevant merchant accounts. (*See, e.g.*, GX 1A-78.) The evidence will also show that he communicated to the MMO Team concerns about increased chargebacks. Mr. Shanahan's testimony will explain the industry standards with respect to chargebacks and shed light on whether the chargeback rate in the Epoch Times Entities' accounts deviated from those norms sufficiently to raise red flags regarding suspicious activity. (Shanahan Notice at 4-6.)

To be clear, Mr. Shanahan will not testify that Mr. Guan did not have the requisite *mens rea* to conspire to commit money laundering. Despite the government's assertions to the contrary,

Mr. Shanahan's expert disclosure does not contain any statement that is even close to that assertion.

Indeed, Mr. Shanahan's testimony would plainly leave for the jury's determination whether to find that Mr. Guan had the mental state to commit money laundering. *See, e.g.*, *Lopez*, 547 F.3d at 373-74 (expert testimony properly admitted where evidence was consistent with drug distribution generally, and did not include an opinion on whether the particular defendant "had the requisite intent to distribute"); *Valle*, 2013 WL 440687, at *10 (admitting testimony from defense expert who "will not opine as to . . . whether [defendant] had criminal intent," and "possibility that the jury may infer from [expert's] testimony that [defendant] did not" intend to commit the crime "does not require exclusion"); *Leech*, 2026 WL 1113346, at *22 (expert testimony was proper where it did not "expressly state[] the inference" that defendant engaged in conduct "with the requisite criminal intent").

Relatedly, the government's contention that Mr. Shanahan's testimony relies on the behavior of others is also mistaken. Mr. Shanahan will testify about industry practices and norms with regards to chargeback disputes to put into context the chargeback rate in the relevant merchant accounts. That is squarely permissible testimony. *Mulder*, 273 F.3d at 102. Mr. Shanahan is not, however, as the government insists, relying on the conduct of anonymous third parties. He is relying on industry standards and norms regarding the chargeback dispute process and an analysis of the chargeback rate in accounts belonging to the Epoch Times Entities.[7]

---

[7] The government complains that the chargeback ratio data put forward by Mr. Shanahan cannot support his opinion because one of the background statistics (including with respect to the global chargeback volume) related to 2026 data and pertained to segments of the industry that the government deemed inapposite. Although we submit that the current citations in Mr. Shanahan's notice in no way undercuts the validity of the notice or the of his testimony (particularly absent an indication that the data that the government would prefer would be materially different), out of an abundance of caution, Mr. Shanahan will be submitting an amended notice that, among

Furthermore, Mr. Shanahan's testimony about industry practice regarding chargebacks, and how the chargebacks applicable to the Epoch Times Entities' accounts fits within those industry practices, does not improperly invade the Court's role in instructing the jury on the applicable law. Shanahan's testimony will instead provide the jury with helpful industry context relevant to deciding whether Mr. Guan's mental state satisfies the elements of the charged conspiracy. *See Cary Oil Co. v. MG Ref. & Mktg., Inc.*, No. 99 Civ. 1725, 2003 WL 1878246, at *5 (S.D.N.Y. Apr. 11, 2003) (Marrero, J.) (allowing law professor to testify as expert on corporate governance and veil-piercing, and noting courts have "latitude to allow experts to testify about issues that would help the jury understand concepts it needed to know to render a verdict despite the fact that the opinions may encroach on matters of law").

The government's argument, however, to exclude Mr. Shanahan's testimony would leave Mr. Guan unable to introduce highly relevant and probative testimony addressing the chargeback rate in the Epoch Times Entities' accounts and whether it indicated suspicious activity based on industry norms and standards. *Litvak*, 808 F.3d at 183-84 (noting that exclusion of defense expert left defendant in the "untenable position whereby he could not introduce testimony" regarding lack of materiality element of securities fraud charges). And while Mr. Guan disputes that Mr. Shanahan's circumscribed testimony poses any risk of confusion regarding the legal standard the jury should apply, any such risk is appropriately addressed by a limiting instruction from the Court. *See id.* at 183 (finding district court unnecessarily excluded entirety of expert's testimony since there "was minimal risk of confusion because [the expert's] testimony in respect of an 'ultimate question' before the jury could have been properly limited by the District Court").

