UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

UNITED STATES OF AMERICA

        -*v.*-                        24 Cr. 322 (VM)

WEIDONG GUAN,
  a/k/a "Bill Guan," and
LE VAN HUNG,
  a/k/a "Hung Van Le,"
  a/k/a "Van Hung Le,"

               Defendants.

-------------------------------------------------------------x

## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO THE DEFENDANTS' MOTIONS *IN LIMINE*

                                    JAY CLAYTON
                                    United States Attorney

Benjamin M. Burkett
Rebecca T. Dell
Paul M. Monteleoni
Amanda C. Weingarten
Assistant United States Attorneys

- Of Counsel -

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................i

TABLE OF AUTHORITIES .........................................................................................iii

ARGUMENT ................................................................................................................ 2

I.     THE COURT SHOULD ADMIT EVIDENCE OF STATEMENTS TO THE
       DEFENDANTS, OR OF COMMUNICATIONS PRELIMINARY TO RELEVANT
       EVENTS OR ACTIONS, TO PROVE THE DEFENDANTS' STATE OF MIND AND
       EXPLAIN SUBSEQUENT STATEMENTS AND ACTIONS ......................................... 2

       A.     Background ................................................................................. 2

       B.     Applicable Law............................................................................ 6

       C.     Discussion ................................................................................... 7

              1.     Statements to the Defendants.......................................... 7

              2.     Communications Preliminary to Statements to the Defendants or Actions 9

II.    THE DEFENDANTS SHOULD NOT BE PERMITTED TO TRUNCATE THE
       GOVERNMENT'S PROOF OF THE FULL SCOPE OF THE CRIMINAL OFFENSE,
       INCLUDING INTEXTRICABLY INTERTWINED AND 404(B) EVIDENCE AND
       LIMITED VICTIM IMPACT EVIDENCE .......................................................... 13

       A.     Background ................................................................................. 13

       B.     Legal Standard ........................................................................... 17

       C.     Discussion .................................................................................. 19

              1.     The MMO Team's Activities.................................................. 19

              2.     Guan's Concealment of the Offense Conduct in His Tax Filings ............ 23

              3.     The Limited Victim Impact Evidence....................................... 25

III.   THE DEFENDANTS ARE NOT ENTITLED TO PRECLUDE THE GOVERNMENT
       FROM ENGAGING IN ORDINARY TRIAL ADVOCACY REGARDING WHAT IT
       EXPECTS THE EVIDENCE WILL SHOW OR HAS SHOWN, OR REGARDING HOW
       TO DESCRIBE CRIME VICTIMS ................................................................... 28

       A.     Background ................................................................................. 28

       B.     Applicable Law........................................................................... 30

       C.     Discussion .................................................................................. 31

|   |   | 1. | Advocacy Regarding What the Government Expects the Evidence Will Show | 31 |
|   |   | 2. | Advocacy Regarding the Inferences to be Drawn from the Evidence Regarding the Defendants' Knowledge | 36 |
|   |   | 3. | Referring to Victims as Victims | 38 |
| IV. | | | THE COURT SHOULD EXCLUDE THE IRRELEVANT, UNFAIRLY PREJUDICIAL, AND UNNECESSARILY CONFUSING PAXFUL MATERIALS | 42 |
|   | A. | | Background | 42 |
|   | B. | | Applicable Law | 45 |
|   |   | 1. | The Rule Against Hearsay | 45 |
|   |   | 2. | Rule 801(d)(2)(B) | 45 |
|   |   | 3. | Rule 803(8)(A)(iii) | 45 |
|   |   | 4. | Rule 402 and Rule 403 | 46 |
|   | C. | | Discussion | 47 |
|   |   | 1. | The Paxful Materials Are Inadmissible Under Rule 801(d)(2)(B) | 47 |
|   |   | 2. | The Paxful Materials Are Inadmissible Under Rule 803(8) | 50 |
|   |   | 3. | Whether Hearsay or Not, the Paxful Materials Must Be Excluded Under Rule 402 and Rule 403 | 53 |
| V. | | | THE REMAINING MOTIONS NEED NOT BE DECIDED AT THIS TIME | 60 |
|   | A. | | The Court Need Not Rule at This Time, But May Share the Indictments with the Jury | 60 |
|   | B. | | Issues of Metadata and Burden Shifting Are Concededly Unripe | 61 |
| | | | CONCLUSION | 63 |

## TABLE OF AUTHORITIES

**Cases**

*Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988) .................................................................... 52

*Berkovich v. Hicks*, 922 F.2d 1018 (2d Cir. 1991) ........................................................................ 18

*Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594 (8th Cir. 2005) ............................. 50

*Bridgeway Corp. v. Citibank*, 201 F.3d 134 (2d Cir. 2000) ......................................................... 50

*Bueno v. Benhamou*, No. 21 Civ. 04595 (JVS) (SPX), 2022 WL 1592593 (C.D. Cal. Mar. 16, 2022) ........................................................................................................................................ 7, 11

*CA, Inc. v. Simple.com, Inc.*, 780 F. Supp. 2d 196 (E.D.N.Y. 2009) ................................... 7, 11, 62

*Figueroa v. Boston Scientific Corp.*, No. 00 Civ. 7911 (DC), 2003 WL 21488012 (S.D.N.Y. 2003) ............................................................................................................................................ 51

*Florida v. White*, 526 U.S. 559 (1999) ......................................................................................... 18

*Frazier v. Cupp*, 394 U.S. 731 (1969) ........................................................................................... 30

*MF Global Holdings Inc. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558 (S.D.N.Y. 2017) .............................................................................................................................................. 39

*Nemeth v. Citizens Fin. Grp.*, No. 08-CV-15326, 2012 WL 13198096 (E.D. Mich. Aug. 13, 2012) ............................................................................................................................................ 13

*Opati v. Republic of Sudan*, 590 U.S. 418 (2020) ........................................................................ 50

*Option Res. Grp. v. Chambers Dev. Co.*, 967 F. Supp. 846 (W.D. Pa. 1996) .............................. 51

*Owens v. Republic of Sudan*, 194 A.3d 38 (D.C. 2018) ............................................................... 50

*Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017) ....................................................... 50

*Palmer v. Hoffman*, 318 U.S. 109 (1943) ..................................................................................... 46

*Paolitto v. John Brown E. & C., Inc.*, 151 F.3d 60 (2d. Cir. 1998) ......................................... 51, 57

*Robbins v. Whelan*, 653 F.2d 47 (1st Cir. 1981) ..................................................................... 46, 50

*Ryan v. Miller*, 303 F.3d 231 (2d Cir. 2002) ................................................................................ 12

*S.E.C. v. Pentagon Cap. Mgmt. PLC*, No. 08 Civ. 3324, 2010 WL 985205 (S.D.N.Y. Mar. 17, 2010) ............................................................................................................................................ 51

*United State v. Peitz*, No. 01 Cr. 852, 2002 WL 31101681 (N.D. Ill. Sept. 20, 2002) ................ 51

*United States v. Adelekan*, No. 22-1232-CR, 2024 WL 4501962 (2d Cir. Oct. 16, 2024) 19, 23, 25

*United States v. Artur Schaback*, No. 24 Cr. 72 (KJM) (E.D. Cal.) ............................................. 43

*United States v. Atuana*, 816 F. App'x 592 (2d Cir. 2020) .......................................................... 24

*United States v. Awad*, No. 06 Cr. 600 (DLC), 2007 WL 1988382 (S.D.N.Y. July 3, 2007)  46, 50

*United States v. Baker*, 923 F.3d 390 (5th Cir. 2019) ................................................................. 48

*United States v. Blaszczak*, No. S1 17 Cr. 357 (LAK), 2018 WL 2021628 (S.D.N.Y. Apr. 29, 2018) ............................................................................................................................................ 61

*United States v. Bonallo*, 858 F.2d 1427 (9th Cir. 1988) ............................................................ 62

*United States v. Borrero*, No. 13 Cr. 58 (KBF), 2013 WL 6020773 (S.D.N.Y. Nov. 1, 2013) ... 57

*United States v. Campos*, 763 F. App'x 97 (2d Cir. 2019) .......................................................... 53

*United States v. Clark*, 525 F.2d 314 (2d Cir. 1975) .................................................................. 30

*United States v. Cloud*, 680 F.3d 396 (4th Cir. 2012) ................................................................ 27

*United States v. Coonan*, 938 F.2d 1553 (2d Cir. 1991) ............................................................. 18

*United States v. Copple*, 24 F.3d 535 (3d Cir. 1994) ............................................................ 26, 27

*United States v. Cruse*, 805 F.3d 795 (7th Cir. 2015) ................................................................ 12

*United States v. Daly*, 842 F.2d 1380 (2d Cir. 1988) .................................................................. 18

*United States v. Dennis*, No. 21-2952, 2025 WL 1751946 (2d Cir. June 25, 2025) ................... 11

*United States v. Diaz*, 176 F.3d 52 (2d Cir. 1999) ................................................................ 19, 22

*United States v. Dupigny*, 18 Cr. 528 (JMF) (S.D.N.Y.) ............................................................ 40

*United States v. Dupre*, 462 F.3d 131 (2d Cir. 2006) .................................................................. 8

*United States v. Dupree*, 706 F.3d 131 (2d Cir. 2013) ......................................................... 6, 7, 8

*United States v. Edwards*, 342 F.3d 168 (2d Cir. 2003) ................................................... 25, 31, 37

*United States v. Edwards*, No. 16 Cr. 103 (BLG) (SPW), 2017 WL 4159365 (D. Mont. Sept. 19, 2017) ............................................................................................................................................ 41

*United States v. Eldridge*, 860 F. App'x 773 (2d Cir. 2021) ................................................. 30, 31

*United States v. Elie*, No. 10 Cr. 336 (LAK), 2012 WL 383403 (S.D.N.Y. Feb. 7, 2012) .......... 36

*United States v. Esso*, 684 F.3d 347 (2d Cir. 2012) ............................................................... 37, 61

*United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980) ....................................................... 17, 47

*United States v. Forbes*, 249 F. App'x 233 (2d Cir. 2007) ......................................................... 34

*United States v. Friedman*, 998 F.2d 53 (2d Cir. 1993) ............................................................. 35

*United States v. Garcia*, 291 F.3d 127 (2d Cir. 2002) ............................................................... 18

*United States v. Gasperini*, 729 F. App'x 112 (2d Cir. 2018) .................................................... 41

*United States v. Gasperini*, No. 16 Cr. 441 (NGG), 2017 WL 3140366 (E.D.N.Y. July 21, 2017) ............................................................................................................................................ 41

*United States v. Giampino*, 680 F.2d 898 (2d Cir. 1982) ........................................................... 60

*United States v. Gibson*, 690 F.2d 697 (9th Cir. 1982) .............................................................. 40

*United States v. Gilliam*, 994 F.2d 97 (2d Cir. 1993) ...................................................... 12

*United States v. Gonzalez*, 110 F.3d 936 (2d Cir. 1997) ............................................ 18, 20, 21, 22

*United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006) ...................................................... 30

*United States v. Hendricks*, 921 F.3d 320 (2d Cir. 2019) ........................................... 25, 26

*United States v. Hill*, No. 12 Cr. 214 (KAM), 2014 WL 198813 (E.D.N.Y. Jan. 14, 2014) ........ 58

*United States v. Ho*, 984 F.3d 191 (2d Cir. 2020) .................................................. 7, 8, 9

*United States v. Huynh*, No. 14 Cr. 275, 2016 WL 7411529 (M.D. Pa. Dec. 22, 2016) .............. 41

*United States v. Janati*, 374 F.3d 263 (4th Cir. 2004) ..................................................... 33

*United States v. Kalaydjian*, 784 F.2d 53 (2d Cir. 1986) ..................................................... 19

*United States v. Kaplan*, 490 F.3d 110 (2d Cir. 2007) ..................................................... 53

*United States v. Kidd*, No. 18 Cr. 872 (VM) (S.D.N.Y.) ..................................................... 40, 61

*United States v. Kidd*, No. 23-6400, 2025 WL 3687811 (2d Cir. Dec. 19, 2025) ........................ 45

*United States v. Klein*, No. 16 Cr. 442 (JMA), 2017 WL 1316999 (E.D.N.Y. Feb. 10, 2017) ................................................................................................. passim

*United States v. Lasanta*, 978 F.2d 1300 (2d Cir. 1992) ...................................................... 18

*United States v. Lizarraga-Tirado*, 789 F.3d 1107 (9th Cir. 2015) ......................................... 7, 11

*United States v. Lubrano*, 529 F.2d 633 (2d Cir. 1975) ...................................................... 9

*United States v. MacPherson*, 424 F.3d 183 (2d Cir. 2005) ................................................. 34

*United States v. Manfredonia*, 414 F.2d 760 (2d Cir. 1969) ............................................... 9

*United States v. Marrale*, 695 F.2d 658 (2d Cir. 1982) ..................................................... 31

*United States v. Martinez*, 616 F.2d 185 (5th Cir. 1980) ................................................... 40

*United States v. Martoma*, No. 12 Cr. 973 (PGG), 2014 WL 5361977 (S.D.N.Y. Jan. 8, 2014). 48

*United States v. Maxwell*, No. 20 Cr. 330 (AJN) (S.D.N.Y.) ................................................. 40

*United States v. Mayers*, 216 F. App'x 77 (2d Cir. 2007) ................................................... 7

*United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984) ..................................................... 49

*United States v. Mejia*, No. 24 Cr. 212 (VSB), 2025 WL 934343 (S.D.N.Y. Mar. 27, 2025) ..... 62

*United States v. Miller*, 626 F.3d 682 (2d Cir. 2010) ...................................................... 46

*United States v. Miller*, No. 04 Cr. 281 (JLH), 2006 WL 2401360 (E.D. Ark. Aug. 18, 2006)... 34

*United States v. Mirabal*, 98 F.4th 981 (9th Cir. 2024) ..................................................... 49

*United States v. Mundy*, 539 F.3d 154 (2d Cir. 2008) ...................................................... 35

*United States v. Osarenkhoe*, 439 F. App'x 66 (2d Cir. 2011) .............................................. 24

*United States v. Pascarella*, 84 F.3d 61 (2d Cir. 1996) ..................................................... 22

*United States v. Paxful Holdings, Inc.*, No. 25 Cr. 235 (JAM) (E.D. Cal.) .................................. 42

*United States v. Pipola*, 83 F.3d 556 (2d Cir. 1996)..................................................... 18, 19, 22, 23

*United States v. Press*, 336 F.2d 1003 (2d Cir. 1964) ...................................................... 61

*United States v. Rahimi*, 794 F. App'x 4 (2d Cir. 2019)................................................... 31

*United States v. Reiss,* 186 F.3d 149 (2d Cir. 1999) ......................................................... 31

*United States v. Rivera*, 971 F.2d 876 (2d Cir. 1992)....................................................... 31

*United States v. Roldan-Zapata*, 916 F.2d 795 (2d Cir. 1990) ................................. 17, 23, 24, 47

*United States v. Rosa*, 17 F.3d 1531 (2d Cir. 1994) ....................................................... 31

*United States v. Ruggiero*, 472 F.2d 599 (2d Cir. 1973) ................................................... 9

*United States v. Slaughter*, 386 F.3d 401 (2d Cir. 2004)................................................. 11

*United States v. Spensley*, No. 09 Cr. 20082 (MPM) (C.D. Ill.)..................................... 41

*United States v. Thomas*, No. 22-1508, 2025 WL 2202512 (2d Cir. Aug. 4, 2025)..................... 27

*United States v. Tin Yat Chin*, 371 F.3d 31 (2d Cir. 2004)............................................... 62

*United States v. Tocco*, 135 F.3d 116 (2d Cir. 1998)....................................................... 31

*United States v. Torres, et al.*, No. 16 Cr. 809 (VM) (S.D.N.Y.) ................................... 61

*United States v. Valenti*, 60 F.3d 941 (2d Cir. 1995)............................................... 19, 24

*United States v. Wagner*, No. 20 Cr. 410 (NSR), 2022 WL 19179 (S.D.N.Y. Jan. 3, 2022) ....... 39

*United States v. Washburn*, 444 F.3d 1007 (8th Cir. 2006)..................................... 41

*United States v. Williams*, 205 F.3d 23 (2d Cir. 2000) ................................................ 19

