# Exhibit A

Q6NLGuaC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

        v.                      24 Cr. 322 (VM)

WEIDONG GUAN,
    a/k/a "Bill Guan," and
LE VAN HUNG,
    a/k/a "Hung Van Le,"
    a/k/a "Van Hung Le,"

              Defendants.

                                    Conference
------------------------------x

                                      New York, N.Y.
                                      June 23, 2026
                                      2:00 p.m.

Before:

                      HON. VICTOR MARRERO,

                                    District Judge

                      APPEARANCES

JAY CLAYTON
     United States Attorney for the
     Southern District of New York
BY:  PAUL MONTELEONI
     REBECCA DELL
     AMANDA WEINGARTEN
     BENJAMIN BURKETT
     Assistant United States Attorneys

PETRILLO KLEIN & BOXER LLP
     Attorneys for Defendant Guan
BY:  GUY PETRILLO
     KEVIN PUVALOWSKI
     SHANICE HINCKSON
     MARCELO TRIANA
     -and-
KASOWITZ LLP
BY: BRIAN CHOI

Q6NLGuaC

                    APPEARANCES (Continued)

PARLATORE LAW GROUP LLP
     Attorneys for Defendant Hung
BY:  TIMOTHY PARLATORE
     MATTHEW MINIKUS


Also Present:  Ngo Thanh Nhan, Interpreter (Viatnamese)
               Andy Tang, Interpreter (Viatnamese)
               Una Wilkinson, Interpreter (Mandarin)
               Tor Huang, Interpreter (Mandarin)

THE COURT: Good afternoon. Thank you. Be seated. This is a proceeding in the matter of United States v. Guan and Van Hung. It's Docket No. 24 Cr. 0322.

Counsel, please enter your appearances for the record.

MR. MONTELEONI: Good afternoon, your Honor. Paul Monteleoni for the government, and with me at counsel table are my colleagues, Rebecca Dell, Amanda Weingarten, and Benjamin Burkett.

THE COURT: Welcome.

MR. PETRILLO: Good afternoon, your Honor. For Mr. Guan, Guy Petrillo, and I have two colleagues sitting behind me who are on the case, Marcelo Triana and Shanice Hinckson, and we are at Petrillo Klein & Boxer, and my partner Kevin Puvalowski is here as well.

MR. CHOI: Brian Choi on behalf of Mr. Guan.

THE COURT: Thank you.

MR. PARLATORE: Good afternoon, your Honor. On behalf of Mr. Hung, Timothy Parlatore. I am joined by Matthew Minikus. He is not admitted to this district, but we will be submitting a pro hac vice in advance of trial for him.

THE COURT: All right. Thank you.

The Court notes for the record that defendant Guan is present in the courtroom and is seated next to his attorneys. Likewise, defendant Hung is present in the courtroom and is seated next to his attorney.

The Court notes defendants are following this proceeding with the assistance of interpretation. It is the practice of this Court to identify for the record the identity of the interpreter, and that the interpreter is either on the staff of the court or is a certified interpreter in a particular language.

Would the interpreters identify yourselves, your name, and whether you are certified or whether you are on staff.

INTERPRETER TANG: Good afternoon. My name is Andy Tang. I am an approved court interpreter for the language of Vietnamese.

INTERPRETER NHAN: Your Honor, my name is Ngo Thanh Nhan. I am a language skilled court interpreter.

THE COURT: All right. Thank you.

INTERPRETER WILKINSON: Your Honor, my name is Una Wilkinson, and I am on the roster of SDNY.

THE COURT: Thank you.

INTERPRETER HUANG: Good afternoon. My name is Tor Huang. I am a Mandarin Chinese interpreter, certified.

THE COURT: All right. Thank you.

Now, I would like to ask the defendants who are using interpretation whether they are able to understand and follow the proceeding with this interpretation. The question is for the defendants to answer.

INTERPRETER WILKINSON: There was a bit of noise with

the equipment.

THE COURT: I'm sorry?

MR. TRIANA: Mr. Guan is hearing some feedback in his earphones. Maybe we could --

THE COURT: Let's take a moment to make sure that that gets corrected.

(Pause)

THE COURT: All right. Has the issue been corrected?

INTERPRETER WILKINSON: Yes.

THE COURT: All right. Thank you. Let's proceed then.

MR. MONTELEONI: Your Honor, did the record reflect defendant Hung's ability to hear the interpreter?

THE COURT: Mr. Hung?

MR. PARLATORE: Yes, he can hear.

INTERPRETER TANG: The answer was "Yes," your Honor.

THE COURT: All right. Thank you.

The Court scheduled this final pretrial conference to address any outstanding issues that are before us prior to the trial of this matter, which is scheduled to begin on July 7, 2026.

First I am going to inquire regarding the government's offer of a plea and the communication of that offer to each defendant. I want each defendant to listen carefully to my questions and the answers given by counsel.

MR. MONTELEONI: Yes, your Honor. We have never made defendant Guan a plea offer. With respect to defendant Le Van Hung, he was provided two plea offers in June of 2025. The initial one was on June 3, 2025, and a revised one was on June 16, 2025. And he rejected these plea offers, and I will describe their basic terms.

Both plea offers would have been to a single count of conspiracy, in violation of Title 18, United States Code, Section 371, and so each offer would have carried a five-year statutory maximum sentence, which produced a five-year sentencing guidelines range.

The object of the conspiracy in the first plea offer would have been a conspiracy to commit money laundering. The object of the conspiracy in the second plea offer would have been a conspiracy to commit identity theft. We understand from conversations with Hung's prior counsel, his counsel at the time, that Hung was aware of and rejected both plea agreements, and both plea agreements have since expired, but we ask the Court to confirm that with Hung.

THE COURT: Was the offer that you have described made in writing?

MR. MONTELEONI: Yes, your Honor, both of those were formal plea offers, signed by authorized representatives of the office and conveyed to counsel as such.

THE COURT: All right. In the government's view, what

is the defendant's sentence exposure if he proceeds to trial and is convicted on every count?

MR. MONTELEONI:  Your Honor, we actually haven't recently conducted a -- generated a *Pimentel* analysis, but it is substantially, substantially higher than the five-year cap. It's north of ten years, certainly.

THE COURT:  Thank you.

Mr. Petrillo, did you give your client a copy of the court exhibit?

Let me come back.

The government has indicated that the offers were made in writing.  I would like to designate, when this office letter is in writing and available, I will mark it, a copy, Court Exhibit A.

MR. MONTELEONI:  So, your Honor, we weren't aware that that was the Court's practice, so we don't have the copies of the plea agreements, which were offers to defendant Hung, not defendant Guan, here.  We can submit them to the Court.  What I have outlined are the terms.