---

other things, will show that for 2020 and 2022, i.e., the period at height of the activity at issue in this case, the average chargeback rate in the United States was 0.6%.

        b.      Mr. Shanahan's Testimony Does not Rely on False Comparisons or Ignore Relevant Evidence

The government next contends that Mr. Shanahan's testimony should be excluded because it relies on the total chargeback rate rather than only chargebacks initiated for fraud. (Gov't Br. at 48.) In other words, the government believes that Mr. Guan is attempting to introduce testimony that it is acceptable to engage in transactions involving proceeds of fraud if also engaging in a large number of transactions not involving fraud proceeds. (*Id.* at 48-49.) Once again, the government misconstrues the substance of Mr. Shanahan's testimony and how it is relevant for the jury.

Mr. Guan is not seeking to introduce Mr. Shanahan's testimony to establish the proposition that participating in transactions that did not involve crime proceeds absolves someone of knowingly transacting in proceeds of fraud. Mr. Guan of course disputes the government's contention that he conspired to engage in any such fraudulent transactions with the mental state sufficient to violate the law. Nevertheless, the government's focus on the chargeback rate alone is not what makes Mr. Shanahan's testimony relevant. Mr. Shanahan's testimony will be introduced to provide background on the industry norms with regard to chargeback disputes and to provide an analysis of the chargeback rate at accounts belonging to Epoch Times Entities. This testimony is relevant to establish that the chargeback rate that Mr. Guan monitored, (*see* GX 1A-78; GX 1A-112), was consistent with industry standards for an acceptable chargeback ratio. And contrary to the government's misplaced hyperbole, Mr. Shanahan is not testifying that because the chargeback ratio was within industry standards Mr. Guan is not guilty of the charges. Instead, the jury will be left to decide whether Mr. Guan's consideration of the chargeback rate is relevant to the issue of whether he intentionally participated in a money laundering conspiracy. *See DiDomenico*, 985 F.2d at 1164-65 (Rules of Evidence do not "prohibit all expert testimony

30

that gives rise to an inference concerning a defendant's mental state"); *Valle*, 2013 WL 440687, at *10; *Leech*, 2026 WL 1113346, at *22; *Lopez*, 547 F.3d at 373-74. Since Mr. Shanahan's testimony is relevant to Mr. Guan's understanding whether the chargeback rate was within industry standards, there is no "apples and oranges" comparison problem in this case. As a result, the government's arguments about the impropriety of Mr. Shanahan's testimony go to weight and not admissibility. *See MBIA*, 2012 WL 2568972, at *15 (noting "most objections to expert testimony are related only to the weight of the evidence, not its admissibility").

Lastly, the government argues that Mr. Shanahan's testimony does not fit this case because many of the transactions involving fraud proceeds were not charged back. (Gov't Br. at 50.) The government states it will show that numerous transactions involved funds that were directed through nominee accounts controlled by alleged co-conspirators before being transferred to the Epoch Times Entities. First, Mr. Guan disputes that the facts at trial will establish this allegation, let alone that he had knowledge of such transfers to nominee accounts. Second, the government here again misunderstands that the chargeback rate standing alone is not what makes Mr. Shanahan's testimony relevant. The expert testimony is relevant because it will compare the chargeback rate for the Epoch Times Entities' merchant accounts to industry standards, a factor the jury may find relevant to Mr. Guan's intent.[8]

---

[8] The government makes note that, more than 20 years ago, a court initially excluded expert testimony from Mr. Shanahan after finding that his expert witness report was overbroad. (Gov't Br. at 52 n.15.) What the government conveniently fails to tell the Court, however, is that the court in that case invited Mr. Shanahan to amend his expert report, *First Premier Bank v. Future Card Ltd.,* No. 02 Civ. 4054 (LLP) (D.S.D. Dec. 7, 2004) (ECF No. 194), and subsequently ruled that Mr. Shanahan's expert testimony would be admitted, *First Premier Bank v. Future Card Ltd.,* No. 02 Civ. 4054 (LLP) (D.S.D. Jan. 7, 2005 ) (ECF 240). (The case was eventually settled before trial, so no testimony actually occurred.) Other than to take note of the government's misleading omission, we submit that this 20-plus year-old case should have no bearing whatsoever on this case or whether Mr. Shanahan's expert testimony should be permitted.