## **Statutes**

18 U.S.C. § 1952(a)(3)......................................................................................... 42

18 U.S.C. § 1952(a)(3)(A) .................................................................................... 42

18 U.S.C. § 1960(a) ............................................................................................. 42

18 U.S.C. § 1960(b)(l)(C)..................................................................................... 42

18 U.S.C. § 371.............................................................................................. 42, 43

31 U.S.C. § 5318(g)(1) ......................................................................................... 43

31 U.S.C. § 5318(h)............................................................................................. 43

31 U.S.C. § 5322(b) ............................................................................................. 43

31 U.S.C. § 5322(c) ............................................................................................. 43

31 U.S.C. § 5322(e) ............................................................................................. 43

31 U.S.C. § 5330.................................................................................................. 43

**Other Authorities**

Fed. R. Evid. 803(8) adv. comm. n. ................................................................................ 46

**Rules**

Fed. R. Crim. P. 2 ........................................................................................................... 34

Fed. R. Evid. 102 ............................................................................................................ 34

Fed. R. Evid. 401 ................................................................................................. 17, 26, 27

Fed. R. Evid. 404(b) ................................................................................................. passim

Fed. R. Evid. 801(a) .......................................................................................................... 7

Fed. R. Evid. 801(c) ........................................................................................................... 6

Fed. R. Evid. 801(c)(2) ...................................................................................................... 6

Fed. R. Evid. 801(d)(2)(E) ................................................................................................. 6

Fed. R. Evid. 802 ......................................................................................................... 6, 45

Fed. R. Evid. 803(3) ........................................................................................................... 6

Fed. R. Evid. 803(8)(B) .................................................................................................... 45

Fed. R. Evid. 803(8)(C) .................................................................................................... 46

Fed. R. Evid. 804(b) ........................................................................................................ 48

**Treatises**

5-900 Weinstein's Federal Evidence § 900.07[1][a] ........................................................ 7

**Regulations**

31 C.F.R. § 1022.210 ...................................................................................................... 43

31 C.F.R. § 1022.320 ...................................................................................................... 43

31 C.F.R. § 1022.380 ...................................................................................................... 43

The Government respectfully submits this memorandum of law in opposition to the motions *in limine* of defendants Weidong Guan (Dkt. 146) and Le Van Hung (Dkt. 148).[1] The defendants seek extraordinary and legally unsupported rulings that, if granted, would (a) prevent the Government from offering evidence for such canonical non-hearsay purposes as proving awareness of certain facts by the defendants or explaining their subsequent actions or non-actions; (b) prevent the Government from providing the jury with the complete story of the offenses charged, including the defendants' attempts to conceal or adapt their conduct over time and evidence intertwined with the charged conduct, as well as victim testimony probative of charged elements; and (c) prevent the Government from arguing to the jury what it believes the evidence will show or has shown on charged elements such as specified unlawful activity and knowledge, including by micromanaging the Government's terminology to prevent it from identifying victims as victims, while the defendants do not constrain themselves in any corresponding way. On top of this, Hung seeks (d) to inject into this trial a confusing set of extraneous matters, of which he concedes he had no personal knowledge, arising out of an entirely separate case concerning the cryptocurrency exchange Paxful; and both defendants (e) raise a handful of disparate issues that need not and should not be decided at this time. Their motions should all be denied.

---

[1] Citations to "Dkt." refer to docket entries in this case; citations to "Guan Mot." refer to the memorandum of law submitted in connection with Guan's motion (Dkt. 146); citations to "Hung Mot." refer to the memorandum of law submitted in connection with Hung's motion (Dkt. 148); citations to the "Guan Indictment" or "Guan Ind." refer to the indictment against Guan (Dkt. 5); citations to the "Hung Indictment" or "Hung Ind." refer to the indictment against Hung (Dkt. 28); citations to "GX" refers to a marked Government Exhibit for trial; and citations to "Ex. A" refer to Exhibit A to this memorandum of law. Terms used herein that are defined in the Indictments have the meaning set forth in the Indictments.

**ARGUMENT**

I.   **THE COURT SHOULD ADMIT EVIDENCE OF STATEMENTS TO THE DEFENDANTS, OR OF COMMUNICATIONS PRELIMINARY TO RELEVANT EVENTS OR ACTIONS, TO PROVE THE DEFENDANTS' STATE OF MIND AND EXPLAIN SUBSEQUENT STATEMENTS AND ACTIONS**

Guan seeks to preclude the Government from offering out-of-court statements for such classic non-hearsay purposes as proving that the defendants were on notice or explaining their subsequent actions. (Guan Mot. 1-6). To the extent that Guan simply seeks an appropriate limiting instruction, the Government of course has no objection, but to the extent he appears to go further and seek preclusion, that motion should be denied under settled principles of hearsay law. Guan is not entitled to the windfall of the jury not learning what he was contemporaneously told and understood.

A.   **Background**

During the course of the charged offenses, the defendants received numerous complaints of fraud from a number of sources. Cardholders complained of fraud directly to the Epoch Times and related entities (the "Epoch Entities") (*see, e.g.*, GX 1A-26, 1A-130, 5608); to their payment card networks, resulting in chargeback notifications alleging fraud (*see, e.g.*, GX 2D-335 (chargeback notification including fraud victim complaint); GX 1A-75A (chart of chargebacks)); or to law enforcement officers, who contacted the Epoch Entities to alert them of the reports of fraud (*see, e.g.*, GX 1A-124). In addition to these reports from defrauded victims, investigators identified telltale evidence of fraud in a number of transactions and reported them to the Epoch Entities (*see, e.g.*, GX 1A-5, 5604). Moreover, whistleblowers reported on the activities of the MMO Team, including the illegal sources of funds. (*See, e.g.*, GX 1A-1, 1A-4TR). Such

2

complaints were transmitted to Guan, who took a variety of telltale actions showing his consciousness of guilt in response.

For the victims who initiated chargebacks, Guan orchestrated an attempt to contest these chargebacks, attempting to convince the affected banks to let the Epoch Entities keep the victims' stolen money rather than allowing its return.[2] The steps Guan took included, among others: briefing Hung and other members of the MMO Team on the chargeback procedure (GXs 1A-12, 1A-13); drafting a false and misleading script for MMO Team members to follow when submitting chargeback contests (*i.e.*, false and misleading evidence submitted in an attempt to convince the banks to deny the customer's attempt to charge the funds back) (GX 1A-3); forwarding numerous of these false and misleading contests, which MMO Team members including Hung submitted following his script, to the banks in an attempt to prevent the victims from receiving their money back (*see, e.g.*, GX 1A-2001 to 1A-2452); and even proofreading these false and misleading contests for errors (*see, e.g.*, GX 1A-57).

When victims submitted complaints directly to the Epoch Entities, Guan forwarded the complaints to members of the MMO Team, sometimes including Hung (*see, e.g.*, GXs 1A-94, 1A-129, 1A-130, 5608), so that a member of the MMO Team could contact the victims, make false and misleading statements distancing the Epoch Entities from the purchase of the stolen funds, and attempt to negotiate a partial or full refund to prevent the victim from complaining to the media or law enforcement (*see, e.g.*, GX 1A-95 (MMO Team member to victim: "Please understand the Epoch Times is not involved in this whirlwind" and "[T]his has become my responsibility when

---

[2] The victims were, in that sense, direct victims of Guan, who attempted to prevent hundreds of victims from recovering their money from the Epoch Entities. (*See* Section III.C.3, *infra*).

the Epoch Times, which should not be involved, may be misunderstood just because they received the funds from donors. At first I expected I would share a loss of 50% but you have requested a full refund"); GX 1A-26 (MMO Team member to victim: "[P]lease withdraw all of your charges against the ET, and please inform the ET of your withdrawal of all the claims you filed with the police against the ET so that they have a reason to contact you regarding a refund."); GX 5608 (Guan to Hung and other MMO Team members, forwarding complaint of victim who had threatened to call TV stations: "It's very urgent! Please arrange someone to call [complaining victim].").

The defendants treated the complaints that came in from bank investigators or law enforcement similarly. Guan forwarded the complaints to Hung and other MMO Team members. (*See, e.g.*, GX 1A-5 (Guan forwarding summary of bank investigator reporting "over 5300 transactions amounting to $2.5 million dollars transactions were done from May to December, stolen funds going to the Epoch Times and they think its money laundering" to Hung and other MMO Team members, writing "Urgent!!! Please take a look")). The purpose of that forwarding was simple, and the same as his forwarding of complaints from victims: so the MMO Team could reach out to the investigator and make false and misleading statements distancing the Epoch Times from the purchase of stolen funds. (*See, e.g.*, GX 2A-8 (MMO Team member to bank investigator the next day, falsely writing, among other things, "it is completely true to confirm that the Epoch Times bears no relationship to the purchasing activity but they are purely and simply receiving the funds as donations made by those who support them"); *see also, e.g.*, (GX 5604 (Guan forwarding bank investigator report of fraud to Hung and others); GX 1A-83 (MMO Team member responding to bank investigator); GX 1A-124 (Guan forwarding detective's complaint and email address to

MMO Team member)). Likewise, Guan responded to whistleblower complaints of the MMO Team's illegal activities not by conducting any investigation into whether those complaints were true, but instead by forwarding those complaints to Hung or other MMO Team leaders—*i.e.*, precisely the people being complained about. (*See, e.g.*, GX 1A-1 (Guan forwarding Hung and MMO Team supervisor an October 2019 complaint about Hung's "illegal trade activities"); GX 1A-4TR (translation of Guan forwarding MMO Team supervisor an August 2020 complaint about MMO Team trading "money stolen by hackers"); GX 2180 (MMO Team supervisor forwarding August 2020 complaint to Hung)).

Ultimately, in response to the numerous complaints of fraud, the defendants took steps to prevent victims from identifying the Epoch Entities as the recipients of their funds, including engaging in numerous layered transactions with stolen identities, which were integral parts of both the identity theft conspiracy charged as Count Four of the Hung indictment and the money laundering conspiracy charged as Counts One of the Guan and Hung indictments. (*See, e.g.*, Guan Ind. ¶ 8 (describing layered transactions); Hung Ind. ¶ 5 (describing use of stolen identities in layered transactions); *see also, e.g.*, GX 2101TR-UR (translated instruction spreadsheet directing MMO Team to use layered transactions)).

Additionally, several financial services companies and cryptocurrency exchanges engaged in internal communications preliminary to their eventual statements to the defendants or to their eventual actions, such as freezing or closing accounts maintained by the defendants. Some of these communications were wholly machine-generated, such as automatically generated listings of certain transaction features falling within an automated filter threshold. Other such internal communications consisted of employees of the companies assessing the relevant transaction data

5

and deliberating regarding what steps to take. The Government intends to offer such communications only insofar as they are preliminary and integral to statements that are admissible (such as the companies providing warnings to the defendants that put them on notice (*see, e.g.*, GX 1A-63)) or relevant events that are not statements at all (such as the companies freezing activity on, or closing, the defendants' bank or cryptocurrency accounts (*see, e.g.*, GX 1A-64)).

### B.    Applicable Law

Federal Rule of Evidence 802 generally bars the admission of hearsay, which is defined in Rule 801(c) as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). It follows that an out-of-court statement is not barred by Rule 802 if it is not offered to prove the truth of the matter asserted in the statement. The Federal Rules of Evidence also contain a number of "exclusions" from the definition of hearsay, including for a statement "made by the party's coconspirator during and in furtherance of the conspiracy," Fed. R. Evid. 801(d)(2)(E), and "exceptions" to the bar to hearsay evidence set forth in Rule 802, such as the exception for a "statement of the declarant's then-existing state of mind (such as motive, intent, or plan)," Fed. R. Evid. 803(3).

Out-of-court statements that are not offered "to prove the truth of the matter asserted in the statement" are excluded from the definition of hearsay. Fed. R. Evid. 801(c)(2). One of the paradigmatic non-hearsay uses of an out-of-court statement is to prove the effect on or notice given to the listener. *See, e.g.*, *United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013) ("We have repeatedly held that a statement is not hearsay where, as here, it is offered, not for its truth, but to show that a listener was put on notice."). Another is to render the preceding or subsequent statements or actions of the defendant or another person intelligible. *See, e.g.*, *United States v. Ho*,

6

984 F.3d 191, 208 (2d Cir. 2020) ("When statements by an out of court declarant are admitted as background, they are properly so admitted not as proof of the truth of the matters asserted but rather to show the circumstances surrounding the events, providing explanation for such matters as the understanding or intent with which certain acts were performed." (internal quotation marks omitted)).

Regardless of the purpose for which they are offered, machine-generated statements such as metadata and automatically generated text, are not made by a "person," Fed. R. Evid. 801(a), and thus are simply not within the definition of hearsay at all. *See, e.g.*, *CA, Inc. v. Simple.com, Inc.*, 780 F. Supp. 2d 196, 224 (E.D.N.Y. 2009) ("Computer-generated data [is] . . . not hearsay" because "[i]n these circumstances, there is no declarant making a statement" and "absent proof of alteration, computer generated data, such as a time stamp attached to a file when it is saved, is generally admissible and taken as true.") (citing 5-900 Weinstein's Federal Evidence § 900.07[1][a]) ("Computer-generated data, which includes metadata . . . are extrajudicial statements that are not hearsay.")); *United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1110 (9th Cir. 2015) (holding that "[a] tack placed by the Google Earth program and automatically labeled with GPS coordinates isn't hearsay" because "machine statements aren't hearsay"); *Bueno v. Benhamou*, No. 21 Civ. 04595 (JVS) (SPX), 2022 WL 1592593, at *6 (C.D. Cal. Mar. 16, 2022) ("metadata is not hearsay because it is machine-generated").

## C.    Discussion

### 1.    *Statements to the Defendants*

The numerous complaints of fraud made to the defendants or their agents are admissible for the non-hearsay purposes of proving the defendants' knowledge and intent, *see, e.g.*, *Dupree*, 706 F.3d at 137 (statement non-hearsay when offered "not for its truth, but to show that a listener

was put on notice"), as well as explaining the defendants' subsequent actions, *Ho*, 984 F.3d at 208 (statement non-hearsay when admitted "to show the circumstances surrounding the events, providing explanation for such matters as the understanding or intent with which certain acts were performed." (internal quotation marks omitted)).

Reports of fraud that the defendants received and did not investigate (but instead responded to with a variety of false and misleading statements, and actions intended to prevent further victims from identifying the Epoch Entities as the recipients of fraud proceeds) are paradigmatic examples of statements offered to prove that the defendants were "put on notice." *Dupree*, 706 F.3d at 137; *see, e.g.*, *United States v. Dupre*, 462 F.3d 131, 137 (2d Cir. 2006) (no error admitting emails sent by group of investors speculating that a project was a fraud as "[t]he messages demonstrated that defendants had received communications detailing the project's likely bogus nature"). In his motion, Guan appears to acknowledge that such statements' "effect on the defendants' state of mind" is a proper non-hearsay purpose (Guan Mot. 6 n.3), although elsewhere he denies the existence of such a purpose (*id.* at 6 (no non-hearsay purpose "is apparent")). Regardless of Guan's position, the law is clear that statements offered for this purpose are "non-hearsay." *Dupree*, 706 F.3d at 138. Guan is entitled to claim that he is not guilty. He is not entitled to prevent the jury from weighing evidence of his guilt—such as straightforward evidence that he received reports of fraud and lied in response. *See, e.g.*, *Ho*, 984 F.3d at 208 (statement non-hearsay when admitted "to show the circumstances surrounding the events, providing explanation for such matters as the understanding or intent with which certain acts were performed." (internal quotation marks omitted)); *see also id.* ("[The defendant's] response—however it was meant—would have made little sense to the jury without the admission of [a third party's] statement and reaction."). The

8

defendants' actions—orchestrating a series of false and misleading statements, and arranging a pattern of layered transactions to conceal the receipt of further fraud proceeds—would make "little sense to the jury without the admission of" the fraud complaints that prompted these actions. *Id.*

### 2.    *Communications Preliminary to Statements to the Defendants or Actions*

The preliminary communications of third parties described above similarly are not offered for the truth of any matter asserted (and often there is no such assertion at all), but rather as relevant background information that explains the context for the bank or cryptocurrency exchange's subsequent actions, including freezing the Epoch Entities' accounts and sending reports to Guan regarding suspicious activity. This too is a classic non-hearsay purpose. *See, e.g.*, *Ho*, 984 F.3d at 208 (2d Cir. 2020) (internal quotation marks omitted) (statement "provided context about the understanding and intent of those involved, and was relevant to contextualize . . . [an individual's] decision to meet with the [Chinese energy] delegation the next day"). There is no rule that the contextual statement must be made to a defendant himself to illuminate a relevant sequence of events, and statements made to others are routinely admitted. *United States v. Lubrano*, 529 F.2d 633, 637 (2d Cir. 1975) ("The instructions by the principal, Peterson, to his agent, Finn, immediately preceding Finn's meeting with [the defendants] were relevant to aid the jury in understanding the background events leading up to the crimes in question"); *United States v. Ruggiero*, 472 F.2d 599, 607 (2d Cir. 1973) (testimony regarding conversations out of defendant's presence "admissible as relevant proof of background operative facts"); *United States v. Manfredonia*, 414 F.2d 760, 765 (2d Cir. 1969) (out of court statements between two individuals conducted prior to their contact with the defendant properly admitted as "relevant to show the events leading up to" the crime, "not for the truth of what they said to each other").