THE COURT:  Coming back to Mr. Petrillo and whether a copy of the plea offer that the government has made reference to has been made to your client.

MR. PETRILLO:  Not to our client, your Honor, but to Mr. Parlatore's client.

THE COURT:  All right.  Let me ask Mr. Parlatore.

MR. PARLATORE: Yes, your Honor. I do not know whether that was communicated in writing to my client. That was something that was prior counsel. I know that, you know, that all happened before I came here. When I took over the case, I did attempt to have communication with the government about a potential plea and I was rejected outright, that the time has passed, there is no plea to be discussed. So I have no idea what happened before, but as we stand here today, any effort to discuss a plea offer with the government has been rejected.

MR. MONTELEONI: Your Honor, we don't fully agree with that characterization. We did retransmit the most recent plea offer at Mr. Parlatore's request in connection with possible plea discussions to him, but we noted that it had expired. And it is true, obviously, that we would not be willing to offer a plea agreement on anything like those terms, but obviously if the client wishes to plead guilty, we can't stop him.

THE COURT: All right. Thank you.

MR. MONTELEONI: And, your Honor, in light of the representations by Mr. Parlatore that he can't confirm that his defendant was -- that his client was made aware of those plea offers, since our understanding is that he was, we would request pursuant to *Frye* that the Court actually allocute the defendant, Le Van Hung himself, as to whether he was made aware of and intentionally rejected those plea offers at the time.

MR. PARLATORE: Your Honor, I can confirm he was made aware of them. Whether he was provided a written copy or had it explained to him, that specific attorney/client communication by the prior attorney, that I can't speak to. But I do know that he was told that there was a plea offer, told what the number was, and essentially told, If you don't take this, then I have to actually start looking at the discovery. And that's when the change was made and I came in.

THE COURT: Mr. Parlatore, do you see any difficulty in the Court asking Mr. Hung to confirm whether that's the case?

MR. PARLATORE: I have no issue with that, your Honor.

THE COURT: Please rise, Mr. Hung.

Mr. Hung, you heard the discussion between the Court and counsel and the question the Court asked. Did you understand that an offer -- plea offer had been made to you under your earlier counsel?

DEFENDANT HUNG: Yes, I do.

THE COURT: Did you fully understand the offer and the consequences of your rejection of that offer?

DEFENDANT HUNG: I did not quite understand them all.

THE COURT: You did not quite understand what?

DEFENDANT HUNG: Because the details in the offer was not that clear to me.

THE COURT: Let's for the moment put aside the

question of whether or not the offer was made in writing or whether you understood it.

Did you reject that offer, whatever it was?

DEFENDANT HUNG: That's correct.

THE COURT: Did you make that -- did you reject the offer knowingly and voluntarily?

DEFENDANT HUNG: That is correct.

THE COURT: All right. Thank you. You may be seated.

Let me ask the government whether the government at this point has any further questions for the defendants.

MR. MONTELEONI: None for the defendant Guan. We request that defendant Hung be asked if he intentionally rejected two plea offers, because there were two that were communicated to him and that were rejected, and I think that he only answered with respect to one.

THE COURT: All right. Would defendant Hung please rise again.

All right. The government has indicated that there were not one, but two earlier plea offers which were made to you. Do you know that there were two offers?

DEFENDANT HUNG: Yes, that's correct.

THE COURT: And you rejected both knowingly and voluntarily?

DEFENDANT HUNG: That's correct.

THE COURT: All right. Thank you.

MR. MONTELEONI: And finally, with apologies, we would ask that the defendant be allocated as to whether he understands that it is the government's position that if he is convicted at trial, he will face substantially higher penalties than the terms of those offers.

THE COURT: All right. Thank you.

Again, Mr. Hung, please rise.

The government has asked that the Court ask you whether you fully understood the government's position that if you rejected those offers, that the consequences in terms of the exposure that you face to imprisonment would be substantially higher than if you accepted the offer.

Did you understand that?

DEFENDANT HUNG: Yes, I do.

THE COURT: All right. Anything else?

MR. MONTELEONI: No, your Honor. Thank you.

THE COURT: Thank you, Mr. Hung.

All right. Mr. Hung, did you authorize your attorney to communicate to the government your rejection of the plea offer?

If you would rise again, please.

DEFENDANT HUNG: That's correct, yes.

THE COURT: Did your attorney make a recommendation to you as to whether you should accept or reject the government's plea offer?

DEFENDANT HUNG:  My attorney did not discuss that issue with me yet.

THE COURT:  All right.  Mr. Parlatore, you heard what Mr. Hung had just said.  Is that your understanding?

MR. PARLATORE:  With the caveat that this was all before I came into the case, so I am hearing it all after the fact, that is consistent with what my understanding is.

MR. MONTELEONI:  Your Honor.

THE COURT:  Yes.

MR. MONTELEONI:  I mean, we obviously were not privy to the communications between Mr. Hung and his prior counsel, but our understanding from prior counsel is that they had had extensive discussions with them.  And I think that when Mr. Hung said he didn't give that advice yet or make that advice yet, I wonder if there's some confusion, and I think that it might be helpful if you could ask if his prior counsel gave him advice on whether to accept or reject those two offers last year.

THE COURT:  All right.  Mr. Parlatore, do you have any further response to what the government has just said before I pose the question to your client?

MR. PARLATORE:  Only that if that is a point of confusion, that that may permeate several of these questions as to what he understood -- whether that's something he understood at the time or whether the questions he's already answered for

you, whether he understands that now, listening to this exchange. I am not 100 percent sure if he is talking about what he knew at the time or what he knows now. So if we are going to get into knowledge then versus knowledge now, I think we have to do it across the board.

THE COURT: Government.

MR. MONTELEONI: Yes, absolutely. If Mr. Parlatore -- I didn't hear this from the questions, but if Mr. Parlatore thinks that his client is not aware, then I think that it would be helpful for the Court to confirm that he was aware at the time that he rejected both of those prior plea offers that the government's position is that he would face substantially higher penalties at trial, and ask him if at the time that he was considering those plea offers, his counsel at the time gave him advice as to whether to accept or to reject them.

MR. PARLATORE: Correct. And also the part about there being two separate offers and whether he understood those offers.

Actually, I withdraw the last part because he said he didn't understand them.

THE COURT: All right. Thank you.

Mr. Hung, let us focus your attention to the time that the government offers were made to you, and you, as you represented here, rejected those offers. At that time, did you discuss that matter with your prior counsel, and prior counsel

advise you of the government's position as to what penalties you would expose yourself to by rejecting the offers?

DEFENDANT HUNG: Yes.

THE COURT: All right. Government, does that answer --

MR. MONTELEONI: I believe that's right.

THE COURT: Do you have any question or confusion about your client's answer?

MR. PARLATORE: No, your Honor.