31

IV.    THE COURT SHOULD PERMIT EVIDENCE CONCERNING MR. GUAN'S COMMUNICATIONS WITH ATTORNEYS NOTWITHSTANDING THAT HE IS NOT ASSERTING AN ADVICE-OF-COUNSEL DEFENSE

Mr. Guan should be permitted to offer evidence and argument relating to his communications with lawyers because those interactions bear directly on his state of mind and good faith, notwithstanding that he is not asserting an advice-of-counsel defense, which in any event, according to the Second Circuit, is no longer to be considered an affirmative defense. *See United States v. Denkberg*, 139 F.4th 147, 156 (2d Cir. 2025) ("Importantly in a fraud case, an advice-of-counsel defense 'is not an affirmative defense that defeats liability even if the jury accepts the government's allegations as true.'" (quoting *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017))). Courts in this district have regularly permitted such evidence when the involvement of lawyers is directly relevant to the facts at issue in the case (as here) and where the evidence is not likely to confuse the jury that the lawyers' involvement served to defeat any suggestion of criminal intent (which it cannot here). Indeed, given that the government has indicated that it intends to offer evidence about the communications for its own purposes, it would be manifestly unfair to block Mr. Guan from offering testimony or making arguments that highlight the ways in which that same evidence supports the defense case. The government's motion should be denied.

As the government notes in its motion papers, Mr. Guan had a series of communications with two attorneys in late 2019 and early 2020 relating to the legality of the purchase of cards on Paxful, the platform on which the vast majority of cards were purchased in this case. The advice that was eventually provided merely begged the question pertinent in this case, i.e., the advice was explicit that the legality depended on whether the cards at issue were stolen or counterfeit. One of the attorneys advised that "it appears that it is not a legal issue, unless you know that the gift cards that are being purchased have been stolen or are counterfeit, which would make you

32

the receiver of stolen property." (GX 1A-21, GX 1A-56.) The attorney's advice concerning legality was thus, in the government's parlance, "conditional." (Gov't Br. at 54.)

We accordingly do not intend to rely on counsel's advice as "a defense" (as the issue of whether Mr. Guan knew that the cards being purchased were stolen is very much disputed here) but rather submit that the fact of his engagement with counsel may reasonably be viewed as evidence that Mr. Guan was acting in good faith[9] and, more generally, informs the jury about his state of mind and intent.

The government contends that Mr. Guan made material, intentional misrepresentations to the attorneys that would prevent Mr. Guan from advocating for an advice-of counsel instruction even if the legal advice had not been conditional in the government's parlance. We strongly disagree with the government's interpretation of the facts and submit that the back-and-forth with counsel instead demonstrates a sincere, good faith (even if not always precise) effort to seek legal advice. This contested factual issue is well and fairly primed for the factfinder: all of the communications at issue occurred by email; The Epoch Times waived the privilege and produced them to the government more than a year ago; and both the government and the defense have

---

[9] The government's long discussion of whether a good faith defense is applicable to general intent crimes (*see* Gov't Br. at 55) is curious and plainly inapposite to Mr. Guan's case, as the money laundering conspiracy and bank fraud charges with which he is charged are specific intent crimes that are subject to a good faith analysis. *United States v. Hassan*, 578 F.3d 108, 123 (2d Cir. 2008) (noting "[c]onspiracy is a specific intent crime" (citation and quotations omitted)); *United States v. Hoke*, 551 F. App'x 611, 613 (2d Cir. 2014) (bank fraud is a specific intent crime); *United States v. Kukushkin*, 61 F.4th 327, 334 (2d Cir. 2023) (approving jury instruction that to find defendant acted willfully for a conspiracy charge, the "jury had to conclude beyond a reasonable doubt that [defendants] intentionally did something that the law forbids, the opposite of good faith"); *United States v. Guldi*, 141 F.4th 435, 448-49 (2d Cir. 2025) (affirming jury instruction, on bank fraud, that if "defendant had a good-faith belief that his or her words and actions were truthful and honest, you must acquit").

33

thus had access to a complete set of the communications and more than ample time to prepare for whatever testimony, cross-examination, and argument they wish to develop about the communications. As a result, the jury will be well positioned to determine whether Mr. Guan acted as a devious co-conspirator trying to dupe unsuspecting lawyers (as the government contends) or a good-faith actor making a laymen's effort to obtain advice on a topic he knew little about (as the defense contends). Resolving such factual disputes is precisely what a jury does, and basic fairness dictates that the jury should be armed with all proper testimony, cross-examination, and argument from *both* sides when it does so.