For example, GX 3B-2, an InComm Financial Services, Inc. ("InComm") document that

Guan challenges (Guan Mot. 1), contains communications between Joshua Nowell and other InComm representatives wherein Nowell gathered information on the Epoch Entities' accounts. Those communications caused Nowell to email the Epoch Times stating that there had been "an increase of customers disputing transactions with us that have your company as the name" and seeking further assistance from the Epoch Times to answer "questions [] we are currently researching." (GX 3B-1). This communication to the Epoch Times was then transmitted directly to Guan, putting him on notice. (*See* GX 1A-63). The internal communications within GX 3B-2 also led Nowell to attempt to institute a rule at InComm that any payment to the Epoch Entities between $200 and $500 was blocked. Without the internal communications contained within GX 3B-2, Nowell's email to the Epoch Times seeking answers to "questions [] we are currently researching" (GX 3B-1), and his actions on the Epoch Entities' accounts, would make little sense. A defendant is not entitled to render evidence against him unintelligible—as Guan's motion, if granted, would do.

Similarly, GX 1C-2, 1C-4UR, and 1C-7, documents containing internal communications of employees of Gemini, a cryptocurrency exchange, are highly relevant to explain Gemini's statements putting Guan on notice and his actions freezing Guan's accounts.[3] As an initial matter, much of the text of these documents is machine-generated, including a number of automated reports by which a machine outputted the number and dollar amounts of transactions falling within specified temporal, numerical, and value thresholds. This "[c]omputer-generated data" is

---

[3] The Government would not object to redacting the red compliance "hits" on pages 3-9 of GX 1C-2, which are less relevant to Gemini's actions freezing the accounts, provided that the defendants did not open the door to these hits, for example, by arguing that Gemini's actions were unwarranted.

categorically not hearsay, as it was not generated by a "person" and thus is not a statement. *See, e.g.*, *CA, Inc.*, 780 F. Supp. 2d at 224; *Lizarraga-Tirado*, 789 F.3d at 1110; *Bueno*, 2022 WL 1592593, at *6.

Of the remainder of the pertinent Gemini documents, almost all of the substance of the human-generated internal communications was ultimately communicated to Guan (*see* GX 5609).[4] Accordingly, the internal communications preliminary to and explaining these communications are admissible "background" to show "the circumstances surrounding" those communications to Guan and explain "the understanding or intent" with which they were made. *United States v. Dennis*, No. 21-2952, 2025 WL 1751946, at *3 (2d Cir. June 25, 2025) (internal quotation marks omitted) (admitting officer's testimony regarding a tip she received because the testimony "was being offered only to show what '[the officer] decided to do as a result of' the call" and therefore offered to show the effect on the officer, not for the truth of the matter asserted); *see United States v. Slaughter*, 386 F.3d 401, 403 (2d Cir. 2004) (admission of hearsay testimony concerning a civilian who pointed to a discarded weapon, allowing the police to recover it not error because it was proffered for a legitimate purpose, namely, explaining how the officer came to find the weapon). And even to the extent they contain any substance not directly communicated to Guan, the internal communications in GX 1C-2, 1C-4UR, and 1C-7 help explain the circumstances and reasoning behind Gemini's decision to freeze Guan's Gemini account, which decision was communicated to Guan. (*See, e.g.*, GX 1A-64 (Gemini employee tells Guan, "Your account is currently frozen as we have detected the [] vast majority of the activity on your account is from

---

[4] The Government does not presently intend to offer in its case-in-chief the other two exhibits to which Guan cites in his motion, namely, GX 3C-1 and 3B-5 (Guan Mot. 1).

11

foreign locations," which correspondence Guan forwarded to Hung and others)).

The need to contextualize such statements is sufficient in its own right, but is of particular importance in this case, where defendants seek to advance irrelevant and inflammatory narratives of alleged persecution and censorship in an attempt to distract the jury or induce nullification. (*See, e.g.*, Dkt. 149 at 64-69).[5] Just as the defendants should be precluded from making such arguments directly (*see id.*), they should be precluded from doing so through the backdoor means of presenting the actions of banks and other institutions as purportedly arbitrary and unjustified, which would be the inevitable effect of preventing the Government from putting these institutions' acts in context. Indeed, one "common scenario[] in which the admission of testimony as background evidence may be appropriate [is] testimony [that is an] appropriate rebuttal to initiatives launched by the defendant." *Ryan v. Miller*, 303 F.3d 231, 253 (2d Cir. 2002). Preventing jury confusion about such matters is a common non-hearsay basis for admitting statements as background for investigative or similar steps. *See, e.g.*, *United States v. Gilliam*, 994 F.2d 97, 103 (2d Cir. 1993) (finding that otherwise hearsay testimony, offered to rebut defense questioning, was permissible because, "The statement about the second gun was admitted . . . under the theory that it was not offered to prove the truth of the matter asserted, but only to explain the actions of the police officers in returning to the scene."); *United States v. Cruse*, 805 F.3d 795, 810 (7th Cir. 2015) ("We have recognized repeatedly that statements offered to establish the course of the investigation, rather than to prove the truth of the matter asserted, are nonhearsay and therefore admissible. If the jury would not otherwise understand why an investigation targeted a particular

_____

[5] Hung has redoubled, and greatly escalated, such baseless attempts in a filing yesterday. (*See, e.g.*, Dkt. 157 at 1).

defendant, testimony regarding a confidential informant's tip 'could dispel an accusation that the officers were officious intermeddlers staking out [the defendant] for nefarious purposes." (internal quotation marks and citation omitted)); *Nemeth v. Citizens Fin. Grp.*, No. 08-CV-15326, 2012 WL 13198096, at \*3 (E.D. Mich. Aug. 13, 2012) ("To the extent that the statements are being offered not to prove the truth of what any of the employees stated or recited, but rather to prove Charter One's basis for the actions it took with regard to suspending and terminating Plaintiff, such evidence is not hearsay and is admissible.").[6]

## II.    THE DEFENDANTS SHOULD NOT BE PERMITTED TO TRUNCATE THE GOVERNMENT'S PROOF OF THE FULL SCOPE OF THE CRIMINAL OFFENSE, INCLUDING INTEXTRICABLY INTERTWINED AND 404(B) EVIDENCE AND LIMITED VICTIM IMPACT EVIDENCE

### A.    Background

The Indictments describe an overarching money laundering scheme to purchase crime proceeds at a discount and launder them into the accounts of the Media Company, and other of the Media Entities, for the benefit of the Media Company. (Guan Ind. ¶¶ 1-5; Hung Ind. ¶¶ 1-5). As detailed in the Indictments, the principal method of doing so was the MMO Team's purchase (under the supervision of Guan and management by Hung) of prepaid debit cards, loaded with stolen funds, for 80 or fewer cents per dollar on Cryptocurrency Platform-1, and then to transfer

---

[6] For similar reasons, testifying witnesses who engaged in relevant communications with the defendants (or other relevant actions) may explain those communications or actions by testifying about their impressions and understanding of the defendants' conduct, such as their belief that the defendants' pattern of transactions was suspicious. Evidence of such an understanding or belief is relevant and admissible when it explains a witness's actions, even if it might not be in the absence of such a connection to the witness's actions. *See, e.g.*, *United States v. Napout*, No. 15 Cr. 252 (PKC), 2017 WL 6375729, at \*13 (E.D.N.Y. Dec. 12, 2017) (admitting evidence of defendants' beliefs about foreign law to the extent a defendant contemporaneously "relied on his belief or understanding" in actions, but otherwise precluding evidence of witnesses' beliefs about foreign law under Rule 403).

those stolen funds to the bank accounts of the Media Entities, including through multiple layered

transactions designed to conceal the unlawful origins of the funds (Guan Ind. ¶ 8; Hung Ind. ¶ 5).

As part of the scheme, the MMO Team engaged in an extensive identity theft conspiracy to create

accounts allowing for these layered transactions (Hung Ind. ¶ 5), in an effort, among other things,

to prevent the rightful owners of the stolen funds from detecting that those funds had gone to the

Media Entities. (*See, e.g.*, GX 2101TR-UR (translated instruction spreadsheet directing MMO

Team to use layered transactions)).

In the course of the scheme and in order to effect its goals of benefiting the Media Company

with stolen funds, the MMO Team committed this laundering activity in a variety of intertwined

ways. To assist the defendants in preparing for trial, the Government previously gave notice

identifying a number of these means and methods of the conspiracy and indicated that it was

offering them as direct proof of the conspiracy itself in addition to under Federal Rule of Evidence

404(b), including:

> (1) running an unlicensed money transfer business, (2) selling gift
> cards and prepaid debit cards at a discount and/or commissioning
> the taking of photographs of such cards, (3) asking others to
> purchase products in the United States with gift cards and/or debit
> cards so that the products could be shipped back to Vietnam,
> (4) commissioning the creation of identification documents in
> others' names, (5) the bulk purchase of stolen personally identifiable
> information, (6) engaging in or receiving the proceeds of business
> email compromise schemes, (7) engaging in or receiving the
> proceeds of romance fraud schemes, (8) commissioning the use of
> the financial or electronic accounts of other persons, or the bulk
> purchase of such accounts in the names of other persons, (9) the
> mailing of checks in the names of other persons to Guan or to other
> co-conspirators for deposit in bank accounts controlled by Guan,
> and (10) the creation of payment processing or other financial
> accounts under false and fraudulent customer information or the
> transfer of funds using false and fraudulent payment descriptions.

(*See* Ex. A at 2).

14

As set forth in more detail in Section II.C.1, *infra*, with one exception the Government does not presently intend to offer in its case-in-chief, these categories of evidence concern the very means and methods of the conspiracy, whether core components such as identity theft and the use of nominee prepaid cards, or alternative laundering paths or adaptations that the MMO Team made in order to accomplish the aims of the conspiracy in different ways. They accordingly do not fall within Rule 404(b) (although they are admissible on that basis as well).

Similarly, the Government intends to prove Guan's state of mind, including his motive and intent, through evidence demonstrating that Guan made misrepresentations to his tax preparer and ultimately the Internal Revenue Service ("IRS") about certain of the cryptocurrency transactions undertaken during the course of the scheme. In particular, Guan represented to his tax preparer that those transactions comprised his own personal proprietary cryptocurrency trading, and falsely claimed a tax loss on it by presenting his expenditures of corporate funds towards those transactions as if they were his own funds. (*See* Ex. A at 1). At trial, the Government expects to offer evidence that, in 2018, Gemini denied Guan's request to open an institutional account with Gemini in the name of one of the Media Entities. After that rejection, in 2019, Guan began using his personal Gemini account to further the money laundering conspiracy. Guan repeatedly directed large transfers of funds, including criminally derived funds, from the Media Entities' bank accounts into his own personal bank accounts and from there (typically in same-day transfers) into his personal Gemini account for the use of the MMO Team in purchasing prepaid cards loaded with crime proceeds. Guan did this through his personal Gemini account from 2019 through 2020 and through his personal account at Kraken, another cryptocurrency exchange, from 2019 through 2022.

15

Despite using his personal Gemini account to benefit the Epoch Entities (rather than himself), Guan lied on his 2019 tax filings and stated that any Gemini losses or gains were his personal losses or gains. The Government expects to call a witness from IRS (the "IRS Witness") to authenticate Guan's tax returns from 2019 through 2024, to testify about basic tax concepts, and to testify about certain aspects of Guan's returns. The Government expects the IRS Witness to testify that, in tax year 2019, Guan received a 1099-K Form from Gemini, which reported that Guan earned $576,867 that year.[7] That same tax year, Guan filed a Schedule C, in which he claimed that he operated a sole proprietorship in his name at his home address that lost $1,296,865 from Gemini and, therefore, suffered a personal loss from Gemini of $719,998.[8] Despite reporting this personal loss from Gemini in 2019, Guan did not report in his tax filings any gains or losses from Gemini for tax year 2020, or any gains or losses from Kraken for the tax years 2020 through 2022, even though he engaged in extensive trading on both platforms during those respective time periods.

The Government also intends to show, through documentary evidence, that Guan induced a tax preparer to (unwittingly) make these false statements on Guan's tax returns by providing the tax preparer with records of the *outflows* of funds from Guan's personal account to Gemini, but withholding from the tax preparer records of the same-day *inflows* from the Media Entity bank

---

[7] A 1099-K Form is a report of payments a taxpayer received for goods and services during the year from "[c]redit, debit or stored value cards such as gift cards (payment cards)" or "[p]ayment apps or online marketplaces, also called third party settlement organizations or TPSOs." Understanding your Form 1099-K, Internal Revenue Service, *available at* https://www.irs.gov/businesses/understanding-your-form-1099-k (last visited June 15, 2026).

[8] A Schedule C Form is a report of income or loss from a taxpayer's sole proprietorship. *See* About Schedule C, Internal Revenue Service, *available at* https://www.irs.gov/forms-pubs/about-schedule-c-form-1040 (last visited June 15, 2026).

accounts which funded those outflows. (*See* GX 1126, 1205). This had the effect of deceiving the tax preparer into believing that Guan was using his own funds (not corporate funds routed through his personal bank accounts) to purchase cryptocurrency, thereby concealing the role of the Media Entities in purchasing cryptocurrency (and in purchasing the crime proceeds with that cryptocurrency) and enabling the scheme to continue.

**B.      Legal Standard**

Under Rule 401 of the Federal Rules of Evidence, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Rule 403 of the Federal Rules of Evidence provides that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. Evidence is unfairly prejudicial within the meaning of Rule 403 "only when it tends to have some adverse effect upon [a party] beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). The touchstone of the prejudice analysis is whether the proffered evidence "involve[s] conduct any more sensational or disturbing than the crimes with which" the defendant is charged. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990).

Federal Rule of Evidence 404(b) allows evidence of uncharged crimes, wrongs, or other acts for any relevant non-propensity purpose, such as to show motive, opportunity, intent, or knowledge. The Second Circuit follows an "inclusionary approach to the admission of prior-act evidence," so that "evidence of prior crimes, wrongs, or acts is admissible for any purpose other than to show a defendant's criminal propensity." *United States v. Lasanta*, 978 F.2d 1300, 1307

(2d Cir. 1992), *abrogated on other grounds by Florida v. White*, 526 U.S. 559 (1999); *see also United States v. Garcia*, 291 F.3d 127, 136 (2d Cir. 2002) (same).

"It is well established that evidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Gonzalez*, 110 F.3d 936, 943 (2d Cir. 1997) (internal quotation marks omitted). Thus, relevant evidence is "not confined to that which directly establishes an element of the crime." *Id.* at 941. "To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.*; *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991) (evidence that "provide[s] background" for the alleged events may be admitted to show "the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.") (quoting *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988)).

Similarly, even where prior bad acts evidence is not considered to be part of or critical to the description of the charged crime, the Second Circuit favors its admission, adopting a long-standing "inclusionary" rule with respect to Rule 404(b). *See United States v. Pipola*, 83 F.3d 556, 565-66 (2d Cir. 1996) ("Our inclusionary interpretation of the rule allows evidence of other wrongs to be admitted so long as it is relevant and it is not offered to prove criminal propensity." (citing *Berkovich v. Hicks*, 922 F.2d 1018, 1022 (2d Cir. 1991))). Thus, the Second Circuit has repeatedly held that it is within the trial court's discretion to admit evidence of prior bad acts "to inform the jury of the background of the conspiracy charged, to help explain how the illegal relationship

18

between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) (internal quotation marks omitted); *see also United States v. Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000); *Pipola*, 83 F.3d at 566; *United States v. Kalaydjian*, 784 F.2d 53, 56 n.3 (2d Cir. 1986).