THE COURT: All right. Thank you.

Mr. Hung, have you taken any drugs or medicines or pills or consumed any alcohol in the past 24 hours?

DEFENDANT HUNG: No.

THE COURT: Is your mind clear today?

DEFENDANT HUNG: Yes.

THE COURT: All right. Mr. Hung, let me just ask by way of summary, you heard the questions that I posed to the government and the government's responses, and your counsel's representations as well?

DEFENDANT HUNG: Yes.

THE COURT: To your understanding, was your attorney's account of his review of the offers from the government that you rejected -- what is your understanding of the discussions between the government and your attorney, and was that representation accurate, the representation that was made to

you by your counsel of the government's position?  Was it accurate?

DEFENDANT HUNG:  I understand that my previous attorney, the way it was explained to me and the way I saw on the document, they were not exactly the same.  And I wasn't totally convinced of my attorney at the time, so I did not pay fully attention to what was explained.  And that was why I decided to change my attorneys.

THE COURT:  All right.  Government, it appears that there is some vagueness about the status of this matter and whether or not this defendant fully understood the offers at the time that they were made.  Let's focus on what to do to correct the situation and enable us to move forward.

MR. MONTELEONI:  Yes, your Honor.  And to be frank, this comes as a surprise to us based on the representations that had been made to us in the course of our discussions.

I think that what makes the most sense is to ascertain from the defendant whether he's actually taking the position that he now wishes to plead guilty.  And I think that in order to avoid the Court's involvement in any plea discussions, which obviously the Court can't do, it makes sense for us to have a dialogue with defense counsel and hopefully get a better factual understanding of exactly what the confusion was than I think this -- you know, this level of allocution can provide.  And then we can report back to the Court and, if necessary,

appear before the Court to allocute on any further facts once we get a better factual understanding from the defense.

THE COURT: Is that something you are proposing that we do today, or to come back at some point before trial and address the issue?

MR. MONTELEONI: Sorry. At some point before trial. I am a little concerned that it might take a long time to get to the bottom of this here in court, and we could try with defense counsel. If the Court wants to set a date for us to report or else to return for any further allocution, that might be more productive.

THE COURT: All right. Would one week be sufficient?

MR. MONTELEONI: Yes, your Honor.

THE COURT: Yes, Mr. Parlatore.

MR. PARLATORE: That sounds fine to me, your Honor, with the one caveat that if we do have to come back in for an allocution on only this one narrow issue, would the Court be open to doing that as a virtual appearance? Just because Mr. Hung is -- he is in the MDC, and I am also based in Washington, D.C., so we are going to come up for a five-minute allocution --

THE COURT: Well, I can't control whether the allocution is going to be five minutes or longer. So I would prefer just to schedule an adjournment of this proceeding for a week. Before then, the parties could submit a -- some

stipulation that sets forth their understanding of the situation, and then we could proceed to the allocution a week from now if it is indicated.

MR. MONTELEONI:  That's fine for the government, your Honor.

MR. PARLATORE:  Give me a moment to confer just on the logistics because, obviously, we will have to set up a call with him, with an interpreter, to be able to discuss.

THE COURT:  Yes.

(Counsel conferred)

MR. PARLATORE:  Just because of the logistical difficulties with the MDC and interpreters, could we set that date for later in the week rather than earlier in the week next week, your Honor?

THE COURT:  What do you consider earlier in the week?

MR. PARLATORE:  You said a week from today, your Honor, and I am suggesting a week and two days.

THE COURT:  All right.  Let's do that then.

What's on the calendar?

THE DEPUTY CLERK:  That would be Thursday, July 2.

THE COURT:  What time?

THE DEPUTY CLERK:  10:00 a.m.?

MR. MONTELEONI:  That works for the government, your Honor.

MR. PARLATORE:  Do we have a later time during that

day?  Because I am taking the train up from D.C. that morning.
Unless we could do it virtually.

THE DEPUTY CLERK:  OK.  1:00 p.m.

MR. PARLATORE:  OK.

THE COURT:  All right.  So we are going to adjourn until 1:00 p.m. next week.

MR. MONTELEONI:  Your Honor, adjourn on the *Frye* issue with respect to the plea, but we are proceeding today?

THE COURT:  Yes, let's proceed with the other parts of the proceeding.  There are currently several motions pending in this matter.  The Court has reviewed those motions.  I am now prepared to rule on three of the motions and proceed to hear what the parties may have to say about the motions in limine.

First, the defendant Hung filed two motions concerning the prosecution team's exposure to allegedly privileged materials.  The Court is not persuaded that Mr. Hung has shown intentional intrusion of his privilege, prejudice to his defense, or entitlement to an evidentiary hearing on that issue.  The inadvertent disclosure of potentially privileged information to the prosecution team is not alone a basis for relief.  Consequently, the Court denies those motions.

In addition, defendant Hung has moved to adjourn the trial.  That motion is also denied.  The Court has already granted several adjournments of the trial, including on the motion of defendant Hung and his current counsel.  Furthermore,

the Court is not persuaded that pending motions are sufficiently complex to warrant adjournment of the trial. The government is directed to produce its witness-related materials to the defendants, the deadline for which was adjourned pending this Court's resolution of defendant Hung's motion for adjournment of the trial.

With respect to the motions in limine, defendant Guan has objected to the government's admission of internal communications, specifically e-mails at third-party companies, as hearsay not subject to an exception. The government's brief in opposition appears to concede that many of these internal communications are not admissible for their truth, but only to provide, quote, "background" or context to admissible evidence. However, some of the e-mails are also included in the list of exhibits the government seeks to admit as business records in the motions in limine. Relevant exhibits include Government Exhibits 1C2, 1C4, 1C4-UR, 1C5, 1C7, and B32.

Accordingly, the government and Mr. Guan should address, one, whether the government concedes that these internal communications are not admissible as business records; to the extent the communications do not constitute business records, what view the parties have as to authentication of those exhibits, and if these communications are only admissible as background information, what support the government has for their admission under standards articulated in *United States v.*

*Reyes*, 18 F .3d 65 (2d Cir. 1994).

MR. MONTELEONI: Sorry, did you wish to hear from us now on this, or did you --

THE COURT: I am posing the questions now. If you believe that you are prepared to respond to those questions and have a meaningful dialogue, we can. If not, we can adjourn that too.

MR. MONTELEONI: No, that's absolutely fine. Your Honor, a number of the business records we acknowledged contain some hearsay within hearsay that we -- we proposed that they be authenticated and redacted, if necessary, without prejudice to either party identifying specific portions that are hearsay within hearsay.