Unfortunately, the government (consistent with the blatantly one-sided approach that it repeatedly advocates in its *in limine* motions) seeks to use the attorney communications for its own purposes, (Gov't Br. at 54, 60-61), while simultaneously trying to cut off plainly relevant argument about the same evidence that would support Mr. Guan's defense and show (along with numerous other examples of good faith conduct) that Mr. Guan lacked any unlawful intent. Such abjectly prejudicial cherry picking has no support in equity or the law; indeed, on facts consistent with those in this case, courts in this district and elsewhere have repeatedly permitted evidence about communications with lawyers notwithstanding the fact an "advice-of-counsel" defense was not invoked. Three examples are particularly illustrative.

In *United States v. Tagliaferri*, No. 17-CV-03026 (RA), Judge Abrams issued an oral ruling during trial permitting the defendant to introduce testimony that attorneys were involved in relevant transactions even though defendant was not asserting a formal advice-of-counsel defense. In that case, the court explained that it was not providing a jury instruction regarding advice of counsel because the defendant explained that "he does not expect the evidence to show that [he] sought specific legal advice on any particular legal issue." (Ex. B, *Tagliaferri* Trial Tr.

at 82:22-83:2.) The court accordingly made clear that it would prohibit "any testimony or argument that [defendant] relied on his attorney's advice." (*Id.* at 83:17-20.) Nevertheless, the court ruled it would permit the defendant to "elicit testimony that attorneys were involved in the transactions (which will in any way event [sic] come out on the government's case), and I will permit[10] him to argue that this involvement affected his state of mind, thus bearing on whether he acted with fraudulent intent." *Id.* at 83:21-84:1.[11]

In *United States v. Bankman-Fried*, No. S6 22-CR-0673 (LAK), 2023 WL 6392718 (S.D.N.Y. Oct. 1, 2023), Judge Kaplan addressed the government's motion *in limine* to preclude the defendant from arguing or adducing evidence regarding the involvement of attorneys in certain events at FTX absent defendant's assertion of what the government dubbed a formal "advice-of-counsel defense." *Id.* at *1. Judge Kaplan noted that "evidence concerning the presence, involvement and even advice of lawyers in relevant events is viewed best as evidence probative of the defendant's intent to defraud or lack thereof." *Id.* Judge Kaplan went on to

---

[10] It should be noted that, given the substance of the actual testimony, Judge Abrams eventually expressed concern that the jury was being misled that specific advice was sought and given notwithstanding counsel's earlier proffer to the contrary, at which point defense counsel dropped the line of questioning. *See Bankman-Fried*, 2023 WL 6392718, at *2 (discussing Judge Abrams' ruling during *Tagliaferri* trial). Here, we submit that the risk of such confusion is minimal given the explicitly conditional nature of the advice given, and no doubt counsel for the government would object if such confusion becomes an issue. Unless and until that becomes an issue (and we have no intention of arguing that the attorneys' advice blessed the conduct at issue here), the Court should not foreclose evidence and argument that so directly bears on what is probably the most crucial issue in this case, i.e., Mr. Guan's state of mind.

[11] In that case, the waiver of attorney-client privilege was made late in the process, causing Judge Abrams to recognize that the issue was a "close question because it requires the Court to balance the defendant's constitutional right to present a defense against the concern about confusion to the jury and prejudice the government may suffer from defendant's last-minute waiver of the attorney client privilege." (*Tagliaferri* Trial Tr. at 82:22-83:2.) That concern about confusion and prejudice does not exist here, as the waiver of privilege and the production of the universe of attorney-client communications occurred more than a year before trial.

35

explain in a subsequent written opinion the proper way to analyze such issues, first opining that

the four requirements for supporting an advice-of-counsel defense were "inapplicable" because:

> the defendant disclaimed any formal advice-of-counsel defense.
> Instead he sought to admit evidence of attorneys' presence for and
> participation in certain events to support his good-faith defense.
> The Court therefore considered the defendant's proffered testimony
> under primarily Federal Rules of Evidence 401 and 403, which call
> for the admission of *relevant* evidence unless the court concludes
> that 'its probative value is substantially outweighed by,' *inter alia,*
> 'unfair prejudice, confusing the issues, [or] misleading the jury.'
> This approach is consistent with that employed by other courts in
> this district in similar circumstances. Thus the issue before the
> Court is not whether the defendant adduced evidence satisfying the
> elements of a formal advice-of-counsel defense, but rather whether
> the testimony he sought to give would have satisfied Rules 401 and
> 403.