For substantially the same reasons, the Second Circuit has repeatedly affirmed the admission of tax return evidence, and testimony regarding that evidence, both as direct evidence and under Rule 404(b). *See, e.g.*, *United States v. Adelekan*, No. 22-1232-CR, 2024 WL 4501962, at *2 (2d Cir. Oct. 16, 2024) (holding tax records were properly introduced to rebut defense theory that certain wire payments were for a legitimate business); *United States v. Valenti*, 60 F.3d 941, 946 (2d Cir. 1995) ("The tax returns were obviously probative to refute [the defendant's] defense that the contested funds were legitimate compensation.").

### C.    Discussion

All of the challenged evidence is, as the Government set forth in its notice, part of or inextricably intertwined with the charged offense conduct, and thus not subject to Rule 404(b) at all (although it is also admissible on that basis). Similarly, limited evidence of the crime's impact on victims is plainly direct proof of the offenses charged under well-settled law.

#### 1.    *The MMO Team's Activities*

Certain of the items in the Government's notice represent the core means and methods of the conspiracy alleged in the Indictments. For example, "(4) commissioning the creation of identification documents in others' names, (5) the bulk purchase of stolen personally identifiable information," and "(8) commissioning the use of the financial or electronic accounts of other persons, or the bulk purchase of such accounts in the names of other persons" (Ex. A at 2), are part of the layering activity that is core to the money laundering allegations, as well as central to the

19

identity theft conspiracy charged in the Hung Indictment. (*See* Guan Ind. ¶ 8; Hung Ind. ¶ 5). Similarly, "(6) engaging in or receiving the proceeds of business email compromise schemes" (Ex. A at 2) is an example of some of the core money laundering activity, as one of the MMO Team's prepaid debit cards used to make numerous transfers of funds to one of the Media Entities' accounts was funded, in part, by the proceeds of a business email compromise scheme. (*See* GX 6B-1). This category of evidence thus all arose out of "the same transaction or series of transactions as the charged offense," or is at a minimum "inextricably intertwined with the evidence regarding the charged offense" and "necessary to complete the story of the crime on trial." *Gonzalez*, 110 F.3d at 943 (internal quotation marks omitted).

By the same token, during the course of the underlying offense conduct Hung frequently commissioned the taking of photographs of gift cards or prepaid debit cards (Ex. A at 2), in order to allow him and other members of the MMO Team to use them to conduct the layered transactions in the scheme. (*See, e.g.*, GX 2213TR, GX 2213K). Indeed, this is listed in the Hung Indictment as among the means and methods of the conspiracy. (Hung Ind. ¶ 8 ("HUNG directed CC-2 to, among other things . . . use CC-2's U.S. address to receive in the mail physical prepaid debit cards that were issued in the name of individuals other than CC-2, and *transfer images of those prepaid debit cards* to HUNG" (emphasis added))). On certain occasions, Hung advertised the funds he had available for sale through such payment accounts in the name of third parties (GX 2218TR-UR), which is clearly part of the same "series of transactions as the charged offense" involving purchasing such funds, and inextricably intertwined with the Government's evidence of such purchases. *Gonzalez*, 110 F.3d at 943 (internal quotation marks omitted).

Other items in the Government's notice represent ways in which the conspirators adapted their means and methods to evade detection. For example, as the conspiracy continued, Hung and other members of the MMO Team would mail "checks in the names of other persons to Guan or to other co-conspirators for deposit in bank accounts controlled by Guan" (Ex. A at 2; *see, e.g.*, GX 1156), and Guan worked to create "payment processing or other financial accounts under false and fraudulent customer information" (Ex. A at 2; *see* GX 1155) and instruct another MMO Team supervisor to transfer funds "using false and fraudulent payment descriptions" (*see* GX 1157). This activity is quite literally "necessary to complete the story of the crime on trial," *Gonzalez*, 110 F.3d at 942 (internal quotation marks omitted), particularly given that it represented a refinement of the conspirators' methods of surreptitiously transferring crime proceeds into the Media Entities' bank accounts, and precluding such evidence would leave the jury with a truncated and confusing view of the progression of the scheme itself.

Hung's conduct of "(3) asking others to purchase products in the United States with gift cards and/or debit cards so that the products could be shipped back to Vietnam" is both part of the underlying scheme and inextricably intertwined with it. This conduct, referred to as "Checkout" activities, was among the multiple revenue streams that the MMO Team generated for the Media Company, in this case through the Media Company's Foreign Office. A spreadsheet with the budget for the Media Company's Foreign Office in 2020 listed numerous inflows of funds from the MMO Team, including those related to the purchase of PayPal funds or gift cards (GX 3201UR ("VN Team" tab, row 176: "Contribution from MMO group (PP Gift)"), and those related to this checkout activity (*id.* (row 179: "Contribution from MMO group (Checkout)"). It is also a paradigmatic example of evidence that helps "explain how the illegal relationship between

participants in the crime developed," *Diaz*, 176 F.3d at 79 (internal quotation marks omitted), as, for example, Hung originally recruited a coconspirator identified in the Hung Indictment (CC-2) through discussion of whether that coconspirator would be willing to engage in checkout activity for Hung. (GX 2223). *See also, e.g.*, *United States v. Pascarella*, 84 F.3d 61, 73 (2d Cir. 1996) (other act evidence admissible "to show the background of a conspiracy or the development of a relationship of trust between the participants"); *Pipola*, 83 F.3d at 566 ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case."). Indeed, underscoring the extent to which this evidence is "inextricably intertwined" with the evidence of the MMO Team's other activities, *Gonzalez*, 110 F.3d at 942 (internal quotation marks omitted), the Facebook group that Hung created to recruit new members and associates for MMO Activity is devoted in part to such "checkout" activity, with the term even appearing in the group name. (*See* GX 2215 (https://facebook.com/groups/1clickmmocheckout)).[9]

In any event, even if it were not part of or inextricably intertwined with the offense, all of this conduct is powerful evidence of Guan's and Hung's motive, opportunity, preparation, plan, and absence of mistake or accident, as well as their familiarity with the instrumentalities of the charged scheme (such as gift cards, prepaid debit cards, payment gateways, and the various means

---

[9] The Government presently does not intend to offer in its case-in-chief evidence of the defendants' money transmission business activities, but it reserves the right to do so if necessary to explain the relationship between a potential witness and Hung, who asked this potential witness to engage both in this activity and in extensive core money laundering activity. The Government presently does not intend to offer evidence in its case-in-chief of the defendants' participation in or receipt of the proceeds of romance fraud schemes, but reserves the right to do so as, among other things, evidence arising from the same "series of transactions as the charged offense," *Gonzalez*, 110 F.3d at 942 (internal quotation marks omitted).

and procedures by which banks and other financial companies monitor and block transactions, and how to circumvent them), and thus is plainly admissible under the Second Circuit's inclusionary approach to Rule 404(b) evidence. *See, e.g., Pipola*, 83 F.3d at 565-66. Nor, of course, is this evidence any more likely to inflame the jury than the defendants' charged offenses. Nothing about any of the conduct described above is salacious, sensational, or in any other way more inflammatory than the charged conduct of laundering of millions of dollars of crime proceeds, making false and misleading statements to banks and crime victims to conceal the offense (and in many cases prevent the victims from recovering their money back), and stealing thousands of identities for use in layered money laundering transactions, and thus would present no Rule 403 issue even if it was separate from the underlying offense, which it is not. *See Roldan-Zapata*, 916 F.2d at 804.

### 2.    *Guan's Concealment of the Offense Conduct in His Tax Filings*

Evidence and arguments regarding Guan's claim of a tax loss in 2019 from Gemini and his omission of any reference to Gemini or Kraken in any subsequent tax year is directly relevant to the charged money laundering conspiracy and, in particular, the object of concealment money laundering. Specifically, in 2019, Guan, consistent with his lie to Gemini about the true purpose of his personal cryptocurrency account, concealed the true purpose of his Gemini trading on his tax filings when he claimed that he *personally* suffered a loss in income from his cryptocurrency trading, even though the purpose of his cryptocurrency trading was to launder criminally derived proceeds for the benefit of the Media Entities. Therefore, Guan's tax filings and testimony from the IRS Witness are direct evidence of Guan's participation in the money laundering conspiracy as they are probative of Guan's fraudulent intent and efforts to conceal the true purpose of his cryptocurrency trading from the IRS. *See Adekelan,* 2024 WL 4501962, at *2 (finding that a

23

defendant's "personal tax records were probative of his intent and the absence of mistake with respect to the charged fraud and money laundering conspiracies"). To the extent Guan argues that he used his Gemini personal account to engage in a legitimate revenue-generating business plan for the Media Entities, this evidence is also relevant to rebut that defense since it shows Guan reporting his Gemini trading on his own personal taxes in 2019, rather than as corporate income (which would have necessitated acknowledging the fact that this activity was linked to the Media Entities). *See id.* (noting that tax records were relevant to rebut a defense theory). For the same reason, this evidence is also admissible under Rule 404(b) to show Guan's knowledge, intent, and absence of mistake in participating in the money laundering conspiracy. *See United States v. Osarenkhoe*, 439 F. App'x 66, 68 (2d Cir. 2011) (approving admission of tax returns under Rule 404(b)).

Contrary to Guan's claims (Guan Mot. 17-18), the probative value of the evidence and argument regarding Guan's tax returns is not at all substantially outweighed by undue prejudice. The fact that Guan lied on his tax returns is no more sensational than the crimes for which he is charged, including participating in a multi-year, multi-million dollar money laundering conspiracy and twice lying to banks. *See Roldan-Zapata*, 916 F.2d at 804; *see also Valenti*, 60 F.3d at 946 ("Any arguable prejudice to Valenti was *de minimis:* it strains credulity to think that the jury might have believed Valenti innocent of transporting stolen goods, but voted to convict him anyway just because he failed to report income on his tax returns."); *United States v. Atuana*, 816 F. App'x 592, 595 (2d Cir. 2020) (affirming the admission of tax-related evidence and finding, among other things, that the evidence was not unduly prejudicial in a money laundering, wire fraud, bank fraud, aggravated identity theft, and false statement case). And to the extent that Guan has a concern to

the contrary, the proper remedy is a limiting instruction, not the windfall of preclusion. *See, e.g.*, *United States v. Edwards*, 342 F.3d 168, 176 (2d Cir. 2003).

Finally, Guan is wrong that the introduction of his tax returns and testimony from the IRS Witness would "require testimony on both sides about whether Mr. Guan's tax returns were reasonable under the circumstances." (Guan Mot. 17). The IRS Witness will be testifying as a fact witness, not an expert witness, and, therefore, will not be offering an opinion about whether or not Guan's tax filings were "reasonable." *See, e.g.*, *Adelekan*, 2024 WL 4501962, at *3 (affirming admission of testimony by this same witness, who did not testify as an expert when he "explained the basic tax reporting concepts that applied to an individual and sole proprietor with respect to the declaration of income on a personal tax return"). The IRS Witness will simply testify about basic tax concepts and what Guan did or not report on his tax returns. The jury can easily weigh the probative value of this evidence.

### 3. *The Limited Victim Impact Evidence*

The defendants ask this Court to exclude victim impact testimony, notwithstanding the clear law that such evidence is admissible. Guan acknowledges, as he must, that "testimony regarding a crime's impact on a victim is admissible." (Guan Mot. 11 (quoting *United States v. Hendricks*, 921 F.3d 320, 329 (2d Cir. 2019)). Nevertheless, Guan asks the Court to preclude victims from testifying about the "impact of a crime" because, he claims, such testimony would be highly prejudicial and not bear on any elements of the money laundering conspiracy. (Guan Mot. 11-12). He is wrong.

In the absence of a stipulation from the defense, the Government is required to prove the commission of a money laundering predicate offense, in this case the specified unlawful activity of wire fraud, as well as to prove other offenses such as bank fraud and identity theft conspiracy,

25

and is entitled to do so in part by limited victim impact testimony under settled law. The Government does not plan to elicit lengthy testimony about the long-term effects that the crime had on victims' lives. Rather, consistent with case law and logic, to tell a coherent narrative, the Government intends to elicit limited testimony about how victims were defrauded of their money or property, and how that fraud affected the victims' behavior. For example, the Government intends to ask victims of the unemployment benefits fraud about steps they took to claim unemployment benefits after fraudulent applications were submitted in their names. And the Government intends to ask bank representatives about the impact on the bank of Guan's statements that certain suspicious transactions were "donations." These topics are highly relevant to essential elements of the charged conduct, including, for example, that the defendants were laundering the proceeds of specified unlawful activity and their intent to defraud. None of these topics constitutes the traditional sort of "victim impact testimony" that Guan claims could inflame the jury.

"Testimony regarding a crime's impact on a victim is admissible at trial if it is relevant to prove an element of the charged offense and is subject to the normal tests for relevancy and unfair prejudice." *See Hendricks*, 921 F.3d at 329 (upholding victim impact testimony from bank tellers as to how they felt during the robbery as relevant to whether the defendant acted "by intimidation" and permitting bank tellers to testify that, after the robbery, they were unable to return to work). In *United States v. Copple*, on which the Second Circuit relied in *Hendricks*, the Third Circuit explained that victim impact evidence is relevant and admissible under Rules 401 and 403—but that certain lines need to be drawn to ensure that such testimony did not become unfairly prejudicial. *United States v. Copple*, 24 F.3d 535, 544-46 (3d Cir. 1994); *see also Hendricks*, 921 F.3d at 329 (citing *Copple*). *Copple* was a mail fraud case where victims "testified about their

26

losses, and about the impact of those losses on their lives." 24 F.3d at 544. The Third Circuit held that even though the government did not need to prove that the victims actually suffered a loss to satisfy the mail fraud statute, evidence of loss was relevant because it went to the defendant's intent. *Id.* at 545. That particular victim impact testimony, however, went too far when it involved victims testifying about, among other things, how "the money they had used to pay back the losses came from money they had saved for their children's college educations." *Id.*

Limited victim impact testimony for the purposes specified above should be permitted here because it is extremely probative under Rule 401 as to the defendants' guilt—specifically, as to whether the defendants engaged in a money laundering conspiracy by using the proceeds of wire fraud and whether Guan intended to defraud financial institutions—and not unduly prejudicial under Rule 403. Just as limited evidence of losses to victims would have been admissible to prove fraudulent intent in *Copple*, limited evidence of losses to the individuals here is "some evidence of the schemer's intent" and thus tends to prove the wire fraud predicate offense. *See* 24 F.3d at 545 ("[p]roof that someone was victimized by the fraud is . . . treated as some evidence of the schemer's intent"). Indeed, courts have permitted far more extended testimony than the limited impact testimony the Government seeks to elicit here. *See*, *e.g.*, *United States v. Thomas*, No. 22-1508, 2025 WL 2202512, at *3 (2d Cir. Aug. 4, 2025) (no plain error where victim of romance scam testified about how the scam affected her life, including that the fraud devastated her finances, left her unable to support her children and mentally disabled brother, and made it difficult for her to trust others); *United States v. Cloud*, 680 F.3d 396, 401-02 (4th Cir. 2012) (no abuse of discretion where five victims testified that, as a result of their dealings with the defendant, they

27

suffered liens on their property, were unable to borrow money, were sued, suffered bad credit, faced foreclosure, and filed for bankruptcy).

### III. THE DEFENDANTS ARE NOT ENTITLED TO PRECLUDE THE GOVERNMENT FROM ENGAGING IN ORDINARY TRIAL ADVOCACY REGARDING WHAT IT EXPECTS THE EVIDENCE WILL SHOW OR HAS SHOWN, OR REGARDING HOW TO DESCRIBE CRIME VICTIMS

The defendants seek to preclude the Government from (1) advising the jury what it expects the evidence will show regarding the volume of crime proceeds laundered by the defendants; (2) making certain arguments about inferences to be drawn regarding Hung's knowledge, and (3) referring to victims as victims. The Court should reject these motions and allow the trial to proceed in the ordinary course.