We will work with counsel for Mr. Guan to describe the particular portions of those cited exhibits, and I think that we are going to be able to reach an agreement on redactions for that. But our view, as we set forth in our motions in limine, is that the fact that a business record may contain some portions that are hearsay, that obviously doesn't affect the certification or the authenticity issues. But we will prepare redacted versions and share them with defense counsel.

THE COURT: All right. Thank you.

Any response, Mr. Petrillo?

MR. PETRILLO: No. We will take a look at what they give to us, and we will be in touch with the Court if we have

anything that we can't resolve, if that's acceptable to the Court.

THE COURT: Government?

MR. MONTELEONI: That's fine.

THE COURT: All right. Any response or comment or thoughts from Mr. Hung?

MR. PARLATORE: Nothing additional, your Honor.

THE COURT: All right. Thank you.

Turning now to the defendants' motions to compel. The defendants' motions identify two agencies that appear to have assisted the government in its investigation: The Department of Labor's Office of Inspector General and the Department of State's Diplomatic Security Service. The government should address, one, the nature and extent of the prosecution's relationship with these two agencies during the investigation of the defendants, and second, whether the government has produced all *Brady* material in possession of those agencies.

Government?

MS. DELL: Yes, your Honor, we can address it now.

Both of those agencies have contributed personnel to assist with the prosecution in this case, and the government has collected discovery from both of those agencies and has produced it to the defense.

MR. PETRILLO: We have a transmission issue.

THE COURT: Anything further from the government?

MR. MONTELEONI: As we set forth in our motion, the prosecution team does not encompass the entirety of both of those agencies any more than it encompasses the entirety of the Department of Justice, but within the prosecution team, we have done that collection of production.

THE COURT: All right. Well, I did not intend to suggest that you knew the entire two agencies. We are cognizant of the scope of the jurisdiction of those agencies, so we are only talking about the function that they played in relation to the action here before the Court.

Anything from defendants related to that, Mr. Petrillo?

MR. CHOI: Brian Choi for the defendant. I can handle this issue.

THE COURT: Yes.

MR. CHOI: I missed some of what Ms. Dell said just based on the transmission issues here, but we do believe the government should provide an explanation and produce any *Brady* or *Giglio* materials that's in the possession of agents that were assigned from the DSS and OIG to this investigation.

There is another issue that the government's response on Friday raised that we intended to file a reply on. We appreciate the opportunity to do that this week, and potentially have argument on it, you know, next week to address some of the other issues that the Court has adjourned.

But there is a third agency whose involvement in this case has come into sharper focus that was way more involved than the government initially let on, and that's the Customs and Border Protection Agency. And, you know, the government's opposition brief said, quote, that the U.S. -- CBP agent had been assigned to the U.S. Attorney's Office to, quote, review the returns from the first search warrant obtained in this case and that during the investigation at USAO SDNY's request, CBP also ran queries in its systems related to certain subjects, and when a subject arrived at John F. Kennedy International Airport in July 2023, the USAO-SDNY coordinated with CBP in order to covertly execute a search warrant on that subject's electronic devices.

Your Honor, this is a classic role that a case agent in any prosecution team would play, and under applicable law in this district, we think the assigned agents from the CBP would qualify as a member of the prosecution team and that their files should also be searched for *Brady* and Giglio material.

THE COURT: Does the government have any response to that?

MS. DELL: Your Honor, to the extent that the CBP has contributed to the case team, the government has collected materials from CBP and has produced it to the defendants. But the limited role that CB played in this case does not translate to it being a member of the prosecution team.

As is often the case in the district, in this district, when the government wants to run queries related to travel or other types of things, they contact CBP and obtain information from CBP. That does not make the entirety of the CBP agency part of the prosecution team.

In addition, as is typical in the district, when it wants to conduct some type of search at the border, it inherently has to work with CBP in order to coordinate that search. So the defendant here is trying to expand the role that CBP had in this case, and it just simply didn't happen.

THE COURT: Yes.

MR. CHOI: Your Honor, that information was just shared on Friday. Before Friday, you know, the government's position was that the CBP had no role whatsoever. So we are a little troubled by, sort of, the dribbling of information that -- whenever the government is pressed and challenged on what it has, the government slowly starts dribbling out more information. As we keep pealing back the onion, we learn more and more.

This is a concern that we have not just with CBP, but with any other agency the government may have conceivably have worked with in a joint investigation or this case. We know that this case is a product of OCDETF, the Organized Crime and Drug Enforcement Task Force, and by its very nature that task force is a prosecutor-led, intelligence-driven, multi-agency

approach, and we think it's important to identify every single agency that was part of that approach in this case.

The government has identified three agencies so far: That's DSS, DOL-OIG, and CBP. And, you know, this is a very fact-specific inquiry, and we think that, you know, some of the descriptions that the government has ascribed to CBP would qualify for case agent work. They have helped execute search warrants. They have coordinated closely with the U.S. Attorney's Office in investigating this case, gathering facts. So under the applicable case law here in this district, we think that the CBP should be considered as a part of the prosecution team, and that they are in possession of *Brady* and *Giglio* material.

THE COURT: All right. Thank you.

It is apparent to the Court that matters were brought into this proceeding that may not have been fully considered before the hearing. Would it be helpful in addressing and enabling the Court to reach a resolution for the parties to address these issues further, for the government to clarify exactly what agencies were part of the prosecution team and what role the agencies that defendant has mentioned played in the matter, and whether that affects the government's view?

MS. DELL: The government believes it created a clear record in its opposition to the defendants' motions. It outlined in its opposition as well in court today that members

from DSS and DOL-OIG assisted with the investigation. As outlined in its motion, the FBI also played a limited role in the first several weeks of the investigation, and as outlined in its opposition, the CBP had also -- and NYPD also had a limited role.

The defendant here tries to take entire agencies and put them as part of the prosecution team, and that's simply not what the law allows it to do. In addition, it's trying to expand the role that these -- that individuals from these agencies played and try to put them onto the prosecution team. Once again, that is not what happened, and the government explained their roles in its opposition to the defendants' motions.

THE COURT: All right. Thank you. I will then do a ruling on this issue before next week.

MR. CHOI: Your Honor, we intend to file a reply brief on this issue just to clarify some of the points that we discussed here, and we think it would be helpful to the Court's consideration in resolving this issue.

THE COURT: All right. So again, we will get back to you on that.

The government has brought to the Court's attention two instances where counsel for defendant Hung cited cases for quotes which those cases do not contain. The Court's own review of defendant Hung's motion concerning the allegedly

privileged material revealed a third such instance.

The motion concerning privileged material attributes the following quote to *United States v. Chandler*, 56 F. 4th, 27, 33 (2d Cir. 2022), quote: "To force the government to make an affirmative demonstration that it derived its evidence from legitimate independent sources, the defendant has to show a factual connection between the allegedly privileged information and the charges in the case."