*United States v. Bankman-Fried*, No. S6 22-CR-0673 (LAK), 2024 WL 477043, at *2, (S.D.N.Y.

Feb. 7, 2024) (citations omitted). Applying this approach, Judge Kaplan analyzed four separate

instances when lawyers were involved in certain activities at FTX that the defendant claimed had

an impact on his state of mind. *Id.* The court permitted testimony about one of those instances

but excluded evidence concerning the other three. *Id.* Notably, with respect to the attorney

involvement that was excluded, Judge Kaplan "found that testimony on these topics would be

minimally probative but would be likely to be substantially confusing and highly prejudicial

because it falsely implied that the lawyers, with full knowledge of the facts blessed what the

defendant is alleged to have done." *Id.* (alterations and quotations to the trial record omitted).

That issue is not presented here because the relevant opinions clearly do not suggest that

knowingly buying a stolen card on Paxful is somehow lawful.

Finally, in *SEC v. Am. Growth Funding II, LLC*, No. 16-CV-828 (KMW), 2018 WL

6322145 (S.D.N.Y. Dec. 4, 2018), the SEC moved to exclude evidence related to involvement of

or reliance on counsel because in the SEC's view defendants could not establish an advice-of-

counsel defense. *Id.* *3. The court rejected the argument because "courts routinely allow the jury to hear evidence about interactions with and advice of counsel even if ultimately there is insufficient evidence for an advice of counsel instruction." *Id.* Cases in other jurisdictions have reached similar conclusions. *See SEC v. Ferrone,* 163 F. Supp. 3d 549, 567-68, 570 (N.D. Ill. 2016) (in case in which an advice-of-counsel defense could not be asserted, SEC's motion to preclude evidence of lawyer's involvement "does not fully account for the issue of good faith and the ways in which it might be raised legitimately by [the defendant] to contest the scienter element of the SEC's case"); *United States v. Gorski,* 36 F. Supp. 3d 256, 268 (D. Mass 2014) (evidence of lawyer's involvement could be relevant to *mens rea* even where the defendant could not meet all of the elements of an advice-of-counsel defense).

We submit that the principles articulated in these cases strongly support permitting Mr. Guan to offer testimony and argument that the communications with the lawyers in 2019 and 2020 demonstrate good faith and inform his state of mind and intent. The communications are directly relevant, as the interactions related to an important issue in this case, i.e., whether purchasing cards on Paxful was lawful. The attorney-client privilege with respect to such communications was long ago waived, the government has long known the universe of such communications, and it has had more than ample opportunity to prepare for evidence on such communications. The likelihood of confusion by the jury about the implications of the lawyers' involvement is very low given the explicitly conditional nature of the advice given. And, perhaps most importantly, the government intends to admit evidence about the communications for its own purposes. Preventing the defense from making arguments about that very same evidence would be manifestly unfair.

37

V.     THE GOVERNMENT CANNOT FORECLOSE EVIDENCE OF RELIGIOUS BELIEF OR PERSECUTION TO THE EXTENT IS BEARS ON A DEFENDANT'S STATE OF MIND

Based on the current record, Mr. Guan does not intend to argue that the government's prosecution was motivated by improper factors. Nonetheless, that portion of the government's motion that seeks to exclude evidence about "alleged patterns of religious or political persecutions . . . whether alleged domestic political persecution or alleged persecution by the Chinese government of the members of the Spiritual Movement," (Gov't Br. at 67), must be denied because such evidence is directly relevant to Mr. Guan's state of mind.

The jury's decision regarding the charges against Mr. Guan will likely turn on its conclusions regarding Mr. Guan's state of mind, specifically, whether he had the knowledge and intent to join a conspiracy to commit money laundering or the intention to commit bank fraud. The facts that Mr. Guan is a sincere practitioner of the Falun Gong spiritual movement and that the Chinese government has persecuted that movement are critically important to understand Mr. Guan's state of mind. The government cannot properly propose the exclusion of evidence that would tend to show non-culpable reasons for his conduct.