#### A. Background

Guan seeks a pretrial ruling precluding the Government from asserting to the jury that a particular amount of money was involved in the charged money laundering scheme without first establishing a "nexus to specified unlawful activity." (Guan Mot. 6-9). The Government understands Guan to be requesting that the Court bar the Government from referencing, in its opening statement, the total dollar amount of funds involved in the scheme.[10] In support of that request, Guan asserts that the Government has not adduced evidence—or at least, in his self-interested view, will not be able to admit evidence at trial—establishing that the charged money laundering scheme involved more than a "very small" quantity of unlawful proceeds flowing into the Epoch Entities. (Guan Mot. 7, n. 4).

Hung makes a similar motion requesting that the Court bar the Government from arguing

---

[10] To the extent that Guan's motion is aimed at the Government's closing argument, it is premature, but is also without any merit.

"that all transactions were criminal absent supporting evidence." (Hung Mot. 15-16).[11] Similarly, Hung seeks to preclude the Government from arguing: (i) the fact that prepaid debit cards and gift cards were sold on the Paxful platform at a discount, alone, establishes that Hung knew that those cards were obtained illegitimately (Hung Mot. 16-18); and (ii) that "awareness of a general risk of illicit activity on the Paxful platform, without more, satisfies the knowledge element" in Count One of the Hung Indictment. (Hung Mot. 19-20).

Guan also seeks to dictate the terminology by which the Government refers to crime victims, precluding the Government from identifying victims as victims. (Guan Mot. 9-11).

Consistent with the allegations in the Indictments, the Government intends to prove that the defendants used a series of layered transactions (*see* Guan Ind. ¶ 8; Hung Ind. ¶ 5) to conceal the fact that large amounts of fraud proceeds were flowing to the Media Entities. Many of these layered transactions involved prepaid debit cards issued by Green Dot Corporation, which, the evidence will show, the defendants used to transfer fraud proceeds to the Media Entities after first routing them through intermediary nominee Green Dot cards. In particular, the Government plans to introduce: (i) Green Dot records showing transfers from specific Green Dot Cards (the "Layer 1 Green Dot Cards") to recipients associated with the Media Entities (GXs 2A-100 through 2A-

---

[11] Hung's motion on this point appears to be largely, if not exclusively, based on what he calls the "ratio of suspicious to legitimate activity" that he submits is allegedly "establish[ed]" by the Paxful FinCEN Consent Order discussed in Section IV, *infra*. (*See* Hung Mot. 6, 15-16). First, as explained below, the Paxful FinCEN Consent Order does not support Hung's "ratio of suspicious to legitimate activity" theory. Moreover, the Paxful FinCEN Consent Order is inadmissible for multiple reasons, mooting Hung's argument that it should somehow limit the Government's advocacy with respect to the amount of crime proceeds involved in the charged money laundering conspiracy. And finally, even if Hung's incorrect reading of the Paxful FinCEN Consent Order were accurate, his supposed view is irrelevant, as there would be no basis to conclude that the transactions Hung engaged in were among the legitimate transactions on the platform even if the order admissibly established the existence of such transactions.

125); (ii) Green Dot records showing that the Layer 1 Green Dot Cards received funds from a different set of Green Dot Cards (the "Layer 2 Green Dot Cards") (GX 2A-300); and (iii) Green Dot records showing that the Layer 2 Green Dot Cards were funded by transfers bearing indicia of fraud (GXs 2A-201, 2A-202, and 2A-203). The Government expects that, viewed collectively, those records will show that the Layer 2 Green Dot Cards received tens of millions of dollars in crime proceeds (far exceeding the $4.5 million figure that Guan references); that the Layer 2 Green Dot Cards likewise transferred tens of millions to the Layer 1 Green Dot Cards; and that the Layer 1 Green Dot Cards, in turn, transferred tens of millions to the Media Entities. As set forth in more detail below, the Government expects to prove through a combination of victim testimony, transaction features, and other evidence, that many millions of dollars transferred into the Media Entities in this way were the proceeds of crime.

### B.    Applicable Law

In its opening statement, the Government is permitted to provide "an objective summary of evidence which the prosecutor reasonably expect[s] to produce." *Frazier v. Cupp*, 394 U.S. 731, 736 (1969); *see also United States v. Clark*, 525 F.2d 314, 316 (2d Cir. 1975) (no error where the Government did "no more than outline" what it "expected to prove"). The touchstone is whether the Government has a "good faith basis" for the assertions made in its jury address. *United States v. Eldridge*, 860 F. App'x 773, 779 (2d Cir. 2021).

As to when, in particular, the Government has a good faith basis to argue that a money laundering scheme involved a particular amount of criminal proceeds, it is well established that, although "the government is required to link the moneys [alleged to be involved in a money laundering scheme] to specified unlawful activities," "this link can be made through circumstantial evidence." *United States v. Gotti*, 459 F.3d 296, 337 (2d Cir. 2006); *see also United States v. Reiss,*

186 F.3d 149, 152-53 (2d Cir. 1999) (concluding that various pieces of evidence gave rise to the inference that the laundered funds in question were drug proceeds).

Similarly, parties "are generally entitled to wide latitude during closing arguments, so long as they do not misstate the evidence." *United States v. Tocco*, 135 F.3d 116, 130 (2d Cir. 1998); *see also, e.g.*, *United States v. Rahimi*, 794 F. App'x 4, 7 (2d Cir. 2019) ("counsel are free to make arguments which may be reasonably inferred from the evidence presented"). In sum, provided that the Government refrains from mischaracterizing the evidence or stating facts not in evidence, *see, e.g.*, *United States v. Rosa*, 17 F.3d 1531, 1548-49 (2d Cir. 1994), it "has broad latitude in the inferences it may reasonably suggest to the jury during summation," *e.g.*, *Edwards*, 342 F.3d at 181 (internal quotation marks omitted). For good reason, a prosecutor is "not precluded from vigorous advocacy . . . in summation," *United States v. Rivera*, 971 F.2d 876, 884 (2d Cir. 1992), and is "entitled to respond to the evidence, issues, and hypotheses propounded by the defense," *United States v. Marrale*, 695 F.2d 658, 667 (2d Cir. 1982).

### C.    Discussion

#### 1.    *Advocacy Regarding What the Government Expects the Evidence Will Show*

There is no basis to preclude the Government from referencing, in its opening statement, the total dollar amount of the criminal proceeds that it reasonably expects to prove were involved in the charged money laundering scheme, and neither defendant has cited a single case suggesting otherwise.

The Government may reference the amount of criminal proceeds in its opening statement so long as it has a good faith basis to do so, and here the Government has far more than a good faith basis. *See Eldridge*, 860 F. App'x at 779. As the Government has maintained throughout the course of this prosecution and intends to prove at trial, the charged money laundering scheme

31

involved tens of millions of dollars of crime proceeds, though the precise dollar figure the Government plans to prove at trial has naturally developed in the ordinary course of trial preparation.

For instance, the Government presently expects to offer at trial—among other evidence— records from Green Dot Corporation, which offered prepaid debit cards that the defendants used to engage in layered transactions for the purpose of laundering fraud proceeds into the Media Entities' bank accounts. As set forth in more detail in Section III.A, above, one layer of Green Dot prepaid debit cards (the Layer 2 Green Dot Cards) was loaded with tens millions of dollars of crime proceeds from fraudulent unemployment applications, and then sent tens of millions to intermediary Green Dot cards controlled by the MMO Team (the Layer 1 Green Dot Cards), which in turn sent tens of millions of dollars to the Media Entities.

The Government presently expects the evidence to show that many millions of dollars (far exceeding the $4.5 million cited by Guan (Guan Mot. 7)) transferred to the Media Entities in this way were crime proceeds.[12] The Government intends to prove to the jury that the inflows of funds to the Layer 2 Green Dot Cards included many millions of dollars in crime proceeds based on, among other things, transaction details included within the Green Dot records (such as discrepancies between the government agency payor and the payee locations inconsistent with payments based on genuine unemployment insurance applications, as well as government agency

---

[12] The Government's precise calculations of the figures it will present at trial are premature, as they will depend on the course of the Government's preparation, fact gathering, analysis, and strategic decisions. The Government also does not mean to suggest, by referring to the above evidence, to limit its presentation of evidence and trial, and the Government is not submitting that the evidence and arguments described herein are the only means by which the Government intends to prove its case. Rather, the Government has provided the above summary merely to aid the Court in its assessment of the defendants' motions *in limine*.

payments to individuals other than the actual cardholders, also indicative of fraud). Importantly, those indicia of fraud will mirror some of the indicia of fraud present in specific financial transactions in which identity theft victims will testify that they did not submit the insurance applications on which payments were made. In one instance, for example, a Green Dot card in the name of "Jonathan Kaye," associated with an address in *California*, received a deposit from the *Kansas* Department of Labor in the name of a particular identity theft victim, who the Government anticipates will, if called at trial, testify that she never applied for unemployment benefits in Kansas. The Government anticipates being able to prove, through other documentary evidence, that the funds transferred to the "Jonathan Kaye" Green Dot Card were sold to a member of the MMO Team on Paxful and, ultimately, transferred to the Epoch Entities.

This means of establishing that a broader universe of transactions represent fraud proceeds—that is, showing specific transaction details present in fraud that is proved through firsthand evidence and allowing the reasoned circumstantial inference that those details, present in other transactions, similarly indicate fraud—is a commonly used, and appropriate, method for the Government to present a complex financial case to the jury. *See United States v. Janati*, 374 F.3d 263, 274 (4th Cir. 2004) ("[W]hen the government prosecutes a conspiracy involving a series of crimes—alleged by the government in this case to number more than 1300—the government must be given additional latitude during trial to carry its burden of proof."). Were it otherwise, defendants could easily escape accountability for massive crimes merely—as here—by victimizing so many individuals that it would be impracticable to call them all to a single trial. This absurd result is contrary to the Federal Rules of Evidence, which draw no distinction between direct and circumstantial evidence, *see, e.g.*, *United States v. MacPherson*, 424 F.3d 183, 190 (2d

Cir. 2005), and in all events must "be construed so as to administer every proceeding fairly" and "eliminate unjustifiable expense and delay" to the end of "ascertaining the truth and securing a just determination," Fed. R. Evid. 102; *see also* Fed. R. Crim. P. 2 (rules should be interpreted "to eliminate unjustifiable expense and delay").

Underscoring the unreasonableness of the defendants' motion, there appears to be very little precedent directly dealing with this issue, but, in both cases that the Government has been able to find, the court determined that the Government was entitled to reference the dollar amount of the criminal proceeds that it anticipated proving at trial. *See United States v. Forbes*, 249 F. App'x 233, 236-37 (2d Cir. 2007) (approving Government's use of the term "$14 billion fraud" in its opening statement); *United States v. Miller*, No. 04 Cr. 281 (JLH), 2006 WL 2401360 (E.D. Ark. Aug. 18, 2006).

*Miller* persuasively addresses this issue:

> The Court is not aware of any basis for prohibiting the government from . . . explaining in opening statement that the government intends to prove that the loss in this case totals $3.5 million. If the government tells the jury in opening statement that the loss was $3.5 million and then proves it, there is no prejudice to either party. On the other hand, if the government tells the jury in opening statement that it will prove that the loss was $3.5 million but then fails to prove it, that failure by the government will adversely affect the government's credibility and will not, in the Court's opinion, unfairly prejudice Miller.

*Miller*, 2006 WL 2401360, at *1.

Rather than offering any case support for his extraordinary request, Guan instead points to his self-proclaimed failure to understand "what number the government actually contends is the amount allegedly laundered." (Guan Mot. 7-8). This argument is puzzling. As an initial matter, the Court, in denying his motion for a bill of particulars, has already *rejected* his claims that he has

34

insufficient information to understand the Government's allegations about the amount that was laundered. As the Court correctly recognized, the Government's disclosures "allow[] Guan to understand the charges against him and prepare for trial," and the "Government is not required to identify each and every transaction it intends to rely upon, nor specify an all-inclusive list." (Dkt. 110 at 9).[13] That being the case, the Government's disclosures—which have continued voluntarily after the motion was denied, including the Government's provision of non-final draft summary charts (both financial and non-financial) to the defendants as a courtesy to assist in their trial presentation—provide no justification for any relief.

More fundamentally, Guan's request to limit the Government's jury addresses is a *non sequitur*. Complaints about pretrial disclosures—even if they had not already been rejected— provide no basis to limit a party's ability to make arguments to the jury. Nor does speculation that the Government's proof will fail. If Guan believes the Government cannot sustain its burden of proof based on the evidence adduced, then Guan, the like any other defendant, is free to argue "what conclusions should, or should not, be drawn from" the Government's evidence. *United States v. Mundy*, 539 F.3d 154, 157 (2d Cir. 2008). It is then for the jury, as fact-finder, to weigh "competing inferences and explanations." *United States v. Friedman*, 998 F.2d 53, 56 (2d Cir. 1993). What Guan cannot do is obtain a ruling hamstringing the Government based on his

---

[13] Guan's claim that two specific Government Exhibits that were referenced in the Government's voluntary disclosures last year allegedly do not identify relevant transactions (Guan Mot. 8 ("USAO_00620985 and USAO00620986, which now appear on the government's exhibit list, do not appear to identify *any* transactions relevant to The Epoch Times,")) does not reflect any deficiency in, or change from, the Government's pretrial disclosures. As explained above, these two exhibits (GX 2A-202UR and GX 2A-203UR) reflect the inflows of funds from the fraud victims into the Layer 2 Green Dot Cards, and thus are highly relevant to proving that the funds ultimately transferred from those Layer 2 Green Dot Cards into the Layer 1 Green Dot Cards, and then to the Epoch Times, are fraud proceeds.

*presupposition* that the Government will not prove its allegations. *See, e.g.*, *United States v. Elie*, No. 10 Cr. 336 (LAK), 2012 WL 383403, at *1 (S.D.N.Y. Feb. 7, 2012) ("[T]here is no summary judgment in criminal cases."). The Court should reject the defendants' attempt to constrain the Government's presentation of its case by limiting its proof—let alone its ability to argue for reasonable inferences to be drawn from that proof—as to the total amount of the fraud proceeds involved in the money laundering scheme.

> 2.   *Advocacy Regarding the Inferences to be Drawn from the Evidence Regarding the Defendants' Knowledge*

Hung similarly seeks to disrupt the Government's closing and rebuttal, by precluding the Government from arguing: (i) the fact that prepaid debit cards and gift cards were sold on the Paxful platform at a discount, alone, establishes that Hung knew that those cards were obtained illegitimately (Hung Mot. 16-18); and (ii) that "awareness of a general risk of illicit activity on the Paxful platform, without more, satisfies the knowledge element" in Count One of the Hung Indictment (Hung Mot. 19-20). This motion is both premature and without any merit.

As an initial matter, the arguments Hung attacks are strawmen. The Government does not intend to argue that Hung possessed the requisite state of mind based *solely* on the fact that he and his co-conspirators were purchasing prepaid debit cards and gift cards at a discount. Nor does the Government intend to argue that Hung's awareness of a "general risk" that the Paxful marketplace contained stolen prepaid debit cards and gift cards alone satisfies the *mens rea* requirement in this case. But plainly, it would not be unreasonable—and certainly not subject to preclusion—for the Government to argue to the jury that Hung's awareness that he and his co-conspirators were able to obtain prepaid debit cards and gift cards at an unexplained discount suggests Hung's awareness (or, at minimum, conscious avoidance) of the fact that the cards were fraudulently obtained. The

36

only argument Hung advances to the contrary rests on the Paxful FinCEN Consent Order which, as explained in Section IV.C.3, *infra*, he grossly misinterprets, and is in any event inadmissible. (*See* Hung Mot. 18 (citing Hung's self-calculated "ratio of suspicious to legitimate activity")).