That quote does not appear in either *Chandler* or *Blau*, but in a different Second Circuit case, *United States v. Hoey*, 725 Fed. App'x 58 (2d Cir. 2018).

Let me then pose a question to the defense as to what is the explanation for that discrepancy and for the fact that it occurs not once, but three times in the relevant record. Mr. Parlatore.

MR. PARLATORE: Yes, your Honor. As I noted in the reply brief we filed this morning, there was that error. The characterization of the search warrant case was put as a quote when it was not, in fact, a quote. And this is a -- these are drafting errors. You know, just by nature of the speed and volume with which we have been trying to get all of these briefings done within the past week, you know, errors were made, and that is why, you know, I noted it in the reply brief this morning. I was not aware of the one that you just brought up in the *in camera*, but that does sound correct, your Honor.

THE COURT: All right. Mr. Parlatore, the difficulty I have with that response is that, again, it might explain one instance of an error, but it does not explain three instances of the same type of error involving different cases.

Did you want to take some time to further seek to explain the circumstances, or should the Court consider this error something more serious than just a harmless error?

MR. PARLATORE: Well, your Honor, so first of all, I would argue that this certainly is a harmless error. You know, these are drafting errors that were made. You know, like I said, you know, this past week has been very seriously work-intensive. I have been up until about 2:00 o'clock in the morning every single night working on this case, you know, with the various, you know, motions, the discovery review, the fact that Rule 16 discovery is still ongoing. We have received another thousand pages in the past week from the government.

And so, yes, errors were made. However, you know, what we are talking about here is a quote that was attributed to one case as opposed to a different case, which, the *Hoey* case, I believe, was also cited in our filings; another case where a quote was -- it had quotation marks when it was actually a summary of the case.

And so ultimately, you know, this is not a situation where, you know, cases are fabricated out of whole cloth. We had some drafting errors due to the significant demands of the

past week, but ultimately they were all harmless. They all did have support, you know, misciting from one case to another, for example. So I would argue that this is harmless error based on just the volume of material that was being put through the past week.

THE COURT: All right. Thank you.

Government, you called to the Court's attention one instance. The Court itself identified a second, and there is a third that was already in the materials. The government's response to all those circumstances?

MR. MONTELEONI: Yes, your Honor. I think that we would -- we would disagree that it's, sort of, a no harm, no foul situation with, you know -- if counsel is not adequately checking what I assume are artificial intelligence tools that he is using to generate his filings, which I was, frankly, surprised that didn't show up in his explanation of this, you know, that is something that imposes costs on the Court, it imposes costs on the parties. And to generate a large volume of materials and to submit them into the Court's record for decision, you know, and put on other people the work that he is supposed to do of ensuring that the facts that are being said to the Court are accurate, I think is really not acceptable practice.

I think that, you know, in one case, what he says is just a, sort of, a drafting error is, like, literally putting

quotation marks around something that doesn't appear in it, which he is saying, well, that captures the spirit of it. But there's obviously a big difference between a quotation and a paraphrase. And the idea that a quotation, you know, could capture the spirit of it but, you know -- you could say that for any quotation that is fabricated that, well, that captures the spirit.

So we obviously don't believe that this was intentional by Mr. Parlatore, that he was intending to submit to the Court statements about what cases say that are false, but we do believe that he needs to check his work so that he is not imposing this type of cost on everyone else.

THE COURT: When the government came across this circumstance the first time, was there any particular impact that it had on your ability to move forward and brief the rest of the case?

MR. MONTELEONI: I mean, we certainly have been able to respond to everything that he has been generating, but it takes time. It takes time and personnel to track down whether the cases are saying what he says they are saying. I am not going to say that as a result of this, we are not prepared to proceed, or anything. However, this obviously does have an impact.

If any litigant is generating through artificial intelligence or any other means filings that are not checked to

the professional standards that lawyers must hold, that imposes costs on everyone else. Again, I am not saying this is intentional, and everyone makes mistakes, but this appears to be a pattern of submitting material to the Court without adequate checking and review in an effort to deluge us. And, obviously, the deluge of filings takes time for us to address.

THE COURT: All right. Thank you. The Court will consider this matter further before we meet next and will determine whether any further steps can or should be taken.

Is there anything else that we have not covered that the parties need to or believe should be covered?

MR. MONTELEONI: We actually have a rather lengthy list, your Honor. So, the first item, which I think should be quick, we wanted to put on the record that we understand that counsel for Mr. Hung is currently serving as a special advisor to the Secretary of Defense, as well as a commander in the U.S. Navy Reserves, and because those positions are in the Executive Branch and we are also in the Executive Branch, though obviously in a very different part of it, we wanted to make sure that Mr. Hung was aware of those positions and had no objection.

So we checked with counsel, and we didn't hear a clear affirmation that Mr. Hung is aware that Mr. Parlatore is serving as a special advisor to the Secretary of War, or Defense, to use the statutory term, and so we request that the

defendant be allocuted on whether he is aware of and consents to his counsel having that position. That's the first one.

THE COURT: All right. Thank you.

Mr. Hung, please rise.

Mr. Hung, you heard what the government has said, asking whether you were aware of your counsel's relationship and work for another federal agency in the Executive Department.

Were you aware of that, and what is your view as to whether that affects your relationship with Mr. Parlatore and whether there is anything that the Court should do in light of any potential conflict that there may be?

DEFENDANT HUNG: I am aware.

THE COURT: You are aware. And you have no objection to Mr. Parlatore to continue as your counsel while he is otherwise in a relationship with those federal agencies?

DEFENDANT HUNG: Yes.

THE COURT: All right.

MR. MONTELEONI: So the next item on the Court's list is, we understand that the Court ruled on the defense's motion with respect to the, allegedly, privileged information, but that actually doesn't resolve the status of whether all of those documents that he's claimed privilege over, which we have honored his request to claw back, whether they are properly privileged and whether some of those documents or redacted

portions of some of those documents should be produced to us and -- rather, the timing on which they should be produced to us. They, obviously, should be. Any portion that's not privileged, we have been deprived of the use of on the eve of trial while we have been attending on this.

So I think we would request that a deadline be set promptly for counsel for Mr. Hung to provide to us any material that is not privileged. And to the extent that the Court is not in a position to rule document by document now, then we would request a privilege log for this purpose. Even though the Court found it unnecessary for deciding the defense's motion, we still need access to these documents which, you know, we don't have, and if we don't have it because they are all privileged, then that's the answer, but we are entitled to test that.

THE COURT: All right. Thank you.

Mr. Parlatore.

MR. PARLATORE: Your Honor, we can provide a privilege log to the government.

THE COURT: By when?

MR. PARLATORE: I would say one week from today.

MR. MONTELEONI: I really think that -- I don't want to split hairs. I don't think he needs until more than Friday, but one week from today is fine.