For example, the evidence at trial will show not only that Mr. Guan is a sincere practitioner of the Falun Gong spiritual movement but also that Mr. Guan understood that many of the people with whom he was dealing (co-conspirators in the government's view) were fellow practitioners. Because of this shared spiritual background, Mr. Guan trusted the veracity and good faith of what fellow practitioners told him and did not believe that those fellow practitioners would engage in dishonest or unlawful behavior. On these facts — particularly in a case that will likely turn on Mr. Guan's intent — the defense must be permitted to show why Mr. Guan afforded the benefit of the doubt to certain individuals, why he was less skeptical of their actions or intentions that he might otherwise have been, and why he was reassured when they

38

provided innocent explanations for occurrences that others might have viewed as suspicious. *See United States v. DiMaria*, 727 F.2d 265, 270-72 (2d Cir. 1984) (reversing conviction where evidence offered by defense to prove lack of criminal intent was improperly excluded); *United States v. Elmaani*, No. 20-CR-661 (CM), 2023 WL 2770742, at *5 (S.D.N.Y. Apr. 4, 2023) ("Defendant will be permitted to present evidence about his state of mind; for instance, that his actions were motivated by his concern about the volatility of cryptocurrency market and his belief that the world was on the cusp of economic Armageddon.").

In addition, the evidence will show that The Epoch Times had been subjected to certain attacks by unknown parties (including hacking attempts and an attack in which many credit cards were charged for subscriptions and then reversed, causing the company great disruption) that Mr. Guan attributed to the Chinese government. These attacks informed Mr. Guan's view of events in this case, among other things causing him to view matters that the government will argue were red flags with some critical skepticism. The government has made it very clear that it intends to admit a laundry list of evidence, (*see, e.g.*, Gov't Br. at 46), that, it argues, suggests that Mr. Guan was aware that his conduct was connected to a money laundering conspiracy. Given the government's intention, the defense must be allowed to argue that the items on its list meant something very different to Mr. Guan, i.e., that the company might be under yet another attack by the Chinese government rather than an indication that cards that MMO donations contained proceeds of unlawful conduct.

We submit further that the evidence will show that persecution of and attacks by the Chinese government against Falun Gong and The Epoch Times caused Mr. Guan to act in ways that would avoid surveillance and prevent attacks by the Chinese government. Such evidence explains conduct that the government contends is instead indicative of money laundering

39

activity. The government alleged in the Indictments that Mr. Guan engaged in certain financial transactions in a manner that was designed to disguise the source of the funds in question, thereby facilitating the alleged money laundering. (Guan Indictment at ¶ 8 (alleging Mr. Guan moved funds into bank accounts of the Epoch Times Entities "through multiple layered transactions designed to conceal the unlawful origins of the funds"). The government's proffered expert witness also appears prepared to testify "about the three stages of money laundering, including placement, layering, and integration," (Delston Notice at 1), in support of the government's theory that the transactions at issue here constitute "layering" and therefore are indicative of money laundering. To the extent that Mr. Guan can establish that the motivation for his conduct was not to engage in illegal money laundering but rather to avoid detection by and attack from the Chinese government, he must be permitted to show that non-culpable rationale. *United States v. Guo*, No. 23-CR-118 (AT), 2024 WL 1939221, at *6 (S.D.N.Y. May 2, 2024) (allowing defendant to introduce evidence related to Chinese government because "evidence showing that Defendants' fears of CCP targeting were objectively legitimate — even if they were not aware of the specific pieces of evidence — gives credence to certain nonculpable explanations for their actions").

In sum, evidence that Mr. Guan and his alleged co-conspirators are adherents of the Falun Gong spiritual movement and that that movement has been attacked and persecuted by the Chinese government plainly should be admitted for proper purposes. Such evidence is not an improper attempt to argue nullification or to garner sympathy, as the government's motion suggests, but rather directly relevant to Mr. Guan's state of mind and whether he knew and intended to join the charged money laundering conspiracy and intended bank fraud.

40

VI.   THE COURT SHOULD ADMIT PROPER CHARACTER EVIDENCE AND
      EVIDENCE OF PRIOR GOOD CONDUCT IF RELEVANT TO THE ISSUES IN THIS
      CASE

With respect to the government's arguments concerning Mr. Guan's "prior commission of good acts," (Gov't Br. at 71-72), Mr. Guan reserves his rights to seek admission of evidence in the form of proper character evidence pursuant to Rules 404(a)(2)(A) and 405 of the Federal Rules of Evidence and to offer evidence of prior conduct to the extent that it properly bears on a fact at issue in this case. *See United States v. Han*, 230 F.3d 560, 563-64 (2d Cir. 2000) (holding that district court improperly excluded as irrelevant defendant's testimony of his reputation of "uprightness and an unwillingness to exploit others," and noting that Rule 404(a)(1) requires "only that the proffered evidence of a character trait relate to some element at issue in the case"); *United States v. Peraire-Bueno*, No. 24-CR-293 (JGLC), 2025 WL 2753560, at *6 (S.D.N.Y. Sept. 29, 2025) (finding defendants are permitted under Rule 404(a)(2)(A) to "offer evidence that they are law-abiding citizens").