In any event, the Government does not intend to establish Hung's state of mind solely through evidence of the discount; nor does it intend to do so solely by reference to a general risk of illicit activity on the Paxful platform. Rather, in addition to evidence about the discount and evidence about the Paxful platform, the Government's evidence in its case-and-chief at trial is expected to include, among other things, Hung's email communications, including email communications containing fraud and money laundering alerts, Facebook communications, including with CC-2 (as described in the Hung Indictment), and spreadsheets Hung maintained tracking, among other things, stolen identity information and financial and online accounts opened in the names of identity theft victims. The Court will, of course, provide the jury with instructions on knowledge and conscious avoidance to the extent applicable, which the jury will be presumed to follow. *See United States v. Esso*, 684 F.3d 347, 352 (2d Cir. 2012). The defendants are entitled to proper legal instructions—not preclusion of arguments, grounded in the evidence, of their guilt.

In sum, Hung provides no reason in law or logic to constrict the "broad latitude" that the law affords the Government "in the inferences it may reasonably suggest to the jury during summation." *Edwards*, 342 F.3d at 181 (internal quotation marks omitted). Given the evidence the Government expects to offer in its case-in-chief at trial and the Court's instructions on the law, the Government should not be precluded from arguing, if it chooses to do so, that Hung's knowledge that Paxful users sold stolen prepaid debit cards and gift cards and his knowledge that Paxful users sold those cards at a suspicious discount are among the many pieces of evidence that the jury can

consider when determining whether Hung knew or consciously avoided knowing that the money laundering conspiracy involved the laundering of crime proceeds.

### 3. *Referring to Victims as Victims*

Guan also takes aim at the Government's use of standard and accurate terminology. Specifically, Guan asks the Court to preclude the Government from referring to state or federal governments, taxpayers, or individuals affected by public benefit theft, prepaid debit, gift, or credit card fraud, or identity theft as "victims." (Guan Mot. 9-11). This request is inconsistent with the overwhelming weight of authority in this Circuit and the uncontested facts of this case.

As an initial matter, Guan notably does not argue that the victims are not, in fact, victims. Nor can he—Guan himself created an email template for MMO members to send to banks to contest hundreds of chargebacks filed by people who claimed that their bank or prepaid cards had been used fraudulently to donate to the Epoch Times. (*See, e.g.*, GX 1A-2001 to GX 1A-2451). In doing so, Guan actively tried to prevent fraud victims from getting their money back from the Epoch Times. Rather, Guan's principal argument is that referencing such victims as victims would be "inaccurate because the money laundering statute does not require any identifiable victim to establish the conspiracy." (Guan Mot. 9). But as Guan concedes in the joint requests to charge, "Count One of the Indictments allege that the defendants conspired to commit money laundering, the underlying specified unlawful activity of which was wire fraud." (Dkt. 144 at 57). Accordingly, the Government must "prove[] beyond a reasonable doubt that the proceeds at issue were from a wire fraud." (*Id.*). Indeed, Guan asks *the Court* to use the term "victim" numerous times throughout the jury charge (*see, e.g., id.* at 51, 56, 80).

Guan does not cite a single case holding that the Government may not use the word "victim" in a money laundering trial where the underlying specified unlawful activity is wire fraud.

38

His citations to *United States v. Wagner* and *MF Global Holdings Inc. v. PricewaterhouseCoopers LLP* are readily distinguishable. In *Wagner*, the court precluded the government from referring to the defendant's ex-girlfriend as a victim where the defendant was charged with possessing a firearm after a felony conviction. *United States v. Wagner*, No. 20 Cr. 410 (NSR), 2022 WL 19179, at *6 (S.D.N.Y. Jan. 3, 2022). Because that crime cannot be committed against a person, the count found that probative value of referring to the ex-girlfriend as a victim was outweighed by the risk of unfair prejudice. *Id.* In *MF Global Holdings Inc.*, a professional malpractice action brought by the administrator of the Chapter 11 liquidation plan of a debtor, a defunct brokerage and financial services provider, against the debtor's outside auditor and accountant, this Court aptly ruled that the parties were precluded from using "derogatory or inflammatory language" such as referencing the claim holders as "vulture funds" or "treasure hunters." *MF Global Holdings Inc. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 570 (S.D.N.Y. 2017) (Marrero, J.). Here, by contrast, the defendants are charged with using the proceeds of wire fraud to perpetuate a multi-million-dollar money laundering conspiracy that benefited the Epoch Times. Accordingly, and as Guan agrees, the Government must "prove that the financial transaction[s] that w[ere] part of the conspiracy involved funds that were the proceeds of wire fraud . . ." (Dkt. 144 at 49; *id.* at 57 ("you do not have to find whether or not the defendants committed wire fraud themselves, but rather whether the evidence proves beyond a reasonable doubt that the proceeds at issue were from a wire fraud, regardless of who committed it.")). Use of the term "victim," therefore, is entirely appropriate to refer to individuals and entities that were harmed by the underlying specified unlawful activity.

Furthermore, use of the word "victim"—in particular, during the Government's opening

and closing jury addresses—is fair argument, and any conceivable prejudice is cured by the Court's standard instruction to the jury that the lawyers' arguments are not evidence and that the Government bears the burden of proving all elements of a crime beyond a reasonable doubt. In addition to being an accurate description of those affected by the specified unlawful activity, the term also accurately reflects their status under the Crime Victims' Rights Act. *See* 18 U.S.C. § 3771(e)(2)(A) (defining the term "crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia.").

Guan's argument that, whatever the law may be, he "could be convicted based upon the inflammatory term 'victim'" (Guan Mot. 10) is hyperbolic, at best. Properly, courts routinely permit the Government to refer to victims as victims at trial, concluding that the Government is within its right to use the term to advocate for its view of the evidence. *See, e.g.*, *United States v. Gibson*, 690 F.2d 697, 703 (9th Cir. 1982) (because the victim suffered losses, "the prosecutor's use of the word 'victim' was fair comment on the evidence") (citing *United States v. Martinez*, 616 F.2d 185, 187 (5th Cir. 1980)); *United States v. Maxwell*, No. 20 Cr. 330 (AJN) (S.D.N.Y.), Pretrial Conf. Tr. of Nov. 1, 2021, (Dkt. 465 at 4-5) (in sex trafficking and enticement trial, denying defendant's motion to preclude use of terms "victim" and "minor victim"); *United States v. Dupigny*, 18 Cr. 528 (JMF) (S.D.N.Y.), Pretrial Conf. Tr. of Oct. 17, 2019, (Dkt. 198 at 50) (denying defendant's motion to preclude use of term "victim" as unnecessary and impractical); *United States v. Kidd*, No. 18 Cr. 872 (VM) (S.D.N.Y.), Trial Tr. of July 9 and 12, 2019, (Dkt. 72, 78) at 89-90, 98-103, 792-800, 877-78, 884-85 (in sex trafficking case, this Court referenced victims as victims in jury instructions and permitted the Government to do the same in jury addresses); *United States v. Edwards*, No. 16 Cr. 103 (BLG) (SPW), 2017 WL 4159365, at *1 (D.

Mont. Sept. 19, 2017) (explaining that "use of the term 'victim' is not prejudicial to the defendant's rights when the presentation of evidence taken as a whole clarifies the government's burden of proving all of the elements of the crime" and finding that the "jury will not be unduly prejudiced against [the defendant] if the government refers to certain witnesses as victims"); *United States v. Washburn*, 444 F.3d 1007, 1013 (8th Cir. 2006) ("[A] number of courts have determined that the use of the term 'victim' in jury instructions is not prejudicial to a defendant's rights when, as is the case here, the instructions taken as a whole clarify the government's burden of proving all elements of the crime"); *United States v. Gasperini*, No. 16 Cr. 441 (NGG), 2017 WL 3140366, at *7 (E.D.N.Y. July 21, 2017) (rejecting defendant's request to exclude terms "victim" and "victimized" because the "Government is within its rights to take and advocate for a different view of the evidence" and such words are not "unduly prejudicial"), *aff'd*, 729 F. App'x 112 (2d Cir. 2018); *United States v. Huynh*, No. 14 Cr. 275, 2016 WL 7411529, at *6-7 (M.D. Pa. Dec. 22, 2016) (denying similar request and noting that "[s]imply because a person or entity involved in this case is accurately referred to as a 'victim,' in no way furthers the government's burden to prove beyond a reasonable doubt that [the defendant] is, in fact, guilty of a crime."); *United States v. Spensley*, No. 09 Cr. 20082 (MPM), Dkt. 25 at 2 (C.D. Ill. Jan. 19, 2011) (allowing the government to refer to the victim as a "victim" and concluding that the jury would not be unfairly inflamed or prejudiced by this reference, particularly given jury instructions regarding the government's burden of proof and the defendant's presumption of innocence). Indeed, it would be absurd to force the Government to use some unfamiliar, lawyerly, and jumbled locution such as "person whose money was taken through wire fraud" or "person whose identity was used without lawful authorization" instead of a simple, direct, and accessible term that has

41

widely been upheld.

Finally, Guan's request that the Government differentiate between categories of victims according to counts in the Indictments (Guan Mot. 11) is nonsensical. *Both* defendants are charged with conspiracy to commit money laundering. Accordingly, use of the term "victim" in reference to state or federal governments, taxpayers, or individuals affected by public benefit theft, prepaid debit, gift, or credit card fraud, or identity theft—the victims of the underlying specified unlawful activity—is appropriate.

## IV.    THE COURT SHOULD EXCLUDE THE IRRELEVANT, UNFAIRLY PREJUDICIAL, AND UNNECESSARILY CONFUSING PAXFUL MATERIALS

Hung invites the Court to introduce extraneous and confusing documents about a separate case involving the cryptocurrency exchange Paxful—which Hung grossly mischaracterizes—in an attempt to prove facts of which he concedes he had no contemporaneous knowledge. (Hung Mot. 3-15). The Could should reject this invitation.

### A.    Background

Hung seeks an *in limine* ruling admitting "selected excerpts" of certain materials pertaining to Paxful, Inc. and Paxful, USA Inc. (collectively, "Paxful"), including:

(i)    **The Paxful Plea Agreement:** a plea agreement between Paxful and the DOJ's Money Laundering and Asset Recovery Section ("MLARS") and the U.S. Attorney's Office for the Eastern District of California (the "E.D. Cal. USAO"), in *United States v. Paxful Holdings, Inc.*, No. 25 Cr. 235 (JAM) (E.D. Cal.) (the "Paxful E.D. Cal. Case"), in which Paxful agreed to plead guilty to a three-count criminal information charging Paxful with: (1) one count of conspiracy to willfully fail to establish, develop, implement, and maintain an effective anti-money laundering ("AML") program as required by the Bank Secrecy Act ("BSA"), in violation of 18 U.S.C. § 371; (2) one count of conspiracy to operate an unlicensed money transmitting business ("MTB"), 18 U.S.C. §§ 1960(a) and 1960(b)(l)(C), in violation of 18 U.S.C. § 371; and (3) one count of conspiracy to violate the Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprise Act (the "Travel Act"), 18 U.S.C. §§ 1952(a)(3) and (a)(3)(A), in violation of 18 U.S.C. § 371 (Dkt. 148-1);

(ii)    **The Schaback Plea Agreement:** a plea agreement between Artur Schaback, Paxful's co-founder and former Chief Technology Officer, and MLARS and the E.D. Cal. USAO, in *United States v. Artur Schaback*, No. 24 Cr. 72 (KJM) (E.D. Cal.) (the "Schaback E.D. Cal. Case"), in which Schaback agreed to plead guilty to an information charging him with one count of conspiracy to willfully fail to establish, develop, implement, and maintain an effective AML program as required by the BSA, 31 U.S.C. §§ 5318(h), 5322(b), 5322(c), 5322(e), and 31 C.F.R. § 1022.210, in violation of 18 U.S.C. § 371 (Dkt. 148-2);

(iii)   **The Paxful Sentencing Memorandum:** a January 29, 2026 sentencing memorandum submitted by MLARS and the E.D. Cal. USAO in the Paxful Case (Dkt. 148-3); and

(iv)    **The Paxful FinCEN Consent Order:** a December 9, 2025 Financial Crimes Enforcement Network ("FinCEN") Consent Order Imposing Civil Money Penalty as to Paxful noting FinCEN's determination that Paxful had: (1) willfully failed to register as a money service business ("MSB") with FinCEN, in violation of 31 U.S.C. § 5330 and 31 C.F.R. § 1022.380; (2) failed to develop, implement, and maintain an effective AML program that was reasonably designed to prevent its trading platform and hosted wallet service from being used to facilitate money laundering and the financing of terrorist activities in violation of 31 U.S.C. § 5318(h)(1) and 31 C.F.R. § 1022.210; and (3) willfully failed to accurately, and timely, report suspicious transactions to FinCEN, in violation of 31 U.S.C. § 5318(g)(1) and 31 C.F.R. § 1022.320 (Dkt. 148-4).

(Hung Mot. 3-15, 20-21).

Hung does not identify with specificity which "selected excerpts" of these materials (collectively, the "Paxful Materials") he seeks to admit, but cites certain statements within the Paxful materials (*see, e.g.*, Hung Mot. 4-5) and indicates his alleged willingness "to work with the Court and the Government to identify specific excerpts from the exhibits that are most directly relevant to the knowledge element, rather than introducing the entirety of those documents" (Hung Mot. 12-13). Accordingly, last week, the Government wrote to counsel for both defendants inquiring whether either Guan or Hung intended to take the position that he had contemporaneous personal knowledge of any of the following assertions, all of which derive from a "Statement of

Facts" appended to the Paxful Plea Agreement (Dkt. 148-1, Attachment A) and are specifically

alluded to in Hung's motion:

(i)     Between July 2015 and at least November 2019, Paxful "[a]llowed customers to open Paxful accounts and trade without providing sufficient identifying information or documents to allow [Paxful] to know the true identities of its customers." (Dkt. 148-1, Attachment A at A-3).

(ii)    Between July 2015 and at least November 2019, Paxful "[m]arketed Paxful to customers as a platform that did not require KYC and/or that allowed 'buying without ID.'" (Dkt. 148-1, Attachment A at A-4).

(iii)   Between July 2015 and at least November 2019, Paxful "[f]acilitated the transfer of funds between customers without conducting KYC, despite knowing Paxful was required to do so, claiming Paxful outsourced KYC procedures to Paxful vendors, who were responsible for KYC and 'following MSB guidelines,' or claiming 'all the KYC is left to our vendors on a per trade basis.'" (Dkt. 148-1, Attachment A at A-4).

(iv)    Between July 2015 and at least November 2019, Paxful "[f]ailed to implement effective AML and KYC policies and procedures to monitor customer transactions for suspicious activity." (Dkt. 148-1, Attachment A at A-4).

(v)     Between July 2015 and at least November 2019, Paxful "[p]resented fake AML and KYC policies to financial institutions that they knew were not, in fact, implemented or enforced at Paxful, Inc." (Dkt. 148-1, Attachment A at A-4).

(vi)    At times, Paxful "touted the benefits of its lack of an AML program to prospective customers. For example, on April 14, 2017, Schaback sent an email to a prospective customer, in which he stated that trades on the Paxful platform were 'instant and anonymous whereas with exchanges you have to KYC yourself and wait 5 days for bitcoins to arrive.'" (Dkt. 148-1, Attachment A at A-6).

In response, counsel for Guan indicated that Guan will *not* be taking the position that he had

contemporaneous knowledge of any of the above assertions. Counsel for Hung advised the

Government, without elaboration: "Contemporaneous knowledge of the information in the plea is

not the theory here."

44

**B.    Applicable Law**

1.    *The Rule Against Hearsay*

Hearsay is generally inadmissible unless another law or rule provides otherwise. *See* Fed. R. Evid. 802. The burden is on the proponent of the evidence to show that an exception to the rule against hearsay applies. *See United States v. Doyle*, 130 F.3d 523, 543-44 (2d Cir. 1997); *United States v. Kidd*, No. 23-6400, 2025 WL 3687811, at *1 (2d Cir. Dec. 19, 2025).

2.    *Rule 801(d)(2)(B)*

Federal Rule of Evidence 801(d)(2)(B) provides for the admissibility, as non-hearsay, of the statement of a party-opponent that the opposing party has "manifested that it adopted or believed to be true." To determine whether a statement qualifies, a court must first find that the party who made the statement is the "same party" as the party-opponent against whom the statement is offered. *See United States v. Klein*, No. 16 Cr. 442 (JMA), 2017 WL 1316999, at *4 (E.D.N.Y. Feb. 10, 2017). The court must then find that the particular party-opponent "manifested that it adopted or believed [the statement] to be true." *Id.*

3.    *Rule 803(8)(A)(iii)*

Federal Rule of Evidence 803(8)(A)(iii) sets out an exception to the rule against hearsay that allows the admission of a "record or statement of a public office" for use against the government in a criminal case if the statement sets out "factual findings from a legally authorized investigation." If the proponent of the admission of a piece of evidence demonstrates that it qualifies for admission under Rule 803(8)(A)(iii), the evidence may still be excluded if its opponent shows, pursuant to Rule 803(8)(B), "that the source of information or other circumstances indicate a lack of trustworthiness."