THE COURT: A week from today is next Tuesday.

MR. PARLATORE: Yes.

MR. MONTELEONI: All right. So next, the next issue on our list is --

THE COURT: Let me ask just for the purposes of setting up other priorities, how many more issues, and how long do you think you would need?

MR. MONTELEONI: I think the remaining ones, I think, are actually quite short. But I have, I think, four more.

THE COURT: OK.

MR. MONTELEONI: All right. So next we have -- we are likely to call several witnesses under orders of immunity, and obviously for those immunity orders to be effective, they need to invoke their Fifth Amendment privilege. We believe that the proper procedure is to call them to the witness stand outside of the presence of the jury, have them invoke, and then have them begin their testimony. But we wanted to propose that to the Court.

THE COURT: And the Court received a request for immunity for one witness so far. Are there more?

MR. MONTELEONI: Yes, your Honor, there's likely to be one or two more.

THE COURT: OK.

MR. MONTELEONI: Next, we have -- as the Court knows, this is a case that involves identity theft, and some of the documents proving the identity theft have a lot of personally

identifiable information, and the jury has to consider that information to determine whether the identity theft is proven and for other purposes.

So as a result, there are some exhibits that we are going to need to offer into evidence under seal. We have actually designated each of those exhibits with a "UR" at the end of their file name. The other ones have been redacted in compliance with Rule 49.1.

So our proposed procedure, which we understand the defense counsel doesn't object to, is that we will offer exhibits under seal, assuming that they are admitted into evidence. They will be admitted under seal, and that if either party wishes to display to a witness or the jury a sealed exhibit, we understand from the court's AV coordinator that the Court has the ability to turn off both the public display monitors for the display screens to the public and also the feed to the press room which would otherwise display what's on the witness monitors.

And so we propose that if a party gets to a time when it needs to show a sealed exhibit, that we will ask the Court to turn those off temporarily, and then we will proceed to examine the witness so that the witness, the jury, the Court, and the parties can see the document, but the public and the press room cannot. And then after that exhibit, or if it's a few exhibits that are going to happen together, after that

group of exhibits, that we would ask for the feed to be restored.

We understand that both parties -- both defendants don't object to that, but we wanted to confirm that with the Court.

THE COURT: Have you confirmed, Mr. Parlatore, that Mr. Hung has no objection?

MR. PARLATORE: I have never dealt with this situation before. If that's your Honor's practice, I have no objection. It seems --

MR. PETRILLO: Seems logical to us, Judge. We don't object.

THE COURT: Thank you.

MR. MONTELEONI: All right. Next is that we, as we mentioned in our motions in limine, we have a series of summary charts because we are trying to condense voluminous evidence in a form that the jury can understand. Some of our summary charts are voluminous enough that we have given copies of them to the defense and asked for their objections by this Friday with the hope that we can work with them and narrow them, and then get a ruling from the Court pretrial, we hope, on any objections to that first set of charts and the exhibits underneath it.

We may be doing this for additional charts, so we are anticipating if we can get these objections from the defense by

Friday, to be in a position to file a letter with you, you know, the next week to tee those up because we think that there may be a lot of objections or there may not, and we want to have a ruling on that in advance.

The final two issues --

MR. PARLATORE: Your Honor, may I respond to that one real quick?

THE COURT: Mr. Parlatore.

MR. PARLATORE: So the summary exhibits that we have gotten, from our perspective, don't make any sense, and I think it's probably because we don't have any context to them, and that may be because the 3500 material that should have been disclosed last week is not, pursuant to your Honor's order.

So the idea that I can, you know, give them objections by this Friday to documents that, quite frankly, I don't understand because it doesn't have any context or explanation -- they just seem to be large spreadsheets, which even within this context has been changing. They have been giving us updated versions. So it's not something I can intelligently speak on whether I have an objection to or not. So the idea of putting a deadline of Friday, you know, to object to it on, you know, as of right now I would have a 403 it-just-doesn't-make-sense objection because I don't understand them.

THE COURT: All right. Government.

MR. MONTELEONI: So, I mean, we had understood from conversations with defense counsel that he would try. I think that it is very important, obviously, to be able to rule on objections to a number of documents in a document-intensive case in an orderly fashion and not at the last minute.

We obviously have an agreement when -- with sharing exhibits to be used with witnesses in the ordinary course. We think that for large document sets like certain of these summary charts, it makes much more sense to do it in advance. So if defense counsel is saying that not having a 3500 has affected his views on these particular exhibits, which I don't see how it does, but we will be producing 3500 today under the Court's ruling. If we can get the objections by Monday instead of Friday, that would be fine. We can still get the Court a letter next week.

THE COURT: Mr. Parlatore.

MR. PARLATORE: First of all, I don't know how much 3500 material there is. Given the rest of the stuff, if they are going to give me another 15,000 pages, then no, I am not going to be able to figure it out by Monday. But, again, these exhibits, without any context, without any explanation, they just don't make any sense.

And so usually the way you would be able to evaluate whether an exhibit is objectionable is to know what the context is, to know what it's being offered for, what it supposedly

shows. So if it's buried somewhere in the 3500 material, maybe I will be able to figure it out. Again, I don't know the volume. If the government has some kind of description, a summary of the summary to say, this is what it is, maybe that would assist. But as of right now, I have huge spreadsheets that make no sense.

MR. MONTELEONI: This is the first we have heard of that question. We are happy to give some discussion of the intended use of these charts to defense, but we think we do need a deadline so we can tee this up in an orderly fashion.

THE COURT: All right. Let's have -- sorry.

MR. PETRILLO: I'm sorry to interrupt, your Honor. I just wanted to add some more to this debate.

There are several categories of these summary charts, some of which we have already agreed are unobjectionable. However, there are one or two that we think we are going to need to brief you on the new Rules of Evidence that apply as of December 2024 because we don't think that those summary charts under those rules and under associated principles to those rules should be admitted as evidence, i.e., material that can go to the jury post summation as opposed to being demonstratives which, of course, they could be used in summations.

So our primary conceptual problem is that all the parties get openings, summations, and the government gets a

rebuttal, but the rules don't provide that the government gets another summation by putting in a summation chart, calling it an exhibit, with thousands of entries that goes back to the jury. So we would like to brief the issue. It raises novel questions, particularly given the change in law, and can do that promptly.

THE COURT: All right. Mr. Petrillo, this is a very important matter. I would not want to be in a position of having to decide what is and is not a proper exhibit when the jury is in the box. So we need to make sure that to the extent these matters could be resolved by the parties' meet-and-confer, let's do it that way. And then to the extent you are not able to resolve particular issues, then bring those to the Court before the trial.