Moreover, one category of such prior conduct that can be anticipated now is evidence that Mr. Guan provided charitable donations and volunteered his time to The Epoch Times and other Falun Gong-related entities. For the reasons discussed in the prior section, the fact that Mr. Guan is a sincere follower of the Falun Gong movement is highly relevant to this case, and the fact that, despite being of very modest means, he donated money to The Epoch Times, a non-profit media entity regularly associated with the Falun Gong movement, makes that sincere belief more likely. The same is true with respect to Mr. Guan's providing volunteer services (and/or services with minimal remuneration) to the Epoch Times and other Falun Gong-related entities. Whether the government views such conduct as "prior good acts" is of no moment and does not impact its admissibility: such donations of money and time are not offered as positive propensity evidence or to garner sympathy as the government suggests in its papers but rather because such evidence

41

provides important insight to the jury on the sincerity of Mr. Guan's association with the Falun Gong movement. It is therefore relevant to Mr. Guan's state of mind for the reasons discussed above. *See United States v. Nachamie*, 28 F. App'x 13, 21 (2d Cir. 2001) (noting that, in healthcare fraud case, district court properly admitted testimony regarding defendant's charity toward senior citizens and allowed defendant to argue that she could not have intended to take advantage of the elderly).

## VII.   MR. GUAN'S BACKGROUND AND CHARACTERISTICS SHOULD BE ADMITTED TO THE EXTENT PERTINENT TO OTHER ISSUES IN THE CASE

As an initial matter, to the extent that Mr. Guan chooses to testify, he should be entitled to testify as to his basic biographical background. *See United States v. Adelekan*, 567 F. Supp. 3d 459, 471 (S.D.N.Y. 2021) (admitting evidence about defendant's professional background, since it is the type of information that can "scarcely be said to involve disputed matter, yet it is universally offered and admitted as an aid to understanding" since it tells "the jury something about the defendant as a person, and his experience in life" (quoting *United States v. Blackwell*, 853 F.2d 86, 88 (2d Cir. 1988))); *United States v. Kosinski*, No. 3:16-CR-00148 (VLB), 2017 WL 4953902, at *6 (D. Conn. Oct. 31, 2017) (permitting defendant to introduce information about his age, basic information about his employment, and family background, if he chooses to testify at trial).

More generally, certain facts about Mr. Guan's personal characteristics are relevant to other issues in the case that bear on guilt or innocence. Just by way of example, the fact that Mr. Guan is Chinese and a practitioner of Falun Gong are directly relevant to his state of mind for the reasons discussed above. Similarly, the fact that he received little remuneration over the many years that he devoted his time and efforts to The Epoch Times is relevant for the same reason. And facts about his background that tend to establish that Mr. Guan has minimal assets may

42

reasonably be seen as probative of whether Mr. Guan profited from the crimes alleged, which would bear on the issue of intent presented by the Indictment.

CONCLUSION

For the foregoing reasons, Mr. Guan respectfully requests that the Court (1) deny the Government's Motion to exclude Mr. Guan's proffered expert witnesses, (2) grant the government's other motions only to the extent that they consistent with the caveats raised in this submission, and (3) grant Mr. Guan such other and further relief as the Court deems appropriate.

Dated: New York, New York
      June 16, 2026

PETRILLO KLEIN + BOXER LLP

By: */s/ Guy Petrillo*
    Guy Petrillo
    Kevin R. Puvalowski
    Marcelo A. Triana
    Shanice D. Hinckson
    655 Third Avenue, 12th Floor
    New York, New York 10017
    Tel: 212-370-0330
    gpetrillo@pkbllp.com
    kpuvalowski@pkbllp.com
    mtriana@pkbllp.com
    shinckson@pkbllp.com

    *Counsel for Weidong Guan*

43