Rule 803(8)(A)(iii) is sometimes referred to as concerning "evaluative or investigative

45

reports." *United States v. Awad*, No. 06 Cr. 600 (DLC), 2007 WL 1988382, at *3 (S.D.N.Y. July 3, 2007). The "reporting agency must have firsthand knowledge of the investigation by which it accumulates the published factual findings that Rule 803(8)(C) contemplates, since it is the quality of the investigation that determines the caliber of the results." *Robbins v. Whelan*, 653 F.2d 47, 52 (1st Cir. 1981).

The Advisory Committee's Notes to Rule 803(A)(iii) enumerate "[f]actors which may be of assistance in passing on the admissibility of evaluative reports," including: "(1) the timeliness of the investigation; (2) the special skill or experience of the official; (3) whether a hearing was held and the level at which conducted; and (4) possible motivation problems suggested by *Palmer v. Hoffman*, 318 U.S. 109 (1943)." Fed. R. Evid. 803(8) adv. comm. n. (1972 Proposed Rules) (citations omitted); *see also United States v. Awad*, No. 06 Cr. 600 (DLC), 2007 WL 1988382, at *3 (S.D.N.Y. July 3, 2007). *Palmer*—the case referenced in the Advisory Committee's Notes— concerned the admissibility of a report prepared by a train engineer following an accident, and the Supreme Court determined that the engineer's report was inadmissible hearsay because it was "calculated for use essentially in the court." *Palmer v. Hoffman*, 318 U.S. 109, 114 (1943).

4.      *Rule 402 and Rule 403*

Under Federal Rule of Evidence 402, "[i]rrelevant evidence is not admissible" at trial; and, under Rule 403, a court may exclude even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403; *see also United States v. Miller*, 626 F.3d 682, 689-90 (2d Cir. 2010). Evidence is unfairly prejudicial within the meaning of Rule 403 "only when it tends to have some adverse effect upon [a party] beyond tending to prove the fact or issue that justified its admission into

evidence." *Figueroa*, 618 F.2d at 943. The touchstone of the prejudice analysis is whether the proffered evidence "involve[s] conduct any more sensational or disturbing than the crimes with which" the defendant is charged. *Roldan-Zapata*, 916 F.2d at 804.

### C.    Discussion

In addition to presenting serious hearsay concerns, which Hung, who bears the burden, has offered no legally valid basis to overcome, the Paxful Materials are paradigmatic extraneous and confusing evidence barred by Rule 403, particularly where there is no indication that Guan or Hung contemporaneously knew of any of the factual matters described in the materials—and, indeed, where Guan and Hung have indicated that they do *not* intend to take the position that they had contemporaneous knowledge of any of those factual matters.

In short, even if the Paxful Materials were non-hearsay and had any shred of relevance, Rule 403 demands their exclusion. To the extent the Paxful Materials could have any probative value (and they appear to have none given defense counsel's representations that Guan and Hung lacked contemporaneous knowledge of the factual matters therein), any theoretical probative value pales in comparison to the tremendous dangers of unfair prejudice and jury confusion that these complex legal documents—from wholly different matters, involving wholly different entities, arising from wholly different investigations, in wholly different contexts—would wreak upon the trial in this case. The Paxful Materials accordingly should be excluded.

#### 1.    *The Paxful Materials Are Inadmissible Under Rule 801(d)(2)(B)*

Hung has not met his burden to show that the Paxful Materials are party-opponent statements admissible under Rule 801(d)(2)(B).

As an initial matter, Hung has not carried his burden of demonstrating that the office prosecuting this case—*i.e.*, U.S. Attorney's Office for the Southern District of New York (the

"S.D.N.Y. USAO")—qualifies as the "same party" as MLARS or the E.D. Cal. USAO (the parties involved in the Paxful E.D. Cal. Case and the Schaback E.D. Cal Case) or FinCEN (the agency that issued the Paxful FinCEN Consent Order). Although both MLARS and the E.D. Cal. USAO are, like the S.D.N.Y. USAO, components of the Department of Justice (the "DOJ"), Hung has not shown that the S.D.N.Y. USAO was involved in the investigations giving rise to the cases that those offices brought in the Eastern District of California, nor is the Government aware of any such involvement. The same is decidedly true with respect to FinCEN's investigation of Paxful.

For good reason, courts in this district have explained that "*some* level of cooperation or collaboration between the agencies in the course of their respective investigations is the *bare minimum* requirement" for treating government agencies as the "same party" under Rule 801(d)(2)(B). *Klein*, 2017 WL 1316999, at \*5 (emphasis added); *see id.* (declining to treat the Securities and Exchange Commission ("SEC") and the U.S. Attorney's Office for the Eastern District of New York as the "same party" where there was "no indication whatsoever that the SEC or DOJ collaborated with respect to their investigations into [the defendant's] trading activities").[14]

In any event, regardless of whether the S.D.N.Y. USAO qualifies as the "same party" that issued the statements in the Paxful Materials, Hung's attempt to admit the Paxful Materials as statements of a party-opponent must fail because he has not demonstrated that the S.D.N.Y. USAO

---

[14] Whether or not MLARS and the E.D. Cal. USAO qualify as the "same party" as the S.D.N.Y. USAO, FinCEN, which is a Department of the Treasury agency, not a DOJ agency, certainly does not. *See United States v. Baker*, 923 F.3d 390, 400 (5th Cir. 2019) (holding, in the Rule 804(b) context, that the SEC and the DOJ were not the "same party" where they did not "coordinate closely" in their respective investigations); *United States v. Martoma*, No. 12 Cr. 973 (PGG), 2014 WL 5361977, at \*5 (S.D.N.Y. Jan. 8, 2014) (same); *see also Klein*, 2017 WL 1316999, at \*5 (looking to Rule 804(b) cases as instructive in assessing potential party-opponent statements under Rule 801(d)(2)(B).

has "manifested that it adopted or believed [the statements] to be true." *Klein*, 2017 WL 1316999, at \*4; *see also id.* (describing same party analysis and adoption as "two separate criteria"). Quite the opposite—Hung has submitted to the Court that, in his estimation, the S.D.N.Y. USAO has staked out a position in this case that is *contradictory* to the statements made in the Paxful Materials. (Hung Mot. 13-14); *see Klein*, 2017 WL 1316999, at \*4. The cases cited in Hung's motion do nothing to help him on that front, as they all involved, with one exception, a defendant seeking to admit a statement or statements made by the *same* U.S. Attorney's Office responsible for the defendant's prosecution. *See, e.g.*, *United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984) (addressing admissibility, in a prosecution brought by the S.D.N.Y. USAO, jury address of S.D.N.Y. USAO attorney in a separate prosecution); *United States v. Mirabal*, 98 F.4th 981, 983 (9th Cir. 2024) (addressing admissibility, in the context of a prosecution brought by the U.S. Attorney's Office for the Central District of California against two defendants, the admissibility of facts included in a plea agreement as to one defendant in the other defendant's trial). The sole exception is *United States v. Kattar*, 840 F.2d 118, 130 (1st Cir. 1988), a case from the First Circuit, which broadly characterized all DOJ components as the "same party," without any discussion as to their respective involvement in the investigations/prosecutions at issue, contrary to the approach of courts in this District, and contrary to the general principle, long adopted by the Second Circuit, that the DOJ is not a monolith, *see, e.g.*, *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) ("[T]he imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis."); *United States v. Quinn*, 445 F.2d 940, 944 (2d Cir. 1971) (rejecting

49

imputation of knowledge between prosecutors' offices, remarking, "The Department of Justice alone has thousands of employees in the fifty States of the Union.").

    2.  *The Paxful Materials Are Inadmissible Under Rule 803(8)*

Hung also has not met his burden to show that the Paxful Materials fall within the "public records" hearsay exception in Rule 803(8)(A)(iii).

Hung does not point to a single case in which a court admitted a plea agreement, sentencing memorandum, or FinCEN consent order under Rule 803(8)(A)(iii). Instead, Hung cites to just two cases—*Bridgeway Corp. v. Citibank*, 201 F.3d 134 (2d Cir. 2000), and *Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), *certified question answered*, 194 A.3d 38 (D.C. 2018), and *vacated and remanded sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020), both of which concerned reports prepared and issued by "area specialists" at the U.S. State Department. (*See* Hung Mot. 10). *Bridgeway Corp.*, 201 F.3d at 143-44. Specifically, *Bridgeway Corp.* concerned U.S. State Department Country Reports for the country of Liberia, which federal law required the State Department to prepare annually. *Id. Owens* involved a similar State Department report titled "Patterns of Global Terrorism." 864 F.3d at 792.

Those State Department reports fall within the heartland of the types of "evaluative" reports that the Advisory Committee Notes contemplate falling within the ambit of Rule 803(8)(A)(iii). *See, e.g.*, *Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 600-01 (8th Cir. 2005) (affirming admission of certain Surgeon General reports concerning smoking as "factual findings"); *Robbins v. Whelan*, 653 F.2d 47, 52 (1st Cir. 1981) (concluding that a Department of Transportation ("DOT") National Highway Safety Bureau report entitled "Performance Data for New 1971 Passenger Cars and Motorcycles" constituted "factual findings"); *Awad*, 2007 WL 1988382, at *4-*5 (concluding that a report and recommendation from the Department of Health

and Human Services ("HHS") that cathinone should be added to Schedule I of the Controlled Substances Act was properly classified as "factual findings"); *Figueroa v. Boston Scientific Corp.*, No. 00 Civ. 7911 (DC), 2003 WL 21488012, at *3 (S.D.N.Y. 2003) (admitting, as "factual findings," a letter from the Food and Drug Administration ("FDA") approving recall of a medical device); *see also Paolitto v. John Brown E. & C., Inc.*, 151 F.3d 60, 65 (2d. Cir. 1998) (declining to hold that reports prepared by the Equal Employment Opportunity Commission ("EEOC") are *per se* admissible under Rule 803(8), in part because such reports "are not homogeneous products; they vary greatly in quality and factual detail"). Though myriad in their subject matter, those reports share common features: They typically were generated solely by agency officials with specialized—even scientific or otherwise technical—knowledge, often as the result of a reporting requirement; and they were published unilaterally by the agency (and not together with any other party, much less as a negotiated disposition in an adversary matter) as objective findings of fact, not in connection with litigation.[15]

---

[15] The Government has identified a handful of cases concerning whether certain documents issued by the SEC qualify as "factual findings" under the Rule 803(8)—none of which is cited in Hung's motion. *See Klein*, 2017 WL 1316999, at *4 (ruling that an SEC complaint and charging decision were *not* "factual findings" within the meaning of the rule because they reflected *allegations*, not findings); *S.E.C. v. Pentagon Cap. Mgmt. PLC*, No. 08 Civ. 3324, 2010 WL 985205 (S.D.N.Y. Mar. 17, 2010) (ruling that certain Orders Instituting Proceedings ("OIPs") issued by the SEC were "factual findings" under the Rule); *United State v. Peitz*, No. 01 Cr. 852, 2002 WL 31101681, at *5 (N.D. Ill. Sept. 20, 2002) (same with respect to an SEC Action Memorandum); *Option Res. Grp. v. Chambers Dev. Co.*, 967 F. Supp. 846, 849 (W.D. Pa. 1996) (ruling that the factual findings contained in an SEC Consent and Final Judgment were admissible under the Rule). The OPIs at issue *Pentagon Cap. Mgmt. PLC* and the Action Memorandum in *Peitz* fit neatly within the broader category of "evaluative" reports in the caselaw the Government has identified. That is, they are unilaterally prepared documents meant to objectively summarize facts found by an investigating agency in the course of its investigation. The *Option Res. Grp.* decision, meanwhile, did not grapple with the differences in context between a detached report and a negotiated plea agreement. On that issue, the better touchstone is *Klein*, which appropriately reasoned that an SEC

51

The Paxful Materials are of a wholly different nature. Two of the documents Hung seeks to have admitted are negotiated plea agreements: one between Paxful and MLARS and the E.D. Cal. USAO, and the other between Schaback and the same entities. (Dkt. 148-1 and Dkt. 148-2). Most of the content of the plea agreements do not contain statements of facts at all, and thus are straightforwardly not factual findings. Even limited to their statements of facts, those factual statements were necessarily the result of negotiations among the relevant parties in an adversary posture and Hung has cited no case establishing that such statements are "findings" that "flow"— and certainly not exclusively—from the sorts of processes that yielded the State Department, Surgeon General, DOT, HHS, and FDA reports typically admitted under the Rule. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 162-63 (1988). Rather, they are facts to which the plea agreements' relevant parties agreed in the course of their negotiations to resolve a criminal investigation short of trial.[16] The Paxful FinCEN Consent Order falls outside the Rule's scope for the same reasons, and the Paxful Sentencing Memorandum that Hung seeks to introduce (*i.e.*, the sentencing memorandum submitted by MLARS and the E.D. Cal. USAO in the Paxful E.D. Cal. Case) presents the same issues to an even greater degree. (Dkt. 148-3). To the extent that the sentencing submission addresses factual matters, it does so in a section titled "APPLICATION TO THIS

---

complaint—a document containing factual narratives undoubtedly drafted with litigation in mind—was inadmissible.

[16] In so noting, the Government does not suggest any irregularity in the conduct of any of the government bodies, or the opposing party, involved in reaching the pleas. Nor does the Government suggest that the facts in the plea agreements are incorrect (although the plea agreements go beyond issues in this case, and the Government does not have knowledge of all such facts). The issue before this Court is far more narrow: whether these materials, which are facially hearsay, are admissible under Rule 803(8)(A)(iii) in an entirely different proceeding for an entirely different purpose with entirely different defendants, who do not even allege to have known contemporaneously of the plea agreements. The answer is they are not admissible.

MATTER." (Dkt. 148-3 at 4-6). As that header suggests, the assertions contained therein are *advocacy* in the course of litigation—not the "evaluative" report that Rule 803(8)(A)(iii) envisions.

        3.      *Whether Hearsay or Not, the Paxful Materials Must Be Excluded Under Rule 402 and Rule 403*

In any event, whether the Paxful Materials are inadmissible hearsay or not (and Hung fails to demonstrate that they are anything but inadmissible hearsay), they are irrelevant, as they have no bearing on either Guan's or Hung's contemporaneous knowledge. And even if the Paxful Materials could be said to have probative value (which they do not), any such value is grossly outweighed by the exceedingly serious risks of unfair prejudice and jury confusion that their admission would entail.

As to relevancy, Hung has not established—and, indeed, has disavowed (as has Guan)— any contemporaneous link between the information contained in the Paxful Materials and his knowledge at the time of the charged conduct. That alone renders them inadmissible. *See United States v. Kaplan*, 490 F.3d 110, 121-22 (2d Cir. 2007) (holding district court erred in admitting evidence of one person's knowledge to show defendant's knowledge, without evidence that defendant was aware of the same information, expressing doubt that evidence was relevant, and explaining that, in any event, it should have been precluded under Rule 403 because it "required [the jury] to draw a series of inferences, unsupported by other evidence," yet was offered on "the ultimate issue in the case"); *see also, e.g.*, *United States v. Campos*, 763 F. App'x 97, 100 (2d Cir. 2019) (precluding defense witness on the basis that "what [the defense witness] knew or believed sheds little, if any, light on what [the defendant] knew or believed"); (*see also* Hung Mot. 2 (submitting that "[t]he central disputed element at trial is *knowledge*," despite Hung's counsel's subsequent representation, as to the Paxful Materials, that "Contemporaneous knowledge of the

information in the plea is not the theory here")).