MR. PETRILLO: Absolutely. Yes, your Honor. And just to move things along, we will do a submission if your Honor permits, you know, at the latest, early next week.

THE COURT: All right.

MR. MONTELEONI: Yes. And just to be clear, it's obviously -- this use of the summary charts is in no way novel. We have plenty of cases we can cite on this. This is just why we need a deadline. First, we need the objections to the particular exhibits. We will be able to put in a submission promptly after that. And then we could have a deadline for the defense to object both to the exhibits underlying it and these,

you know, these objections that counsel is raising, which I think, you know, it's quite clear are meritless under the law, but you obviously need briefing on that.

MR. PETRILLO: Your Honor, I understand what the AUSA's position is, but there is new law, and there are new rules, and so cases like the one he recently tried in 2024, which addressed this issue, are no longer good law.

THE COURT: All right. So that's all the more reason why you need to meet and confer and reach an understanding as to what law the Court is going to be applying.

Let me just make an observation that this is not the first case in which the parties have exhibits that are summarized, and there are always these disputes as to whether what the government places in an exhibit is or is not substantive enough to be objectionable under hearsay, and what is essentially an aid to the Court or to the jury in understanding the evidence. It's a very subtle difference sometimes, but that is how it narrows, and you should look at it in that context. To the extent the government has material that is a gray area as to whether it belongs in an exhibit in the first place, again, point those out and the Court can rule.

MR. MONTELEONI: Yes, your Honor, and we will. And you will see, obviously, plenty of our cases are from post the rules amendment. But we do need a deadline for the defense objections so we can put in our submission.

I guess I would propose that the deadline would be that the defense objections are due to us by Monday so that we will be able to put in a submission -- we could have a deadline for our submission on Wednesday to give the defense some time next week to --

THE COURT: How much have you already turned over to the defense on this?

MR. MONTELEONI: Weeks ago we have turned over voluminous summary exhibits, and then early -- a week ago today, we directed their attention to three particular summary exhibits that I think are the ones that make sense to address first. Others might raise other issues which will have to be addressed later. But I think these three would need to be addressed first.

They are quite voluminous. They have already had them for a week. We are talking in the order of, I would say, hundreds of exhibits under them. I think that most of those exhibits are going to have very similar admissibility issues, and then three charts summarizing those exhibits. That's what we are proposing; the defendants have until Monday to give us our objections, after --

THE COURT: Let's set Monday as the deadline.

And let me call to the government's attention that your statement that this may include hundreds of sub-exhibits, the Court is not going to have time in this trial for hundreds

of potential exhibits.

MR. MONTELEONI: Well, yes, but this is actually why you use the summary chart, because in a case with -- where there's more documentary evidence than percipient witnesses, the jury needs to be aware of the documentary evidence. And I would totally agree, pulling up 100 exhibits, exhibit by exhibit before the jury, is not going to work, but three charts, even if some of them are lengthy charts, definitely could work. In any case, we will be quite efficient with that.

The last thing that I wanted to ask on my list -- hopefully this will be quicker than the last one -- is just regarding voir dire. We have -- we are obviously trying to line up our witnesses for the first week of trial. Some of those witnesses who will need to testify quite early in the trial are from out of town, and any clarity that the Court can provide as to how long the Court anticipates voir dire in this case is likely to go, or if there is anything we can do to help our witnesses make travel plans now, we would appreciate it.

THE COURT: All right. Well, on that score, voir dire is going to take awhile, let me say. You have a case that involves more than one defendant and a case that's projected to last as much as five weeks. Those are instances in which it is very difficult to find jurors who have six weeks or five weeks to give to a trial, which means that we are going to have to have a very large jury pool, which means that it's going to

take more than a day.

Generally when I have had criminal cases of this type, we spend at least the entire first day, and then part of the second day just to choose the jury, so bear that in mind. We are not going to have witnesses testifying on Monday or possibly even on Tuesday.

MR. MONTELEONI: Yes, your Honor. If we could have the understanding that even if we were to finish early on Tuesday, which, frankly, I doubt, given the exact factors that you suggest, that even if we were to finish early on Tuesday, that we wouldn't be able to call -- we wouldn't have to put on our first witnesses until Wednesday at the earliest, that would help us in making travel plans for some of our first witnesses.

THE COURT: Understood.

MR. MONTELEONI: I said Monday -- Tuesday versus Wednesday, but actually it would be Wednesday into Thursday because we are starting on a Tuesday.

THE COURT: Yes, we are starting on Tuesday.

Yes, Mr. Petrillo.

MR. PETRILLO: Also on the category of housekeeping, are we going to be sitting on Fridays?

THE COURT: It is the practice of the Court to hold court on trial for five days rather than four, but that also may be affected by the type of case, and I can't predict that at this moment.

MR. PETRILLO: Understood.

The other housekeeping matter -- I have a couple. Would your Honor be open to an order that would permit counsel to bring in electronic devices to the court?

THE COURT: Those orders are fairly routine. Take them to the District Executive's office. They sign them.

MR. PETRILLO: OK. I didn't know that. Thank you.

And then Mr. Monteleoni mentioned the AV group within the court. Would it be possible for us to have access to that group before the trial so that we can understand the technology a little bit better, and hopefully make things a little smoother when, you know, the trial starts? In other words, with the Court's permission, could we contact that group and set up a time for our paralegal to interact and learn the system?

THE COURT: I am not sure exactly what this entails.

MR. PETRILLO: I have done this in other districts and during trials where a court staff individual who is responsible for the audio-video equipment gives a tutorial to counsel so that counsel and staff of counsel who are operating the AV --

THE COURT: All right. I have not encountered this situation in the past, but it's not to say I couldn't inquire and find out whether we have any such practice, whether we could adopt anything like that.

MR. PETRILLO: May I have a minute with the

government?  Maybe I can clarify what I mean.

(Counsel conferred)

MR. PETRILLO:  I think we are OK, your Honor.  We can work with the government to understand the technology.  Thank you.

THE COURT:  OK.  Thank you.  Let me just point out that the court has a very sophisticated and extensive IT operation.  They provide whatever support you may need that's standard.  If some urgency develops with respect to a particular issue, we could always have them available during the course of the trial.

MR. PETRILLO:  Thank you, your Honor.

THE COURT:  Anything else, Mr. Parlatore?

MR. PARLATORE:  Just one brief thing, your Honor.  If we could get an idea of how much 3500 material there is.

MR. MONTELEONI:  I mean, we haven't -- I don't have the page count in my mind.  We will produce it today.  It's going to be substantial, but we are about to produce it.

MR. PARLATORE:  Right, but "substantial" -- in the past when they have said "substantial," we get tens of thousands of pages.  And since your Honor had ordered that we were going to have three weeks to be able to review this material before trial, and now we have a week and a half to review it before trial, if they are going to send us over, you know, 30,000 pages, that is something relevant to know and

whether the defendant can actually be ready for trial given the truncated schedule here.