In short, without that link, the Paxful Materials simply have no bearing on any issue relevant to trial. To be sure, the extent that Hung has competent evidence of his contemporaneous knowledge or beliefs about the Paxful platform, he can seek to present that evidence if it is otherwise admissible. But he cannot present the Paxful Materials to the jury as evidence of his knowledge at the time of the charged offenses when he admits he had no such knowledge.[17]

Even if the Paxful Materials had relevancy (and they do not), Rule 403's balancing test demands their exclusion. Even accepting, for the sake of argument, that the Paxful Materials bore some theoretical probative value, the parties appear to agree that they have no probative value as to what Hung has characterized as the "central disputed element at trial"—*i.e.*, knowledge. (Hung Mot. 2). Nor could they. Neither Guan nor Hung is mentioned once in the Paxful Materials; they do not otherwise concern matters contemporaneously known to the defendants; and both defendants have stated, through counsel and in writing, that they do not intend to advance a theory

---

[17] Hung's improper attempt to offer up the Paxful Materials as evidence of an apparent belief on his part that the Paxful platform was operating legitimately and that Paxful users could not have understood that they were involved in the purchase of criminal proceeds (facts which, as discussed below, the Paxful Materials do *not* support) mirrors Guan's attempt to offer similar evidence through his proposed expert Matthew Price. The same principles that warrant the exclusion of Price's testimony compel the preclusion of the Paxful materials. (*See* Dkt. 149 (Gov. Mot.) at 34-40). Just as Guan cannot use Price's testimony to establish that Paxful was a legitimate platform without any linkage to whether Guan believed as much, Hung cannot use the Paxful Materials to establish that Paxful was an *illegitimate* platform deceiving its users about its policies and the identities of its users without any linkage to whether Hung was so deceived. Indeed, the inherent tension between the defendants' respective plans to backdoor arguments about their knowledge into this trial through evidence unmoored from their contemporaneous knowledge—Guan through Price's proposed testimony, and Hung through the Paxful Materials—underscores the dangers of admitting either Price's testimony or the Paxful Materials. To the extent the defendants seek to offer evidence or testimony going to their knowledge, they must establish that the evidence or testimony, in fact, bears on their knowledge, and also is admissible under the Federal Rules of Evidence. Price's proposed testimony and the Paxful Materials do not so qualify.

that they had contemporaneous knowledge of the facts described in the materials.

In light of the Paxful Materials' non-existent probative value, Hung's proposal to put them before the jury and argue about their bearing on this case poses a tremendous danger of unfair prejudice, confusing and misleading the jury, and wasting time.

Beginning with the plea agreements, the Paxful Plea Agreement and the Schaback Plea Agreement are negotiated contracts among different parties in different cases, arising from separate investigations into crimes different from those with which the defendants are charged in this case. To ensure that the jury did not misapprehend their relevance and meaning, their entry into evidence at this trial thus would likely necessitate the admission of evidence and testimony to explain, among numerous issues, the provisions of the Bank Secrecy Act and the Travel Act; the details of Anti-Money Laundering policies, Know Your Customer policies, and unlicensed money transmitting businesses relevant to those pleas; the distinctions among the S.D.N.Y. USAO, the E.D. Cal. USAO, and MLARS; and the context and the processes through which the plea agreements were negotiated, including why Paxful and Schaback pleaded guilty to crimes different from those charged in the case at hand. Even if some approach to redacting the plea agreements or reconfiguring the factual summaries appearing therein could mitigate the need to educate the jury as to the context surrounding those factual summaries' negotiation and drafting—a solution the Government seriously doubts could be achieved in light of the specific context in which the plea agreements arose—the factual matters referenced in the plea agreements alone would necessitate mini-trials about the degree to which the evidence gathered in MLARS's and the E.D. Cal. USAO's investigations differs from the evidence gathered in the investigation giving rise to the instant case, and the purposes and drafting history of a plea agreement. The Paxful Sentencing

Memorandum, which largely recites the facts set forth in the Paxful Plea Agreement, would invite many of the same problems, with the added need to educate the jury as to the purpose of a sentencing memorandum, the intentions of its drafter, and what to make of the fact that Paxful received a sentence for conduct implicated in this very case, without being party to this case.

The Paxful FinCEN Consent Order presents the same problems to an even greater degree. Its admission, for one thing, would likely require evidence and testimony as to what FinCEN is, how its directives and goals differ from those of the prosecution team in this case, the differences among FinCEN regulations and criminal statutes, the purposes of FinCEN consent orders and the processes by which they are negotiated, as well as a whole host of technical terms, among them "domestic financial institution," "money services business," "money transmission services," and many more.

Exploring these issues to properly contextualize the Paxful Materials for the jury would seriously divert the jury's attention from whether the Government has satisfied its burden of proof in the case at hand and, instead, invite the jury to evaluate the entirely different proceedings involving MLARS, the E.D. Cal. USAO, and FinCEN—a particularly fraught inquiry where those agencies relied on evidence different from that gathered in the investigation giving rise to this case. That demanding exercise would not just waste time but also effect unfair prejudice on the Government and assuredly confuse the jury.

As to unfair prejudice, in particular, Hung has made clear that he intends to use the Paxful Materials to advance arguments about what he terms the Government's "enforcement record"— *i.e.*, an improper detour into which entities and individuals different parts of the federal government have resolved to prosecute and which ones it has not, in different cases, in different

years. (Hung Mot. 8). That has no bearing on whether the defendants are guilty of the crimes with which they have been charged. Indeed, this is the very subject that, as the Government has explained in its motions *in limine*, must be *precluded in its entirety*, not proved, let alone by extraneous and confusing materials. (*See* Dkt. 149 at 64-69).[18]

Courts considering whether to admit similar legal documents in other criminal cases have reached the same conclusion. In *Klein*, for instance, Judge Azrack ruled that an SEC complaint and charging decision were inadmissible under Rule 403 because admitting those materials would "divert[] the jury's attention away from the question whether the prosecution has satisfied its burden of proof and towards the question whether the SEC or DOJ 'got it right.'" 2017 WL 1316999, at *9. As Judge Azrack explained: "Posing such a question to the jury—even where that question is implied, as it likely would be here—invites a substantial danger of confusion. And, such a proposal invites an even increased danger of unfair prejudice and confusion here, since the DOJ and SEC made their decisions based on different bodies of evidence." *Id.*; *see also, e.g.*, *Paolitto*, 151 F.3d at 64 (upholding district court decision to exclude the findings of a Connecticut administrative body dismissing plaintiff's claims because the probative value of such findings substantially outweighed the danger of unfair prejudice), *United States v. Borrero*, No. 13 Cr. 58 (KBF), 2013 WL 6020773, at *2 (S.D.N.Y. Nov. 1, 2013) (holding that "the limited amount of probative value that" a prosecutor's "charging decisions add is substantially outweighed by the

---

[18] Even if the Court did not preclude Hung from advancing such an improper argument—which it should regardless of whether the Paxful Materials are deemed admissible—the Paxful Materials would still be inadmissible under Rule 403. The extraneous and dense Paxful Materials would compound the prejudice to the Government from any digression into law enforcement priorities. At a minimum, the jury would be *deeply* confused. Rule 403 exists precisely to prevent this from occurring.

risk of undue confusion and an unnecessary sideshow into [the] circumstances"); *United States v. Hill*, No. 12 Cr. 214 (KAM), 2014 WL 198813, at \*1-\*2 (E.D.N.Y. Jan. 14, 2014) ("[T]he reasons for the Kings County District Attorney's Office decision not to charge [the defendant] in 1997 are unknown and would cause confusion of and speculation by the jury."). This Court should be mindful of the same pitfalls these other courts have wisely avoided in precluding documents like the Paxful Materials.

To better understand the risks those pitfalls entail, the Court need only look to Hung's brazen mischaracterizations of certain of the factual assertions in the Paxful Materials. To be clear, the Paxful Materials are inadmissible even if Hung accurately described them—but he does not. For instance, the Schaback Plea Agreement states that Paxful "[p]resented fake AML and KYC policies to third parties that they knew were not, in fact, implemented or enforced at Paxful, Inc." (Dkt. 148-2 at A-2)—a factual assertion that Hung wrongly characterizes as establishing that "the platform presented fabricated compliance policies *to its users*, leading them to believe the platform was lawfully operated" (Hung Mot. 14).

A closer read of the Paxful Materials reveals that they establish the opposite of Hung's claims (and would in fact be highly inculpatory, were the defendants to have had contemporaneous knowledge of them). As the Paxful Plea Agreement makes clear, the "third parties" to which Paxful presented fake AML and KYC policies were financial institutions, not Paxful's users. (Dkt. 148-1 at A-4 to A-6). As to Paxful's *users*—contrary to Hung's mischaracterization—the Paxful Plea Agreement and Schaback Plea Agreement both make clear that "the Defendant touted the benefits of its *lack* of an AML program to prospective customers." (Dkt. 148-1 at A-6 (emphasis added); *see also* Dkt. 148-2 at A-3 (explaining that Schaback sent an email *to a prospective customer*, in

which he stated that trades on the Paxful platform were "instant and anonymous whereas with exchanges you have to KYC yourself and wait 5 days for bitcoins to arrive.")).

Hung makes a series of similar mischaracterizations in describing what he calls a "ratio of suspicious to legitimate activity" that he submits is "establish[ed]" by the Paxful FinCEN Consent Order. (Hung Mot. 6). As best the Government can tell, in referring to this supposed "ratio," Hung has taken the Paxful FinCEN Consent Order's reference to FinCEN's identification of $10 billion worth of customer Bitcoin transactions on Paxful (Dkt. 148-4 at 5) and compared it to references, elsewhere, to FinCEN's identification of "hundreds of suspicious transactions for which Paxful failed to timely and accurately file a [Suspicious Activity Report ("SAR")]" and "over $500 million in suspicious activity associated with ransomware attacks, darknet and other illicit marketplaces, unregistered MSBs, including unregistered CVC mixing services, CSAM [Child Sex Abuse Material], elderly financial exploitation, individuals later listed on OFAC's SDN [the Office of Foreign Assets Control's list of Specially Designated Nationals], terrorist financing, high-risk jurisdictions, and stolen funds or other illicit proceeds" (Dkt. 148-4 at 15).[19] With no acknowledgement of the distinctions between the total value of transactions on Paxful generally and the total value of the transactions that FinCEN identified as ones for which Paxful failed to file a SAR, Hung submits that these factual assertions somehow establish that only 5% of Paxful transactions were "suspicious," writ large. (Hung Mot. 16). This is a baseless mischaracterization of the FinCEN Consent Order that the Government trusts the Court—with its understanding of the limited circumstances in which companies are required to file a SAR, the impossibility of a

---

[19] The Paxful Materials' references to child sex abuse, elderly financial exploitation, the darknet, and terrorism underscore the unfairly prejudicial and confusing effects they would likely have on the jury.

59

comprehensive and definitive adjudication of the legality of every transaction on a cryptocurrency exchange in a FinCEN proceeding, and the careful manner in which the FinCEN Consent Order is worded—will see for what it is. Were the FinCEN Consent Order to be admitted at trial, however, the Government would likely have no choice but to provide the jury with a detailed and lengthy education of those matters for it to properly consider the defense's mischaracterization of the facts set forth in the FinCEN Consent Order.

In sum, even were they both non-hearsay and relevant (and they are neither), admitting the Paxful Materials would require the Government to painstakingly walk the jury through complex issues and materials, and correct material mischaracterizations, likely necessitating additional testimony and evidence. Particularly where the Paxful Materials offer no apparent probative value at all, the Court should protect this trial from such a lengthy—and highly confusing—diversion.

## V.    THE REMAINING MOTIONS NEED NOT BE DECIDED AT THIS TIME

### A.    The Court Need Not Rule at This Time, But May Share the Indictments with the Jury

Although the Court need not rule on this issue in advance of trial, Guan has identified no basis for the Court to deviate from its ordinary practices regarding sharing the Indictments with the jury. If the Court does so, the Government will work with the defendants to correct the statutory typographical error Guan identifies (Guan Mot. 22) and remove references to matters, if any, not supported by the admitted evidence. There is thus no live dispute that need be resolved at this time.

The Second Circuit has long held that a trial court may allow "the jury to take a copy of the indictment into the jury room, after taking care to instruct the jury that the indictment was not to be considered evidence." *United States v. Giampino*, 680 F.2d 898, 901 n.3 (2d Cir. 1982). In addition, in "protracted cases" involving many counts, "reference to the indictment often serves as

a helpful guide in delineating the issues the jury may be called on to decide." *United States v. Press*, 336 F.2d 1003, 1016 (2d Cir. 1964). As a result, district courts have regularly provided indictments, including speaking indictments, to the jury. *See, e.g.*, *Esso*, 684 F.3d at 350 (allowing jurors to take home a 20-page speaking indictment); *United States v. Blaszczak*, No. S1 17 Cr. 357 (LAK), 2018 WL 2021628, at *2 (S.D.N.Y. Apr. 29, 2018).

The Government understands that this Court has previously provided a copy of indictments to the jury. *See, e.g.*, *United States v. Kidd*, No. 18 Cr. 872 (VM) (S.D.N.Y. July 9, 2019) (Trial Tr. at 875); *United States v. Torres, et al.*, No. 16 Cr. 809 (VM) (S.D.N.Y. Jan. 24, 2020) (Trial Tr. at 2088). Accordingly, to the extent it continues to be the Court's practice to provide the jury with a copy of the Indictments, the Court should share the Indictments in this case with the jury, as long as the jury is instructed that the Indictments are not evidence. *See Esso*, 684 F.3d at 352 (absent evidence to the contrary, the Second Circuit "presume[s] that jurors remain true to their oath and conscientiously observe the instructions and admonitions of the court"). As noted above, the Government is prepared to correct an immaterial statutory typographical error in the Indictments, and, if requested, redact portions of the Indictments, if any, on which the Government did not introduce evidence.

## B.     Issues of Metadata and Burden Shifting Are Concededly Unripe

Guan and Hung both raise issues—Guan concerning metadata and Hung burden-shifting—that similarly are concededly not ripe for decision at this time (and are also meritless, to the extent comprehensible at this time).

Guan does not seek a ruling from the Court with respect to evidence of document metadata, but simply "reserves his right to oppose" the admission of such evidence. (Guan Mot. 23). No action is of course required by the Court in advance of a defense objection, and thus this motion

may be denied without prejudice. However, the Government notes that each of the alleged grounds for objection that Guan describes goes squarely to the *weight* of document metadata, which is plainly admissible. *See, e.g.*, *United States v. Mejia*, No. 24 Cr. 212 (VSB), 2025 WL 934343, at *6 (S.D.N.Y. Mar. 27, 2025) ("To the extent Mejia continues to assert that there may have been inadvertent manipulation of the metadata . . . such an assertion at most goes to the weight of the evidence, not its admissibility); *CA, Inc.*, 780 F. Supp. 2d at 224 ("[A] party opposing computer generated data must put forth more than mere assertions of tampering."); *United States v. Bonallo*, 858 F.2d 1427, 1436 (9th Cir. 1988) ("The fact that it is possible to alter data contained in a computer is plainly insufficient to establish untrustworthiness. The mere possibility that the logs may have been altered goes only to the weight of the evidence not its admissibility."). Accordingly, if Guan makes objections of this nature to the offer of evidence of document metadata, those objections should be overruled (and the points that he wishes to make should be brought out on cross-examination or argued in summation, if appropriate and consistent with the Federal Rules of Evidence). *See, e.g.*, *United States v. Tin Yat Chin*, 371 F.3d 31, 38 (2d Cir. 2004) ("[T]he other party then remains free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the *weight* of the evidence—not to its *admissibility*.")

Hung argues that the Court should be alert for the Government supposedly shifting the burden of proof. The Government is aware of, and embraces, its burden to prove every element of the offenses charged—including knowledge, whether established directly or through conscious avoidance (Dkt. 144 at 101-03 (parties' proposed language regarding conscious avoidance))—beyond a reasonable doubt. Indeed, Hung concedes there is no factual predicate for a motion at

this time, simply asking the Court to be alert, not to make any ruling. (Hung Mot. 20). Accordingly,

this motion should be denied as moot.

## **CONCLUSION**

For the foregoing reasons, the defendants' motions *in limine* should be denied.

Dated: New York, New York
June 16, 2026

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:    s/ _____
Benjamin M. Burkett
Rebecca T. Dell
Paul M. Monteleoni
Amanda C. Weingarten
Assistant United States Attorneys
(212) 637-2455/2198/2219/2257