MR. MONTELEONI: I don't have a page count. He will be able to count the pages today. But, of course, he's had the benefit of our exhibits for an extremely lengthy period, and in a very document-intensive case, I think he will have no trouble orienting himself in time for trial.

MR. PARLATORE: Could the government say by orders of magnitude? Is this counted in four figures, five figures, six figures? I mean, I am not expecting an exact page count, but he should have at least some idea. Are we talking about 800 pages or 800,000 pages?

And the reason why I am asking this is because while we are here, your Honor should -- I mean, your Honor once granted an adjournment of this trial based on the fact that when they turned over the exhibits, that they had thousands of exhibits, far more than your Honor knew at the time that you set the initial schedule. And so, once again, I am asking. And it's notable that he is not willing to answer this question. Just a ball park. Is it hundreds, thousands, tens of thousands, hundreds of thousands?

THE COURT: The question is also whether it's in terabytes, or what.

MR. PARLATORE: Right.

MR. MONTELEONI: I have really been, sort of, focused

more on the strategic aspects of trial preparation. I would say it is more than 800 pages and fewer than 800,000 pages. I mean --

MR. PARLATORE: Can somebody else at the table answer that?

MR. MONTELEONI: We will be producing our witness list and we will also -- we will be producing the 3500 for those witnesses. As we often do, but are not required to do, but often do for the convenience of the defense, we are also going to be presenting a large variety of additional materials that the defense may or may not find relevant in helping them prepare for trial.

The idea of, sort of, quizzing us on page counts in front of the Court, I just don't really think that that's productive. I think the more productive procedure is for us to produce our witness list, our 3500 for our witnesses, our additional above-and-beyond disclosures that we don't have to, and then for the defense to review them.

THE COURT: All right. You made reference to the defense being able to determine whether or not it's relevant, but for the defense to determine whether something is relevant, it has to be put forward to them by the government. Essentially, you are determining what evidence you are going to put forward that you determine is relevant.

MR. MONTELEONI: Well, yes, your Honor. Sorry. Our

disclosures are going to include a list of the witnesses and the 3500 for those witnesses is going to be marked and indexed separately for the testifying witnesses. Then in addition, we are producing a large volume of materials to aid them related to non-testifying witnesses.

Though a bit of an oxymoron, a non-testifying witness is a term that we use to describe additional materials that we believe that we are giving to the defense to assist in their preparation even though they are very much not required under the Jencks Act, not required under any rule of law. But it's something that we often do and have decided to do in this case. And those are separately marked and are separately indexed. So to the extent the defense wants to know which those materials are, there is an index. They will get it today. They will see it.

THE COURT: All right. Anything else? Mr. Petrillo, anything else?

MR. PETRILLO: No, your Honor. Thank you.

THE COURT: Mr. Parlatore, anything else?

MR. PARLATORE: Just that if we are getting 800,000 pages, I am not going to be ready for trial in a week and a half, so we may have to come back and talk about scheduling again, depending on how voluminous this material is.

MR. MONTELEONI: Your Honor, I mean, we saw this exact movie play out when we disclosed exhibits. There was no

surprise, and the Court set a schedule giving them six weeks with our exhibits before trial. There was no sense that this was not going to be a document-intensive trial. There had been extensive briefing about it being a document-intensive trial.

They got our exhibits, and all of a sudden they decided that the six weeks wasn't enough for them. They wanted to double their preparation time. Now they have had more than three months with our exhibits. To run the exact same play on the 3500 is really gamesmanship, and I think it's not appropriate. We will produce it, and I think that they will clearly be ready for trial.

MR. PARLATORE: Judge, I mean, he can't even say a ball park, which indicates to me it's probably hundreds of thousands of pages, because if it was really just 5,000 pages, he would say that right now. The reason he is dancing around is because this is hundreds of thousands of pages. And if it's hundreds of thousands of pages, then, you know, a week and a half before trial --

THE COURT: The number -- those pages may or may not be relevant, and to the extent that they are not, I presume that you will cull those out and streamline as much as possible sometime within the next week. All right.

MR. PARLATORE: They all have to be read. I can't read hundreds of thousands of pages in a week and cull them out.

THE COURT: We only have five weeks of trial, so you are going to have to do your best. All right.

MR. PETRILLO: I guess I do have one more item just to put on the record, and would expect the government to consider, not necessarily respond to today. Given the length of the trial and the number of witnesses and documents, in past trials that I have been involved in of similar description, the government has advised the defense 48 hours ahead of calling witnesses whom they plan to call. For example, on Tuesday, you would tell us, without holding them to it strictly, that the plan for the week is to call the following five witnesses, so that we can, you know, given the complexities of the case, focus our efforts. Again, I am not asking for a final answer from the government, but I do think it's a worthwhile possible approach here.

MR. MONTELEONI: We agreed to this. The Court -- and the Court so ordered our agreement in docket item 120. It's all there. I mean, obviously, we will be working together in good faith, but we have a schedule for these disclosures.

MR. PETRILLO: OK. Thank you.

THE COURT: All right. Let me ask whether the parties have had any meetings, discussions concerning stipulations. A stipulation is a very effective way of avoiding unnecessary witness lists, unnecessary exhibits. And I generally ask the parties to meet and confer and determine which items are going

to be considered by stipulation rather than by having to call witnesses to the stand.

I also ask the parties to identify before the trial what exhibits are not under dispute; the exhibit is not disputed, and we should not have anything related to that during the course of the trial. And I ask that the parties prepare a list of exhibits that are not in dispute. We read that list to the jury in advance of trial and, therefore, the parties don't have to introduce those documents one at a time. Look at the Court's trial practices, and you will see how that operates in practice.

Lastly, when I see a list of witnesses, and it appears that those witnesses are testifying to the same issue, I will tell the parties we don't need five witnesses to testify to a date. If one will do, then get rid of the other four.

MR. MONTELEONI: Yes, your Honor. We have been working with the defendants, and we have made some progress on a limited number of additional stipulations. In fact, just before we came to court, we understand that they are going to sign an additional -- the limited stipulation. We haven't gotten the signatures on that yet.

Ultimately, I think a large number of the documents, including ones which there may not be a lot of dispute about, will not be offered by stipulation because some of the -- because Mr. Hung does not want to do that. But they will be

done by certification. And we definitely approve of the idea of offering large batches of documents by lists rather than reading their numbers. So we will work with the defendants to determine what there is really dispute about and try to prepare lists like that and to move as fast as possible. And we understand about calling duplicative witnesses.

THE COURT: All right. Anything else?

OK. Thank you very much. We will see you soon.

(Adjourned)